

FILED

JUN 1 3 2002

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JERRY VALDIVIA, ALFRED YANCY,
and HOSSIE WELCH, on their own
behalf and on behalf of the class
of all persons similarly situated,

       NO. CIV. S-94-671 LKK/GGH

       Plaintiffs,

     v.

       O R D E R

GRAY DAVIS, Governor of the State
of California, et al.,

       **TO BE PUBLISHED**

       Defendants.
_____/

    Plaintiffs sue the Governor of the State of California, and various state correctional officials for allegedly maintaining parole revocation procedures which violate the Due Process Clause of the Fourteenth Amendment.[1]  Plaintiffs now move for partial

_____

    [1] Previously the court certified a class consisting of California parolees (1) who are at large; (2) who are in custody as alleged parole violators awaiting revocation of their parole status; or (3) who are in custody having been found in violation of parole.

664

1

summary judgment on their claim that the State's unitary parole revocation hearing system is unconstitutional.[2]  I resolve the matter on the pleadings and evidence filed herein and after oral argument.

# I.

## FACTS[3]

Under California's system, a parole officer can impose a hold if the officer concludes that there is reasonable cause to believe the parolee has violated a condition of his parole and is a danger to himself, a danger to the person or property of another, or may abscond.  A parole hold authorizes the detention of a parolee charged with an alleged parole violation pending a parole revocation hearing.  The parole officer is not required to obtain an arrest warrant prior to placing the hold and taking the parolee into custody.  Within seven days after detention pursuant to the parole hold, the parolee must be notified of the reasons for the hold.

As noted, California's process does not provide for a preliminary revocation hearing to determine whether there is probable cause to believe that a parolee committed a parole violation.  Rather, California has adopted a wholly internal review system from which the parolee is entirely excluded.

---

[2]  By "unitary," the court means that the sole hearing accorded a parolee is directed to disposition of the alleged violation without a preliminary determination of probable cause.

[3]  The facts contained herein are undisputed unless otherwise noted.

Following the placement hold, the parole officer has a case
conference with the unit supervisor to review the decision to
place the hold, and to determine a possible disposition.
Thereafter, the parole officer prepares and files a parole
violation report which is, after review by the unit supervisor,
submitted to the Board of Prison Terms.  The report contains
information on the alleged parole violation and supporting
evidence, a summary of the parolee's adjustment while on parole,
and a recommendation as to what action should be taken.

Based on the parole violation report, a Board of Prison
Terms' deputy commissioner determines the terms of a "screening
offer" to be presented to the parolee.  A "screening offer"
tenders to the parolee a specific term of incarceration in
exchange for the disposition of the case and a waiver of the
parolee's right to have a revocation hearing.[4]  When the deputy
commissioner reviews the parole violation report to determine
the appropriate screening offer, the parolee is neither present,
nor has he had any opportunity to communicate with the deputy
commissioner.  Put directly, at no time prior to the
determination of the screening offer has the parolee been given
an opportunity to speak to the charges, challenge the contents

---

[4]   The screening offer has the benefit to the parolee of
providing a definite resolution of the alleged violation, which
ordinarily is less severe than the potential sentence following a
revocation hearing.  Thus, the screening offer system presents a
parolee who has not engaged in the charged conduct an inducement
to, in effect, enter an "Alford" plea, i.e. admit to the charge in
order to avoid a more severe consequence.  See North Carolina v.
Alford, 400 U.S. 25 (1970).

1  of the violation report, present his own evidence, or to
2  question witnesses.

3      If the parolee accepts the screening offer, a revocation
4  hearing is not held and thus the parolee has no chance to
5  challenge either the parole hold or the charges.  If the parolee
6  does not accept the screening offer, a formal revocation hearing
7  is scheduled where the parolee may then challenge the charge
8  leading to the hold, rather than the parole hold.  Pending the
9  revocation hearing, parolees who are under a parole hold remain
10 in custody.

11     In sum, at no time prior to the unitary revocation
12 hearing, do parolees have an opportunity to present their
13 position to an independent decision-maker or to challenge, in
14 any manner, whether the parole officer had probable cause for
15 the parole hold and resulting detention.

