JERRY VALDIVIA, ALFRED YANCY,
and HOSSIE WELCH, on their own
behalf and on behalf of the class
of all persons similarly situated,

        Plaintiffs,

    v.

ARNOLD SCHWARZENEGGER, Governor of
the State of California, et al.,

        Defendants.

_____/

NO. CIV. S-94-671 LKK/GGH

O R D E R

**TO BE PUBLISHED**

    Plaintiffs are a class comprising California parolees who challenged the parole revocation procedures utilized by defendants as violative of their due rights under the Fourteenth Amendment. After the court granted partial summary judgment in favor of the plaintiffs, a stipulated permanent injunction was entered in March 2004. The instant motion seeks to enforce the injunction notwithstanding the passage of Proposition 9 by California's voters on November 4, 2008. Plaintiffs assert that portions of Section 5.3 of Proposition 9 conflicts with the

1

requirements of the injunction. Defendants cross-move to modify the injunction to conform to Proposition 9. The court resolves the motions on the papers and after oral argument. For the reasons stated herein, the court grants plaintiffs' motion and denies defendants'.

## I. BACKGROUND AND FACTS[1]

### A. Procedural History

This case commenced in 1994. That year it was certified as a class action, the plaintiff class consisting of (1) California parolees at large; (2) California parolees in custody as alleged parole violators, and who are awaiting revocation of their state parole; and (3) California parolees who are in custody having been found in violation of parole and who have been thereupon sentenced to prison custody. In June 2002, the court granted plaintiffs' motion for partial summary judgment on the issue of whether defendants' parole revocation procedures violated the class members' due process rights. See Valdivia v. Davis, 206 F. Supp. 2d 1068 (E.D. Cal. 2002).

At the time of the order defendants had operated a parole revocation process that was constitutionally problematic for several reasons. A parolee could be retaken into custody if his parole officer believed that the parolee had violated his parole and represented a danger of absconding or a danger to himself,

_____

[1]Although the court and the parties are undoubtedly familiar with the history of the case and the orders that have been entered in it, a detailed review of that history is helpful to understand the basis for the disposition of the instant motions.

others, or others' property. He was to receive notice of the reasons for the parole hold within seven days of it being placed.    After the parole hold was placed, the parole officer had a case conference with his supervisor to decide whether there was probable cause to believe the parolee violated his parole. This decision and the reasons thereof were then memorialized in a report that was sent to the Board of Prison Terms ("BPT"). Based on this report, the BPT created a "screening offer" for the parolee, which was essentially an offer of the revocation of parole for a specific term of incarceration in exchange for the parolee's waiver of his right to a revocation hearing. If the parolee chose not to waive his right to a revocation hearing, the California regulations provided for forty-five days as the time in which the hearing was to occur. Although this deadline was not mandatory, the vast majority of revocation hearings occurred within that timeframe.

This procedure, the court concluded, violated parolees' due process rights as set forth in Matthews v. Eldridge, 424 U.S. 319 (1976), Morrissey v. Brewer, 408 U.S. 471 (1972), and Gagnon v. Scarpelli, 411 U.S. 778 (1973). In those cases, the Court had held that a probable cause hearing must be held promptly for parolees being held in custody, and the defendants' forty-five day deadline for holding revocation hearings did not meet that definition under any court's formulation. The court's holding was based on the parolee's right to be promptly heard when his liberty interest was at stake as well as his due process

interest in the state making a reliable parole revocation

determination. <u>Valdivia v. Davis</u>, 206 F. Supp. 2d at 1078.

**B.    Creation of a Remedy**

In October 2002, the court ordered defendants to file a

proposed remedial plan to address the Constitutional

deficiencies identified in the June order. The parties were also

directed to meet and confer so that the defendants could adapt

the proposed remedial plan into a proposed remedial order to be

presented to the court.

On July 23, 2003, the court issued an order responding to

the defendants' request for guidance from the court as to "what

precisely the Constitution requires with respect to the timing

and content of revocation hearings." Order, July 23, 2003 at 3-

4. The court expressed its hesitation at doing so since

procedural due process requirements are flexible as to each

factual situation. Nevertheless, to facilitate the development

of an adequate remedy, the court explained what it understood to

be the minimum features that the plan would need to include in

order to be constitutionally sound.

After a comprehensive review of the case law surrounding

the promptness of probable cause hearings in the parole context,

as well as in the context of other constitutional deprivations,

the court advised the defendants that, "a period of ten days [to

hold a probable cause hearing] strikes a reasonable balance

between inevitable procedural delays and the state's interest in

conducting its parole system, on the one hand, and the liberty

interests of the parolees, on the other."[2] Id. at 13.

Recalling that the summary judgment order rested not only on the importance of the promptness of the probable cause hearing but its accuracy as well, the court then set forth some minimal standards for the probable cause hearings. As stated in Morrissey, the parolee needed to have notice of the grounds for his revocation, the probable cause hearings needed to be conducted by a neutral decisionmaker and the parolee had to have an opportunity to present documentary evidence and witnesses and to cross-examine adverse witnesses. Finally, the results of the hearing needed to be documented in a written report. Alternatively, the defendants could hold a unified hearing that was sufficiently prompt and whose contents met the due process requirements for both probable cause and revocation hearings.

After months of delay by defendants in filing their proposed remedial plan, caused by the defendants' appeal of the court's order, withdrawal of the appeal, and failed settlement negotiations with plaintiffs, the court granted defendants "one last chance" to file a remedial plan by November 29, 2003. Order, Nov. 5, 2003 at 4. On November 24, the parties filed a stipulated motion for approval of settlement.

