# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

JERRY VALDIVIA, et al.,

     Plaintiffs,

     vs.                        No. CIV S-94-671 LKK/GGH

ARNOLD SCHWARZENEGGER, et al.,

     Defendants.

_____/

## SIXTH REPORT OF THE SPECIAL MASTER
## ON THE STATUS OF
## CONDITIONS OF THE REMEDIAL ORDER

### Background

On May 2, 1994, the lawsuit now known as *Valdivia vs. Schwarzenegger* was filed. The Court certified the case as a class action by order dated December 1, 1994. On June 13, 2002, the Court granted partial summary judgment in favor of the Plaintiffs. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan, with specific guidance regarding "…a prompt preliminary probable cause hearing that affords the parolee rights provided by *Morrissey*, including notice of the alleged violations, the opportunity to appear and present evidence, a conditional right to confront adverse witnesses, an independent decision-maker, and a written report of the hearing."

On March 8, 2004, the Court entered the Stipulated Order for Permanent Injunctive Relief ("Permanent Injunction") containing the agreed-upon elements of the

PDF created with pdfFactory trial version www.pdffactory.com

settlement terms. On July 1, 2004, the Defendants submitted a variety of policies and procedures to the Court. On June 1, 2005, this Court signed a Stipulated Order Regarding Policies and Procedures for Designating Information as Confidential. On June 8, 2005, the Court filed an order finding violation of the Permanent Injunction regarding remedial sanctions. On August 31, 2005, the Court issued an Order concerning parolee attorney access to information in clients' field files.

On August 18, 2005, a Stipulation and Amended Order Re: Special Master Order of Reference was entered; on December 16, 2005, an Order appointing Chase Riveland Special Master was entered; and on January 31, 2006, an Order was entered appointing Virginia Morrison and Nancy Campbell as Deputy Special Masters.

The Special Master filed his first report on September 14, 2006. Subsequently, the Court issued an Order on November 13, 2006 requiring improvements to Defendants' information system and internal oversight mechanisms. On April 4, 2007, the Court entered a Stipulation and Order Regarding Remedial Sanctions. The second Special Master's report was filed on June 4, 2007 after receiving concurrence from the Court that the report would be delayed.

The Court entered a Revised Stipulated Protective Order Regarding Parolee Defense Counsel Access to Witness Contact Information and Certain Mental Health Information on June 11, 2007. On September 28, 2007 and October 22, 2007, the Court issued Orders determining that interstate parolees and civil addicts were not part of the *Valdivia* class.

The third Special Master Report was filed with the Court on November 28, 2007, and an Order issued by the Court on January 15, 2008 directed the Defendants to address

PDF created with pdfFactory trial version www.pdffactory.com

due process for parolees who appear, either in the judgment of their attorneys or defendants' staff, too mentally ill to participate in revocation proceedings.

The Special Master filed a Report and Recommendation Regarding Motion to Enforce Paragraph 24 of *Valdivia* Permanent Injunction on February 8, 2008 and the Court adopted the recommendations in an Order issued March 25, 2008. That Order is on appeal, but a stay was denied by both the district and appellate courts. The Special Master filed his fourth report on April 28, 2008. Granting Plaintiffs' motion, this Court ordered on August 8, 2008 that parolees have timely access to inpatient psychiatric hospitalization, and psychiatric evaluation pursuant to California Welfare and Institutions Code § 5150 under certain circumstances. .

The Fifth Special Master Report was filed on October 25, 2008. No action was requested of the court, but the following recommendations were made to the Defendants:

"While the Special Master does *not* seek court orders at this time, it is strongly recommended that Defendants:

1. Address the practice of Deputy Commissioners failing to expressly consider and make findings concerning probable cause during probable cause hearings

2. Address the handling of hearsay objections when it is not consistent with any reading of the law advanced by the parties or endorsed by the Court, and expeditiously implement the Court's March 25, 2008 Order concerning confrontation rights

3. Investigate the causes of myriad deficiencies in revocation proceedings at Los Angeles County Jail and consistently work toward remedying them

4. Pay strict attention to the requirement to maintain staffing levels sufficient to meet all obligations of the Permanent Injunction

5. Investigate the cause for delay in transfer of parolees from jails and institutions to community-based ICDTP programs"

PDF created with pdfFactory trial version www.pdffactory.com

On November 14, 2008, Plaintiffs filed a Motion to Enforce the Injunction and prohibit Defendants from implementing those amendments to Penal Code § 3044 included in the Victims' Rights and Protection Act of 2008 which conflicted with the Permanent Injunction. This Court granted that motion on March 26, 2009.

## Special Master Activities

The Special Master's team worked with the parties to develop procedures to: (1) protect due process for mentally ill parolees, (2) review decisions for consistency with the law and regulations, (3) refine the referral and placement processes for remedial sanctions, (4) implement the parole decision-making matrix, and (5) determine the appropriate scope of monitoring in some areas, particularly in ICDTP, one of the remedial sanctions programs. The team worked with CDCR to advance efforts to revise confrontation rights policies, conduct more rigorous probable cause hearings, investigate and address deficiencies at Los Angeles County Jail, improve monitoring processes, and implement requirements in the context of vacancies and budget pressures.

The team observed the *Valdivia* Task Force and trainings on the decision-making matrix and due process considerations for parole agents. The team participated in site visits to San Quentin State Prison and Stanislaus, San Francisco, Los Angeles, and Placer county jails. The Special Master's team and CDCR continued with monthly information update calls and participated in efforts shaping the information gathering and analysis of CDCR and CalPAP.

As all parties could benefit from clearly defined goals, the Special Master initiated discussions to define substantial compliance with the Permanent Injunction. This

PDF created with pdfFactory trial version www.pdffactory.com

will likely be a long-term effort, as the parties consider appropriate measures and qualities for the different requirements. The Special Master has invited the parties' input so that he can reach informed decisions.

### Scope and Approach for This Report

This report continues the approach of reviewing each component of the Permanent Injunction and issues arising out of its interpretation. There is particular emphasis on topics subject to this Court's additional orders concerning remedial sanctions, mentally ill parolees, information systems, internal oversight, and confrontation rights.

This report discusses observations and activities spanning September 2008 through March 2009, collectively referred to as "the Round." Where data is employed, it covers the period of September 2008 through January 2009 unless otherwise noted.

This report also uses some language conventions. Progress and compliance are often discussed separately, reflecting that movement during the Round is worth recognizing, even where overall results may not match. The Special Master does not always comment on progress.

In assessing either, this report uses the terms "resolved," "good," "adequate,' and "poor." At this stage of the remedy, one would expect most requirements to be partially implemented and, thus, "adequate." "Good compliance" is a high bar, and it takes sustained Rounds of "good" compliance to reach "resolved" status. When discussing problems, descriptors progress in severity from "minor" to "substantial" to "significant," and then stronger terms are used for issues of greatest concern. References to the Special Master's activities frequently include the actions of one or more members of his team.

PDF created with pdfFactory trial version www.pdffactory.com

The term "monitoring reports" refers collectively to reports generated by Plaintiffs' monitoring and by Defendants' self-monitoring, unless otherwise specified.

## Substantial Compliance Initiatives

The Special Master's team decided it was timely to begin to pursue substantial compliance definitions. There are several strategies to consider in doing so. The Special Master established a couple of "ground rules." First, it is the Court that will ultimately decide what the compliance definitions are. Secondly, that meet and confer sessions would be held between one or more members of the Special Master's team and no more than two representatives from each party. The Special Master feels that having a room full of attorneys and staff is not conducive to attempting to reach some agreement on compliance definitions. Thirdly, the Special Master emphasized that the parties reaching agreement on substantial compliance definitions would be desirable but not a requirement, as ultimately, the Special Master would make recommendations to the Court, and the Court would ultimately decide the definitions or conditions of compliance.

The first such meeting was held during this Round between the Special Master and two representatives of each party. Agreement on an approach did not appear imminent. Yet, it is clear that the Defendants are compliant with some requirements of the Orders set forth by the Court, and that some of the Defendants' geographic areas or Decentralized Revocation Units are either at, or close to, compliance more than others. It is the Special Master's belief that it is important to recognize those areas or units that have been successful in fulfilling Court requirements.

PDF created with pdfFactory trial version www.pdffactory.com

The second meeting was held specifically regarding substantial compliance in the area of remedial sanctions. The meeting focused on defining possible models or approaches for defining substantial compliance. Three loosely defined models were discussed; these included the fixed number, needs-based and results models. Strengths and limitations of each model were discussed. Defendants are now reviewing the options with the operations staff at CDCR. Parties agreed that the progress made to date in the area of remedial sanctions needs to be acknowledged and it is time to find ways to increase the Defendants' authority in this area.

It is assumed by the Special Master that the Court does not expect perfection, but rather, performance at a responsible level, particularly in those areas that involve constitutionally protected rights and the potential of harm being done. The Court must have confidence that the Defendants have institutionalized those practices.

The Special Master informed the parties that the Defendants should select what they envision as their best performing Decentralized Revocation Unit (or units) and assess them and 'make the case' for partial or total compliance by those units. Plaintiffs shall review and assess this information. Working together, the parties plan to identify principal factors contributing to the success of the best-performing facilities and methods for promoting such best practices at other locations.

If the reviewed unit (or units) is found to be in substantial compliance with some or all of the requirements the Court has set forth, the Special Master will treat that unit (or units) as exempt from monitoring. This would remain in place unless information is provided by the Plaintiffs to the Special Master, or the Special Master learns independently, that performance has deteriorated. In that instance, the Special Master's

PDF created with pdfFactory trial version www.pdffactory.com

team would investigate the circumstances and determine if the relief from monitoring should be withdrawn.

Concurrently, attempts have been initiated to develop substantial compliance definitions around remedial sanctions, particularly the availability of programs for those decision-makers who are to consider remedial sanctions as alternatives to revocation. Again, it would be desirable for the parties to agree to a level of availability. If not, however, the Special Master will make recommendations regarding substantial compliance to the Court.

In their objections to this report, Plaintiffs argue that substantial compliance is not the appropriate standard. The Special Master will consider this argument as he continues to work with the parties to determine appropriate measures and goals.

Ultimately, the objective will be the development of an exit plan. Certainly, it is incumbent upon the Defendants to display sustainable progress sufficient to give the Court confidence that not only have the expectations of the Court been met, but that those expectations will be continued into the foreseeable future.

**Areas of Emphasis**

As implementation has evolved, a set of issues has emerged as requiring priority. Some are complex and carry the risk of great harm. Some are systems necessary to guide and structure future compliance in many areas. Some negotiations had been underway long-term and require closure. Some arose from compliance failure or from legal challenges.

In talks with CDCR staff in late 2008, the Special Master's team summarized those issues as:

PDF created with pdfFactory trial version www.pdffactory.com

1. Development and implementation of the plan for mentally ill parolees unable to participate in revocation proceedings (January 15, 2008 and August 8, 2008 Orders)
2. Ensuring that hearing officers assess probable cause in probable cause hearings (Fifth Report recommendations)
3. Preserving confrontation rights (March 25, 2008 Order; Fifth Report)
4. Aspects of remedial sanctions (April 4, 2007 Order; Fifth Report) -- especially definitions of the third prong of the remedial sanctions requirements (self-help/outpatient aftercare programs and structured and supervised environments), ICDTP monitoring, timely transfer to ICDTP, structured decision-making
5. Addressing myriad compliance deficiencies at Los Angeles County Jail (Fifth Report)
6. Staffing sufficient to carry out the Permanent Injunction (Fifth Report)
7. Decision review
8. Resolution of Marsy's Law challenge
9. Information systems improvements (November 13, 2006 Order)
10. Translating and simplifying forms
11. Timeliness of hearings after an optional waiver has been activated

The development of sustainable, effective internal oversight also remains a key goal. (November 13, 2006 Order)

Defendants took up the challenge very well during this Round. Executives contributed to shaping the effort. Divisions mobilized and redirected staff to priority tasks. Effort was sustained to ensure that projects, drafting, and negotiations continued to progress. Nearly all of the priority areas received some attention and some are nearing implementation. This is an important step forward. It demonstrates a renewed seriousness of purpose toward achieving *Valdivia* compliance, and a capacity to accomplish it. These are the some of the qualities necessary in the long run for CDCR to assume full responsibility for its operations without court oversight. This Round gives the Mastership reason for optimism.

Most of the priority areas will be discussed in the sections that follow. In summary, there has been good progress concerning mentally ill parolees, confrontation

PDF created with pdfFactory trial version www.pdffactory.com

rights, remedial sanctions, decision review, and Los Angeles County Jail issues. There is a reasonable pace in carrying forward the Marsy's Law challenge and information systems. There has been limited attention to probable cause assessments, forms translation, optional waivers, and staffing. In some cases, this is a reasonable matter of prioritization; in some, significantly more will be needed in the short term.

Efforts have been strong, but there are glaring exceptions. The parties and the Mastership will need to continue emphasis on these topics to ensure that they come to fruition and that effective practices truly take root.

Since the Los Angeles County Jail issues cut across various requirements, this will be discussed here.[1] This is critical in the short term as the number of parolees affected represents such a significant percentage of the total in the state, and is critical in the long term if substantial compliance is ever to be achieved. CDCR initiated its efforts by convening executive level representatives from multiple divisions and confirming lists of problems identified at Los Angeles County Jail.

Paroles Division has since done excellent work to address issues within its control. Headquarters staff conducted multiple visits and designed enhanced oversight by identifying several regional administrators to coordinate improvement activities and redirecting a Parole Administrator position from another region. Regional administrators will report on the status of improvements, including the reasons for progress or its absence, in monthly conference calls with the division's Deputy Director.

Parole Administrators and Supervising Notice Agents were tasked with designing viable corrective actions with input from line staff. Headquarters, regional, and local

PDF created with pdfFactory trial version www.pdffactory.com

management reviewed the performance of staff and conducted other investigations to determine the likely source of breakdowns.

As they believe promotions with insufficient training were one contributing factor, these management levels jointly conducted training in basic *Valdivia* duties and requirements for all of the region's unit supervisors and district administrators in March 2009. Likewise, they jointly retrained all notice agents concerning the substance of the conversation when serving notice, timeliness, and completeness of service document packets. Agents reportedly were provided laminated reminder cards summarizing required steps. To address frequent turnover, Paroles Division plans to make the division audit team and Parole Administrators available to coach other staff; to provide one-on-one training when new hires are in place before full, scheduled trainings; and to repeat trainings on the March 2009 topics periodically. This staff also plans to work with parole agents to improve the timeliness of providing notice documents, the quality of factual summaries, and the accuracy of identifying information.

Leaders have taken steps to address other causes, including reorganizing notice agents' areas of responsibility. They are negotiating for a centralized office with data line capability, support staff, and better access to Board staff;  an improved location for service; and additional times to access parolees to serve them.

The Board, on the other hand, did not demonstrate any serious efforts to address longstanding problems. Reportedly, there was limited inquiry into the problems identified by the Special Master, monitoring reports, and the executive-level committee. The Board appeared not to examine internal practices that may cause or contribute to deficiencies; it did not issue corrective action plans as requested. Staff reportedly initiated discussions to

PDF created with pdfFactory trial version www.pdffactory.com

improve inter-division coordination, which certainly is part of this puzzle. Otherwise, the Board did not appear to attempt solutions.

These omissions are particularly troubling. All divisions have contributions to make to improving compliance at Los Angeles County Jail, and the Mastership will look to the Board for more participation.