16     California's regulations suggest that the unitary
17 revocation hearing for parole revocation be scheduled within
18 forty-five days from the date the parole hold is placed.  This
19 forty-five day period is only advisory,  See Cal. Code Regs.
20 tit. 15, § 2640(f),[5] and can be extended if defendants determine
21 a delay does not prejudice the parolee.  Id.[6]  The average hold

22

23     [5]  The regulations provide that "these time limits are
   directory and do not affect the board's jurisdiction to hold a
24 revocation hearing in the event of delay which does not prejudice
   the parolee."  Cal Code Regs. tit. 15, § 2640(a).

25     [6]  It is undisputed that approximately ten percent of all
   revocation hearings take place in more than forty-five days.  See
26 Defendants' Statement of Undisputed Facts, at No. 1.

4

1  to revocation hearing time statewide is 35.2 days.[7]

2  **II.**

3  **SUMMARY JUDGMENT STANDARDS**

4  Summary judgment is appropriate when it is demonstrated

5  that there exists no genuine issue as to any material fact, and

6  that the moving party is entitled to judgment as a matter of

7  law.  Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress &

8  Co., 398 U.S. 144, 157 (1970); Owen v. Local No. 169, 971 F.2d

9  347,355(9th Cir. 1992).

10  Under summary judgment practice, the moving party

11    [A]lways bears the initial responsibility of
  informing the district court of the basis for

12    its motion, and identifying those portions of
  "the  pleadings,  depositions,  answers  to

13    interrogatories,  and  admissions  on  file,
  together with the affidavits, if any," which

14    it  believes  demonstrate  the  absence  of  a
  genuine issue of material fact.

15

16  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here

17  the nonmoving party will bear the burden of proof at trial on a

18  dispositive issue, a summary judgment motion may properly be

19  _____

20  [7] As of March 2001, the average hold to revocation hearing
time in the State was 35.2 days. See Plaintiffs' Undisputed Facts,

21  at No. 23.  Specifically, the State's regional averages with
respect to this time lapse are as follows:  Region I – 38.8 days,
Region II – 36.2 days, Region III – 37.7 days, and Region IV – 28.8

22  days.  See Plaintiffs' Undisputed Facts, at Nos. 19-22. As of May
2001, sixty-four percent of parolees alleged to have violated a

23  condition of their parole had a hold to revocation hearing time of
thirty-one to forty-five days. See Plaintiffs' Undisputed Facts,

24  at No. 28.  Specifically, the State's regional percentages of
parolees who had their revocation hearings between thirty-one  and

25  forty-five days are as follows: Region I – 79.6%, Region II –
93.7%, Region III – 92.9%, and Region IV – 33.1%.  See Plaintiffs'

26  Undisputed Facts, at Nos. 24-27.

1  made in reliance solely on the 'pleadings, depositions, answers
2  to interrogatories, and admissions on file.'"  Id.  Indeed,
3  summary judgment should be entered, after adequate time for
4  discovery and upon motion, against a party who fails to make a
5  showing sufficient to establish the existence of an element
6  essential to that party's case, and on which that party will
7  bear the burden of proof at trial.  See id. at 322.  "[A]
8  complete failure of proof concerning an essential element of the
9  nonmoving party's case necessarily renders all other facts
10 immaterial."  Id.  In such a circumstance, summary judgment
11 should be granted, "so long as whatever is before the district
12 court demonstrates that the standard for entry of summary
13 judgment, as set forth in Rule 56(c), is satisfied."  Id. at
14 323.

15     If the moving party meets its initial responsibility, the
16 burden then shifts to the opposing party to establish that a
17 genuine issue as to any material fact actually does exist.  See
18 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
19 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv.
20 Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los
21 Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979), cert. denied, 455
22 U.S. 951 (1980).