**C.   The Stipulated Permanent Injunction**

Pursuant to the settlement, a stipulated permanent

---

[2]The court observed that in the year since the entry of the summary judgment order, the delays in holding revocation hearing had apparently increased so that a vast majority of hearings were not held within forty-five days.

5

injunction was provided to the court, which issued it by order

on March 9, 2004. There are several provisions relevant to the

instant motion:

1) A parole revocation hearing shall be held no later than 35 calendar days from the date of the placement of the parole hold. Stipulated Permanent Injunction ("Inj.") ¶¶ 11(b)(iv), 23.

2) Defendants shall hold a probable cause hearing no later than 10 business days after the parolee has been served with notice of the charges and rights, which shall occur not later than three business days from the placement of the parole hold. Inj. ¶ 11(d).

3) Defendants shall appoint counsel for all parolees at the beginning of the RTCA[3] stage of the revocation proceedings. Defendants shall provide an expedited probable cause hearing upon a sufficient offer of proof by appointed counsel that there is a complete defense to all parole violation charges that are the basis of the parole hold. Inj. ¶ 11(b)(I).

4) At probable cause hearings, parolees shall be allowed to present evidence to defend or mitigate against the charges and proposed disposition. Such evidence shall be presented through documentary evidence or the charged parolee's testimony, either or both of which may include hearsay testimony. Inj. ¶ 22.

5) The use of hearsay evidence shall be limited by the parolees' confrontation rights in the manner set forth under controlling law as currently stated in United States v. Comito, 177 F.3d 1166 (9th Cir. 1999). The Policies and Procedures shall include guidelines and standards derived from such law. Inj. ¶ 24.

6) Parolees' counsel shall have the ability to subpoena and present witnesses and evidence to the same extent and under the same terms as the state. Inj. ¶ 21.

The injunction was accompanied by the defendants' remedial

---

[3]RTCA refers to Return to Custody Assessment, which is "the practice by which Defendants offer a parolee a specific disposition in return for a waiver of the parolee's right to a preliminary or final revocation hearing, or both." Inj. ¶ 9(d).

plan, a primary feature of which was the use of remedial sanctions or community-based treatment in lieu of the parole officer finding a parole violation. <u>Valdivia</u> Remedial Plan at 1-2. It also provided that when an expedited hearing is granted, it is to be held within the sixth and eighth business day after the placement of the parole hold, or as soon as possible thereafter. <u>Id.</u> at 4. As the court held in its June 9, 2005 order, this plan was integrated into the Injunction and thus binds the defendants.

**D. Proposition 9**

On November 4, 2008, the voters of California passed Proposition 9, the "Victims' Bill of Rights Act of 2008: Marsy's Law." The initiative was based on the conclusion that the rights of crime victims were not adequately respected in the criminal justice process, specifically mentioning perceived problems in the parole consideration process for those convicted of violent crimes. Declaration of Geoffrey T. Holtz in Support of Motion to Enforce Injunction ("Holtz Decl.") ¶ 5, Ex. D (text of Proposition 9, hereafter "Prop. 9") § 2.[4] In its Statement of

[4]Defendants request the court take judicial notice of the text of Proposition 9 and the California Attorney General's description and legislative analysis of it sent to voters. A court may take judicial notice of a fact not subject to reasonable dispute, either because the fact is generally known within the territorial jurisdiction of the trial court or because the fact is capable of accurate and ready determination from sources whose accuracy cannot reasonably questioned. Fed. R. Evid. 201(b). A court shall take judicial notice of a judicially noticeable fact "if requested by a party and supplied with the necessary information." Fed. R. Evid. 210(d). Here, both of those elements have been met and the court accordingly takes judicial notice of both documents.

1 Purpose and Intent, the proposition provides in full,

2    It is the purpose of the People of the State of
     California in enacting this initiative measure to:
3    1.   Provide victims with rights to justice and due
          process.
4    2.   Invoke the rights of families of homicide victims
          to be spared the ordeal of prolonged and
5         unnecessary suffering, and to stop the waste of
          millions of taxpayer dollars, by eliminating
6         parole hearings in which there is no likelihood a
          murderer will be paroled, and to provide that a
7         convicted murderer can receive a parole hearing
          no more frequently than every three years, and
8         can be denied a follow-up parole hearing for as
          long as 15 years.
9 Id. § 3.

10    Proposition 9 amends the Penal Code to add section 3044,

11 which provides,

12    (a) Notwithstanding any other law, the Board of Parole
     Hearings. . .shall be responsible for protecting
13   victims' rights in the parole process. Accordingly, to
     protect a victim from harassment and abuse during the
14   parole process, no person paroled from a California
     correctional facility following incarceration for an
15   offense committed on or after the effective date of
     this act shall, in the event his or her parole is
16   revoked, be entitled to procedural rights other than
     the following:
17   (1) A parolee shall be entitled to a probable cause
     hearing no later than 15 days following his or her
18   arrest for violation of parole.
     (2) A parolee shall be entitled to an evidentiary
19   revocation hearing no later than 45 days following his
     or her arrest for violation of parole.
20   (3) A parolee shall, upon request, be entitled to
     counsel at state expense only if, considering the
21   request on a case-by-case basis, the board or its
     hearing officers determine:
22   (A) The parolee is indigent; and
     (B) Considering the complexity of the charges, the
23   defense, or because the parolee's mental or
     educational capacity, he or she appears incapable of
24   speaking effectively in his or her own defense.
     (4) In the event the parolee's request for counsel,
25   which shall be considered on a case-by-case basis, is
     denied, the grounds for denial shall be state
26   succinctly in the record.