## Remedial Sanctions

Defendants have continued to make consistent and good progress on meeting the requirements of the Remedial Sanctions Order[2] and have begun to lay the foundation for the broader discussion of what additional steps may be needed to achieve compliance with the Permanent Injunction. Defendants have demonstrated consistency in their efforts to meet the benchmarks of the Remedial Sanctions Order, maintained the progress achieved in prior Rounds, and have made progress on further enhancing and institutionalizing the use of remedial sanctions. It is the opinion of the Special Master that the Defendants have continued to meet the following benchmarks of the Remedial Sanctions Order:

- Establish policies and procedures necessary to implement both interim and long-term remedial sanctions;

- Provide training regarding the remedial sanction programs and the implementation of policies and procedures;

- Establish 1,800 In-Custody (or In Community) Drug Treatment Program ("ICDTP") beds for use as remedial sanctions;

- Establish a minimum of 400 ICDTP beds per region;

- Establish a minimum of 40 ICDTP beds per region for female parolees;

PDF created with pdfFactory trial version www.pdffactory.com

- Establish a minimum of 20 ICDTP beds per region for dually diagnosed parolees;

- Have 500 electronic monitoring units available statewide and dedicate the use of 250 of these to remedial sanction placements;

- At the discretion of CDCR, provide telephone service for use in electronic monitoring;

- Make available one-half of Residential Multi-Service Center, Female Residential Multi-Service Center, and Parolee Service Center beds for remedial sanctions until 1,800 ICDTP beds are available;

  - § Given the success in meeting the objective of establishing and filling 1,800 ICDTP beds, it is no longer necessary to continue reserving half of the interim remedial sanction beds for parolees in the revocation process;

- Report every 60 days regarding the development and implementation of a parole decision-making matrix;

- Modify policy to allow for the temporary placement of out-of-county parolees into remedial sanction programs;

- Develop a system by which every Paroles Division and Board decision-maker is able to determine the availability of ICDTP remedial sanctions statewide on any given day; and

- Provide parolee defense counsel all program policies and procedures, to include exclusionary and inclusionary placement criteria.

In addition, the following issues were identified in the last Round as areas in the

Remedial Sanctions Order that may require additional exploration.

- There has not yet been the development of a system by which every Paroles Division and Board decision maker is able to determine the availability of electronic monitoring remedial sanctions statewide on any given day.

- While there are ICDTP beds in each region for female parolees and also a Female Residential Multi-Service Center, there has not yet been discussion regarding the issue of whether women are offered an equivalent service or equal access to remedial sanctions. The issue of equivalency for disabled parolees has not yet been fully explored. Defendants are revising their policies and procedures to ensure equal access.

13

- Defendants have done several rounds of training for decision-makers in the *Valdivia* process. Data analysis in this Round shows evidence of remedial sanctions being considered at each stage in the revocation process, but it is unclear if actions to date are adequate. There is no defined plan for how to track the consideration of remedial sanctions at each stage in the proceeding.

- While there is clear evidence of the use of other programs that are not specifically called remedial sanctions to avert revocation, it is not clear what is the standard to achieve the benchmarks regarding "alternative placement in structured and supervised environments" and "self-help outpatient/aftercare programs."

Removed from this list is the issue of availability of Electronic In-Home Detention equipment, equivalency of services for parolees with disabilities, and consideration of remedial sanctions at each step of the *Valdivia* process. There are no known problems with lack of availability of Electronic In-Home Detention equipment. As seen in the section on Parolees with Disabilities, the Defendants have created a system to further refine which community-based providers are best equipped to serve specific disabilities and will place parolees accordingly. Similarly, the data supports that decision-makers throughout the *Valdivia* process are considering remedial sanctions. The question remains whether the decision-makers are knowledgeable enough about the array of remedial sanctions to make judicious placements. This is an issue that can continue to be discussed in the context of the broader Permanent Injunction. It is the opinion of the Special Master that the remaining issues can also be discussed in the context of the broader Permanent Injunction and that the Defendants have fully met the requirements of the Remedial Sanctions Order.

> § Defendants have completed all of the requirements of the Remedial Sanctions Order. There is continued and good compliance and progress on this item.

PDF created with pdfFactory trial version www.pdffactory.com

*Policies and Procedures*

The most notable accomplishment in this Round with regard to Remedial Sanctions policy and procedures was the agreement reached by parties to eliminate the interim policy that Defendants make available one-half of Residential Multi-Service Center, Female Residential Multi-Service Center, and Parolee Service Center beds for remedial sanctions until 1,800 ICDTP beds are available. Policy 09-02 that rescinds Policy 07-04 was issued on February 24, 2009 and takes effect on March 24, 2009.[3]

Defendants have continued to use the programs listed above as resources for parolees in the revocation process. Because Defendants have consistently demonstrated their ability and commitment to keeping the 1,800 ICDTP beds filled, this interim measure designed to create options for parolees as an alternative to revocation when there were not 1,800 ICDTP beds available is no longer required.

Another area of notable progress was the revision of the permanent ICDTP policies and procedures.[4] After lengthy negotiations between the parties, the policies and procedures were revised to clarify the changes in practice that have resulted from the transfer of many ICDTP functions from the Paroles Division to the Division of Addiction and Recovery Services, to distinguish between the procedures for the community-based program and the jail-based program, and to address Plaintiffs' concerns regarding parolees with disabilities. The policies are in negotiations with labor and have not yet been sent to the field for implementation.

It is the belief of the Special Master that the issue of interim policies and procedures no longer needs to be addressed after this Round because Defendants have not only implemented permanent policies and procedures that meet all the requirements of

PDF created with pdfFactory trial version www.pdffactory.com

the Remedial Sanctions Order, but have moved into a stage of revising and improving the permanent policies and procedures.

§ Defendants have completed all of the requirements of the Remedial Sanctions Order contained in the Long-Term Memorandum Regarding Remedial Sanctions. There is continued and good compliance and progress on this item.

### Interim Remedial Sanction Placements

In a meet and confer session on November 26, 2008,, Defendants informed Plaintiffs that having met the Remedial Sanctions Order benchmark for making available and filling 1,800 ICDTP beds, they would no longer dedicate one-half of the Residential Multi-Service Center, Female Residential Multi-Service Center, and Parolee Service Center beds for remedial sanctions. Defendants agreed to share the policy memo with the Plaintiffs prior to disseminating it to the field. Plaintiffs requested 60 days' notice before implementation of the policy memo. On February 24, 2009, policy 09-02 was issued; it amends policy 07-40. Implementation of the policy began on March 24, 2009.

Defendants have indicated that they are only removing the reservation of one-half of these program beds for remedial sanctions and will continue to encourage parole agents to refer parolees in the revocation process to these programs. Policy 09-02 explicitly states "programs available as remedial sanctions include Residential Multi-Service Centers, In-Custody Drug Treatment, Parolee Substance Abuse Program, Community-Based Coalition, Female Residential Multi-Service Center, Day Reporting Centers and Substance Abuse Services Coordination Agencies" and encourages parole agents to use these programs as remedial sanctions. The omission of Parolee Service Centers was an oversight and they remain a placement option for parolees in the

PDF created with pdfFactory trial version www.pdffactory.com

revocation process.[5] Because the agreement regarding this matter was arrived at so late in the Round, a brief exploration of the use of the interim remedial sanction placements during the Round was undertaken by the Special Master's team.

Measuring the use of Residential Multi-Service Centers was done through comparing the Residential Multi-Service Center tracking sheet[6] and reports from the revocation database titled Closed Case Remedial Sanctions by Decentralized Revocation Unit[7] for the period of the Round. The majority of referrals to Residential Multi-Service Centers continue to be made by parole agents and there is growth in the number of other decision-makers throughout the process who are using interim remedial sanctions.

In past Rounds, the data regarding interim remedial sanctions in the Remedial Sanctions Monthly Workload Report for Residential Multi-Service Centers and the Female Residential Multi-Service Center aligned with internal Paroles Division data systems. This trend continues for the Female Residential Multi-Service Center. In this Round, the Parolee Service Center data also aligns with the revocation database information.[8] The revocation database and the Paroles Division Residential Multi-Service Center placement numbers are slightly different. The differences in data sources are insignificant enough that the Remedial Sanctions Monthly Workload Report will be used as the source of assessing the use of interim remedial sanctions.

As seen in Table 1, the number of interim remedial sanction referrals has remained consistent for the Round and there are differences from the last Round in some trends. The number of remedial sanction referrals to the Female Residential Multi-Service Center and Parolee Service Centers has remained largely the same since the last Round. The number of remedial sanction referrals to Residential Multi-Service Centers has

PDF created with pdfFactory trial version www.pdffactory.com

dropped from an average of 177 per month for the eight-month period from February to August, 2008 to 74 per month for the five-month period of this Round. The revocation database data shows fewer placements than the Paroles Division tracking sheet. It is unclear if the revocation database data is underreporting referrals or if the decline is an artifact of having more ICDTP placements available and, thus, less reliance on the interim remedial sanctions. Despite this discrepancy, Defendants have clearly demonstrated the use of interim remedial sanctions throughout the Round.

**Table 1** [9]
**Interim Remedial Sanction Referrals**

| Month | Residential Multi-Service Center | Female Residential Multi-Service Center | Parolee Service Center |
|---|---|---|---|
| September08 | 72 | 19 | 77 |
| October 08 | 64 | 17 | 74 |
| November 08 | 66 | 24 | 74 |
| December 08 | 79 | 14 | 20 |
| January 09 | 90 | 21 | 82 |

In light of the agreement to no longer designate one-half of the beds in Residential Multi-Service Centers, the Female Residential Multi-Service Center, and Parolee Service Centers for remedial sanctions, it is the opinion of the Special Master that after this Round, assessment of the use of these programs will continue as part of the remedy for the Permanent Injunction but not under the terms of the Remedial Sanctions Order. Until such time as agreement has been reached between the parties regarding what constitutes

PDF created with pdfFactory trial version www.pdffactory.com

substantial compliance for remedial sanctions under the Permanent Injunction, no further monitoring of these programs will be done by the Special Master.

> § Defendants have completed all of the requirements of the Remedial Sanctions Order regarding the use of interim remedial sanctions. There is continued and good compliance and progress on this item.

### *Expanding Jail and Community-Based ICDTP Programs*

The Remedial Sanctions Order required the Defendants to make every reasonable effort to establish 1,800 ICDTP beds by April 1, 2008. In addition, it requires that there be no fewer than 400 ICDTP beds per region, and no fewer than 40 ICDTP beds designated for female parolees in each region. The Remedial Sanctions Order also indicates that Defendants shall make every effort to secure 20 beds in each region that target the needs of parolees with dual diagnoses of mental illness and substance abuse. Defendants have continued to refine their strategies and systems to meet the requirements of the Remedial Sanctions Order. They have done an excellent job of creating a pool of identified beds that ensures availability of the type and number of beds required by the Remedial Sanctions Order. As of January 30, 2009, there were 1,830 parolees in ICDTP beds throughout the state.[10] Defendants have demonstrated high use of the ICDTP programs throughout the Round.

Table 2 demonstrates that there has been a slight change in the numbers and location of community-based and jail-based beds. This table reflects the best estimate of ICDTP beds designated for each region. The "available beds" is a list created daily that indicates, by community-based program, where there is space available.[11] An available bed is one in which a parolee could be placed within 5 days. In each region, Defendants remain in compliance with the Remedial Sanctions Order.

PDF created with pdfFactory trial version www.pdffactory.com

**Table 2[12]**
**ICDTP Beds by Region**

| Type of Bed | Region I | Region II | Region III | Region IV |
|---|---|---|---|---|
| **Total Jail-Based** | 478[13] | 220 | 0 | 72 |
| **Total Community-Based** | 124 | 280 | 600 | 330 |
| **Female[14]** | 80 | 75 | 60 | 86 |
| **Total Beds** | 602 | 500 | 600 | 402 |

As identified in Table 3, the number of identified community-based ICDTP beds as of January 31, 2009 was 2,461. The term "identified beds" is the number of beds the Substance Abuse Services Coordination Agencies and providers have agreed is a realistic representation of potential availability for any given program. The Division of Addiction and Recovery Services maintains a list of identified beds statewide. This number is significantly higher than the 1,800 beds agreed to in the Remedial Sanctions Order because of the fluctuations in movement of the multiple contracts of the community-based ICDTP providers.

PDF created with pdfFactory trial version www.pdffactory.com

**Table 3[15]**
**Division of Addiction and Recovery Services**
**Provider Counts Tracking**



Community Based ICDTP Bed Capacity By Region
Total Capacity 2461 Beds

Region IV 524
Region I 811
Region III 630
Region II 496

Region I
Region II
Region III
Region IV

Most important is the data from this Round that shows a very high level of occupancy in both the jail-based and community-based programs. In residential settings, maintaining an occupancy rate in the 90th percentile is, at best, challenging and is rarely achieved. The Defendants' system of creating a pool of identified beds has resulted in their ability to maintain very high occupancy rates. Table 4 shows the average number of parolees in jail- and community-based programs by month during this Round.

PDF created with pdfFactory trial version www.pdffactory.com

**Table 4**[16]
**Average Number of Participants Statewide**[17]

| Month | Average Number of Participants Statewide |
|-------|------------------------------------------|
| September 08 | 1,812 |
| October 08 | 1,770 |
| November 08 | 1,698 |
| December 08 | 1,728 |
| January 09 | 1,827 |

Plaintiffs have continued to raise concerns about the validity of the number of beds attributable to specific programs.[18] It is the Special Master's opinion that the number of identified and available beds is not of concern as long as the system results in filling the 1,800 beds agreed upon in the Remedial Sanctions Order. Who the Defendants contract with and in what number is relevant only if there is a failure to meet the requirements of the Remedial Sanctions Order. This issue will again be addressed in the discussion of ICDTP monitoring.

Plaintiffs have raised concerns regarding the measures taken by the Division of Addiction and Recovery Services to keep the number of placements in jail and community-based ICDTPs within their budget authority. Placements have averaged higher than the 1800 beds authorized by the Defendant's budget in some months and resulted in a reduction in placements in other months to ensure staying within the legislatively authorized budget allocation.

Concerns were also raised during the last Round by Plaintiffs that many system decision-makers, such as Deputy Commissioners, did not have accurate or timely

PDF created with pdfFactory trial version www.pdffactory.com

information regarding the nature of the programs and bed availability.[19] One measure of progress in this area is the number of ICDTP placements ordered by Deputy Commissioners. Recognizing the difference in timing between placements and referrals, out of 8,835 parolees in jail- and community-based ICDTP programs in this Round, there were 3,639 Board referrals to jail- and community-based ICDTP programs.[20] It would appear that approximately 40% of the cases are being referred through Board actions, which may, in turn, indicate that many Deputy Commissioners are familiar with the program.

Another issue from the last Round is that of unacceptably long time periods to transfer parolees from some jails and institutions to ICDTP community-based programs. While the full number is not known and the cases appear small in number, more examples of delays have occurred in this Round. Defendants began an audit process this Round to attempt to better understand any impediments in the referral and placement process with a major focus on the transportation delays from jails and institutions to ICDTP programs. The audit for Region I was completed and the Region II audit is underway.[21]

The Division of Addiction and Recovery Services has implemented the first recommendation from the Region I audit. To expedite the transfer process from jails to ICDTP, once the Board has identified a referral to ICDTP, the referral is immediately forwarded to the Division of Addiction and Recovery Services to initiate the placement process. It is hoped that this change in practice will expedite placement timeframes.

Despite not having completed the Region II audit, the Division of Addiction and Recovery Services has made a change at the Humboldt County Jail.[22] Historically,

PDF created with pdfFactory trial version www.pdffactory.com

parolees were moved immediately, which resulted in the parolees going to a CDCR institution, where they were held to schedule transportation to the ICDTP. Upon arriving at an institution, parolees must go through a medical screening process, which slows their transfer. Rather than moving parolees immediately, Humboldt County Jail has agreed to provide time for the Division of Addiction and Recovery Services to find a bed in a local ICDTP program. If a local bed is available, the parolee is moved directly to the program, eliminating the waiting period at the institution. Five parolees have now been moved directly to a program as a result of this change.

Another important change is the modification of the revocation database so that the Division of Addiction and Recovery Services has immediate access to the names and CDCR numbers of parolees who accept ICDTP placement. This eliminates time taken to generate placement lists in the field and send them to headquarters, and results in faster transfers of parolees to ICDTP programs.[23]

Transportation issues are often complex and thorny. The Defendants are attempting to understand the problem and to devise solutions. Given the different nature of local jails, it is quite possible that there is no one policy change that will solve this problem. It is likely, as was seen in the Humboldt County Jail that solutions will require unique agreements in different locations throughout the state.

§ Defendants have completed all of the requirements of the Remedial Sanctions Order regarding the availability of 1,800 ICDTP beds. There was continued and good compliance and progress on this item.