23     In attempting to establish the existence of this factual
24 dispute, the opposing party may not rely upon the denials of its
25 pleadings, but is required to tender evidence of specific facts
26 in the form of affidavits, and/or admissible discovery material,

1  in support of its contention that the dispute exists.  Rule

2  56(e); see also Matsushita, 475 U.S. at 586 n.11; First Nat'l

3  Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th

4  Cir. 1973).  The opposing party must demonstrate that the fact

5  in contention is material, i.e., a fact that might affect the

6  outcome of the suit under the governing law, see Anderson 477

7  U.S. at 248; see also T.W. Elec. Serv., Inc. v. Pacific Elec.

8  Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987), and that

9  the dispute is genuine, i.e., the evidence is such that a

10  reasonable jury could return a verdict for the nonmoving party,

11  see Anderson 477 U.S. 248-49; see also Wool v. Tandem Computers,

12  Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

13       In the endeavor to establish the existence of a factual

14  dispute, the opposing party need not establish a material issue

15  of fact conclusively in its favor.  It is sufficient that "the

16  claimed factual dispute be shown to require a jury or judge to

17  resolve the parties' differing versions of the truth at trial."

18  First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv.,

19  809 F.2d at 631.  Thus, the "purpose of summary judgment is to

20  'pierce the pleadings and to assess the proof in order to see

21  whether there is a genuine need for trial.'"  Matsushita, 475

22  U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

23  note on 1963 amendments); see also International Union of

24  Bricklayers & Allied Craftsman Local Union No. 20 v. Martin

25  Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

26  ////

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); see also SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); see also Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

////

////

////

////

8

## III.

### PROCEDURAL DUE PROCESS

**A.    FRAMEWORK FOR ANALYSIS**

In Mathews v. Eldridge, 424 U.S. 319 (1976), the Supreme Court established a three step balancing test to resolve procedural due process claims.  While Mathews did not involve claims arising in a parole context, that fact does not appear significant.  Indeed, procedural due process jurisprudence appears to employ the same three part test irrespective of the context in which the claim arises.  See Greenholtz v. Inmates, Nebraska Penal & Correctional Complex, 442 U.S. 1, 18 (1979).[8] Of course.to recognize that the same standard applies, is not to say that context is irrelevant.  On the contrary, as explained below, context is one of the elements to be considered in arriving at a conclusion as to what process is due.  I turn to the three part test.

The first criteria in assessing the process due is the value of the liberty interest and the degree of potential deprivation.  See Mathews, 424 U.S. at 341. (citing Morrissey,

---

[8]    Morrissey v. Brewer, 408 U.S. 471 (1972), the seminal parole violation case preceded Mathews.  It cited to Mathews' direct ancestors in reaching its conclusions.  See Morrissey, 408 U.S. at 481 (citing Goldberg v. Kelly, 397 U.S. 254, 263 (1970); Fuentes v. Shevin, 407 U.S. 67 (1972)).  Moreover, Mathews, while involving a property interest in Social Security disability benefits, cited to cases in the prison context, as well as Morrissey, to develop its test for determining the process due before deprivation of a constitutionally protected interest.  See Mathews, 424 U.S. at 333-34 (citing Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974); Morrissey, 408 U.S. at 481).

1  408 U.S. 471).  As the Court in Morrissey noted, "consideration
2  of what procedures due process may require under any given set
3  of circumstances must begin with a determination of the precise
4  nature of the government function involved as well as of the
5  private interest that has been affected by the governmental
6  action."  Morrissey, 408 U.S. at 481 (quoting Cafeteria &
7  Restaurant Workers Union v. McElroy, 367 U.S. 886, 895 (1961)).
8  After identifying the nature of the right at issue, the court
9  must consider "the fairness and reliability of the existing
10 pretermination procedures, and the probable value, if any, of
11 additional procedural safeguards."  Mathews, 424 U.S. at 343.
12 Finally, the court must consider the administrative burden and
13 other societal costs, or benefits, which might be associated
14 with requiring more process as a matter of constitutional law.
15 Id. at 347.

16     As Morrissey noted, the liberty interest at stake in cases
17 such as the one at bar, is a parolee's interest in retaining the
18 "enduring attachments of normal life" so long as he or she does
19 not violate the conditions of parole.  408 U.S. at 482.[9]  While
20 there may be no constitutional right to parole and while the
21 conditions of parole may significantly restrict a parolee's

22
23        [9]   The Court explained that:

24        "Subject to the conditions of his parole, he [the
           parolee] can be gainfully employed and is free to be
25        with family and friends and to form the other enduring
           attachments of normal life . . ."