8

(5) Parole revocation determinations shall be based on
        a preponderance of evidence admitted at hearings
        including documentary evidence, direct testimony, or
        hearsay evidence offered by parole agents, peace
        officers, or a victim.
        (6) Admissions of the recorded or hearsay statement of
        a victim or percipient witness shall not be construed
        to create a right to confront the witness at the
        hearing.
        (b) The board is entrusted with the safety of victims
        and the public and shall make its determination
        fairly, independently, and without bias and shall not
        be influenced by or weigh the state cost or burden
        associated with just decisions. The board must
        accordingly enjoy sufficient autonomy to conduct
        unbiased hearings, and maintain an independent legal
        and administrative staff. The board shall report to
        the Governor.

Prop. 9 § 5.3.

        Finally, the proposition contains a severability provision

that provides that any provision found to be invalid or

unconstitutional may be severed and the remaining provisions

given full force and effect. Id. § 8.

        The Voter Information Guide, prepared by the Attorney

General, described Proposition 9 to voters and included analysis

by the Legislative Analyst. Defendants' Request for Judicial

Notice ¶ 1, Ex. A. On the first page of the analysis, the

Legislative Analyst summarized the estimate of the fiscal impact

of the proposition as including a net savings "for the

administration of parole hearings and revocations, unless the

changes in parole revocation procedures were found to conflict

with federal legal requirements." Id. at 58. In the more

extensive analysis, the Legislative Analyst described that the

proposition contained changes affecting the revocation of

parole. Id. at 59. This discussion began with the "Background"
section, in which the Analyst explained that, "A federal court
order requires the state to provide legal counsel to parolees,
including assistance at hearings related to parole revocation
charges." Id.

The Analyst then described some of the central elements of
the Injunction in this case, including the deadlines for holding
probable cause and revocation hearings. Id. at 60. The Analyst
explained that Proposition 9 extends the deadlines for holding
revocation procedures and restricts the appointment of counsel.
The Analyst then opined, "Because this measure does not provide
for counsel at all parole revocation hearings, and because the
measure does not provide counsel for parolees who are not
indigent, it may conflict with the Valdivia court order, which
requires that all parolees be provided legal counsel." Id.

Finally, the Legislative Analyst provided an estimate of
the fiscal impacts of the proposition at the state and county
levels, emphasizing throughout that the estimates might change
depending on how the proposition is interpreted by the courts.
Id. at 60-61. The Analyst cautioned that, "some of these changes
may run counter to the federal Valdivia court order related to
parole revocations and therefore could be subject to legal
challenges, potentially eliminating these savings." Id. at 61.

## II. STANDARD

**A.  Motion to Enforce the Injunction**

A district court has continuing jurisdiction to enforce its

injunction. <u>Crawford v. Honig</u>, 37 F.3d 485, 488 (9th Cir. 1994).
When an action by the state, including the passage of
legislation, conflicts with a federal order to remedy
Constitutional violations, the state act must give way to the
court's order. <u>Missouri v. Jenkins</u>, 495 U.S. 33, 55 (1990);
<u>North Carolina State Bd. of Educ. v. Swann</u>, 402 U.S. 43, 45
(1971).

**B.    Motion to Modify the Injunction**

Under Federal Rule of Civil Procedure 60(b)(5), a court may
relieve a party from its obligations under an order of the court
if prospective application of the order is no longer equitable.
<u>See</u> <u>Sys. Fed'n No. 91 v. Wright</u>, 364 U.S. 642, 646-47.
Modification of an injunction, including a consent decree, is
considered equitable when there has been a significant change in
relevant law or factual circumstances. <u>Id.</u> at 647-48; <u>see also</u>
<u>Rufo v. Inmates of Suffolk County Jail</u>, 520 U.S. 367, 384
(1992). The party seeking the modification bears the burden to
show that modification is warranted. <u>Rufo</u>, 520 U.S. at 383. If
it does, the court must then consider whether the modification
is appropriately tailored to the changed circumstance. <u>Id.</u>

**III. ANALYSIS**

Plaintiffs assert that portions of Penal Code section 3044,
as set forth in Proposition 9, conflict with provisions of the
permanent injunction and must be held invalid. Defendants
dispute this, contending that several of the provisions of the
Proposition identified by plaintiffs do not conflict with the

injunction. To the extent that they do, defendants argue, the injunction should be modified to conform to the will of the California electorate. The court considers each argument in turn.

**A.  Conflict Between Proposition 9 § 5.3 and the Permanent Injunction**

Under the relevant law, both consent decrees and statutes enacted by initiative should be interpreted according to their plain meanings. <u>See</u> Cal. Civil Code § 1638 (governing interpretation of contracts); <u>Gates v. Rowland</u>, 39 F.3d 1439, 1444 (9th Cir. 1994) (rules of contract interpretation for the court's situs state govern interpretation of a consent decree); <u>Davis v. City of Berkeley</u>, 51 Cal. 3d 227, 234 (1990). With regards to both contracts and consent decrees, if the language employed is clear, there is no need to search elsewhere for the drafters' intent. Cal. Civil Code § 1638; <u>Davis</u>, 51 Cal. 3d at 234. Nonetheless, because the Supremacy Clause requires that state law give way to contrary federal court orders or consent decrees, <u>Swann</u>, 402 U.S. at 45, a court should "adopt an interpretation [of an initiative] consistent with the statutory language and purpose, [which] eliminates doubts as to the provision's constitutionality." This is because the voters are presumed to know the superceding effect of the United States Constitution on state law. <u>In re. Lance W.</u>, 37 Cal. 3d 873, 890 n. 11 (1985); <u>see also</u> <u>Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg & Constr. Trades Council</u>, 485 U.S. 568, 575 (1988)

(principle of statutory construction that the court will construe a statute to avoid constitutional infirmity so long as such construction is not "plainly contrary to" the intent of the legislature); <u>Ctr. for Bio-Ethical Reform, Inc. v, Los Angeles Co. Sheriff Dep't</u>, 533 F.3d 780, 791-92 (9th Cir. 2008) (same, collecting California and other federal court of appeals cases).