### Creating ICDTP Options for Dually Diagnosed Parolees

During the last Round, Defendants demonstrated the availability of more than 20 *credible* beds for dually diagnosed parolees by community-based ICDTP providers in

PDF created with pdfFactory trial version www.pdffactory.com

each region but it was unclear what the actual usage of the beds was. The Division of Addiction and Recovery Services is now tracking the use of the beds for the dually diagnosed parolee and it is clear that placements are being made in community-based ICDTPs.[24] Upon request, the Division of Addiction and Recovery Services provided the Special Master a list of all CCCMS parolees in ICDTP programs in every region. The list was provided immediately and demonstrates that placements are being made of dually diagnosed parolees.

The Division of Addiction and Recovery Services has created a system whereby the Parole Outpatient Clinic in the parole office where the community-based ICDTP is located is notified of any medication or treatment needs of a dually diagnosed parolee.[25] The Parole Outpatient Clinic works with the ICDTP provider to access any needed medications. This system ensures that any medications needed for mental health issues are provided. There are no known incidents of parolees being moved from one of the ICDTP programs designated for dually diagnosed parolees due to lack of resources or the ability to address mental health needs. There have been some challenges with the ICDTP providers not being able to accommodate medical needs for parolees with unusually serious conditions. The Division of Addiction and Recovery Services is working to refine the placement system to attempt to remedy this situation. It appears that the current system of the Division of Addiction and Recovery Services to match referrals with providers is working well.

Plaintiffs contend that there is not yet enough information to know if the programs meet the standard for targeting persons with co-occurring mental health and drug and alcohol disorders. Plaintiffs note that The Division of Addiction and Recovery

PDF created with pdfFactory trial version www.pdffactory.com

Services created qualifications that the provider must meet to serve parolees with co-occurring disorders and shared these with the Plaintiffs and the Special Master in 2007. All parties approved the standards. The Special Master believes that the establishment of these criteria demonstrates that the Defendants have the capacity to provide the type of services needed for this parolee population. The Special Master is also of the opinion that neither the *Valdivia* Injunction or Remedial Sanctions Order require an evaluation of the quality of services to be provided.

Unclear is the extent to which parolees designated as Enhanced Outpatient Parolees (EOP) are being served in ICDTP programs. This population, while smaller than the CCCMS population, often has more complex needs and is more difficult to serve. Also unclear is the level of referrals for the CCCMS and EOP populations from parole agents, Unit Supervisors, Parole Administrators, Deputy Commissioners, and parolee counsel.

§    Defendants have completed the requirements of the Remedial Sanctions Order regarding the availability of 20 ICDTP beds for dually diagnosed parolees per region. There is continued and good compliance and progress on this item.

### *Accommodating Parolees with Disabilities*

Defendants' February 2009 Compliance Report shows some evidence of placement of parolees with disabilities in ICDTP community-based programs. It is still not clear the rate or level at which these placements are being made. It is clear that there are many community-based ICDTP programs that believe they are capable of serving this population and that the Defendants are in the process of refining their decision criteria for which ICDTP community-based program is most capable of serving which parolees with a particular disability.

PDF created with pdfFactory trial version www.pdffactory.com

Despite not having sent the revised ICDTP policies to the field, the Division of Addiction and Recovery Services has implemented and tested the changes regarding parolees with disabilities. Real-time access to the disability database system, having a contract with the Substance Abuse Services Coordination Agencies for interpretation services, and maintaining a list of certified interpreters are all now practices of the Defendants. While it is yet unclear if the ICDTP Self-Disclosure Questionnaire is having its intended result of providing better information to community-based providers and thereby ensuring better matching of parolees to programs, it is being used and will be monitored for results.[26]

As a part of their ongoing process improvement, the Division of Addiction and Recovery Services has engaged the California Association of Addiction Recovery Resources, which is funded through federal block grant dollars to the California Health and Human Services Agency, Department of Alcohol and Drug Programs, to audit community-based ICDTP programs. This entity has a Disability Access Project which provides training and assessment services for programs that provide services to disabled people. The Disability Access Project is scheduled to provide a workshop for all ICDTP community-based providers. Through a check list audit process, the workshop helps providers to understand their obligations under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, and how to develop an "Access to Services Plan." This plan ensures that providers can accommodate parolees with disabilities.[27] "Following these training sessions, the subcontractors who wish to have their community-based ICDTP considered for placement of parolees with disabilities will need to schedule a time for [the Disability Access Project] to tour the facility and perform an

PDF created with pdfFactory trial version www.pdffactory.com

ADA accessibility audit. The Division of Addiction and Recovery Services will use the results of [those] audits to create a matrix of those ICDTP community-based providers which can accommodate various types of disabilities, and this information will be used for placement purposes." [28] The target date to complete the program audits is July 1, 2009.

Defendants have revised their policies and procedures to ensure equal access for parolees with disabilities. Once labor negotiations have concluded the policies should be sent to the field and any remedial training required must be done. Besides having created sound policy that supports services for disabled parolees, the Defendants have created an additional screen for community-based ICDTP programs with the Disability Access Project training and audits.

Section VII. C of the Remedial Order states that "Defendants plan to provide remedial sanctions to parolees with disabilities that are the same or equivalent to parolees without disabilities…" Plaintiffs contend that not knowing the rate of placement of parolees with disabilities in community-based ICDTP is basis for non-compliance. The Special Master believes that the requirement for equivalency for disabled parolees in the Remedial Sanctions Order has been met because Defendants have and continue to demonstrate that they have the capacity to serve parolees with disabilities. The Special Master agrees with Plaintiffs that continued monitoring is needed to ensure that the systems for serving the disabled are in place and working..

> § Defendants have completed the requirements of the Remedial Sanctions Order regarding accommodating parolees with disabilities. There is continued and good progress and good compliance on this item.

PDF created with pdfFactory trial version www.pdffactory.com

### Out of County Transfers

Defendants continue to demonstrate that they do provide out-of-county transfers in all regions of the state.[29] At the request of the Special Master, Defendants shared tracking sheets that demonstrate consistent use of out-of-county transfers.

§ Defendants have completed the requirements of the Remedial Sanctions Order regarding the out of county transfer requirement. There is continued and good compliance and progress on this item.

### Electronic In-Home Detention

Two data sources were reviewed for the use of Electronic In-Home Detention. Both sources support use of Electronic In-Home Detention but at different rates. As in the last Round, the monthly tracking data from the Electronic In-Home Regional Coordinators shows a significantly higher number of uses of Electronic In-Home Detention for remedial sanctions than does the revocation database.[30]

The revocation data for June and July 2008 documented over 200 placements, which begins to approximate the agreed upon number of 250 in the Remedial Sanctions Order. This number declined from August 2008 through December 2008, reaching a low of 164 Electronic In-Home Detention placements in December 2008. In January 2009, the number increased to 208 Electronic In-Home Detention placements.[31] When compared to the Paroles Division internal data, the revocation database typically underreports usage of most remedial sanctions, including Electronic In-Home Detention.

The data collected by the Paroles Division Regional Electronic Monitoring Coordinators indicates much higher usage. The coordinators report an average of 364 Electronic In-Home Detention remedial sanction placements for the Round.[32] It appears more work is needed to encourage parole agents and Unit Supervisors to record the use of

PDF created with pdfFactory trial version www.pdffactory.com

electronic monitoring in the revocation database. Recognizing the continued challenge of consistent reporting in the revocation database, the hand counting of the Regional Electronic Monitoring Coordinators is largely supported by the revocation database.

Questions have been raised regarding whether Paroles Division and Board decision-makers are able to determine the availability of electronic monitoring remedial sanctions statewide on any given day. There have been no identified instances of refusals to recommend Electronic In-Home Detention due to lack of resources during the Round. Paroles Division staff has indicated that at this time, placements would have to exceed 600 placements for there to be a shortage of equipment and thus inability to place a parolee on Electronic In-Home Detention.

§ Defendants have completed the requirements of the Remedial Sanctions Order regarding the dedication of 250 electronic monitoring units for use as remedial sanctions. There is continued and good compliance and progress on this item.

### Decision Matrix

As noted in the last Round, the *Valdivia* process in and of itself will not achieve a reduction in the number of unnecessary parole revocations. This outcome can only be achieved by helping parole agents to think more broadly and sometimes differently about revocation and its likely impacts. One way to help parole agents is by providing evidence regarding the impact of their decisions. To do this requires a structured decision-making process that can be evaluated for outputs and outcomes.

The Paroles Division has worked long and hard with experts across the country to develop the needed elements of an effective structured decision-making process. The decision-making process considers assessed risk, violation severity, and stabilizing or destabilizing factors. While this process is part of an overall strategy that includes

PDF created with pdfFactory trial version www.pdffactory.com

reducing risk of recidivism, enhancing success on parole, and wise use of parole resources, the only aspect of this process that is directly related to the *Valdivia* Permanent Injunction is how the Parole Violations Decision-making Instrument affects revocation outcomes. Typically, the implementation of structured decision-making in the revocation process has been a successful strategy in reducing unnecessary parole revocations in jurisdictions throughout the country that have introduced a similar tool.

The Paroles Division conducted a master trainer training October 14 through 16, 2008. An additional master training session was held November 14 and 15, 2008. Members of the Parole Board, as well as Paroles Division decision-makers and staff, attended the first training session. Some of the Parole Division staff trained in these sessions became the trainers for four regional pilots throughout the state. The training of the pilot sites took place in November 2008.[33]Trainers helped parole agents and Deputy Commissioners to understand the concept and purpose of structured decision-making and evidence-based practice as well as the components of the instrument, which include the California Static Risk Assessment and the decision-making instrument.[34] The instrument includes levels of review for parole agents, Unit Supervisors, and Parole Administrators.

The Board issued a Hearing Directive that explained to Deputy Commissioners that the instrument would replace the activity report that documents parole violations and explained the process for the pilot projects. Deputy Commissioners from each pilot project region typically participated in the pilot trainings.[35]

Implementation of the four pilot projects has gone well and outcome data from the pilot sites was positive enough for the Paroles Division to decide to implement the use of the instrument statewide. Defendants provided notice to Plaintiffs of this action in

PDF created with pdfFactory trial version www.pdffactory.com

advance of the training for remaining parole units and prior to implementation of the related policy.[36]

The decision-making instrument allows for identification of decision-making by parole agents, Unit Supervisors, Parole Administrators, and Deputy Commissioners. A summary of results from three months of its use are shown in Table 5. The data show the percentage of cases where the decision-maker agreed with what the instrument recommended or requested an "override" for a more serious sanction or an "underride" for a less serious sanction than that suggested by the instrument. These data indicate that initial agreement with the tool is relatively high.

The pilot data indicated that in 69% of the cases, parole agents followed the recommendations of the instrument. Parole agents requested a more serious sanction in 17% of the cases and a less serious sanction in 14% of the cases. Additional training and coaching should increase the percent of agreement with the instrument. Unit Supervisors were in agreement with the parole agents in 97% of the cases. Parole Administrators were in agreement with the Unit Supervisors in 91% of the cases, recommended enhanced sanctions for 4%, and recommended a lesser sanction in 5% of the cases. To gain further agreement with the instrument, the Paroles Division will need to continue to work with those supervisors and administrators who are simply agreeing with the prior decision-maker and not reflecting on the merits of the situation.

Deputy Commissioners were in agreement with the Parole Administrator in 85% of the cases. They requested more serious sanctions in 11% of the cases and reduced sanctions were requested in 4% of the cases. This means that 59% of the time, Deputy Commissioners agreed with the instrument, and they requested a more serious sanction

PDF created with pdfFactory trial version www.pdffactory.com

32% of the time. Closer scrutiny of the data seems to indicate that the majority of these overrides are carried out by one or two Deputy Commissioners.

**Table 5[37]**
**Decision-maker Agreement with the Decision-making Instrument**

| Decision-maker | Agreement | Override for more serious sanction | Underride for less serious sanction |
|---|---|---|---|
| Parole Agent | 69% | 17% | 14% |
| Unit Supervisor | 66% | 19% | 15% |
| Parole Administrator | 64% | 25% | 11% |
| Deputy Commissioner | 59% | 32% | 9% |

The initial training and implementation of the decision-making instrument has gone well. While there is room for improvement, initial agreement with the tool recommendations is adequate given how early in the implementation process the results are drawn from. To increase agreement, the Paroles Division and the Board will need to continue to ensure that all staff is thoroughly trained not just in the tool but in the reasoning behind the tool and will need to use the data to provide booster training for staff.

One of the many benefits of structured decision-making is the data it produces. Each decision-maker must provide the reason for not agreeing with the tool. This in turn provides senior managers the data needed to ensure that agency policy and procedure is understood and being followed. For example, the initial list of reasons for not agreeing with the tool tells us that parole agents routinely used community resources as remedial sanctions. Frequently, parole agents cited placement in the Substance Treatment and

PDF created with pdfFactory trial version www.pdffactory.com

Recovery program or other community-based detoxification and/or treatment programs, as well as programs that provide housing. On the other hand, reasons sometimes appeared to not be accurate or in agreement with Paroles Division policy. Senior Paroles Division leaders and Unit Supervisors can look at this data, learn which parole agents understand policy and procedures and abide by them and which do not, and then take appropriate corrective action.[38]

It is imperative that senior managers in the Paroles Division and the Board demonstrate their support for the instrument and the decisions it supports. The instrument provides the data needed for supervisors and managers to ensure that staff is not inappropriately relying on incarceration for classes of parolees who do not represent a public safety risk and will not benefit from a disruption in their parole supervision. The decision-making instrument provides the type of data needed by Paroles Division managers to ensure that the actions taken in the revocation process are aligned with current research regarding what reduces recidivism and thereby enhances public safety.

> § Defendants have made good progress regarding the implementation of a structured decision-making process in the revocation process.

### Consideration of Remedial Sanctions at Each Step

As in the last Round, the data reports titled Parole Administrator Statistics and Closed Case Remedial Sanctions Summary by Decentralized Revocation Unit continue to indicate that referrals to remedial sanctions are being made at all steps of the *Valdivia* process. A different version of the Closed Case Remedial Sanctions Summary by Decentralized Revocation Unit has been created; it tracks the number of remedial sanctions assigned at each step in the *Valdivia* process. Additional measures have been

PDF created with pdfFactory trial version www.pdffactory.com

taken to insure that all decision-makers have access to information about remedial sanctions.

An analysis of Parole Administrator decisions from September 1, 2008 through January 31, 2009 demonstrates that in 5,980 instances, Parole Administrators recommended remedial sanctions or other CDCR or community-based alternatives to revocation. The breakdown of the Parole Administrator decisions is in Table 6. Recognizing that this is a shorter time period than the last Round so the base numbers are smaller, overall percentages of use remain similar. The most significant change is an increase in the use of ICDTP and a decrease in the use of Proposition 36.

It should be noted that there is disagreement between the parties regarding if Proposition 36 is indeed a remedial sanction. Until this issue is resolved references to Proposition 36 do not infer that it is or is not a remedial sanction. This issue will be addressed in discussion regarding the use of regarding "alternative placement in structured and supervised environments" and "self-help outpatient/aftercare programs."

PDF created with pdfFactory trial version www.pdffactory.com

**Table 6[39]**

**Use of Remedial Sanctions by Parole Administrators
September 1, 2008 through January 31, 2009**



In an effort to help both Paroles Division and Board staff understand the full array of remedial sanctions, the Paroles Division added a matrix of remedial sanction programs to its intranet and has provided access to this information to Board staff.[40] The Board has been encouraged to include the use of remedial sanctions in its upcoming Deputy Commissioner training.

The Closed Case Remedial Sanctions Summary report again shows some consideration for the use of remedial sanctions at every step in the revocation process.[41]

PDF created with pdfFactory trial version www.pdffactory.com

The report does not distinguish between a recommendation and a decision. For example, at the probable cause hearings, remedial sanctions were recommended or ordered in 13% of the cases and in 6% of the cases at revocation hearings.

The new Closed Case Remedial Sanctions report that shows recommendations or decisions for each type of remedial sanction at each step of the *Valdivia* process by Decentralized Revocation Unit, demonstrates that the two most heavily used sanctions are Proposition 36 and ICDTP.[42] There is some evidence of use of almost all remedial sanctions by all decision-makers in the *Valdivia* process.