26 Morrissey, 408 U.S. at 480.

1 freedom, it is self-evident that the liberty interest of a
2 parolee is quite significant, and much greater than the liberty
3 interest of a prisoner still confined within the prison system.
4 See id.[10] ("Though the State properly subjects [a parolee] to
5 many restrictions not applicable to other citizens, his
6 condition is very different from that of confinement in
7 prison.").[11]

8    Under the rationale of Morrissey, the "fairness and
9 reliability" of the existing procedures should then be measured
10 by determining how effective the procedures are in assuring a
11 factually accurate statement of (1) whether there is probable
12 cause to believe that the parolee violated parole (procedures
13 during preliminary stage), and (2) whether the parolee did in
14 fact violate parole (procedures during revocation hearing). As
15 the High Court explained, "[i]n analyzing what [process] is due,
16 we see two important stages in the typical process of parole
17 revocation . . . The first stage occurs when the parolee is
18 arrested and detained, usually at the direction of the parole
19 officer. The second occurs when parole is formally revoked."
20 408 U.S. at 485. The first stage is to insure that the

21

22    [10]  Just ask any defendant in a criminal trial whether he
wants probation or imprisonment.

23    [11]  Since the liberty interest of those persons outside the
24 prison is far greater then those who are imprisoned, cases such as
Sandin v. Conner, 515 U.S. 472 (1995), and Meachum v. Fano, 427
25 U.S. 215 (1976), which involve asserted rights within prison, do
not inform what weight is to be accorded the liberty interest at
26 stake in the parole context. See also Young v. Harper, 520 U.S.
143, 147-48 (1997).

1  parolee's life is not disrupted by an unjustified parol hold,
2  while the second stage requires reliable information justifying
3  the parolee's long term reincarceration. Id. Fundamentally, the
4  process due must include procedures which will prevent parole
5  from being revoked because of "erroneous information or because
6  of an erroneous evaluation." Id. at 484.

7      Of course, as with all due process considerations, the
8  balance which the court strikes in the parole revocation context
9  is informed by an understanding that "due process is flexible
10 and calls for such procedural protections as the particular
11 situation demands." Id. at 481. Put bluntly, however,
12 flexibility is not a shibboleth permitting something less than
13 what the particular situation does demand.

14     Given all the above, I now consider the process that is due
15 when a parolee's liberty interest is endangered by a claimed
16 violation of the terms of parole.[12]

17 ////

18

19 [12]  Defendants appear to suggest that the Prison Litigation
   Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(1)(A), has altered the
20 values to be balanced requiring the court to afford "substantial
   weight" to any adverse impact upon public safety or the operation
   of the criminal justice system. I cannot agree.
21     By its terms, Section 3626(a)(1)(A) applies to any "civil
   action with respect to prison conditions." Here, plaintiffs do not
22 challenge prison conditions. Rather, plaintiffs challenge quite
   a different subject, parole violation procedures. As noted supra,
23 the Supreme Court has long recognized different issues are at stake
   when addressing parolees as contrasted with those who are
24 imprisoned. Young v. Harper, 520 U.S. 143 (1997). While
   considerations of public safety and the impact on the criminal
25 justice system are proper factors to weigh in determining the
   process due, the weight to be accorded those factors is unaffected
26 by PLRA.

12

1    Plaintiffs assert that California's unitary parole
2 revocation hearing system does not comport with the requirement
3 of the federal constitution's Due Process Clause.   In this
4 motion, they contend that the State's failure to conduct
5 preliminary hearings at the time of a parolee's arrest and
6 detention is unconstitutional.

7    To assess the validity of plaintiffs' claim, the court must
8 first determine whether there is controlling precedent speaking
9 to the particular procedures due at the initial stage of the
10 parole revocation process.   Obviously where binding precedent
11 requires particular procedures, the pertinent question is
12 whether defendants are providing those required procedures.   In
13 the absence of such controlling precedent, the task is to apply
14 the Mathews process to the procedures at issue.   As I now
15 observe, the courts by which I am bound have spoken with less
16 than perfect clarity on the issues before me.