There are several areas in which Proposition 9 § 5.3 (Penal Code § 3044) and the Permanent Injunction are in plain conflict. First, Penal Code § 3044(a) provides that no parolee shall have any procedural rights other than those listed in the statute, notwithstanding any other law. The statute lists as procedural rights the provision of probable cause hearings and revocation hearings within particular timeframes, entitlement to counsel in certain circumstances, and the limited use of hearsay evidence, as well as specifies what shall be the evidentiary basis of and policy considerations guiding the revocation decision. <u>See</u> Prop. 9 § 5.3. By purporting to be an exclusive list of the procedural rights of parolees in the revocation process, Proposition 9 conflicts with those elements of the Permanent Injunction that give additional procedural rights. These include, *inter alia*, prompt notice of the basis for the parole hold, accommodation for parolees' disabilities and other communication barriers, ability of the parolee to present evidence at the probable cause hearing, expedited probably cause hearings in certain circumstances, and provision of the evidence intended to be relied on by the state to the parolee's counsel. <u>See</u> Inj. ¶¶ 11,

13

13, 14, 18.

Second, section 3044(a)(3) sets forth certain circumstances in which a parolee may be appointed counsel. This conflicts with the Permanent Injunction, which provides counsel for all parolees. Inj. ¶ 11(b)(i).

Third, section 3044(a)(2) sets the deadline for the parole revocation at 45 days from arrest for violation of the terms of parole. This conflicts with the Permanent Injunction, which provides that the revocation hearing should occur within 35 calendar days of the parole hold, unless the parolee waives it or seeks a continuance.[5] Inj. ¶ 11(b)(iv).

Fourth, section 3044(b) provides that the Board of Parole Hearings shall make its decisions without regard to the "state cost or burden associated with just decisions." Plaintiffs assert that this conflicts with the Permanent Injunction's use of remedial sanctions and community based treatment in lieu of revocation, where appropriate. Defendants disagree, observing that neither the Permanent Injunction nor the Remedial Plan integrated into it specify what factors the Board should consider in making its determinations. While, strictly speaking, this is true, it is such a narrow reading of the Permanent Injunction as to constitute a mischaracterization of it. The

---

[5]As plaintiffs point out, there is no conflict where the parole revocation hearing occurs but the parolee has not been placed in custody, or where the parolee has been arrested but the parole hold is placed 10 or more days after the arrest, or where a parole hold is placed but the parolee is released before the revocation hearing occurs.

Injunction, through the Remedial Plan, provides that the defendants will utilize remedial sanctions programs in lieu of initiating the parole revocation process where appropriate. Although the Remedial Plan does not enumerate expressly what factors the defendants shall use in determining whether remedial sanctions are appropriate, the Plan does provide that, "The goal is to reduce the number of returns to prison for violations of parole by up to 10% in 2004 and up to 30% by 2006." Inj., Remedial Plan at 2. This strongly suggests that the decision to refer a parolee to a remedial sanctions program is informed, at least in part, by the goal of reducing the custodial burden on the state by diverting parolees for whom a return to custody is not necessary in order to preserve public safety. See id. Section 3044(b) appears to conflict with this goal.

There are other provisions of Penal Code § 3044 that could be construed to contradict the Permanent Injunction, but may equally validly be interpreted so as to avoid the conflict. These are sections 3044(a)(5) and (a)(6), which discuss the use of hearsay evidence. They provide, "Parole revocation determinations shall be based on a preponderance of evidence admitted at hearings including documentary evidence, direct testimony, or hearsay evidence offered by parole agents, peace officers, or a victim" and "Admissions of the recorded or hearsay statement of a victim or percipient witness shall not be construed to create a right to confront the witness at the hearing." The former may suggest to a reasonable reader that the

15

only hearsay evidence that may be provided is that offered by parole agents, peace officers, or victims,[6] or that this evidence may be relied on without qualification. The latter may suggest to a reasonable reader that the parolee does not have a confrontation right when hearsay evidence by a victim or witness is admitted. If these interpretations were adopted, they would conflict with the Permanent Injunction, which provides that parolees may present hearsay evidence at probable cause hearings and that the use of hearsay evidence is governed by "controlling law as currently stated in United States v. Comito. . . ." Inj. ¶¶ 22, 24, Remedial Plan at 5. The Injunction also acknowledges the parolee's confrontation rights as a limitation on the use of hearsay evidence. Inj. ¶ 24.

Despite this, these sections of Proposition 9 § 5.3 could also reasonably be construed as being in accord with the terms of the Injunction. See In re. Lance W., 37 Cal. 3d at 890 n. 11. Penal Code section 3044(b)(5) may be read as setting forth a non-exhaustive list of evidence that may be relied on if it is admitted. It can reasonably be read not to limit the type of evidence considered or admitted to only those categories listed.