The patterns of use of options other than Proposition 36 and ICDTP may provide information for how the Defendants can increase usage of these options. The use of options other than ICDTP and Proposition 36 varies significantly by Decentralized Revocation Unit and the pattern is not related just to the size of the Decentralized Revocation Unit. It may be an artifact of having a particular program within the geographic region of the Decentralized Revocation Unit or it may be that decision-makers in that location have learned about a particular program and are now referring to it. Defendants might be able to expand the use of remedial sanctions by learning what causes significantly higher usage of some remedial sanctions in certain locations.

§   There is good progress on this item and compliance is good.

**Future Issues**

Monitoring of the use of remedial sanctions in this Round has shown continued and good progress and compliance in almost all areas. Defendants are to be commended for their continued efforts to use remedial sanctions and to establish tracking mechanisms

PDF created with pdfFactory trial version www.pdffactory.com

that can identify where and when usage is occurring in the *Valdivia* process. It is the opinion of the Special Master that at this point in time, the Defendants have met all of the benchmarks of the Remedial Sanctions Order. Future Rounds will focus on ensuring institutionalization of gains made and addressing the broader issue of achieving substantial compliance with the Permanent Injunction requirements.

There remain a few issues that are beyond the scope of the Remedial Sanctions Order that require attention. The issue of delays in transferring parolees from jails and institutions to community-based ICDTP programs remains a concern. The Special Master looks forward to the results from the remaining regional audits by the Division of Addiction and Recovery Services. It is also unclear to what extent parolees designated as Enhanced Outpatient Program are being served in remedial sanctions.

Having met the benchmarks of the Remedial Sanctions Order at this point in time, it is time to focus on how to meet the requirements of the Permanent Injunction. Parties have had one meet and confer in which they reviewed possible models for addressing the larger issue of compliance with the Permanent Injunction.

One area that is not clear that must be addressed in any model is understanding the role that the array of programs that are not identified in the Permanent Injunction but are referenced as structured and supervised environments or self-help outpatient/aftercare programs have in the revocation process. The decision-making instrument data shows clear evidence of use of community-based programs that are not presently identified as remedial sanctions and are used to divert parolees from revocation.[43]

PDF created with pdfFactory trial version www.pdffactory.com

## Mentally Ill Parolees

The parties have worked since 2005 on determining methods to provide due process to parolees who appear unable to participate in revocation proceedings by virtue of mental illness. This involves balancing providing access to treatment in the hope that the person will be able to participate in a defense while ensuring there is legal authority to hold the person.

On January 14, 2008, this Court ordered CDCR to "…undertake and sustain work toward the earliest practical solution to providing due process to parolees who appear, either in the judgment of their attorneys or defendants' staff, too mentally ill to participate in revocation proceedings."[44] That order required consultation with the Special Master's team and Plaintiffs' counsel, and set forth a schedule for updates, plans, policies and procedures, and implementation.

Many ideas were considered, and plan development sometimes progressed, sometimes stalled or reversed course in those years. In the last two Rounds, the parties have worked diligently and they have now agreed upon a plan and have written the policies and procedures. Training is planned for April and May 2009.

Several of the plan's components have been in use. All staff are encouraged to refer parolees to mental health services when it appears needed. Hearings are suspended if the hearing officer is concerned that the parolee cannot meaningfully participate. Attorneys, clinicians, and Board staff communicate about the parolee's condition; this is an important component that should continue. Attorneys meet with these clients, or confer with clinicians, at least at every two weeks, and the Board automatically calendars

PDF created with pdfFactory trial version www.pdffactory.com

this population every two weeks so that hearings can occur promptly when the parolee is ready. CDCR and CalPAP information system tracking methods serve as a failsafe for each other. If a parolee is never able to participate, he is to be released on the expiration of a provisional term given at the "return to custody assessment" stage.

In February, there were about 50 people affected; there were similar numbers at any given time during the Round.[45] A significant number stabilize and participate in hearings. There is evidence that hearing officers mitigate penalties in recognition of mental illness, giving credit for time served or dismissing the charges.[46] The procedure worked as intended in releasing parolees who were never able to have a hearing; this was apparent for at least seven parolees.

Defendants offered an analysis of one such group: As of January 2, 2009 there were 46 parolees on CalPAP's tracking list. Eleven of those parolees were eventually able to resume the revocation process after receiving mental health treatment and had final probable cause or revocation hearings where disposition was reached; seven have been ordered to State Hospitals; three are awaiting a revocation hearing after being deemed able to participate; one is in suspended status and currently located at DMH; and 24 remain in suspended status.[47]

In a complementary order on August 8, 2008, this Court ordered that parolees pending revocation were to have full access to Department of Mental of Health facilities according to *Coleman* Program Guide criteria and without regard to their release date. This practice has been initiated. Parolees have been transferred to acute and intermediate care and to each of the four Department of Mental Health facilities to which *Coleman* patients commonly transfer.[48] Communications indicate as many as 23 parolees have

PDF created with pdfFactory trial version www.pdffactory.com

been referred since August 2008 and at least 13 have transferred. One was rejected and most others apparently remain on the Salinas Valley Psychiatric Program waiting list; resolution is unclear for a handful.[49]

The August 8, 2008 Order also requires the Paroles Division to have parolees evaluated pursuant to California Welfare & Institutions Code §5150 if the parolee's agent takes him into custody and believes the parolee may pose a danger to himself or others by virtue of his mental condition. During the last Round, CDCR distributed policies referencing this requirement. Staff assert that this has been a longstanding practice for parole agents. Neither the Special Master nor the parties examined compliance with this aspect of the Order during this Round.

> § There is good progress and good compliance with most of the Court's Orders concerning the mentally ill. Compliance is unknown as to the use of §5150.

### Information Systems

This Court ordered in November 2006 that Defendants initiate information system application changes to improve their ability to manage revocation proceedings and to demonstrate compliance. Defendants were required to complete the changes within one year and six months of that Order.[50]

The major information system upgrade of the Fifth Round continues to provide better information in multiple areas. Some features necessary to demonstrating compliance, however, remain outstanding. These were discussed from the first Special Master's report, included in project design discussions beginning in 2007, and commented on in each subsequent Special Master's report. They were not included in the May 2008 upgrade and progress in the 10 months since then has produced few results.

PDF created with pdfFactory trial version www.pdffactory.com

Still absent is an ability to show accurately the timeliness of notices of rights, hearings after activated optional waivers, attorney appointment, and open cases for several of the populations with special requirements.

Anticipated revisions to the notices of rights reports appear well-designed; implementation is projected for several months hence.[51] A few of the needed reports exist but do not capture a critical element, or do not perform simple calculations, merely producing vast lists. This leaves staff with only the option to manually calculate information on dozens, sometimes hundreds, of pages to demonstrate compliance levels, when a straightforward logic change could produce viable reports.[52] Most of the revocation extension reports do not serve well and are little used; reportedly they will require reworking as well.

Importantly, there was progress by creating new reports for remedial sanctions recommendations and placements.[53] Staff reported that they continued to revise the system to improve functionality for operations. They also initiated a report that counts supplemental charges,[54] and they report having a tool to review confrontation rights objections. They report that they also upgraded several aspects of the disability database that serves both *Valdivia* and *Armstrong* functions.[55]

It is now almost a year since the changes were ordered to be complete. It will be important for Defendants to concentrate on finishing the basic tasks necessary to demonstrating compliance with this Order.

§   There is adequate progress and adequate compliance on this requirement.

PDF created with pdfFactory trial version www.pdffactory.com

## Internal Oversight

In prior Rounds, Defendants created the Office of Court Compliance consistent with the *Valdivia* Court's November 13, 2006 Order. Staffing remains as it was in Round Five, with nearly half of the positions vacant or on assignment to another department. Only one of the five leadership and Deputy Commissioner positions is filled.[56] While the unit is staffed by highly skilled and dedicated people, this situation is untenable if the Department wishes to assume more responsibility for monitoring in the short-term and for ending court oversight.

This group continues to conduct site visits to monitor Decentralized Revocation Units, a few jails and parole units, and to interview at CalPAP offices. Staff use good methods to identify problem areas and questions, in advance of visits and during them, and to provide meaningful feedback. CDCR does not empower them to direct or enforce corrective action, a significant limitation not usually seen in an office such as this.

Court Compliance staff continued work on an information system that should serve their efforts well, and are designing audit tools to ensure a rigorous and systematic review during site visits.[57]

In addition to the Office of Court Compliance, efforts continue as described in prior reports of the Special Master, through divisions' management, the Quality Control Unit, and the multidisciplinary task force.

§    There is adequate progress and adequate compliance on this requirement.

PDF created with pdfFactory trial version www.pdffactory.com

### Permanent Injunction Requirements

*Meet periodically regarding policies, forms, and plans; submit policies and procedures to the court no later than July 1, 2004 with full implementation by July 1, 2005*
*Complete implementation of policies and procedures by July 1, 2005*

Defendants met the initial timeframe for submitting policies and procedures to the Court, though the parties remain in dispute as to the adequacy and completeness of those policies. Throughout the term of the Special Master's involvement, the parties have maintained a reasonable pace in negotiating these differences, resolving some and bringing others to the Court for resolution. Full implementation has not been achieved more than three years after the Court-ordered deadline.

During the Round, the parties conferred on policies or forms concerning mentally ill parolees, attorney access to clients, decision review, confrontation rights, revocation extension, systems to fulfill ADA requirements, remedial sanctions, and other matters of operations. Many of these reportedly have been finalized.[58] Toward the end of the Round, the parties resumed an effort to determine whether all needed policies have been identified and to indicate which policies and forms are complete and which require further negotiation.[59]

Previous reports of the Special Master have detailed substantial difficulty with CDCR's compliance with the provision of the Permanent Injunction requiring the parties to meet and confer before draft policies are finalized and disseminated. There continued to be instances in this Round when CDCR released policies contrary to this dictate. Most notably, these concerned two policies related to confrontation rights, which was also the

PDF created with pdfFactory trial version www.pdffactory.com

subject of a pending appeal and additional obligations to meet and confer under this Court's subject-specific orders.[60]

In response to Plaintiffs issuing a notice of violation and the Special Master convening a meeting on point,[61] CDCR appropriately put in place an oversight mechanism to reduce these breakdowns in future. Executive staff issued instruction introducing this mechanism and reinforcing the requirement.[62] These are important steps forward.

§    There is adequate progress and adequate compliance on this requirement.

*Appoint counsel for all parolees by Return to Custody Assessment (RTCA) stage of revocation hearing*

CDCR continued to improve in providing revocation packets to CalPAP by the agreed upon date; this occurred timely in 95% of cases measured, according to CalPAP data and a study conducted by CDCR.[63]

Deficiencies were consistently highest at the decentralized revocation units associated with CalPAP's Madera office, in the range of 22% to 38% of the cases; Wasco State Prison and California Institution for Men also tended to have high numbers of late assignments.[64] The problem in Madera has continued unabated for several Rounds and should be addressed. When packet provision was late, data does not reflect the amount of time, so one cannot practically determine whether there was sufficient time to prepare a defense or whether postponements were taken.

Rio Cosumnes Correctional Center, Santa Rita County Jail and High Desert State Prison consistently had the strongest performance. A number of facilities had 100% timeliness at some point in the Round.

45

The Special Master previously has reported the parties' and CalPAP's concerns about documents missing from packets and about notice of hearing schedules close in time to the hearings themselves. The Special Master's team understands that these issues continue, although we do not know to what degree.

CalPAP has again not only provided excellent representation for parolees but has contributed in many ways to improving the *Valdivia* process. CalPAP continues to provide important input to key *Valdivia* task forces and operational committees. This Round, CalPAP played a central role in helping to design a fair, flexible and efficient system for decision review. When challenges arose with community-based providers not having adequate information regarding remedial sanctions placements, CalPAP accepted the task of having parolees complete a form that gives community-based providers much-needed information. CalPAP continues to participate regularly in the *Valdivia* task force and ad hoc committees and, from all reports, provides an invaluable perspective that is trusted by the parties.

§    There is adequate progress and good compliance with this requirement.


*Defendants shall develop training, standards, and guidelines for state-appointed counsel*

No new information came to the Special Master's attention through observation or information from the parties.


*If the hold is continued, the parolee will be served actual notice of rights, with a factual summary and written notice of rights, within 3 business days*

Although information system changes have been undertaken, they are not yet sufficient to accurately demonstrate the timeliness of service. Data maintained by

PDF created with pdfFactory trial version www.pdffactory.com

CalPAP presents a very large, reliable sample. It shows that 90% of the mainstream cases were known to be timely, a figure very similar to the last Round.[65]

Defendants also undertook an internal review of a reasonable-sized sample of revocation packets and database records. They found that 95% of the notices were timely in that sample.[66] Most occurred soon thereafter, so that 99% were completed by one day after the deadline. The longest time to service was seven business days from the hold.

The lowest compliance percentages were at Pitchess Detention Center, Santa Rita County Jail, and Los Angeles County Jail, although the latter improved during the Round. These jail sites routinely had late service percentages in double digits. Richard J. Donovan Correctional Facility, Rio Cosumnes Correctional Center, and High Desert State Prison consistently had the best performance.

There was a much lower compliance rate for one of the special populations, those returned from out of state for revocation proceedings. While there were only 1,191 cases during the Round, service was accomplished timely for only 78% of them.[67] This is a substantial decline from previous periods.

The data system shows unsuccessful service attempts; these could ultimately have been completed timely, but the system does not yet show the time to completion for them. Half of these attempts continued to occur at one facility, Los Angeles County Jail.[68] By far the most frequent reason recorded was that the parolee was in transit to or from another location; this occurred in half of the cases.[69] The parolee being out to court was shown nearly as often (42% of unsuccessful attempts). These both may be reduced by improving systems of communication, routines for checking information on public websites, or other mechanisms.

PDF created with pdfFactory trial version www.pdffactory.com

Several other obstacles of concern occur at a fairly low frequency. Only 24 attempts were not completed because of the parolee's medical condition, and only 42 because the parolees were in inpatient mental health treatment. Lockdowns prevented service on 214 occasions. This happened a handful of times at most institutions, and the highest proportions were at Los Angeles County Jail, Santa Rita County Jail, and California Institution for Men. In 24 cases, the reason was recorded as Administrative Segregation. There should be systems in place so that parolees in this housing can be served within *Valdivia* timeframes. The Special Master does not know the facts of these cases, but would not normally consider this to be a good cause reason. The fact that service might still have been accomplished timely, and the small number of persons affected, do not suggest the need for an urgent response, but this topic should be monitored for whether it is being handled appropriately

A complementary report shows another 695 unsuccessful attempts that would not be repeated because the parolees were released from custody, transferred out of state, or died. This is a rate similar to the prior Round. More than half occurred at Los Angeles County Jail; the others were about equally distributed. None recorded reasons such as parolees' medical or mental incapacity; those parolees were always included on the list to retry.

Monitors and the Special Master generally note that service is conducted reasonably, with notice agents reviewing with the parolees their rights, charges, and expectations for the process. Plaintiffs sometimes relate concerns about disability reviews, effective communication, and privacy and related safety risks.

PDF created with pdfFactory trial version www.pdffactory.com

Substantive concerns with the notice and charge documents tend to revolve around the factual summary of the conduct and alleged violation, and whether all charges are contained in the original notice.

In self-monitoring reports from this Round, Defendants reviewed 546 revocation documents to determine the adequacy of the factual summary of charges in the notice of violation.[70] The Office of Court Compliance has noted that 172 of the 546 notices of charges did not have adequate factual summaries. High Desert State Prison had the best record with 100% of 20 documents with an adequate factual summary of charges. California Institution for Women had the worst record in the third quarter of 2008 with 55% of 49 forms having inadequate factual summaries. By the first quarter of 2009, California Institution for Women had improved by 10%, reducing its rate of inadequate factual summaries to 44%. The majority of institutions that were monitored during the Round had inadequate factual summaries in the twentieth percentile.

The Office of Court Compliance and Paroles Division have appropriately been emphasizing the need to improve this practice. For at least two Rounds, they have collaborated on designing and delivering training, reinforcing the expectations, and monitoring performance.