17 **B.    PRE-REVOCATION HEARINGS**

18    Plaintiffs assert that they are being denied due process
19 because defendants do not afford parolees preliminary hearings
20 to verify the existence of probable cause prior to the
21 revocation hearing.   Defendants acknowledge that under
22 California's regulations and the current practice, the Board
23 conducts pre-revocation hearings only when the parolee is
24 suspected of a serious parole violation within thirty days of
25 the parolee's maximum discharge date.   See Cal. Code Regs. tit.
26 15, § 2644(a).   Otherwise, parolees suspected of parole

13

1 violations are only afforded a unitary parole revocation
2 hearing, often held within forty-five days of the date the
3 parole hold is placed. Defendants contend, however, that a
4 preliminary hearing is not required, and that the State's
5 unitary parole revocation procedure provides a constitutionally
6 equivalent process. Below, I explain why defendants' arguments
7 are less than persuasive.

8      In Morrissey, the Supreme Court appeared to determine that
9 the Constitution requires a two stage process. 408 U.S. at 485
10 ("[W]e see two important stages in the typical process of parole
11 revocation," the first being the "arrest and preliminary
12 hearing" stage, and the second, "when parole is formally
13 revoked."). The Court explained that the initial "inquiry
14 should be seen as in the nature of a 'preliminary hearing' to
15 determine whether there is probable cause or reasonable ground
16 to believe that the arrested parolee has committed acts that
17 would constitute a violation of parole conditions." Id.

18      The Morrissey Court's explanation of the requirements for a
19 preliminary procedure plainly suggests that it contemplated a
20 "hearing" rather than some ex-parte process, for confirming
21 probable cause. For instance, in describing the "preliminary
22 hearing," the Court stated that "the parolee should be given
23 notice that the hearing will take place and that its purpose is
24 to determine whether there is probable cause to believe he has
25 committed a parole violation." Id. at 486-87. The Court added
26 that "[a]t the hearing, the parolee may appear and speak in his

14

1 own behalf; he may bring letters, documents, or individuals who
2 can give relevant information to the hearing officer." Id. at
3 487. Moreover, on request of the parolee, the "person who has
4 given adverse information on which parole revocation is to be
5 based is to be made available for questioning in his presence."
6 Id. Finally, the Court required that the determination of
7 reasonable grounds "should be made by someone not directly
8 involved in the case." Id. at 485.

9     Despite the fairly detailed description of a
10 constitutionally sufficient preliminary determination, it
11 remains true that the Court has repeatedly taught, and not just
12 in Morrissey, that the requisites of due process are flexible.
13 As will be seen, this teaching has suggested to some that
14 Morrissey did not command two hearings under all circumstances.
15 As I now explain, that conclusion, while plausible, is difficult
16 to maintain in light of the Supreme Court's next discussion of
17 the issue.

18     A year after Morrissey, the Court explained that in that
19 case "we held that a parolee is entitled to two hearings, one a
20 preliminary hearing at the time of his arrest and detention to
21 determine whether there is probable cause to believe that he has
22 committed a violation of his parole, and the other a somewhat
23 more comprehensive hearing prior to the making of the final
24 revocation decision." Gagnon v. Scarpelli, 411 U.S. 778, 781-82
25 (1973); see also id. at 786 ("Morrissey mandated preliminary and
26 final revocation hearings."). The Gagnon Court again emphasized

15

1 that "[a]t the preliminary hearing, a probationer or parolee is
2 entitled to notice of the alleged violations . . . an
3 opportunity to appear and to present evidence on his own behalf,
4 a conditional right to confront adverse witnesses, an
5 independent decisionmaker, and a written report of the hearing."
6 411 U.S. at 786.  Observing no difference between parole
7 revocation and probation revocation, the Court stated that "we
8 hold that a probationer, like a parolee, is entitled to a
9 preliminary and final revocation hearing."  Id. at 782.