Similarly, section 3044(b)(6) may reasonably be read to provide that the admission of hearsay evidence against the

---

[6]Proposition 9 defines "victim" as "a person who suffers direct or threatened physical, psychological, or financial harm as a result of the commission or attempted commission of a crime or delinquent act." Prop. 9 § 4(e). It also includes that person's spouse, parents, children, siblings, or guardian. Id. It apparently does not include uncles or neighbors.

parolee does not alone create a confrontation right. The construction of this subsection is odd, to say the least, in light of the longstanding rule that hearsay evidence shall be admitted only after the importance of the confrontation right is weighed against other considerations. See, e.g., Crawford v. Washington, 541 U.S. 36 (2004). In other words, admission of hearsay evidence does not "create" a confrontation right, but is itself guided by the confrontation right. Given this, section 3044(b)(6) may be understood to provide that hearsay evidence may be admitted, because the parolee may not necessarily have a right to confrontation of every hearsay witness whose statements are sought to be admitted. Whether that hearsay evidence is admitted, however, is guided by the terms of the Injunction, which incorporates controlling law as set forth in United States v. Comito.

**B.   Legal Effect of the Conflict Between Proposition 9 and the Permanent Injunction**

To the extent that Proposition 9 § 5.3 conflicts with the Permanent Injunction, the former may not be enforced. The Supremacy Clause commands this result. The Supreme Court as well as other courts have repeatedly reached this conclusion in various contexts, including where underlying constitutional violations were at issue and where the federal court's order was a consent decree.

In Cooper v. Aaron, 358 U.S. 1 (1958), the Court explained this principle when confronted with the state of Arkansas'

statutes and state constitutional amendments that contradicted the Court's desegregation orders. The Court characterized the case as "rais[ing] questions of the highest importance to our federal system of government." Id. at 4. After reiterating that the Fourteenth Amendment explicitly binds the states, the Court "recall[ed] some basic constitutional principles that are settled doctrine," in light of Arkansas's Executive and Legislative branches' belief that they were not bound by certain court orders. Id. at 17.

As the Court explained, Article VI of the Constitution provides that the Constitution is the "supreme Law of the Land" and its judiciary supreme in construing what the law is. Id. at 18 (internal citations omitted). Every state officer takes an oath to uphold this Constitutional rule. Id. Consequently, recalling the opinion of Chief Justice Marshall, "'If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery.'" Id., citing United States v. Peters, 5 Cranch 115, 136 (1809). "A Governor who asserts a power to nullify a federal court order is similarly restrained." Id. at 18-19; see also Jenkins, 495 U.S. at 57 (district court order requiring the state to raise taxes beyond the state statutory limit in order to fund a desegregation plan must be enforced in spite of the state statute, as "[t]o hold otherwise would fail to take account of the obligations of local governments, under

the Supremacy Clause, to fulfill the requirements that the
Constitution imposes on them"); Swann, 402 U.S. at 44-45 (state
law prohibiting bussing for desegregation purposes was invalid
as it contradicted federal district court's order addressing
school segregation).

In these cases, the Court also addressed the argument that
defendants raise here, that it is a central element of democracy
that the people make their own laws and a feature of the
California system of government that the Executive's power
derives wholly from the people. See Reply In Support of Mot. for
Summ. J. at 1, 8-9. While these both may be true, the federal
system requires the state -- whether in the form of legislative
or executive action -- to accept the limits of its authority as
defined by the Constitution. See Jenkins, 495 U.S. at 56-57; see
also Cooper, 358 U.S. at 19 ("It is, of course, quite true that
the responsibility for public education is primarily a concern
of the States, but it is equally true that such
responsibilities, like all other state activity, must be
exercised consistently with federal constitutional requirements
as they apply to state action.").

The Supreme Court has applied this principle in various
contexts, including when underlying violations of federal
constitutional rights were not at issue. See Washington v.
Washington State Commercial Passenger Fishing Vessel Assoc., 443
U.S. 658, 693-95 (1979) (treaties with tribes and federal
regulations interpreting them override contrary state

regulations); <u>City of Tacoma v. Taxpayers of Tacoma</u>, 357 U.S. 320, 340-41 (1958) (final judgment of a federal court was binding on state as to question of use of navigable waters; state could not enforce a contrary judgment rendered by the state supreme court). Courts have also applied this rule where the state action would conflict with a consent decree entered in federal court. <u>See</u> <u>Hook v. Arizona Dep't of Corr.</u>, 107 F.3d 1397, 1402-1403 (9th Cir. 1997); <u>Stone v. City & County of San Francisco</u>, 968 F.2d 850, 861 n. 20 (9th Cir. 1992). Finally, the state's action is not given special deference by virtue of having occurred through the initiative process. <u>See generally</u> <u>Citizens Against Rent Control v. Berkeley</u>, 454 U.S. 290, 295 (1981); <u>In re. Lance W.</u>, 37 Cal. 3d at 890.

Consequently, the Permanent Injunction must be enforced so long as it remains in effect; to the extent that Proposition 9 is in conflict with it, the Proposition may not be enforced.

**C.    Interpretation of Proposition 9 As a Statement of State Law**

Plaintiffs offer an alternative interpretation to Proposition 9 § 5.3.  They suggest that it articulates the due process requirements for parole revocation proceedings, under state law only.[7] This is the approach adopted by the California Supreme Court in <u>In re. Lance W.</u>, 37 Cal. 3d 873, when it considered a state ballot initiative that had the possible effect of contradicting prior Supreme Court orders.

_____

[7]Defendants, curiously, have not responded to this argument in their Reply brief.

In Lance W., the California electorate had passed as a ballot initiative the Truth In Evidence amendment to the California Constitution. Id. at 879. Briefly, the amendment allows for the admission of all relevant evidence against the defendant in a criminal proceeding and therefore appeared inconsistent with the exclusionary rules accompanying the search and seizure provisions of the state and federal constitutions. Id. at 884. Specifically, the court considered the effect of the amendment on the admissibility of evidence obtained in violation of another person's right to be free from unreasonable searches and seizures. Id. at 879.