The parties take different positions regarding the need to include all charges in the original notice. Defendants argue that this is not feasible and that due process is not violated when there are supplemental charges. Plaintiffs contend that adding charges after notice prejudices the ability to prepare a defense, and undermines the requirement and its purpose. Both agree, however, that it is desirable to lessen the occurrence of supplemental charges when those charges were known or reasonably easily discoverable

PDF created with pdfFactory trial version www.pdffactory.com

by the parole agent. Defendants' Office of Court Compliance and Paroles Division continue to emphasize this point in supervision, training, and monitoring. Supplemental charges occurred at a rate of 137 per month, according to the CDCR database.[71]

§   There is limited progress and adequate compliance on this requirement.

_Counsel shall have timely access to all non-confidential reports, documents, and field files_

CalPAP data shows one objection during a revocation hearing based on an attorney being denied access to a field file.[72] Otherwise, no new information came to the Special Master's attention through observation or information from the parties.

§   There is good compliance on this issue.

_Parolee's counsel shall have the ability to subpoena and present witnesses and evidence under the same terms as the State_

On the whole, monitors and the Special Master have observed good practice as to parolees subpoenaing and presenting evidence. CalPAP data captures 12 objections on point, allegations of cross-examination being limited, witnesses or documents being denied or excluded, and what appears to be a charge that CDCR prisoner-witnesses were not transported or permitted. Only two of those objections were granted.[73]

These issues are of concern, though the apparently low frequency is commendable.

§   There is adequate compliance on this issue.

_Hearsay evidence must be limited by parolees' confrontation rights under controlling law. Defendants are to preserve this balance in hearings and to provide case law-based guidelines and standards._

PDF created with pdfFactory trial version www.pdffactory.com

Pursuant to the Special Master's Report and Recommendations, this Court ordered a revision of policy and procedure consistent with the reading of the law captured in the Special Master's report; a plan for training Deputy Commissioners and Paroles Division staff initially and in continuing education; and plans for setting minimum standards for Deputy Commissioners conducting revocation hearings, and for evaluating those hearing officers.[74] That order is on appeal and stays have been denied.

In prior Rounds, there had been poor progress in executing the Court's Order, so the Special Master emphasized this issue in the fifth report and in discussions of priorities with the parties. The parties have accomplished a great deal in the few short months of this year. As a foundation, they have agreed to a new policy. Revisions of prior, conflicting policies are underway. The parties met and agreed on some principles for training; CDCR has submitted a draft training plan and Plaintiffs have returned comments. More will be necessary to generate confidence that the training meets the terms of this Court's Order, but this is important progress.

As least as importantly, the Board has begun meaningful oversight to improve practice. The Office of Court Compliance continued to seek, on its site visits, hearings where confrontation rights were likely, reviewing 10 during this Round.[75] The Board issued plans to review hearing records and tapes.[76] An experienced Associate Chief Deputy Commissioner drafted minimum standards, as the Order requires, and those have been refined in consultation with Plaintiffs, CalPAP, and the Special Master, with agreement close at hand.[77] The Quality Control Unit and the Associate Chief Deputy Commissioner work jointly to carry out the review, and they issue detailed instruction

PDF created with pdfFactory trial version www.pdffactory.com

when practice can use improvement.[78] To date, the reviews have been limited, at 16 files, about 4% of the revocation hearings since the reviews were to be initiated. However, the process is designed well and should yield useful results.

The reviews have surfaced several practice issues, and the important work of training and guidance has begun. About half of the cases have been determined to be deficient. It was very common for the hearing officer not to document the objection at all. Failing to apply the balancing test, carrying the test out incorrectly, and the absence of express rulings on objections were additional issues.

A review of the CalPAP database indicates there were 589 objections on this basis made during a four-month period in this Round.[79] Of those, 68% were sustained. This database does not serve to reflect whether the reasoning was consistent with this Court's ruling, and whether the outcomes were directly related to the confrontation rights ruling. However, when the confrontation rights objection was sustained, about 31% of those cases were dismissed and additional small percentages resulted in "continue on parole" or "credit for time served" dispositions.

In previous Rounds, CalPAP designed an information system to learn about and manage cases involving confrontation rights issues. CDCR reported that it has supplemented this with tracking in its own database, and that materials from both systems are cross-referenced for quality review. The CDCR mechanism was not shared with the Special Master's team, so it cannot be assessed for adequacy or effectiveness at this time. While the CalPAP system will need refinement, it is a very useful effort toward complying with the Court's requirement for tracking.

§    There is good progress and adequate compliance on this requirement.

PDF created with pdfFactory trial version www.pdffactory.com

*Monitoring by Plaintiffs "as reasonably necessary"*

Several challenges with monitoring arose during this Round. For the most part, the monitoring of decentralized revocation units, parole units, and CalPAP offices, and document productions were executed smoothly during this Round. Challenges have arisen when clarifying the nature of Plaintiffs' monitoring of the ICDTP community-based programs, in reaching agreement on the monitoring activities and schedule for 2009, and the Plaintiffs' lack of timeliness in some monitoring reports.

At a September 16, 2008 meet and confer session, the parties continued to address their areas of disagreement regarding the monitoring of community-based ICDTP programs. Issues in contention were the scope of the Plaintiffs' questions and the amount of copying requested by Plaintiffs of a community-based provider. Defendants requested the development of a monitoring proposal for ICDTP providers. It was agreed that Plaintiffs would craft a proposal for Defendant review and comment. On September 26, 2008, Plaintiffs submitted a proposal[80] for review, which the Defendants responded to on October 31, 2008.[81]

In a December 3, 2008 meet and confer session, the parties discussed at length the benefits and challenges of monitoring, as well as what we have learned to date from the monitoring of the ICDTP community-based programs. Defendants agreed to provide access to the disability database to community and jail-based ICDTP providers and to Plaintiffs in the pre-tour documents. In addition, Defendants would provide Plaintiffs a blank set of forms used by the community-based ICDTP provider being monitored. These changes eliminated the Plaintiffs' need to look at treatment files and to copy any records.

PDF created with pdfFactory trial version www.pdffactory.com

Plaintiffs agreed that, given the high occupancy rate of the ICDTP community and jail-based programs, it was no longer necessary to explore issues related to community-based providers' funding sources and identified beds. Plaintiffs focus their monitoring on the use of the beds and issues that relate to the *Valdivia* process. Finally, Defendants revised the pre-tour letter sent to the community-based ICDTP providers.[82] No formal agreement regarding what elements of the program are subject to monitoring was ultimately agreed upon but the parties are not in dispute about community-based ICDTP monitoring at this time.[83] The parties did reach agreement on a monitoring tour schedule for the first quarter of 2009 and, to date, the tours have gone well and there have been no disagreements regarding the nature of the monitoring of the community-based ICDTP programs by Plaintiffs. The Special Master will continue to monitor this issue to ensure that agreements reached to date are sufficient in this area.

It is the opinion of the Special Master that monitoring of community-based ICDTP facilities should no longer include any discussion of the provider's funding sources, contracts, or how they allocate their beds among their contracts. Defendants have created a successful system for meeting their obligation under the Remedial Sanctions Order regarding the establishment and use of ICDTP beds. In light of their success, monitoring of how the Defendants fill the 1,800 ICDTP beds agreed to in the Remedial Sanctions Order no longer requires on-site monitoring. Barring some unforeseen circumstance, the data tracking system at the Division of Addiction and Recovery Services should be the monitoring method in the future on this issue.

As in prior Rounds, parties exchanged monitoring proposals for 2009.[84] Reaching agreement on a schedule has not taken place in part due to efforts to think differently

PDF created with pdfFactory trial version www.pdffactory.com

about the role and purpose of monitoring. The Special Master has suggested that new monitoring approaches may be warranted at this point in the case. The Mastership has raised questions regarding what has been learned from monitoring efforts to date, what has changed in data collection systems, at what point does monitoring shift to Defendants, and if goals and strategies for future monitoring should differ from past efforts. These inquiries resulted in both parties presenting new approaches to monitoring. Parties are exploring ways to use alternative monitoring approaches such as using revocation packets and tapes instead of on-site monitoring for certain locations.

These changes have resulted in a somewhat more challenging monitoring negotiation but one that the Special Master believes is warranted and necessary. The parties agreed to use the same strategy for the first and second quarters of 2009 as they did in 2008.[85] The second quarter of 2009 will not have the Defendants' self- monitoring tours because Defendants are developing an audit tool for monitoring. The monitoring audit tool may influence the global monitoring discussion for the remainder of 2009.

In November 2008, Defendants expressed a concern about the practice of Consolidated monitoring reports by Plaintiffs. Defendants noted that the report for Wasco State Prison dated November 3, 2008 covered tours that occurred on November 5 through 6, 2007, April 23 through 25, 2008, and September 9 through 11, 2008.[86] In a conference call on December 15, 2008, the parties agreed that monitoring reports will be produced "within four weeks after concluding monitoring tours."[87] There is adequate progress and adequate compliance on this requirement.

**Other Permanent Injunction requirements**

PDF created with pdfFactory trial version www.pdffactory.com

*Expedited probable cause hearing shall be held upon sufficient offer of proof that there is a complete defense to all charges*

Defendants report there were no requests made for expedited hearings during the Round.[88] No other information came to the Special Master's attention through observation or information from the parties.

§    The Special Master is unable to assess compliance.

*The parole officer and supervisor will confer within 48 hours to determine if probable cause exists to continue a hold*

CDCR continues to be very timely in completing the probable cause determination. In general, this step was completed within timeframes 99% of the time, with an additional small number completed one day late.[89] The timeliness of mainstream cases was consistent with this, with extradition cases a few percentage points behind. Defendants' substantial-sized study, of 649 files, yielded results consistent with this.[90]

Not in custody referrals were timely much less often; only 81% met the requirement and 85% were completed timely or within one additional day.

It has been reported for several Rounds that unit supervisors sometimes make this determination based on document review alone. The Special Master has noted this in prior reports, and the parties have not examined the frequency with which this occurs.

Defendants now assert that the requirement "the parole agent and unit supervisor will confer" does not mean that they must speak. Given that the plain English definition of confer is "to meet in order to deliberate together or compare views; consult,"[91] this is a difficult argument to support.

PDF created with pdfFactory trial version www.pdffactory.com

§ There appears to be good compliance on a decision being made at the 48-hour point, but it is unknown whether the conference requirement is being met.

<u>*Final hearing within 35 days of the placement of the parole hold*</u>

In assessing this requirement, there are a number of considerations. The system must consistently provide timely hearings to the great majority of cases. It must also function to provide hearings timely to special populations, sometimes small groups whose circumstances dictate counting timelines differently or suspending and resuming proceedings once conditions have been met. In operation, the hearings must provide due process, satisfying questions such as fairness, opportunity to be heard, elements of the violation proved sufficient for the applicable standard, and consideration of appropriate sanctions.

**Timeliness**

To understand whether these hearings were timely, one must be able to assess the time to hearing for:

- mainstream cases completed according to the usual *Valdivia* standards
- mainstream cases pending and handled according to the usual *Valdivia* standards
- extradition cases handled according to the *Valdivia* standards calculated from arrival in California, rather than hold date – completed and pending
- activated optional waiver cases, handled according to the usual *Valdivia* standards calculated from the date of activation -- completed and pending
- cases held while the parolee is not in custody, determined soon after the hold was placed and calculated, for now, at 60 days after the hold -- completed and pending
- cases held while the parolee is not in custody, ordered at a probable cause hearing and calculated, for now, at 60 days after the hold -- completed and pending
- cases where supplemental charges are brought after original charges are in process, timing not established[92]

PDF created with pdfFactory trial version www.pdffactory.com

In both CDCR and CalPAP figures, mainstream cases were completed timely 97% of the time; cases that missed by a short period changed this percentage minimally.[93] Thus, 2% of mainstream case hearings were held more than a week after the required date. The longest times to hearing were typically one to two months late, but a small handful stretched to as much as six months late.

The handling of timeframe objections was potentially problematic. Attorneys alleged such violations in 76 cases; only 9 objections were sustained.[94] A low rate of sustained objections was also observable during the last Round. It may be advisable to study such cases to ensure that they are being handled according to CDCR policy and due process.

### Special populations

Optional waivers: There were 3,247 optional waivers activated during the Round. When optional waivers are activated – invoking a parolee's right to a revocation hearing after court proceedings have concluded -- the parties have agreed that a hearing must take place within 35 days of activation. The data system shows that timeliness for activated optional waivers was 89% at best, and could be as little as 81%.[95] This is much lower compliance than in mainstream hearings, though it is significantly better than initial indications from a much smaller snapshot available during the last Round. About ¼ of the untimely cases were completed within an additional week, but more than 40% took from 2 to 11 months to complete. Absent an explanation, this latter time to hearing is very unreasonable.

PDF created with pdfFactory trial version www.pdffactory.com

California Institution for Men had by far the highest rates of late proceedings, and Los Angeles County Jail was high both by absolute numbers and by percentage. Nearly half of Wasco State Prison's cases were shown as activated and completed on the same day, suggesting a data entry issue requiring attention. High Desert State Prison did extraordinarily well, with 100% compliance.

To reach substantial compliance, Defendants must either address this timeliness rate or demonstrate, for a high proportion of these cases, that good cause explains what would otherwise be untimely cases.

Extradition: The *Valdivia* requirements begin for extradition cases on the date they return to California, rather than the hold date. Defendants apply all the same timeframes and follow the same steps, except a Parole Administrator does not review these cases. There were 1,191 extradition cases during the Round.[96]

CDCR had previously studied and exercised oversight for these cases, and the timeliness of several revocation steps had improved. Since that oversight concluded, there has been decline. Notice is particularly problematic and probable cause hearings are moderately timely (see above). Revocation hearings were timely at a rate of 90%. Few of the late cases came close to the requirement; the majority were from two weeks to three months late.[97]

Not in custody: The Board ordered "not in custody" hearings -- when the parolees were in custody but released to await hearing – an average of 14 times per month, significantly more often than in the prior Round.[98] Among them, 36 were ordered when the deadline for hearing was approaching or had been reached or exceeded.[99] Plaintiffs have been concerned that such orders are used to circumvent required timeframes. Six

PDF created with pdfFactory trial version www.pdffactory.com

events per month is not enough to support any inferences about Defendants' intent.. Reports do not capture whether the subsequent hearings were held timely; it will be necessary to make this showing to demonstrate substantial compliance.[100]

Not In Custody hearings initiated without the parolee being taken into custody occurred about 50 times per month, according to CDCR's database;[101] CalPAP shows this number significantly higher, at 64 per month.[102] Both of these figures show a greater use of not in custody hearings over the prior Round.

The parties have negotiated a longer time allowed to serve such parolees notice of their charges.[103] The information system does not yet measure compliance according to that standard. Reports showed compliance rates in other prehearing steps far below those for the mainstream population. The Unit Supervisor case conference was timely in 78% of the cases and his or her subsequent review was timely 85% of the time.[104] Defendants assert that no return to custody assessments or probable cause hearings are required for this group; this is a point of disagreement.[105]

Defendants are applying a standard of 60 days to revocation hearing for this population, based on the lessened impact on parolees' liberty interest and, presumably, on language found in *Morrissey;* the parties have not agreed to any timeframe exceeding 35 days. About 94% of these cases were timely according to Defendants' 60-day standard, consistent with the prior Round.[106] About 1/3 of the cases heard beyond that standard took place within one additional week, while the majority were not heard until 2½ to 5½ months after the hold.[107] This represents a decline and, while the frequency is low, the lengths of time to hearing are quite troubling.

60

<u>Priority</u>: When a parolee's history contains a statutorily defined serious and violent crime, CDCR labels the parole revocation case Priority. CalPAP figures show that 29% of cases assigned an attorney are considered Priority cases. Since hearing officers sometimes cite public safety as a reason they choose to go forward with a case despite timeframe violations, Plaintiffs have been concerned that this could be a widespread, harmful practice. The CalPAP analysis does not examine practices at probable cause hearing, but it shows that 5% of Priority cases are untimely at revocation hearing, a few percentage points higher than for all revocation hearings taken together.[108] The parties acknowledge that this does not qualify as good cause for exceeding the timeframe.