10      While it would appear that, without more, Morrissey and
11 Gagnon are dispositive, this court is also bound by the Ninth
12 Circuit's interpretation of the teachings of the High Court.  I
13 thus turn to the Circuit's cases.

14      Nine years after Gagnon, the question of hearings under
15 Morrissey was discussed in Pierre v. Wash. St. Bd. of Prison
16 Terms & Paroles, 699 F.2d 471 (9th Cir. 1983).  There, a habeas
17 petitioner, after having his parole revoked, claimed that the
18 State did not adhere to its own guidelines for determining his
19 minimum prison term.  The petitioner also claimed that he was
20 denied due process because the State did not provide him with a
21 preliminary hearing prior to his revocation hearing.  On appeal,
22 the petitioner abandoned his claim regarding the preliminary
23 hearing.  Nonetheless, after rejecting his claim concerning
24 State guidelines, the Circuit panel stated that "[a]lthough
25 appellant abandoned his contention that failure to hold a
26 preliminary hearing prior to the formal on-site revocation

16

1  hearing violated his due process right, we believe the issue is
2  before us."  Pierre, 699 F.2d at 472.[13]  The Pierre court then
3  opined that the Supreme Court did not intend to require two
4  hearings in every case, but only in cases with a fact pattern
5  similar to the one before it in Morrissey.  See Pierre, 699 F.2d
6  at 472-73.[14]  Emphasizing the language in Morrissey abjuring
7  formalism in the revocation process, Pierre then declared that
8  "[u]nder the facts of Morrissey, the two-hearing system
9  requirement was just one way to satisfy minimum due process; it
10 is not the only way in every case."  Id.  The Circuit panel
11 failed to discuss Gagnon's explanation that in Morrissey the
12 Court had held that, indeed, two hearings were required.

13     At least one way of reading Pierre so as to be consistent
14 with Morrissey, is to read it as not departing from an
15 obligation to provide a preliminary hearing, but rather, as
16 concluding no more than that a final revocation hearing
17 occurring within twenty-one days of the arrest of a parolee was
18 "prompt enough to qualify as the preliminary probable cause

19

20     [13]  Given that anyone may waive a constitutional claim, the
21 Pierre court's assertion is indeed puzzling.

22     [14]  In Morrissey, the Court explained the importance of a
   prompt preliminary hearing noting that because "there is typically
23 a substantial time lag" between arrest and the final revocation
   determination, and since "it may be that the parolee is arrested
24 at a place distant" from the place where the final revocation
   hearing will take place, "due process would seem to require that
   some minimal inquiry be conducted at or reasonably near the place
25 of the alleged parole violation or arrest and as promptly as
   convenient after arrest while information is fresh and sources are
26 available."  408 U.S. at 485.

17

1 determination required by Morrissey." Pierre, 699 F.2d at 473.
2 This reading of Pierre is supported by subsequent Ninth Circuit
3 cases. In United States v. Stocks, 104 F.3d 308 (9th Cir.
4 1997), a panel stated that "[a]fter Morrissey, parole may not be
5 revoked unless the parolee is afforded a hearing as to probable
6 cause and a final revocation hearing. At the preliminary parole
7 revocation hearing, a parolee is entitled to notice of the
8 alleged parole violations, an opportunity to appear and to
9 present evidence, a conditional right to confront the
10 government's witnesses, an independent decision-maker, and a
11 written report of the hearing." Id. at 311; see also White v.
12 White, 925 F.2d 287 (9th Cir. 1991)(finding that Morrissey
13 contemplated both a preliminary and a final revocation
14 hearing).[15]

15     Whatever else may be said for Pierre, it seems apparent it
16 is dicta. Moreover, although this court should pay respectful
17 attention to Circuit dicta, given all the above it would seem
18 the defendants can only rely on Pierre if their practice of
19 delaying the revocation hearing roughly between thirty-one and
20 forty-five days meets Morrissey's requirement that there be a
21 prompt determination of probable cause. California's time frame

22

23 [15]     In White the Ninth Circuit held that the Parole
Commission's refusal to allow plaintiff to confront and
24 cross-examine adverse witnesses at his parole revocation hearing
violated his right to due process. 925 F.2d at 290. While the
25 case addressed the final revocation hearing, the White court
examined Morrissey in detail and concluded that "[t]o gather the
26 facts necessary to make the two-part decision, the Morrissey court
contemplated two hearings." Id. at 291.