The court recognized that the federal exclusionary rule, although grounded in the guarantees of the Fourth Amendment, is "defined by the United States Supreme Court." Id. at 882. The state electorate is deemed "to know of the superseding impact of federal constitutional provisions on state laws or constitutional provisions which conflict with and restrict rights guaranteed by the United States Constitution." Id. at 890 n. 11. Moreover, the Legislative Analyst, in the initiative description sent to voters, explained that the initiative would cause unlawfully seized evidence to be admitted except where excluded by virtue of the federal Constitution. Id. at 890. From this, the court deduced that the intent of the voters was for the initiative to only alter the state exclusionary rule. Id.; see also People v. Daan, 161 Cal. App. 3d 22, 28 (1984) ("As Proposition 8 cannot reach the federal Constitution, only the

federal Fourth Amendment constraints on searches and seizures as explicated by the United States Supreme Court are valid in California.").

Here, a similar construction is necessary. Nothing in the Findings or the Statement of Purpose and Intent indicate that Proposition 9 was intended to set forth or amend parolees' rights arising from the federal Constitution or a consent decree issued by a federal court. Prop. 9 §§ 2-3. The voters are presumed to know the overriding effect of the Constitution and federal court judgments on contrary state laws, In re. Lance W., 37 Cal. 3d at 890 n. 11, and to intend for the state laws to extend only to non-conflicting federal law, whether constitutional, statutory or judicial in origin. In re. Kay, 1 Cal. 3d 930, 942 (1970). This presumption must prevail despite the fact that the relevant portions of Proposition 9 § 5.3 begin, "Notwithstanding any other law. . .," since there is nothing in this clause to suggest that it was intended to accomplish what voters are presumed to know cannot be done. Finally, support for this interpretation may be found in the fact that the voters were informed that certain provisions of Proposition 9 may conflict with the orders of this court. See In re. Lance W., 37 Cal. 3d at 890. Given this admonition, the voters could reasonably have intended for the initiative to define state law only.

In summary, the Permanent Injunction in this case contains various procedural due process requirements for the parole

revocation process, grounded in the court's determination that the prior procedures had violated the Fourteenth Amendment of the Constitution. As an order of the court, the ongoing validity of the Permanent Injunction remains undisturbed, notwithstanding contrary state law or action by the state's executive branch. This derives from the authority of this court vis-a-vis the states as provided by the Supremacy Clause.

Proposition 9 § 5.3 (Penal Code § 3044) can be construed to only set forth the procedures deriving from state law and the court adopts this construction because it is reasonable and in order to not invalidate a law if it may be reasonably interpreted to avoid constitutional infirmity. See Edward J. DeBartolo Corp., 485 U.S. at 575; Ctr. for Bio-Ethical Reform, Inc., 533 F.3d at 791-92; In re. Lance W., 37 Cal. 3d at 890. Accordingly, the provisions of Proposition 9 addressing the parole revocation procedures, see Prop. 9 § 5.3, do not supercede those set forth in the Permanent Injunction. It is the responsibility of the defendants to ensure that Penal Code § 3044 is implemented consistent with this interpretation, unless and until the decree is modified.

**D.    Motion to Modify the Injunction**

Defendants move to modify the Permanent Injunction to incorporate the changes to parole revocation procedures embodied in Proposition 9. For the reasons explained below, the court denies the motion.

Motions to modify a consent decree pose a number of

23

conflicting values.  On the one hand is the imperative that, generally speaking, there is an essential value that judgments are final and binding.  Any undermining of that understanding diminishes the fundamental structure of litigation.  Moreover, when addressing stipulated judgments, unconsented to modifications implicate the fundamental quality of contractual obligations.

On the other hand, modification of even stipulated judgments may be appropriate in institutional litigation, in order to permit response to real world changes which effect the circumstances which justified the entry of the judgment in the first place.  This is so because institutional judgments tend to be long lasting, as the institution effected changes to meet the requirements of the judgment.  Accordingly, it has been held that modification of a federal consent decree in institutional litigation may be warranted when there is a change in factual circumstances or in relevant federal law. Rufo, 502 U.S. at 383; see also Fed. R. Civ. Proc. 60(b). The burden is on the movant to make the showing justifying modification. Rufo, 502 U.S. at 383. Thus, although a consent decree resembles, in many respects, a contract between the parties, it is a judicial decree and thus subject to the same rules for modification or recision of judicial orders generally. Id. at 378-79.

In Rufo, the High Court confronted a consent decree that had been entered in order to address unconstitutional prison overcrowding. Id. at 374. Six years later, when the prison

24

population had increased beyond initial projections, the county defendant moved to modify the decree. Id. at 376. The district court denied the motion, which the court of appeals affirmed. Id. at 376-77.

When the Supreme Court reviewed, it weighed concerns of the parties somewhat similar to those that have been raised in this case. On one hand, a court must be flexible in modifying consent decrees, particularly in cases of institutional reform, because "such decrees remain in place for extended periods of time." Id. at 380. As such, unforseen circumstances may arise that are out of the defendant's control and which warrant modification of the decree. Id. at 381. Such flexibility is particularly important, the majority explained, because institutional reform decrees "reach beyond the parties directly involved in the suit and impact on the public's right to the sound and efficient operation of its institutions." Id. (internal citation omitted).