### *Substantive due process*

In the vast majority of cases observed by monitors and the Special Master, revocation hearings are run fairly and the parolee has an opportunity to be heard and to present evidence. Potential exceptions are evident in tracking kept by CalPAP.[109] Most occur relatively infrequently. Some, however, may warrant examination in the future because of their frequency and to ensure that the handling of objections is consistent with the law, the Permanent Injunction, regulations, and due process.

|  | Objections | Number granted | Percent granted |
|---|---|---|---|
| Evidence not previously provided to attorney | 34 | 14 | 41% |
| Parolee not permitted a witness or scope of examination unfairly limited | 12 | 2 | 16% |
| Neutral and detached hearing officer | 6 | 1 | 16% |

PDF created with pdfFactory trial version www.pdffactory.com

The practice concerning allowing in hearsay evidence, and balancing it with parolees' confrontation rights, remains much more problematic. It will be discussed *supra*.

There is also indication that hearing officers observe due process issues such as jurisdiction and sufficiency of the evidence.

|  | Objections | Number granted | Percent granted |
|---|---|---|---|
| Insufficient evidence | 26 | 19 | 73% |
| Unconstitutional conditions of parole | 95 | 30 | 32% |
| Jurisdiction | 17 | 1 | 6% |

There is also evidence of Deputy Commissioners dismissing about 169 cases per month for due process reasons, principally for insufficient evidence.[110] They dismissed cases for lack of jurisdiction, hearing timeframes being exceeded, unconstitutional parole conditions, the interests of justice, or for reasons of mental health.[111] These occurred at probable cause hearing or revocation hearing and represented 2% of the cases that reached those steps.[112]

Thus, timeliness has been established as strong for the great majority of cases; the outlying cases, however, could be quite extended. Hearings following an activated optional waiver, extradition, or held not in custody, were much less timely. Due process is often preserved in these proceedings. As better information is beginning to surface to allow the parties and the Special Master to assess substantive due process, questions for examination are being raised.

§    There is adequate compliance on this item.

PDF created with pdfFactory trial version www.pdffactory.com

*By July 1, 2004, an assessment of availability of facilities and a plan to provide hearing space for probable cause hearings*

The Defendants worked aggressively to negotiate with each of the counties for hearing space as well as space for attorney interviews with parolee clients and installation of on-line capability. Arrangements differ in each location, with some being less desirable than others, but generally are compliant with expectations that hearings can be held with sufficient privacy.

One site that raised some concern is the Placer County Jail. To mitigate the jail's staffing requirements, the arrangement is one in which the parolee is escorted by jail staff to a door that leads to a "run" that ordinarily would contain inmates meeting their visitors. The county reserves this visiting room for hearings on the days and times hearings are due so that no other inmates nor visitors are on the premises. The parolee is released into the "run" without restraints. The hearing officer, the parolee's attorney and any witnesses, if it is a final revocation hearing, sit on the other side of reinforced glass. The hearing officer sits at a table that abuts the front of the glass where the parolee is located. The hearing officer and attorney are positioned so that all participating in the hearing can see the other participants or monitor them.

There is a microphone on the hearing officer's side of the glass that allows the attorney, hearing officer, and any witnesses to converse with the parolee. The parolee, in turn, has a telephone through which he/she can hear and communicate. In the event the

PDF created with pdfFactory trial version www.pdffactory.com

attorney or the parolee wish to have a private conversation, there is a mobile phone available to each of them and the attorney can move to an isolated room and the conversation can be had privately. A security pass through which papers may be exchanged between the parties is available. The hearing officer had access to an on-line computer, with access to RSTS and DECS. No persons were on either side of the glass that were not involved in hearings.

The Special Master monitored two probable cause hearings and one revocation hearing at this site during this Round. Nothing observed appeared bothersome in terms of the parolee's rights being compromised. An experienced Deputy Commissioner, who has completed hearings in many locations over the years, suggested that he believes the physical arrangement works fairly and efficiently. Two CalPAP attorneys representing parolees in the three hearings stated that they saw nothing in the arrangement that impeded on their clients' rights nor their ability to fairly represent their clients.

It appears that confidentiality is not only preserved but superior to several other sites, and that rights of the parolee are fully available. The Plaintiffs have not presented evidence that these practices are contrary to the law or the Permanent Injunction.

Defendants note a handful of locations where there are issues with access to hearing rooms, attorney access to clients, or privacy. They have devised alternate arrangements for hearings in those instances, and continue to address issues impacting attorneys as CDCR learns of them.[113] These are appropriate responses to inevitable changes and problems. Few rise to the level of great concern to the Mastership; the most troubling are the spaces used for notice at Los Angeles County Jail and for attorney contacts and hearings at Santa Rita County Jail.

PDF created with pdfFactory trial version www.pdffactory.com

§   There is good compliance on this requirement.

*By July 1, 2005, probable cause hearings shall be held no later than 10 business days after service of charges and rights*

As described in previous Special Master's reports, the Special Master and monitors have observed that some Deputy Commissioners do not discuss probable cause during these hearings, and therefore it is not clear whether they are assessing whether probable cause exists for each charge. The Special Master has noted repeatedly that it is troubling that this exists, and that Defendants have not examined, in the three years it has been known, whether this is an isolated or widespread problem. The chronic nature of this issue led the Special Master to highlight it in the fifth report as requiring particular attention.

Defendants initiated a partial response. In January 2009, they redistributed a memorandum that details the required components of probable cause hearings, and they describe a plan to emphasize this in training planned for April and May.[114] They indicate that they discussed means of determining the scope of the problem, and found several understandable obstacles. They did not follow up with those hearing officers previously identified as failing in this practice.   They assert that the review that Quality Control clerical staff can assist in this effort, but it appears that will have limited effect.[115]  It has, however, generated good information to help improve the written records, and hearing officers' supervisors have followed up with written guidance.[116]

PDF created with pdfFactory trial version www.pdffactory.com

Defendants do continue to manage a very large volume of these proceedings efficiently, and the great majority reach conclusion at this step, without continuing to a revocation hearing. The CDCR information system shows that 97% of the mainstream cases were heard within Permanent Injunction timelines. The number climbs to 99% by a day after the deadline, and very nearly 100% by the 16th business day. Only 261 cases, out of about 35,000, were heard later than that.

This does not take into account parolees whose revocation hearings are held "not in custody," as Defendants assert no probable cause hearings are required for those parolees, a position that is disputed.[117]

One issue bearing examination is how the information system treats postponements. The parties have not agreed on acceptable reasons for postponements; if the system automatically treats them as timely, this would inappropriately increase the timeliness numbers. Additionally, Defendants must demonstrate that postponed cases are resumed within a reasonable time.

As to the 1,191 extradition cases, probable cause hearings were timely 94% of the time.[118] The greatest numbers of late hearings occurred at Los Angeles County Jail and California Institution for Men. The parties have been in dispute concerning whether probable cause hearings satisfy due process if they are held by telephone with the Deputy Commissioner in one location and the parolee and attorney in another. Tracking, which the Special Master verified previously is maintained using valid methods, indicates that the majority of jail locations, and a few prisons, held a telephonic hearing from time to time. The most frequent users changed during this Round to Placer, San Joaquin, and

66

Yolo county jails. The collective frequency continued to fall to an average of 27 hearings per month, far less than 1% of all probable cause hearings.[119]

The parties have asked the Special Master's team to conduct an investigation into the practice of telephonic probable cause hearings and its adequacy. The analysis of telephonic hearing practice is pending resolution of other matters.

In summary, it is increasingly likely that the timeliness for mainstream cases is extraordinary. Taken alone, CDCR would appear compliant. Some questions remain to be resolved about that method of calculation and about the special populations. Importantly, the Court must have certainty that the proceedings that occur are serving their intended purpose – to ensure a neutral assessment of probable cause and an opportunity for the parolee to challenge it.

> §    For those reasons, compliance is adequate on this requirement.


*Defendants shall develop and implement policies and procedures for designation of information as confidential consistent w/ requirements of due process*

No new information came to the Special Master's attention through observation or information from the parties.

> §    There is adequate compliance on this requirement.

*Defendants shall assure that parolees receive effective communication throughout the process*

This area affects parolees with hearing, visual, or speech impairments; speakers of languages other than English; those with limited literacy; and parolees with cognitive limitations, including those generated by mental illness. Defendants' structure to address

PDF created with pdfFactory trial version www.pdffactory.com

these needs involves maintaining a database of known disabilities; requiring staff to check the database and paper files, and to assess needs, at each step of the revocation process; providing reasonable accommodations; and documenting new disability information, the reviews, and the accommodations.

Defendants are required by the Court in *Armstrong v. Schwarzenegger* to maintain a database concerning prisoners' and parolees' disabilities, and to consult and to add to it at different times in the revocation process. This occurred regularly when the Special Master was observing.

A printout gives a window into the practice of providing accommodations. At four institutions comprising a large percentage of the revocation actions in the state, the document shows 8,654 accommodations given.[120] The Special Master is unable to discern whether this met all need, but this clearly indicates accommodations are made available often. A substantial percent of those were previously not identified but nevertheless provided. It is commendable that Defendants were able to meet these parolees' needs. At the same time, this number of spontaneously generated accommodations raises a question of whether the system to identify and carry forward knowledge of disabilities is operating as it should. This particularly occurred at Los Angeles County Jail, where 31% of the provided accommodations had not been identified before the hearing. There were two recorded instances of a planned accommodation not being provided, according to this printout.

For those needing language assistance, a large proportion of translation is provided through telephone services. Also, in-person translators were hired an average of 95 times per month, according to Defendants' documents.[121] CalPAP documents reflect

PDF created with pdfFactory trial version www.pdffactory.com

that a revocation hearing was postponed for lack of an interpreter four times at Los Angeles County Jail and once at Wasco State Prison.[122] Those hearings were rescheduled in two to three weeks.[123]

Another report shows usage of sign language interpreters 37 times, principally at probable cause hearings, during a five-month period.[124] It is not practical for the Special Master to discern whether there was any unmet need. The report does not capture availability of this service during notice service and attorney consultation, which will likely be necessary to demonstrate substantial compliance in this area. One case listed on the report did not have an interpreter during his attorney consultation.[125]

If disability screening forms ("1073s") and source documents are missing, this potentially compromises providing reasonable accommodations, effective communication, and timely contacts and hearings. CalPAP data shows an improvement in including the disability screening form in revocation packets.[126] Where there was a problem, it continued principally to be concentrated at Los Angeles County Jail and Pitchess Detention Center, but improvement was evident at California Institution for Men and Rio Cosumnes Correctional Center.

Provision of source documents continued to be deficient, however; they have been absent in relevant packets at a rate of 20% for several years and this remained unchanged. This occurred in high numbers or percentages at California Institution for Men, Santa Rita County Jail, Wasco State Prison, and Los Angeles County Jail – **49%** were missing at Los Angeles County Jail. Deuel Vocational Institution, on the other hand, had near-perfect performance.

§    There is adequate progress and adequate compliance on this item.

PDF created with pdfFactory trial version www.pdffactory.com

*Forms provided to parolees are to be reviewed for accuracy, simplified, and translated to Spanish*

Although some forms remain under negotiation, reportedly none of the agreed-upon forms have been translated into Spanish or alternate formats as required.[127] Toward the end of the Round, the parties initiated an effort to identify finalized policies and forms; part of the benefit of this action would be to identify those ready for translation. This requirement is long overdue.

§ Progress is limited and compliance on this requirement is poor.

*Upon written request, parolees shall be provided access to tapes of revocation hearings*

Defendants' log shows 407 tape requests during a period of nearly six months.[128] Of those requests, 97% were answered, or were pending, within a 30-day timeframe, somewhat of a decline from the previous Round. Nearly all of the untimely cases were processed within two additional weeks, with the longest outlier taking 57 days. There were seven cases where the same person or entity made a second request for the same tape, but in each, the record indicated the tape had been sent; it is unclear whether the repeated requests reflect mail delays, tape quality, requiring an additional copy, or other reasons.[129] Recent correspondence between the parties discusses the possibility of a handful of other breakdowns.

PDF created with pdfFactory trial version www.pdffactory.com

§ Progress is not apparent in this Round, but there is good compliance on this requirement.

*At probable cause hearings, parolees are to have the ability to present evidence to defend or mitigate the charges or proposed disposition*

No new information came to the Special Master's attention through observation or information from the parties.

*On or before the fourth business day, the Parole Administrator shall review the packet to determine whether the case is sufficient to move forward and whether remedial sanctions may be appropriate*

Information system reports indicate that Parole Administrators reviewed 42,217 cases during this five-month period, continuing the trend of fewer cases during each successive Round.[130] An additional 2,296 cases appear as sent to the next step with no action by the Parole Administrator.[131] This is a much higher rate than in the last Round, despite there being fewer actions to act upon. By far, Los Angeles County Jail and California Institution for Men had the greatest number of missed cases, both in absolute numbers and as a percentage of the actions they handled. Staff have not investigated the reasons for these deficiencies.

§ There is poor progress but adequate compliance regarding this requirement.

*Defendants shall maintain staffing levels sufficient to meet all obligations under the Order*

PDF created with pdfFactory trial version www.pdffactory.com

Arguably, the Defendants maintained sufficient staffing levels, despite challenging times created by budget cuts, mandatory furloughing of state employees, and failure of timely passage of the state budget. The full implications of the passed state budget remain unclear at the time of this report, so the Special Master's team will continue to assess compliance with this requirement during the upcoming Round.

Staffing allocations grew nevertheless. Several divisions maintained the same number of positions, while Paroles Division added a notice agent, supervising notice agent, and 26 clerical staff, and Institutions Division gained 20 clerical staff with an expectation of more in 2009.[132] The Division of Addiction and Recovery Services lost a small number of positions but gained a similar number in other classifications.

The picture on vacancies was more varied. The Office of Court Compliance and the Board continued to experience high levels of vacancy in some pivotal jobs. Half of the positions in the Office of Court Compliance – the body most responsible for internal oversight – have been vacant for nearly a year.

The Board has had chronic vacancies among supervisors, hearing officers, and clerical staff, and these worsened during the Round. A permanent hire for the Chief Deputy Commissioner was a welcome development; staffing declined to ***less than half*** for the Associates immediately below her, however. Associates – together with temporary coverage from hearing officers and retired annuitants -- struggled under the responsibility of concurrently exercising systemwide supervision, managing their own regions' staff, writing and negotiating complex policies and procedures with long-term import, shepherding several information system implementations, designing and

PDF created with pdfFactory trial version www.pdffactory.com

implementing trainings to address core deficiencies, and the responsibilities of defendants in litigation.[133]

At the same time, management was greatly needed. Many hearing officers came to the task under provisions requiring "training and development," with limited experience in several of a hearing officer's core responsibilities.[134] Many are retired annuitants, who work on a part-time basis. The hearing officer vacancy rate climbed to 25% during the Round. All of these factors require more coordination, more support to ensure that requirements are communicated and carried out, and more guidance in the areas new to this staff.

Vacancy rates also remained unabated at 60% for Program Technicians and at 25% for some clerical staff.[135] Training staff and research staff have a very small number available in their departments. Board Revocation Representatives newly developed a 20% vacancy rate. Several other job categories, however, remain fully staffed, and the Board made hires for 11 positions. A recent series of interviews for hearing officers reportedly produced some good candidates.[136]

Other divisions have had much more success filling positions. Paroles Division and Institutions Division each continue to report only a handful of vacancies, for a total of 6% and with no job categories disproportionately affected.[137] The Division of Addiction and Recovery Services hired into more than half of its vacancies during the Round. The Office of Legal Affairs – responsible for much of the policy negotiation and coordinating the implementation of the remedy -- recently became fully staffed.

The fifth report of the Special Master called on CDCR to "Pay strict attention to the requirement to maintain staffing levels sufficient to meet all obligations of the

PDF created with pdfFactory trial version www.pdffactory.com

Permanent Injunction." No positions have been cut despite dire state budget circumstances and, in fact, a few have expanded. Many job classifications are consistently filled. The divisions have accomplished some hires during the Round.

Where there are vacancies, the Board draws on a large cadre of retired annuitants – reportedly 80 for the duties of hearing officers and their supervisors, and 17 for correctional counselors and their supervisor.[138] Since retired annuitants cannot work full-time, these additions could cover the correctional counselor vacancies for part of a year. The pool available to serve as hearing officers is much larger than in the recent past. Given 2008 usage numbers, this pool should be sufficient to cover all hearing officer vacancies.[139]

Hiring activity occurred, but CDCR did not describe any special measures to address the chronically high vacancy rates that remained untouched in some positions.[140] It is particularly difficult, where supervision is greatly needed, that management positions lose some of the financial benefits available to their staff. To the Special Master's knowledge, no examination has been undertaken to determine the types and numbers of positions necessary to carry out this Court's orders and whether existing allocations are consistent with that. On the other hand, despite the stated difficulties, Defendants are complying well with many of the Permanent Injunction requirements and there has been no indication that any deficiencies are a product of staffing issues.