18

1 for holding a hearing far exceeds the twenty-one days the <u>Pierre</u>
2 panel thought sufficed.[16]

3      Defendants provide no authority to support the proposition
4 that an average delay of thirty-one to forty-five days is
5 acceptable under <u>Morrissey</u> and <u>Gagnon</u>.[17] While some state courts
6 have held that a preliminary hearing can occur within thirty
7 days from the date of arrest, <u>see</u> <u>State v. Myers</u>, 86 Wash.2d 419
8 (1976)(en banc), it does not appear that any court has indicated
9 that a delay of more than thirty days would be justifiable.[18]
10 Indeed, even in <u>Ellis v. District of Columbia</u>, 84 F.3d 1413
11 (D.C. Cir. 1996), the D.C. Circuit case on which defendants
12 rely, the policy required the final revocation hearing to occur

13

14     [16] Defendants' process may have other problems. As noted, it
encourages <u>Alford</u> type admissions of violation. <u>See</u> n. 4 <u>supra</u>.
15 Putting the parolee to such a choice without at least a
determination of probable cause may itself raise due process
16 questions. Because the court resolves the instant motion on other,
more established grounds, I need not consider that issue further.
17 As I point out in the text, however, the effect of the screening
offer in assuring reliable fact-finding bears on the <u>Mathews</u>
18 balancing test.

19     [17] While <u>Pierre</u> opined that twenty-one days was not
inappropriate, the Seventh Circuit has suggested in dicta that a
20 ten day delay may violate <u>Morrissey</u>. <u>See</u> <u>Luther v. Molina</u>, 627
F.2d 71, 75, n.3 (7th Cir. 1980)("Chief Justice Berger [in
21 <u>Morrissey</u>] seemed to be contemplating an almost immediate hearing
. . . . It is possible that a ten day delay between detention and
22 the preliminary hearing does not meet . . . constitutional . . .
requirements.").

23     [18] It may be of some interest that the United States Senate
has noted relative to preliminary hearings in the federal parole
24 system, that a two-day detainment could result in a loss of
employment and severe disruption of the reintegration effort. <u>See</u>
25 S. Rep. No. 369, 94th Cong., 1st Sess. 25-26 (1975), <u>reprinted</u> <u>in</u>
1976 U.S.C.C.A.N. 335, 347, <u>cited</u> <u>in</u> <u>Ellis v. District of Columbia</u>,
26 84 F.3d 1413, 1430 (D.C. Cir. 1996).

1 within thirty days from the date the Board was notified of the
2 execution of a warrant, and regulations mandated a preliminary
3 interview prior to the revocation hearing. Id. at 1240. [19]

4     Given all the above, this court concludes that even if a
5 prompt unitary hearing would meet constitutional muster, a
6 question I need not resolve, California's system allowing a
7 delay of up to forty-five days or more before providing the
8 parolee an opportunity to be heard regarding the reliability of
9 the probable cause determination does not.

10     Again, even assuming that Morrissey and Gagnon do not
11 compel a prompt preliminary hearing, the court's conclusion
12 above is necessitated by application of the Mathews test.  In
13 order to protect a parolee's liberty interest, Morrissey
14 requires procedures to insure not only that the State does not
15 revoke parole without an adequate factual basis, but that