On the other hand, application of too lax a standard in modification of decrees would undermine the parties' purpose in entering into the decree. Id. at 383. By entering into a consent decree, a party has obtained an end to the litigation and avoided the risk of a more unfavorable judgment had the case proceeded to trial. Id. at 382-83. Moreover, a court is constrained by Rule 60(b)(5), which provides that modification is only permitted when the decree's prospective application is no longer equitable. Id. at 383. Thus, any modification that

occurs must rest on equitable concerns that have arisen since the entry of the decree. Id.

From all this, the High Court established the rule that a consent decree may be modified if a change in federal law or the facts warrants it and, if so, if the modification is narrowly tailored to address that change. Id. at 383. In describing the effect of a change in law, it held that a federal consent decree should be modified if "one or more of the obligations placed upon the parties has become impermissible under federal law." Rufo, 502 U.S. at 388. It may also be modified when the federal law has changed to "make legal what the decree was designed to prevent." Id., citing Ry. Employees v. Wright, 364 U.S. 642 (1961) and Firefighters v. Stotts, 467 U.S. 561 (1984); see also Agostini v. Felton, 521 U.S. 203 (1997). Here, defendants have not shown, nor even asserted, that there is has been a change in relevant federal law that calls for the modification of the Permanent Injunction.

Instead, defendants argue that the passage of Proposition 9 constitutes a change in factual circumstance warranting the modification of the Permanent Injunction. Setting aside the defendants' confounding of law and fact, the argument is unpersuasive.

In explaining the standard for modification of consent decrees, the Rufo Court observed that typically a change in factual circumstances may require modification where the new circumstances "make compliance with the decree substantially

more onerous" or "unworkable due to unforeseen obstacles" or when "enforcement of the decree without modification would be detrimental to the public interest." 502 U.S. at 384-85 (citations omitted); see also Jeff D. v. Kempthorne, 365 F.3d 844, 854 (9th Cir. 2004) (acknowledging these as the reasons warranting modification of a consent decree based on changed factual circumstances). Even when changed factual circumstances exist, however, the court must also consider whether modification of the decree would undermine its purpose. Rufo, 502 U.S. at 387.

For example, the Rufo Court cited with approval N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 706 F.2d 956 (2d Cir. 1983), where a consent decree had been entered requiring the State to remove mentally retarded persons from constitutionally substandard, large facilities and place them in 15-person or smaller facilities by a specified date. The Court of Appeals held that the decree should have been modified, upon defendants' motion, to place persons covered by the decree in slightly larger facilities (housing 50 persons or fewer). Id. at 965. Defendants had shown in their motion to modify that it was extremely difficult to find small facilities to accommodate all the persons covered by the decree, but that immediate placement could be made if the restrictions governing the size of the facilities were loosened. Id. at 966. Defendants also presented expert testimony that some of the mentally retarded persons covered by the decree would fare equally well in a somewhat

larger facility than in a smaller one. _Id._ at 966-67. The court
concluded that the unforseen difficulty in obtaining small
facilities merited modification of the injunction, since the
modification proposed would accomplish the ultimate objective of
promptly providing constitutional living conditions to the
affected persons. _Id._ at 968-71.

In light of the rule described in _Rufo_, it is apparent that
a change in state law standing alone is not the type of change
in factual circumstance that renders continued enforcement of a
consent decree inequitable. Indeed, the history of federal
institutional litigation demonstrates that fact. _See_ _Jenkins_,
495 U.S. at 56-57; _Swann_, 402 U.S. at 44-45. The Ninth Circuit
has had occasion to recognize and apply that principle. In _Hook_
_v. Arizona Dep't of Corr._, 107 F.3d 1397 (9th Cir. 1997), the
circuit held that passage of a state law to prohibit funding
special masters without legislative approval did not merit
modification of a consent decree that provided for a special
master. There, the district court had entered consent decrees in
four civil rights cases brought by prisoners and the decrees in
each case included appointment of a special master to monitor
compliance. _Id._ at 1399-1400. After the Arizona legislature
passed a statute requiring its approval of a master before
paying the special masters' fees, the state moved to modify the
consent decrees on the grounds that this change in factual
circumstance required modification, premised on federalism
principles. _Id._ at 1402.

28

1    The Circuit upheld the district court's denial of the

2    motion to modify. Id. at 1403. Applying Rufo, it held that the

3    state bears the burden to show that there is a "significant

4    change" in law or fact warranting the modification. Id. at 1402,

5    citing Rufo, 502 U.S. at 383-84. The court observed that the

6    special masters had been originally appointed in each case due

7    to the courts' inability to monitor compliance itself and the

8    state's perpetual non-compliance with court orders. Id. at 1402-

9    1403. Accordingly, the passage of the state statute did not meet

10   the Rufo standard, because the statute's passage did not alter

11   the district courts' reasons for originally appointing special

12   masters in each case. Id.; see also United States v. Wayne

13   County, Michigan, 369 F.3d 508 (6th Cir. 2004) (consent decree

14   between federal and state government should not be modified

15   because changes in state statutory and decisional law do not

16   constitute a change in factual circumstances under Rufo and Rule

17   60).

18       Nonetheless, certain language in Hook might appear to lend

19   credence to the approach urged by the defendants here, i.e. that

20   the passage of Proposition 9 indicates the California voters'

21   preference to modify parole revocation procedures in a manner

22   that, defendants contend, is constitutionally adequate.

23   Defendants argue that this suffices to warrant modification.

24       In considering whether modification was merited, the Hook

25   court applied the Rufo factors within the context of the

26   "federalism concerns" it noted as being implicated by

29

institutional injunctions. <u>Hook</u>, 107 F.3d at 1402. It observed
that the Supremacy Clause requires state law to give way when it
conflicts with the Constitution or federal statute or with an
essential part of a federal court's remedial scheme. <u>Id.</u>, citing
<u>Stone</u>, 968 F.2d at 862. In holding that modification was not
justified, the <u>Hook</u> court apparently concluded that the
modification did not meet the Rufo factors and that the elements
of the consent decree at issue also were necessary to the
remedial scheme, per <u>Stone</u>. <u>Id.</u> at 1402-1403.