§   On balance, there is limited progress. Compliance is adequate.

_Agreed-upon mechanism for addressing concerns regarding individual class members and emergencies_

CDCR's log indicates that Plaintiffs employed this mechanism on 71 occasions during the Round, about half as often as the comparable period of the prior Round.[141] In

PDF created with pdfFactory trial version www.pdffactory.com

96% of those cases, Defendants responded within a month, as agreed by the parties. The remaining three cases were answered in six weeks. This represents an improvement in timeliness.

The greatest numbers of requests concerned potentially late revocation hearings or probable cause hearings and issues related to drug treatment programs. Other topics included late notice, treatment of optional waivers, ADA accommodations, confrontation rights, over-detention, and mental health issues. Concerns were most often generated from Deuel Vocational Institution, Los Angeles County Jail, San Quentin State Prison and Wasco State Prison.

Among the concerns raised, 17 were resolved either by providing the requested information, taking the requested action, or forwarding the information provided. Problems were acknowledged in another 14 instances. Defendants defined 40 requests as unfounded, justified by good cause, or an exception was made for public safety reasons.

§ There is good progress and good compliance on this requirement.

<u>Appeals</u>

While appeals are not subject to a *Valdivia* court order, they were expressly reserved in the Permanent Injunction as an open issue in the litigation that the parties expected to negotiate.

That issue remains unresolved. In the meantime, Defendants employ a system they distinguish from appeals and which they term "Decision Review."

After providing the Plaintiffs with a sample of 14 Decision Review cases to review on August 1, 2008, on November 7, 2008, the Plaintiffs, in consultation with

PDF created with pdfFactory trial version www.pdffactory.com

CalPAP, presented a draft Decision Review policy for Defendants to review.[142] Plaintiffs developed broad guidelines for the process and broke the policy into state- and parolee-initiated policies. The Plaintiffs' proposal was reviewed at a December 4, 2008 meet and confer session. After reaching agreement on several changes, Defendants agreed to produce the Board's and Paroles Division's policies for decision review. On December 29, 2008, Defendants delivered the draft policies to Plaintiffs and to the Special Master.[143] The parties met on February 3, 2009 to revise the draft policies.[144] On March 16, 2009, Defendants sent revised policies to Plaintiffs and the Special Master.

§   There is good progress on this item.

*Revocation Extension Proceedings*

CalPAP data indicates there were an average of 109 revocation extension actions per month, somewhat higher than in the previous Round.[145]  Defendants report that their information system shows these compliance figures: only 23% of Classification and Parole Representative reviews are timely, 13% of notices are timely, 41% of referrals to the Board are timely, 30% of attorney appointments are timely, 46% of revocation extension assessments are timely, 12% of attorney consultations are timely, 47% of probable cause hearings are timely, and 72% of revocation hearings are timely.[146] CDCR also notes that some staff report not using the information system, so performance may be underrepresented by these figures. The Office of Court Compliance and other headquarters staff have provided substantial, structured guidance on revocation extension for several years. Several of those efforts are ongoing and described in Defendants'

76

PDF created with pdfFactory trial version www.pdffactory.com

Compliance Report. It is difficult to assess the reasons that this appears, by far, the most deficient component of the Permanent Injunction implementation.

> § No progress is apparent and there is poor compliance on this item.

*Whether revocation hearings are held within 50 miles of the alleged violation*

CalPAP data captures four hearings in which the revocation hearing was set outside the 50-mile limit over a four-month period.[147] It appears the vast majority of hearings are held in compliance with this requirement.

> § This issue remains compliant.

**Interpretation Issues:**

The following issues were noted in prior reports of the Special Master and remain the subject of dispute or negotiation. No new information concerning them came to the Special Master's attention during the Round:

> § Parolee rights waivers before being appointed counsel

> § Whether there are sufficient provisions for attorney-client communications to be confidential in some locations

> § Adequate notice to parolees of the dates of their revocation hearings

> § Whether state employees and witnesses will be provided with attorney representation during hearings

PDF created with pdfFactory trial version www.pdffactory.com

§ Parolee timeliness waivers, including whether they are voluntary, parolee attorneys are requesting them at a reasonable rate, and whether hearings are resumed after a reasonable time

§ Appropriate remedies and responses when the state does not meet its timeline obligations in an individual case

## Summary

Defendants have made substantial progress in three out of the five issues identified by the Special Master as a focus for this Round. Progress has been seen in addressing deficiencies in revocation proceedings at the Los Angeles County Jail, the handling of hearsay objections, and investigating the cause for delays in transfers of parolees from jails and institutions to community-based ICDTP facilities. In two of the five areas -- the failure of some Deputy Commissioners to expressly consider and make findings regarding probable cause and paying particular attention to the requirement to maintain sufficient staffing levels to meet the obligations of the Permanent Injunction -- Defendants have demonstrated little to no change. In addition to these focus areas, there has been notable progress on several important issues.

The most notable progress, and one which will have significant impact on many progress measures, is the effort made to address the many challenges presented by the Los Angeles County jail revocation process. The Paroles Division and CDCR executive management are to be commended for sending a clear and convincing message that this issue is being taken seriously. The Paroles Division has done an excellent job of assessing the situation, providing immediate direction about acceptable standards, devising intervention strategies, and providing additional line and management resources to manage the needed changes in the revocation process. A stark contrast is presented by

PDF created with pdfFactory trial version www.pdffactory.com

the Board, which has failed to seriously engage in the change efforts. The Mastership expects this situation to be rectified in the next Round.

The Board and the Office of Legal Affairs have initiated effective efforts to remedy failures in the handling of hearsay objections. Negotiating and modifying policies, beginning to design training, determining minimum standards, and devising systems for monitoring are all necessary steps that were completed at a reasonable pace this Round.

The Division of Addiction and Recovery Services has continued to investigate and create remedies for the unacceptably long delay in the transfer of some parolees from jails and institutions to community-based ICDTP facilities. Changes in systems to access placement data more quickly and negotiations with local jails, as well as funding requests for additional transportation resources, are all evidence of the sincere effort to resolve this challenging issue.

CDCR divisions are to be commended both for working to retain their staffing levels and for continuing to move issues forward despite staff furloughs and budget reductions. Significant vacancies pose an obstacle for the Office of Court Compliance. Recognizing the serious financial challenges facing CDCR, the Office of Court Compliance has done a good job of working toward its obligation with its reduced staffing. Despite the hard work of a small cadre of staff, these vacancies slow the ability of CDCR to demonstrate substantial compliance with the Permanent Injunction and to assume more responsibility for oversight.

The same staffing concern exists for the Board, where shortages hamper the ability to provide supervision to ensure that substantive due process is being met. A key example is

PDF created with pdfFactory trial version www.pdffactory.com

al focus area for this Round that has not been adequately addressed: some Deputy Commissioners failing to demonstrate their consideration and findings of probable cause. This issue goes to the heart of the Permanent Injunction. Without a clear finding of probable cause, it is hard to argue that due process has been accorded. The Special Master looks forward to the impending training for Deputy Commissioners and expects that this issue will be a significant focus in that training and that significant progress will be made in the next Round.

A major accomplishment for the Round has been the completion of policies and procedures that create a system to serve mentally ill parolees who can not participate in the revocation process. Negotiating across several systems has been challenging and the parties are to be congratulated for their creativity and flexibility in resolving this longstanding issue. Significant progress has also been made in the longstanding issue of decision review. Closure on this topic has almost been achieved.

Other areas of note in this Round include the continued progress in both maintaining and refining the use of remedial sanctions. The Defendants continue to make progress in orchestrating the many systems needed to ensure access to an array of remedial sanctions. Assisting in this process is the new decision-making structure. The Defendants have also provided training to parole staff regarding the need for clear factual summaries of charges that demonstrate probable cause.

Key challenges to be addressed in the next Round are implementing training and oversight concerning the handling of confrontation rights objections, and ensuring that probable cause assessments take place during probable cause hearings. Other priority issues remaining include improving information systems, the Marsy's Law litigation,

PDF created with pdfFactory trial version www.pdffactory.com

identifying the remaining policies and procedures that require modification, and creating a process for completing, translating, and simplifying forms. The Special Master will continue to work with the parties to gather input regarding defining substantial compliance.

To summarize substantive compliance this Round:

In compliance:
- 50-mile limit
- Compliance with the Remedial Sanctions Order:
    - Policies and procedures, training
    - Out-of-county transfers
    - ICDTP – mainstream, dual diagnosis, and disabled participants
    - Interim availability of programs
    - Electronic in-home detention

Good performance:
- Compliance with the January 14, 2008 and August 8, 2008 Orders concerning mentally ill parolees (partial)
- Consideration of remedial sanctions at each step
- Attorney appointment
- Facilities
- Access to non-confidential documents and field files
- Hearing tape requests
- Mechanism for individual concerns

Adequate performance:
- Remedial sanctions: alternative placement in structured and supervised environments and self-help outpatient/aftercare programs
- Compliance with the November 13, 2006 Order concerning information systems
- Compliance with the November 13, 2006 Order concerning internal oversight
- Policies and procedures
- Training, standards, and guidelines for state appointed counsel
- Notice of rights and charges
- Probable cause hearings

81

PDF created with pdfFactory trial version www.pdffactory.com

- Revocation hearings
- Evidence under the same terms as the State
- Present evidence to defend or mitigate the charges or proposed disposition at probable cause hearings
- Confrontation rights
- Designation of information as confidential
- Effective communication
- Staffing
- Monitoring

Poor performance:
- Translating and simplifying forms
- Revocation extension

Unknown status:
- Expedited probable cause hearings
- Unit Supervisor and agent conference
- Parole Administrator review
- August 8, 2008 Order concerning evaluation of mentally ill parolees pursuant to California Welfare and Institutions Code § 5150

Where quantification is possible, compliance can be summarized as:

| | |
|---|---|
| Unit Supervisor and agent conference | 99% |
| Notice to parolee | 90% |
| Parole Administrator review | unknown |
| Timely revocation packet to attorney | 95% |
| Disability form in attorney packet | 98% |
| Source documents in attorney packet | 80% |
| Probable cause hearing | 97% |
| Revocation hearing | 97% - mainstream cases |
| | 90% - extradition |
| | $\leq$89% - activated optional waivers |
| | 94% -- Not In Custody referrals held within 60 days |
| Hearing tape copies | 97% |

PDF created with pdfFactory trial version www.pdffactory.com

Respectfully submitted,

_/s/*Chase Riveland*

Chase Riveland
Special Master                                    DATED: April 23, 2009

---

[1] All discussion in this section is based on a telephone conference with Defendants on March 12, 2009 and the Special Master's observations.

[2] 2 Stipulation and Order Regarding Remedial Sanctions, Apr. 3, 2007

[3] See CDCR Policy 09-02

[4] See ICDTP Policies and Procedures, June 2008

[5] See E-mail from Macias-Price, March 4,2009, PSC and Policy 09-02

[6] See Paroles Division BSA 2008 2009 Spreadsheet

[7] See Closed Case Remedial Sanction-OSM (2)

[8] The numbers are not identical but demonstrate increasing agreement as the RSTS screens become used more consistently by staff.

[9] See RS Sept 08- RS Jan 09. Numbers include referrals by parole agent directly (COP) and those referred to the Board for action (RCOP)

[10] See ICDTP Weekly Report Jan. 30, 2009

[11] For a current example, see ICDTP Beds Available, All Regions, Sept. 19, 2008

[12] Data is drawn from the ICDTP Weekly Report issued Jan. 30, 2009

[13] This includes 200 PSAP beds

[14] Female beds are included in the totals for jail and community-based beds

[15] ICDTP Bed Availability Feb. 2, 2009

[16] Data taken from the Defendants' compliance report and the ICDTP weekly count reports

[17] The average for the month is derived from the ICDTP weekly count reports.

[18] Plaintiffs' Region I Parole and ICDTP Oct.22, 2008 tour report, p. 7

[19] Examples of such concerns would be the Plaintiffs' letter of July 31, 2008 referencing the consolidated monitoring report of CIW and Defendants' Self Monitoring report of June 10-12, 2008 at Santa Rita County Jail.

[20] Board actions are based on the RSTS Closed Case Remedial Sanction by DRU report.

[21] See ICDTP Audit Region I

[22] See Riley e-mail of Feb. 9, 2009 for an example of correspondence about this issue and Defendants' Feb. 2, 2009 Compliance Report

[23] See Defendants' Feb. 2, 2009 Compliance Report

PDF created with pdfFactory trial version www.pdffactory.com

[24] See Division of Addiction and Recovery Services tracking sheets labeled Region I CCMS, Region II CCMS, Region III CCMS and Med, Region IV Transfer and CCMS

[25] Per conversation between the Office of the Special Master and Kevin Hoffman of Division of Addiction and Recovery Services

[26] See e-mails from Mary Swanson of CalPAP and Rebecca Lira of Division of Addiction and Recovery Services, both dated Mar. 2, 2009, indicating it is in use.

[27] See ICDTP ADA Training Materials PDF

[28] Direct quote taken from Katie Riley E-mail CAARR Training and Audits. Feb. 10, 2009

[29] See Division of Addiction and Recovery Services spreadsheets labeled Region I, II and III Out of County Transfer and Region IV Transfer and CCMS

[30] See Defendants' Feb. 2, 2009 Compliance Report

[31] See RS Sept 08 through RS Jan 09

[32] EID 08 and EID Jan 09

[33] See PVDMI Pilot Training

[34] See CDCR 1500

[35] See BPH Hearing Directive Memo

[36] See PVDMI Policy 09-TEMP-02. The COMPAS Policy 09-TEMP-01, a necessary step in the PVDMI process, was also shared with Plaintiffs and issued at the same time.

[37] See PVDMI Results % Feb, 2, 2009

[38] See the comment section for stabilizing and de-stabilizing factors in PVDMI Results % Feb. 2, 2009

[39] See ParAd Decision Counts Mar. 18, 2009

[40] See page 18 of the Defendants' Feb. 2, 2009 Compliance Report

[41] See Closed Case Remedial Sanctions Summaries, Sept 1 through Nov. 30, 2008 and Dec. 1, 2008 through Jan. 31, 2009

[42] See Closed Case Remedial Sanctions OSM (2)

[43] See Other comment section in PVDMI Results % Feb. 2, 2009

[44] Order, Jan. 14, 2008

[45] Gap Parolees Open Cases Feb. 13, 2009, generated by CalPAP; CDCR's Excel spreadsheets titled Gap Parolees , for each month from Sept. 2008 through Feb. 2009

[46] *Id.*; see also Board Decision Dismiss Sept. 1 through Nov. 30, 2008, and Board Decision Dismiss run for each of Dec. 2008 and Jan. through Feb. 2009 (in monthly productions)

[47] Defendants' Compliance Report, Feb. 2, 2009

[48] Excel spreadsheet with computer file name DMH.xls; CSRs for three parolees; informal communication with CalPAP Mar. 25, 2009

[49] The total on the spreadsheet may include up to four parolees who did not have suspended hearings.

[50] Order of Nov. 13, 2006

[51] Document with computer file name NOR Report Changes Functional Requirements_Design 3-09.doc; informal communications with Defendants

[52] Special Master's review of various reports – for example, Closed Case Parolee Activated Optional Waiver, Board Decision Dismiss, and Parole Administrator Statistics – and informal communication with Defendants

[53] See Closed Case Summary Remedial Sanctions

[54] See Closed Case Summary Supplemental Charge Cases

[55] See document with computer file name DECv3_1_changes.pdf

[56] Document with computer file name BPH Staffing 9-5-08.pdf, Defendants' Compliance Report dated Aug. 29, 2008, and *Valdivia* Staff Vacancy Report Mar. 4, 2008

[57] Defendants' Compliance Report, Feb. 2, 2009

[58] Defendants' Compliance Report, Feb. 2, 2009, pp. 32-34

[59] Informal communication with the parties

[60] See letter from L. Stewart to K. Tebrock and K. Riley dated Nov. 24, 2008, attaching memo with subject line Investigating Alleged Violations of Parole, Witness Determination, and the Presentation of Evidence at Revocation Proceedings, dated Oct. 28, 2008; and memo with subject line Board of Parole Hearings Comito Objection Tracking Plan, dated Nov. 5, 2008. There was also an indication that CDCR had issued a policy concerning implementation of Proposition 9 in violation of this requirement, but it was determined that a draft document was merely distributed for comment.