16

17     [19] The majority in Ellis, like Pierre, emphasized the
18 flexible nature of due process and distinguished the facts in the
District of Columbia from those in Morrissey.  As the dissent
19 pointed out, however, that reasoning fails to come to grips with
Gagnon's explanation that two hearings are required by Morrissey.
20 See Ellis, 84 F.3d at 1429-30 (J. Tatel, dissenting).  While the
majority relied on the footnote in Gagnon encouraging the States
to devise "creative solutions" to cope with the practical
21 difficulties of complying with Morrissey, Ellis, 84 F.3d at 1422
22 (citing Gagnon, 411 U.S. at 782, n.5), that cannot reasonably be
construed as an invitation to avoid the fundamental requirements
23 of Morrissey.  Whatever "creative solutions" or flexibility the Due
Process Clause permits, it would appear that the Supreme Court has
24 so far done nothing to indicate a retreat from its previous
position.  Finally, for what it is worth, California's situation
25 far more clearly resembles that found in Morrissey rather than the
situation in the District of Columbia.  In sum, then, with all due
26 respect, I do not find Ellis helpful in resolving the issue before
this court.

20

1 parolees are not detained without some sort of assurance that
2 there is probable cause to suspect a parole violation.  The
3 effect of detention itself, in its disruption of the parolee's
4 family relationship, job, and life, is sufficiently significant
5 to require such a procedure.

6      Moreover, it is clear that the screening offer procedure
7 places a severe strain on an accurate fact-finding process.
8 While, clearly, Alford pleas do not offend the Constitution, and
9 indeed frequently benefit the parolee, that is not the issue in
10 terms of the three part balancing test.  In that context, the
11 issue is whether greater process produces a more reliable
12 result.  Certainly when a probable cause determination has been
13 made, society can have greater confidence that the screening
14 offer has not produced an unreliable result.

15      Finally, of course, the court must balance the social
16 interest in protecting an individual's interest in remaining at
17 large with the State's interest in protecting the public from
18 parolees who have violated the conditions of their parole.  In
19 seeking to weigh that interest, however, the court is
20 handicapped, since the defendants offer no evidence for the
21 proposition that a delay of thirty-one to forty-five days is
22 necessary to insure protection of that interest.  Moreover,
23 while administrative inconvenience is a proper Mathews
24 consideration, the inconvenience occasioned by a prompt probable
25 cause hearing would not appear to be, in and of itself, a
26 sufficient justification for the potentially catastrophic

21

1  consequences of delay.  Indeed, the Supreme Court seems to view

2  with equanimity the inconvenience that <u>Morrissey</u> engendered.

3  <u>See</u> <u>Gagnon</u>, 411 U.S. at 782, n.5 ("[s]ome amount of disruption

4  inevitably attends any new constitutional ruling.").

5       For all the above reasons, the court concludes that whether

6  viewed as compelled by <u>Morrissey</u>, or the result of a <u>Mathews</u>

7  balancing test, the current California parole revocation system

8  violates the plaintiffs' due process rights.

9                              **IV.**

10                            **ORDERS**

11       Accordingly, plaintiffs' motion for partial summary

12  judgment is GRANTED.

13       IT IS SO ORDERED.

14       DATED:  June 13, 2002.

15

16                         LAWRENCE K. KARLTON
                           SENIOR JUDGE
17                         UNITED STATES DISTRICT COURT

18

19

20

21

22

23

24

25

26

United States District Court
for the
Eastern District of California
June 13, 2002


* * CERTIFICATE OF SERVICE * *


2:94-cv-00671


Valdivias

    v.

Wilson et al

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  June 13, 2002, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

        William Vernon Cashdollar        SJ/LKK
        Attorney General's Office of the State of California
        PO Box 944255
        1300 I Street
        Suite 125
        Sacramento, CA  94244-2550

        Stephen J Perrello Jr
        Law Office of Stephen J Perrello
        P O Box 880738
        San Diego, CA  92168

        Alexander L Landon
        Law Offices of Alex Landon
        2442 Fourth Avenue
        San Diego, CA  92101

        Karen Kennard
        McCutchen Doyle Brown and Enersen
        Three Embarcadero Center
        Suite 1800
        San Francisco, CA  94111

Michael W Bien
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA  94104

Donald Specter
Prison Law Office
General Delivery
San Quentin, CA  94964

John T Philipsborn
Law Offices of John T Philipsborn
507 Polk Street
Suite 250
San Francisco, CA  94102

Jack L. Wagner, Clerk

BY: _____
Deputy Clerk