Hook, however, cannot be interpreted to hold that any
portion of the consent decree not strictly necessary to
remedying the constitutional violation may be modified out of
the decree at any time. The <u>Rufo</u> standard, guided by the
language of Rule 60(b), is straightforward in what elements must
be present for modification to be appropriate. Because <u>Hook</u>
might be read to impose standards outside of the <u>Rufo</u> factors,
and because the <u>Hook</u> facts fully met the <u>Rufo</u> standards, such
language is simply dicta. Moreover, I now explain with the
greatest respect, that the dicta cannot guide subordinate
courts.

The <u>Rufo</u> court expressly recognized, as many other courts
have, that a government entity may enter into a consent decree
that is broader than the minimum necessary to remedy a
Constitutional violation. The <u>Rufo</u> court explained,

> [W]e have no doubt that, to save themselves the time,
> expense, and inevitable risk of litigation petitioners
> could settle the dispute over the proper remedy for

the constitutional violations that had been found by undertaking to do more than the Constitution itself requires (almost any affirmative decree beyond a directive to obey the Constitution necessarily does that), but also more than a court would have ordered absent the settlement.

Rufo, 502 U.S. at 389 (internal citations omitted); see also Suter v. Artist M., 503 U.S. 347, 354 n. 6 (1992); Local No. 93 v. City of Cleveland, 478 U.S. 501, 525 (1986); Jeff D., 365 F.3d at 851-52; Gilmore v. People of the State of Cal., 220 F.3d 987, 1005 (9th Cir. 2000). Instead, in order to be valid the remedy as a whole must "flow from" the constitutional violation identified by the court. Milliken v. Bradley (Milliken II), 433 U.S. 267, 282 (1977); see also Rufo, 502 U.S. at 389.

Here, defendants have not borne their burden to show that the Permanent Injunction should be modified due to a significant change in factual circumstances. They have not shown that the passage of Proposition 9 makes compliance with the injunction substantially more onerous, unworkable, or otherwise no longer in the public interest. See Rufo, 502 U.S. at 384-85 (citations omitted); Jeff D., 365 F.3d at 854. Instead, the defendants appear to suggest that Proposition 9 offers a constitutionally adequate alternative for remedying the deficiencies in the parole revocation process that the court held were present in 2002. Without more, this does not merit modification of the decree. See id.; cf. Carey, 706 F.2d 956 (modification appropriate because it would effectively achieve the purpose of the consent decree and compliance with the decree had become

31

prohibitively difficult).

Defendants' position that the Permanent Injunction should be altered because it includes provisions that are not strictly necessary to address the plaintiffs' due process violations holds no force. As the Supreme Court, Ninth Circuit, and other courts have recognized, a consent decree is not invalid simply because it contains elements that may be broader than those required by federal law. See, e.g., Rufo, 502 U.S. at 389-90; Jeff. D., 365 F.3d at 851-52. The court determined when it entered the Stipulated Permanent Injunction that it represented a valid remedy to the constitutional violations extant at the time, and the defendants have presented nothing to suggest that that determination was in error.[8] See Milliken II, 433 U.S. at 282 (federal court decrees must be "aimed at eliminating a condition that [violates] the Constitution or . . . flow[s] from such a violation"); Jeff. D., 365 F.3d at 852 (consent decree valid where it "came within the general scope of the pleadings and furthered the objectives upon which the complaint was based"). The consent decree was a bargained solution that the defendants entered into freely; as part of the bargain, each party may have gained or lost elements of a remedial plan that may or may not have been part of a final judgment, had the case proceeded to trial. As plaintiffs point out, at the time the consent decree was entered, California Penal Code § 3056 allowed

---

[8]Nor, given the passage of time to appeal, could they.

32

the state very broad discretion in retaking a parolee into custody. See also In re Etie, 27 Cal.2d 753, 758 (1946) ("The authority under whose legal custody a paroled prisoner remains (Pen. Code § 3056) has broad power to suspend or revoke parole without notice.") Hence, at the time defendants entered into the consent decree, the decree was in conflict with state law. Under Rufo and related authority, it cannot be the case that conflict with a new state law suffices to merit modification of the decree.[9]

## IV. CONCLUSION

Accordingly, the court ORDERS as follows:

1. Plaintiffs' motion to enforce the Permanent Injunction is GRANTED as provided herein. To the extent that there is no conflict between the Permanent Injunction and Proposition 9 § 5.3 (Penal Code § 3044), no order is necessary. To the extent that they are in conflict, as identified herein, the Permanent Injunction SHALL supercede California Penal Code § 3044.

/////

/////

_____

[9] Because the defendants have not shown that there has been a change in pertinent law or fact that merits a modification of the Permanent Injunction, the court need to reach the question of whether Proposition 9 is "suitably tailored to the changed circumstance" or whether defendants' proposed modification is simply an attempt to "rewrite [the] consent decree so that it conforms to the constitutional floor." Rufo, 520 U.S. at 391; see also Jeff D., 365 F.3d at 854.

1  2.  Defendants' motion to modify the Permanent Injunction

2      is DENIED.

3  IT IS SO ORDERED.

4  DATED: March 26, 2009.

5

6

7                              _____

8                              LAWRENCE K. KARLTON
                               SENIOR JUDGE
                               UNITED STATES DISTRICT COURT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26