PDF created with pdfFactory trial version www.pdffactory.com

[61] See letter from L. Stewart to K. Tebrock and K. Riley dated Nov. 24, 2008 and letter from C. Riveland to K. Tebrock dated Nov. 25, 2008

[62] Memo with subject line *Valdivia v. Schwarzenegger* Sharing of Draft Policies and Procedures with Plaintiffs' Counsel Pursuant to Stipulated Order, dated Dec. 2, 2008

[63] Defendants' Compliance Report dated Feb. 2, 2009 and its Exhibit 17; Date Case Assigned Compliance Report, run each month from Aug. through Dec. 2008. CalPAP data does not include several categories of cases: not-in-custody hearings, where there may not be a hold date and there is no set timeframe for attorney appointment; supplemental charges and optional waiver activations, where the attorney would already have been appointed.

It also does not include extradition cases; CDCR and CalPAP should be coordinating more effectively to share the date of California arrival in these cases. As it stands, CalPAP cannot include these cases in its figure, but the group is small enough that the omission is unlikely to make a statistical difference.

[64] *Id.*

[65] All figures in this section arise from the Special Master's analysis of California Parole Advocacy Program, Notice of Rights Compliance Report for each of Aug. through Dec. 2008. Missing from this analysis are 2% of cases where the service date was missing from the materials available to CalPAP (819 cases). Thus, of the 98% of the cases that could be examined, 92% were timely, yielding a compliance rate of 90%. Other categories of cases – not in custody, supplemental, optional waiver activation, and extradition – are treated separately

[66] Defendants' Compliance Report dated Feb. 2, 2009 and its Exhibit 17. The study included 669 cases, of which, 635 were timely. Defendants' initial sample included another 26 cases that did not contain the information necessary to measure compliance. This was explained by paperwork or data entry not fully complete, or missing documents; it might also indicate missed service in some cases (per informal communication with Defendants, March 2009). If all cases were noncompliant – which is unlikely – this would reduce the compliance percentage to 91%.

This study has some limitations. It reviewed many cases from earlier in 2008, which may or may not reflect current practice. Cases were chosen by random method but for set snapshots of time. They were drawn from 10 of the Decentralized Revocation Units but not every one. While there were a large number of cases, they represent only about 2% of the activity at those facilities, and only 1% of the notices statewide, in that period. Each of these factors might affect whether the study is representative of system practice. Compare to Closed Case Summary – Case Prep Events Jul. 1 through Dec. 31, 2008.

[67] Closed Case Summary – Extradition Cases, Sept. 1, 2008 through Jan. 31, 2009;  see also this report run monthly and produced in monthly document productions from Dec. 2008 through Feb. 2009, which show some variability month to month

[68] Notice of Rights Unsuccessful, Will Retry, Sept. 1, 2008 through Jan. 31, 2009

[69] It is of note that the data system allows staff to choose among the seven most common reasons. Some of the figures that follow may not be fully correct if staff  entered an existing reason that did not apply because the correct reason was not offered as an option

[70] Defendants' self-monitoring reports visits conducted between Sept. 2008 and Jan. 2009 at CIW, VSPW/CCWF, SQ, WSP, NKSP, HDSP, DVI

[71] Closed Case Summary – Supplemental Charge Cases, Sept. 1, 2008 through Jan. 31, 2009; Open Case Summary – Supplemental Charge Cases. This assumes that the number open on the date of the latter report is typical.

[72] Excel spreadsheet titled Other Objections, run each month from Sept.  through Dec. 2008.

[73] Excel spreadsheet titled Other Objections, run each month from Sept.  through Dec. 2008

[74] Order, Mar. 25, 2008, incorporating by reference the Recommendations language at pages 26-29 of the Report and Recommendation Regarding Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction

[75] Defendants' Compliance Report, Feb. 2, 2009 and informal communications with Defendants

[76] Memorandum with subject line Board of Parole Hearings Comito Objection Tracking Plan, Nov. 5, 2008

[77] Document with computer file name DC Worksheet Comito.doc and informal communications with parties

[78] Document with computer file name Comito Memos.pdf

PDF created with pdfFactory trial version www.pdffactory.com

[79] Comito Objections Denied; Granted Comito Objections – both reports run for each of Sept. through Dec. 2008

[80] See Sept 26 Plaintiff ICDTP Monitoring Proposal

[81] See ICDTP Touring Protocols (2)

[82] See ICDTP Pre-Tour letter Edited (2)

[83] See OSM def Dec 3 Meet and Confer Follow-up

[84] See Defendants' Monitoring Protocol 2009 and HMB Defs re: Monitoring Dec. 1, 2008

[85] See HMB Def's Confirming Quarter 2 monitoring plan Mar. 19, 2009

[86] See Nov. 14, 2008 letter regarding late tour reports

[87] See HHB Defendants and OSMconfirming agreements re: Qtr 1 2009 monitoring

[88] Defendants' Compliance Report, Feb. 2, 2009

[89] Closed Case Summary by DRU – Case Prep Events, and related drill down reports; Closed Case Summary by DRU – Extradition; Closed Case Summary by DRU – NIC Referral. All reports covered Aug. 1, 2008 – Jan. 31, 2009.

[90] Defendants' Compliance Report, Feb. 2, 2009

[91] The American Heritage® Dictionary of the English Language: Fourth Edition, 2000 – see http://www.bartleby.com/61/92/C0559200.html

[92] Reports now capture timeliness for closed mainstream cases, open mainstream cases, closed extradition cases, and closed NIC referrals from the parole units.

It cannot yet show time open for pending extradition cases, activated optional waivers, NIC referrals, and NICs ordered at probable cause hearing. It cannot show time to hearing for completed NICs ordered at probable cause hearing. Without a standard to apply, supplemental charge timeliness cannot be calculated.

[93] Closed Case – Hearing Events Sept. 1, 2008 through Jan. 31, 2009; Revocation Hearing Cases – Over 35 days run each month from Aug. through Dec. 2008. These figures do not take into account open cases.

[94] Excel spreadsheet titled Other Objections, run each month from Sept. through Dec. 2008; this total may include some objections at probable cause hearing

[95] Optional Waiver Open Cases, Waivers Activated Sept. 1, 2008 through Mar. 20, 2009; Closed Case Parolee Activated Optional Waiver Sept. 1, 2008 through Jan. 31, 2009. Of the 3,633 proceedings reflected in these documents, 412 were held or pending after 35 days. Additionally, 276 cases were shown as activated and a hearing held on the same day, or were shown as open longer than one year; both of these examples are not likely to be accurate.

[96] Closed Case Summary – Extradition Cases Sept. 1, 2008 through Jan. 31, 2009; see also this report run monthly and produced in monthly document productions from Dec. 2008 through Feb. 2009, which show some variability month to month

[97] Id. and the Closed Case Detail reports for the 8 cases late at revocation hearing (not printed). Three cases were heard within a week after the requirement. The longest time to hearing was 123 days.

[98] Board Decision NIC run for each month from Dec. 2008 through Feb. 2009 (in monthly document productions); Board Decision NIC Sept. 1 through Nov. 30, 2008. The total of these actions was 82 in a six-month period.

[99] Id. Of these, 16 were assigned the reason code "Impending Violation of Valdivia Timeframes." Another 20 were assigned the reason code "Not a Threat to Public Safety" and occurred 30 or more days after the hold was placed or after the discovery date. The latter was determined by the Special Master's team reviewing in RSTS each case where there was no hold date on these reports; in each instance, RSTS contained a discovery date but no hold date. The records from this review were not printed.

[100] The report captures the date the decision was made to have a "not in custody" hearing and the date the hold was lifted.

[101] Closed Case Summary – NIC Referral run for each month from Dec. 2008 through Feb. 2009 (in monthly document productions); Closed Case Summary – NIC Referral Sept. 1 through Nov. 30, 2008. The total of these actions was 300 in a six-month period.

[102] Date Case Assigned Compliance Report, run each month from Sept. through Dec. 2008. The total of these actions was 254 in that four-month period. The Special Master is unaware of the reasons for the differences in the tracking systems.

[103] Informal communication with parties

[104] Closed Case Summary – NIC Referral run for each month from Dec. 2008 through Feb. 2009 (in monthly document productions); Closed Case Summary – NIC Referral Sept. 1 through Nov. 30, 2008.

PDF created with pdfFactory trial version www.pdffactory.com

[105] Informal communication with parties

[106] Closed Case Summary – NIC Referral run for each month from Dec. 2008 through Feb. 2009 (in monthly document productions); Closed Case Summary – NIC Referral Sept. 1 through Nov. 30, 2008

[107] Closed Case Detail reports linked to Closed Case Summary – NIC Referral reports referenced above

[108] Priority Case Summary, Sept. 1, 2008-Jan. 31, 2009; Closed Case Summary-Hearing Events for same period

[109] All discussion of objections is drawn from Excel spreadsheet titled Other Objections, run each month from Sept. through Dec. 2008

[110] Board Decision Dismiss Sept. 1 through Nov. 30, 2008, and Board Decision Dismiss run for each of Dec. 2008 and Jan. through Feb. 2009 (in monthly productions). Some occurred at probable cause hearing and some at revocation hearing; because the report does not distinguish them, we will discuss them collectively here.

[111] Those dismissed for insufficient evidence totaled about 824 (adding that code to the instances recorded as "Other"). Several of the other due process reasons occurred about 50 times during the Round, and some fewer than that. The total was about 1,012 over a six-month period.

[112] Although these reports contained a greater number of dismissals, a significant number were deferring to another jurisdiction or correcting an error; another subset was dismissing only in order to refile because the parolee was believed to have absconded.

[113] Defendants' Compliance Report, Feb. 2, 2009

[114] Memorandum with subject line Probable Cause Hearing Procedures, June 12, 2006; informal communications with Defendants March 2009

[115] Clerical staff review a sample of 10% of cases applying several criteria, the most relevant of which is whether the record cited evidence sufficient to support a finding of probable cause. Staff are guided by two instruction sheets. These are limited in the sense that they do not define probable cause, do not provide the elements of the violations that must be supported, and do not give examples of language that would be insufficient (the examples of acceptable language is very minimal indeed).

In combination with life experience in probable cause and sufficiency of evidence, the material could serve well; absent that, it is not clear that staff would recognize all deficient cases. They have, however, identified some, and have assisted in improving practice.

Just as importantly, this exercise gets at a somewhat different problem. It would not allow CDCR to know whether probable cause was discussed during the hearing. It is a good tool for determining whether the necessary thought process was captured on paper.

Informal communications with Defendants March 2008; document with computer file name QCU Desktop Procedures – Lack of Information.pdf; document with computer file name QCU Desktop Procedures – What to Review.pdf

[116] Document with computer file name QCU Percentages of Insufficient Decisions.pdf; document with computer file name Insufficient Decisions – sample letter.pdf

[117] Informal communication with parties

[118] Closed Case Summary – Extradition Cases, Sept. 1, 2008 through Jan. 31, 2009; see also this report run monthly and produced in monthly document productions from Dec. 2008 through Feb. 2009, which show some variability month to month

[119] Telephonic Probable Cause Hearing Summary Sheet Jul. through Dec. 2008 (using only data for the Round – Aug. through Dec. 2008)

[120] DECS Accommodations Planned vs. Provided, Oct. 1, 2008 through Mar. 5, 2009. At CDCR institutions, the document reports together those accommodations provided at lifer hearings and in revocation proceedings. The four jail-based DRUs, however, report only revocation proceedings accommodations; these are Los Angeles County Jail, Pitchess Detention Center, Rio Cosumnes Correctional Center, and Santa Rita County Jail. We do not know whether this is fully generalizable to other DRUs, since practice at these DRUs may be influenced by their unique circumstances. Nevertheless, this is a very large sample of all revocation proceedings and gives some worthwhile indications.

[121] Interpreter Logs provided with monthly productions from Sept. 2008 through Feb. 2009. Usage on these invoices totaled 569.

[122] Rev. Hearings Postponed Beyond Valdivia Timelines, Aug. 1 through Dec. 31, 2008

[123] Id.; one case reconvened in that time but was further postponed because of the parolee's request for a witness. See document with computer file name 1103- interpreter+further continuance.pdf.

PDF created with pdfFactory trial version www.pdffactory.com

[124] In addition to probable cause hearings, the chart showed sign language interpreters at 4 revocation hearings and 2 optional waiver reviews. Defendants appropriately investigated and explained when parolees appeared to have interpreters at revocation hearing but not at the preceding probable cause hearing. Similar explanations were evident in the Special Master's RSTS review of the optional waiver reviews. BPH Provided SLI 9-1-08 – 1-31-09

[125] See individual's 1103 filed in ADA documents (name withheld here for reasons of protective order)

[126] The forms were present in 98% of files, as contrasted with 96% in the prior Round. Missing 1073 and Source Documents Monthly Report, run each month Aug. through Dec. 2008

[127] Informal communications with Defendants

[128] The analysis in this section is based on Excel spreadsheets with computer file names 2008 Tape Request Log.xls and 2009 Tape Request Log.xls. These cover Sept. 2008 through Feb. 2009.

[129] There were an additional 33 parolees who initially appeared to have a similar problem. After analysis, however, these requests were either for different hearings, made by different requesters, second requests made too close in time to have expected Defendants to have filled the first request, or duplicate data entry.

[130] Cumulative Parole Administrator Actions by DRU, Sept. 1, 2008 through Jan. 31, 2009. Historically, staff and the Special Master have not used RSTS to determine the timeliness of this requirement as it did not appear that this was tracked. The Special Master's team newly learned that this calculation *is* possible, but there was not sufficient time to make use of the information before filing this report.

[131] Cumulative Parole Administrator Actions by DRU, Sept. 1, 2008 through Jan. 31, 2009; informal communications with Defendants, who said that the line labeled "Cases With Missed/Late ParAd Review" actually captures missed cases alone

[132] This section relies on *Valdivia* Staff Vacancy Report, Mar. 24, 2009 and *Valdivia* Staff Vacancy Report, Oct. 29, 2008

[133] Special Master's observations

[134] Informal communications with Defendants, 2008

[135] *Valdivia* Staff Vacancy Report, Mar. 24, 2009

[136] Informal communications with Defendants, 2008

[137] Staffing for the Female Residential Multi-Service Center reportedly was allocated when CDCR intended to provide 275 beds. While current staffing is only at 1/3 of allocated positions, the department only has 25 beds open and does not currently plan to expand.

[138] *Valdivia* Staff Vacancy Report, Mar. 24, 2009

[139] According to the document with the computer file name BPH RA Staffing.pdf, retired annuitants served as Deputy Commissioners for 49,039 hours in 2008, which is the equivalent of just over 27 positions. On average, 49 retired annuitants worked 83 hours each per month.

Retired annuitants may work as much as 900 hours per year. Therefore, to cover the current 21 vacancies (2 of which are staff redirected to supervisory positions), CDCR would need 42 retired annuitants working their maximum allotted hours, or a larger number working fewer hours. With 80 available, this should be feasible.

[140] Informal communications with Defendants, 2008 and 2009

[141] Source for all information in this section is Excel spreadsheet titled "Valdivia Problem Cases" covering requests received from Sept. 1, 2008 through Jan. 31, 2009.

[142] See Plaintiffs' Response regarding Decision Review, Nov. 7, 2008

[143] See DAPO and BPH Draft Decision Review Policies

[144] For Plaintiff feedback on policies, see HMB defs re comments on draft decision review policies, Feb.2, 2009

[145] Revocation Extensions by Location, run for each month from Aug. through Dec. 2008

[146] Defendants' Compliance Report, Feb. 2, 2009

[147] Over 50 Mile Report Sept. 1 through Dec. 31, 2008

PDF created with pdfFactory trial version www.pdffactory.com