# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

**JERRY VALDIVIA, et al.,**

    **Plaintiffs,**

       vs.                       **No. CIV S-94-671 LKK/GGH**

**ARNOLD SCHWARZENEGGER, et al.,**

    **Defendants.**

_____/

## SEVENTH REPORT OF THE SPECIAL MASTER
## ON THE STATUS OF
## CONDITIONS OF THE REMEDIAL ORDER

### Background

On May 2, 1994, the lawsuit now known as *Valdivia vs. Schwarzenegger* was filed. The Court certified the case as a class action by order dated December 1, 1994. On June 13, 2002, the Court granted partial summary judgment in favor of the Plaintiffs. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan, with specific guidance regarding "…a prompt preliminary probable cause hearing that affords the parolee rights provided by *Morrissey*, including notice of the alleged violations, the opportunity to appear and present evidence, a conditional right to confront adverse witnesses, an independent decision-maker, and a written report of the hearing."

On March 8, 2004, the Court entered the Stipulated Order for Permanent Injunctive Relief ("Permanent Injunction") containing the agreed-upon elements of the

PDF created with pdfFactory trial version www.pdffactory.com

settlement terms. On July 1, 2004, the Defendants submitted a variety of policies and procedures to the Court. On June 1, 2005, this Court signed a Stipulated Order Regarding Policies and Procedures for Designating Information as Confidential. On June 8, 2005, the Court filed an order finding violation of the Permanent Injunction regarding remedial sanctions. On August 31, 2005, the Court issued an Order concerning parolee attorney access to information in clients' field files.

On August 18, 2005, a Stipulation and Amended Order Re: Special Master Order of Reference was entered; on December 16, 2005, an Order appointing Chase Riveland Special Master was entered; and on January 31, 2006, an Order was entered appointing Virginia Morrison and Nancy Campbell as Deputy Special Masters.

The Special Master filed his first report on September 14, 2006. Subsequently, the Court issued an Order on November 13, 2006 requiring improvements to Defendants' information system and internal oversight mechanisms. On April 4, 2007, the Court entered a Stipulation and Order Regarding Remedial Sanctions. The second Special Master's report was filed on June 4, 2007 after receiving concurrence from the Court that the report would be delayed.

The Court entered a Revised Stipulated Protective Order Regarding Parolee Defense Counsel Access to Witness Contact Information and Certain Mental Health Information on June 11, 2007. On September 28, 2007 and October 22, 2007, the Court issued Orders determining that interstate parolees and civil addicts were not part of the *Valdivia* class.

The third Special Master Report was filed with the Court on November 28, 2007, and an Order issued by the Court on January 15, 2008 directed the Defendants to address

PDF created with pdfFactory trial version www.pdffactory.com

due process for parolees who appear, either in the judgment of their attorneys or defendants' staff, too mentally ill to participate in revocation proceedings.

The Special Master filed a Report and Recommendation Regarding Motion to Enforce Paragraph 24 of *Valdivia* Permanent Injunction on February 8, 2008 and the Court adopted the recommendations in an Order issued March 25, 2008. That Order is on appeal, but a stay was denied by both the district and appellate courts. The Special Master filed his fourth report on April 28, 2008. Granting Plaintiffs' motion, this Court ordered on August 8, 2008 that parolees have timely access to inpatient psychiatric hospitalization, and psychiatric evaluation pursuant to California Welfare and Institutions Code § 5150 under certain circumstances. .

The Fifth Special Master Report was filed on October 25, 2008. No action was requested of the court, but the following recommendations were made to the Defendants: "While the Special Master does *not* seek court orders at this time, it is strongly recommended that Defendants:

1. Address the practice of Deputy Commissioners failing to expressly consider and make findings concerning probable cause during probable cause hearings

2. Address the handling of hearsay objections when it is not consistent with any reading of the law advanced by the parties or endorsed by the Court, and expeditiously implement the Court's March 25, 2008 Order concerning confrontation rights

3. Investigate the causes of myriad deficiencies in revocation proceedings at Los Angeles County Jail and consistently work toward remedying them

4. Pay strict attention to the requirement to maintain staffing levels sufficient to meet all obligations of the Permanent Injunction

5. Investigate the cause for delay in transfer of parolees from jails and institutions to community-based ICDTP programs"

PDF created with pdfFactory trial version www.pdffactory.com

On November 14, 2008, Plaintiffs filed a Motion to Enforce the Injunction and prohibit Defendants from implementing those amendments to Penal Code § 3044 included in the Victims' Rights and Protection Act of 2008 which conflicted with the Permanent Injunction. This Court granted that motion on March 26, 2009 and this order is currently on appeal.

The Special Master filed his sixth report on April 23, 2009. It contained no new recommendations.

### Special Master Activities

The team observed and participated in the Deputy Commissioner academy and observed Deputy Commissioner refresher training. The team participated in site visits to San Quentin State Prison; Rio Cosumnes Correctional Center; San Francisco and Los Angeles county jails; the Stockton, Inglewood and Pasadena parole units; and two drug treatment programs treating dually diagnosed parolees. The Special Master's team and CDCR continued with monthly information update calls. The team continued to assist the parties in negotiations concerning decision review, monitoring, quality improvement, remedial sanctions, confrontation rights policies and training, mentally ill parolees, and the information system.

### Scope and Approach for This Report

This report continues the approach of reviewing each component of the Permanent Injunction and issues arising out of its interpretation. There is particular emphasis on topics subject to this Court's additional orders concerning remedial

PDF created with pdfFactory trial version www.pdffactory.com

sanctions, mentally ill parolees, information systems, internal oversight, and confrontation rights.

This report discusses observations and activities spanning April through August 2009, collectively referred to as "the Round." Where data is employed, it may cover January 1, 2009 through August 31, 2009, or a subset of that period, depending on data availability and scope of coverage during the previous Round.

The report is structured to begin with background material followed by overarching observations of factors affecting Defendants' compliance. The report then discusses issues where Defendants have newly attained "substantial compliance" status, a major milestone they are reaching for the first time.

The report then treats separately those areas that are subject to court orders during implementation, or Special Master recommendations, in the chronological order in which those orders and recommendations were issued. An assessment of each Permanent Injunction requirement follows, to the extent it is known by the Special Master, and the report concludes with a summary and recommendations.

This report also uses some language conventions. Progress and compliance are often discussed separately, reflecting that movement during the Round is worth recognizing, even where overall results may not match. The Special Master does not always comment on progress.

In assessing either, this report uses the terms "substantial compliance," "good," "adequate," and "poor." At this stage of the remedy, one would expect most requirements to be partially implemented and, thus, "adequate." "Good" performance is a high bar, and it takes sustained Rounds at that level to reach "substantial compliance." When

5

PDF created with pdfFactory trial version www.pdffactory.com

discussing problems, descriptors progress in severity from "minor" to "substantial" to "significant," and then stronger terms are used for issues of greatest concern.

References to the Special Master's activities frequently include the actions of one or more members of his team. The term "monitoring reports" refers collectively to reports generated by Plaintiffs' monitoring and by Defendants' self-monitoring, unless otherwise specified.

In responding to the draft of this report, as to a number of requirements, Plaintiffs cited apparent or possible deficiencies observed in visits or documentation. Where those potentially deficient cases were few in number, the Special Master declines to incorporate them in this report. However, all parties would do well to be watchful of those issues to determine whether the scope is more broad than has been determined to date. Similarly, Plaintiffs requested that this report frequently cite the need for monitoring and tracking of deficient or recently improved practices, or for specific improvements in inadequate electronic reports. While not written here, those are certainly the Mastership's expectations for all deficiencies discussed herein.


**Trends and Observations**


The fiscal crisis of the last year has created some unusual conditions for the Defendants and created many challenges that must be addressed to understand the outcomes for the Round and what portends for the near future. California has suffered enormously this year from the international fiscal crisis that has impacted the rest of the nation. The crisis has exacerbated what was already a challenging fiscal situation for

PDF created with pdfFactory trial version www.pdffactory.com

CDCR. This section of the report will provide observations regarding the impact of the fiscal crisis on the Defendants and note some challenging and hopeful trends.

Understanding how the fiscal crisis has impacted the Defendants is important for two reasons. First, to understand how the Defendants' ability to address some of the goals for this Round has been impacted and second, to fully appreciate the progress they have made in many areas in spite of what are often daunting organizational impediments.

The fiscal situation significantly compromises staff availability, experience, and working conditions. Most of the Defendants' staff are subject to "Furlough Fridays," which has resulted in the staff having 15% less time to complete work. With layoff notices pending, staff  have left for employment with more stability. Some departments have been disproportionately affected by staff losses. For example, the information systems programming group that maintains and makes changes to the revocation database has lost almost every programmer.

These changes also led to an experience drain that leaves staff less able to produce. Defendants have relied heavily on retired annuitants in both management and direct service areas, and the decision to cease using them was a real loss. Several key experienced staff members have chosen to retire, leave state service, or move to positions which afford them greater job security during this period. This has resulted in critical historical and operational information being lost. Staff who had longstanding relationships with key internal and external stakeholders have left, and rebuilding relationships that are often key to effective system functioning will take time. With reductions in staff in other agencies, those staff with longer state service move into CDCR positions, bringing limited corrections or parole experience. Staff with little

PDF created with pdfFactory trial version www.pdffactory.com

experience and often inadequate training and guidance suddenly find themselves in charge of areas that are critical to effective system functioning.

In times of staff turnover and vacancies, a healthy organization provides more training and supervision for the staff who find themselves in new roles and with new responsibilities. The fiscal crisis has not often allowed for additional training and supervision of staff. Indeed, *all* of the Board's training positions are vacant. Defendants are struggling to meet the basic mandates of the Permanent Injunction and do not have the ability to provide the additional support needed by employees.

Additionally, the uncertainty of the fiscal situation has created widespread anxiety for staff and understandably diverted their attention from the work at hand to worrying about their job security and their own personal financial security. Uncertain working conditions almost always result in a reduction in productivity. This fiscal crisis, being of such historic proportions, has certainly diverted the attention and psychic energy of the staff away from their work. When combined with the frequent consideration of major structural and functional changes, these conditions severely restrict planning, innovation and forward movement.

At the same time, experience and guidance is a critical need for the Board, and will be essential to accomplishing many of this Court's orders.  The fiscal crisis has heightened an already difficult situation.  For a lengthy period, the Board has functioned with more of its *Valdivia* senior management positions vacant than filled. With temporary appointments in key positions, the lack of permanent managers who have the needed organizational expertise to address systems change continues to hamper the Board's ability to partner with other divisions to implement needed process and system change.

PDF created with pdfFactory trial version www.pdffactory.com

Moreover, without enough skilled managers to oversee and direct hearing officers, there is a serious impediment to identifying and addressing the deficiencies in due process during hearings.

While there is no question that the disruption created by the fiscal crisis has limited progress, to their credit, the Defendants have lost little ground. The hard work to develop better information systems is paying off. Defendants can now demonstrate more effectively that the parole revocation system is working well in the majority of cases. However, in the most recent month, timeliness compliance was markedly down. It is also becoming apparent that there is a significant divide between the majority of cases and Defendants' management of the populations where special handling is needed. In situations such as extradition, postponement, and not in custody hearings, compliance levels are substantially lower and will require attention to remedy.

Defendants have now demonstrated that several important and long-awaited policies and practices have been adopted. Examples of this include the completion of negotiations with Plaintiffs regarding the Decision Review process. The agreed upon Decision Review process training has been completed and next Round, Defendants' data collection will allow for analysis of the effectiveness of this new system. Similarly, great progress has been made in developing referral and placement processes for an array of alternatives to incarceration for parolees in the revocation process. Means to provide due process to severely mentally ill parolees are well underway, and critical first steps have been taken in protecting confrontation rights.

PDF created with pdfFactory trial version www.pdffactory.com

On balance, Defendants are holding their own at this time. These pressures will continue unabated for the foreseeable future, and the effects threaten to undermine their ability to progress.

## Requirements in Substantial Compliance

Defendants have designed and operated most of the systems needed to implement the Permanent Injunction and related orders. There is sufficient operational history and, in many cases, a demonstrable track record, on which to base conclusions about the effectiveness of those systems. Not surprisingly, there is a range of performance varying by topic and location.

Where Defendants' systems have proven highly effective consistently over time, the Special Master will consider those requirements to be fulfilled. These requirements will be termed "substantially compliant." This will generally apply to performance across the system, but sometimes a Decentralized Revocation Unit may reach this status on a requirement or as to the Permanent Injunction as a whole.

Substantially compliant items will remain within the Permanent Injunction, but the Special Master will discontinue review of such items unless and until a significant decline in performance surfaces. Defendants should continue to review these items during quality improvement efforts at regular intervals to prevent such a decline.

During the seventh Round, the following items have reached substantial compliance.

PDF created with pdfFactory trial version www.pdffactory.com

**Requirements from the Permanent Injunction**

**<u>*By the tenth business day after the hold, Defendants shall create a Return to Custody Assessment*</u>** (Exhibit A – Remedial Plan)

Return to Custody Assessments, an offer of resolution required in the Remedial Plan, must be completed by the tenth business day following the hold. As discussed *infra*, Los Angeles County Jail had difficulty meeting this requirement. The rest of the system, however, was compliant in 95% of the cases, and 99% were completed within two days after the deadline. Thus, only 1%, or an average of 57 cases per month, had an assessment sufficiently delayed that it would significantly affect defense counsel's preparation or hearing timeliness. This level of performance has been sustained since at least March 2008.

- The Special Master therefore finds this requirement to be substantially compliant for all facilities *except* the Los Angeles County Jail Decentralized Revocation Unit.

**<u>*Revocation hearings to be held within 50 miles of the alleged violation*</u>** (Exhibit A – Remedial Plan)

CalPAP data captures 10 hearings in which the revocation hearing was set outside the 50-mile limit during a seven-month period.[1]  Only two of these were held over an attorney's objection; in one of those two cases, notes indicate evidentiary witnesses were unnecessary as good cause was established by a court conviction. Documents have shown the rate of hearings occurring outside the limit to be 0.3% or less for four Rounds.

- This sustained level of compliance leads the Special Master to consider this issue to be substantially compliant.

PDF created with pdfFactory trial version www.pdffactory.com

***Counsel shall have access to all non-confidential portions of field files*** (¶ 16)

Since Defendants issued a revised policy in September 2007, CalPAP has consistently reported good access to field files with extremely rare exceptions. As CalPAP receives reporting forms on each case and otherwise maintains routine contact with its attorneys, it is reasonable to believe that difficulties of any magnitude would have come to CalPAP's attention or been raised as objections during hearings.

- This sustained level of compliance leads the Special Master to consider this issue to be substantially compliant.

## Requirements from the April 2007 Remedial Sanctions Order

**Remedial Sanctions Order**

In the last Round, the Special Master noted that that the Defendants have fully met most requirements of the Remedial Sanctions Order and that any of the remaining issues can be discussed in the context of the broader Permanent Injunction. The areas noted below are the requirements of the Remedial Sanctions Order that are deemed to be in substantial compliance.   Areas of the Remedial Sanctions Order that are not substantially compliant will be discussed in the Remedial Sanctions section of the report as will those items that are not requirements of the Remedial Sanctions Order but will require attention in the future to achieve resolution of remedial sanctions issues in the broader Permanent Injunction.

### *Policies and Procedures*

As noted in the last Round, Defendants have moved into a stage of revising ICDTP policies and procedures. The ICDTP policies were first implemented in 2007. The last revisions were sent to the field July 27, 2009 after labor negotiations were completed.[2]

PDF created with pdfFactory trial version www.pdffactory.com

Defendants have developed the policies and, after implementation, modified them, demonstrating that they are paying attention to how well the policies are understood by staff and their effectiveness in guiding staff behavior. While no changes were needed for other programs that are used as remedial sanctions, there continues to be education and encouragement for staff regarding the use of these programs. A quarterly newsletter provides updates on the program and an online Google mapping tool has been created so staff can easily find the programs.[3] All policies and procedures required by the Remedial Sanctions Order have been implemented after negotiations with Plaintiffs and labor.

- The sustained level of compliance leads the Special Master to consider this issue to in substantial compliance.

### Interim Remedial Sanctions

In the last Round, the Defendants issued Policy 09-02. This policy removed the requirement of designating beds in Paroles Division programs for use as remedial sanctions. The policy encourages staff to continue using the programs as remedial sanctions. The Remedial Sanction Workload Report continues to demonstrate that these programs are used as remedial sanctions.[4] In addition, Defendants continue to track use of other Paroles, Institutions, and Division of Addiction and Recovery Services programs that were designated as interim remedial sanctions.[5] These reports continue to show referrals and placements of remedial sanction parolees. Despite the difficult economic situation, Defendants have protected these programs from budget cuts so they remain available for use as remedial sanctions.

- The completion of this interim requirement leads the Special Master to consider this issue to in substantial compliance.

PDF created with pdfFactory trial version www.pdffactory.com

*Expanding Jail and Community-Based ICDTP Programs*

Defendants continue to make full use of the 1,800 funded ICDTP drug treatment beds. Per the Remedial Sanctions Order, a minimum of 400 beds must be in each region and a minimum of 40 of beds per region must be for female parolees. This is the third Round in which Defendants have complied with this element of the Remedial Sanctions Order.

As in the past, there have been some changes in the providers and location of some programs. Some   programs have closed and others opened. For example on May 1, 2009, a jail-based ICDTP opened at Rio Cosumnes Correctional Center. The overall number of providers and identified beds for placement has expanded significantly. As of January 31, 2009, the number of identified beds statewide was 2,461. Today it is 6,195. The growth in identified beds is largely attributable to the loss of funding for the Proposition 36 program and the harsh economic times, which has resulted in a decrease of clients for the programs who provide ICDTP services.[6] The Division of Addiction and Recovery Services, both because of the financial crisis and an excellent track record of working with the jail and community-based providers, has been very successful at continuing to find new ICDTP beds in all regions. Defendants have been successful in their long-term efforts to add more jail-based ICDTP beds.

Table 1 indicates the number of ICDTP beds in each region. The ICDTP weekly report was created to track compliance with the Remedial Sanctions Order requirement of having 1,800 ICDTP beds available. It underestimates the number of identified community-based ICDTP beds. The number of parolees in ICDTP actually exceeds the

14

PDF created with pdfFactory trial version www.pdffactory.com

1,800 beds noted in this report. A more complete number of community-based beds is found in the community-based provider list.

In the month of August, the actual number of parolees in ICDTP exceeds the available beds of 1,800. Defendants continue to maintain an adequate number of identified beds to provide enough flexibility to have over 1,800 parolees in treatment on any given day.

**Table 1[7]**
**ICDTP Beds by Region: Round Seven**

| Type of Bed | Region I | Region II | Region III | Region IV |
|---|---|---|---|---|
| Total Jail Based | 542[8] | 220 | 0 | 72 |
| Total Community Based | 818 | 895 | 3080 | 767 |
| Female[9] | 166 | 287 | 451 | 161 |
| Total Beds | 1360 | 1115 | 3080 | 839 |

As of August 31, 2009, 2,173 parolees were in ICDTP programs. During most months of the fiscal year, more than 1,800 parolees were in ICDTP. This resulted in a reduction in placements beginning in March 2009 and in the last half of June no placements were made in ICDTP. As soon as the new fiscal year began on July 1, 2009, Defendants began placing parolees in ICDTP again.

Using the existing number of placements the last week of each month of the fiscal year, the average placement number throughout the fiscal year was 1,771. This is a 98% occupancy rate. Clearly, the system devised by the Division of Addiction and Recovery Services is an outstanding success. It has managed a very high occupancy while staying

PDF created with pdfFactory trial version www.pdffactory.com

within its allocated resources rate in a situation where turnover exists and entrance and exit dates can fluctuate. This level of efficiency is extraordinary and is to be commended.

- The sustained level of compliance leads the Special Master to consider this issue to be in substantial compliance.

### Determining Availability of ICDTP

The Remedial Sanctions Order required the development of a system by which every Paroles Division and Board decision-maker is able to determine the availability of ICDTP remedial sanctions statewide on any given day. Defendants have continued to work to create a system by which decision-makers have accurate and immediate information regarding placement availability. Changes have been made to ensure more accurate and timely information to those who manage the system of placements that is then sent to decision-makers. They include:

- The Division of Addiction and Recovery Services placement coordinators now receive daily placement lists from the Decentralized Revocation Units. This process has been improved by implementing an automated report that was created for the Division of Addiction and Recovery Services by the Office of Court Compliance. The report is generated through the revocation database and provides a daily, real-time update on all ICDTP decisions, including jail and community-based endorsements. The Decentralized Revocation Unit and the automated report provide an opportunity to cross-reference endorsed participants to ensure that timely placements are made.

- The automated report from the revocation database is also used to manage bed slot availability on a daily basis. A Timeliness Remedial Sanctions Report is run

PDF created with pdfFactory trial version www.pdffactory.com

daily to provide a statewide aggregate endorsement roster that allows Division of Addiction and Recovery Services to project usage.

Each day, Parole Administrators and Deputy Commissioners are provided access via e-mail regarding placement availability statewide.[10] This information helps to guide Parole Administrators and Deputy Commissioners regarding placement. Those Parole Administrators and Deputy Commissioners who work with jail-based ICDTPs are provided with the exclusionary criteria of jails.[11]

It is not enough to know that a program is available; the decision-makers must understand what the programs are and how best they can serve a parolee. In the last Round, the Board of Parole Hearings had been encouraged to improve its training regarding remedial sanctions. It did so. During this Round, training regarding remedial sanctions was provided for both existing Deputy Commissioners as well as new Deputy Commissioners. The training was of much better quality than in the past. Representatives from the Paroles Division, the Division of Addiction and Recovery Services, CalPAP, Plaintiffs and the Office of the Special Master participated in various trainings. A matrix regarding ICDTP and other Paroles Division programs that are available was developed by the Paroles Division and shared with new and existing Deputy Commissioners.[12] This matrix is an excellent tool to help decision-makers understand how to use an array of programs provided by several divisions of the California Department of Corrections and Rehabilitation. In the last Round, the Paroles Division also added a matrix of remedial sanctions programs to its intranet and has provided access to this information to Paroles Division and Board of Parole Hearing staff.[13]

- The sustained level of compliance leads the Special Master to consider this issue to be in substantial compliance.

PDF created with pdfFactory trial version www.pdffactory.com

*Electronic In-Home Detention*

The revocation database continues to show the use of electronic in-home detention. The revocation database typically shows fewer uses than does the electronic in-home detention coordinator reports. The numbers continue to show use that meets or exceeds the designated 250 units. There is no evidence from any source of a parolee being denied the use of electronic in-home detention.

- The sustained level of compliance leads the Special Master to consider this issue to be in substantial compliance.

*Sharing Information with Parolee Defense Counsel*

All policies and procedures that have been developed regarding remedial sanctions have been provided to parolee defense counsel. Defendants have worked collaboratively with CalPAP, the agency that provides parolee defense counsel services. Defense counsel attends meet and confer sessions with the parties and provides input in the development of policies and procedures. It is not unusual for CalPAP to take the lead on issues and to assist with problem solving. For example, Defendants and CalPAP worked collaboratively to develop the Self Disclosure Questionnaire. Defense counsel is kept abreast of all program policies and procedures, including exclusionary and inclusionary criteria.

- The sustained level of compliance leads the Special Master to consider this issue to be in substantial compliance.

PDF created with pdfFactory trial version www.pdffactory.com

***Training about Remedial Sanctions***

Training about remedial sanctions has been provided to Paroles Division staff, and Board of Parole Hearings staff. The quality of the initial training was not good. Over time, the quality of the training has notably improved.

The first trainings were statewide and the trainings were held for each division and trained by their own staff. The training curricula received input from the Special Master, Plaintiffs and parolee defense counsel. The Special Master and Plaintiffs attended trainings and provided feedback to Defendants.

The divisions that supervise the decision-makers in the *Valdivia* process have institutionalized a system for ensuring that new Parole Agents and Deputy Commissioners are knowledgeable about remedial sanctions. Most recently, the Board of Parole Hearings has reached out to Paroles Division and the Division of Addiction and Recovery Services to provide training for the Deputy Commissioner academy. The quality of the training has notably improved. The Paroles Division has also added remedial sanction training to its Parole Officer academy.

In addition, the Division of Addiction and Recovery Services has worked with the staff of the Substance Agency Coordination Agencies to provide mandatory training regarding the ICDTP policies and procedures to all ICDTP providers. This training is provided to ensure that the providers understand the referral system and program requirements. The training is taking place throughout the state in the month of September.[14]

At this time, all *Valdivia* decision-makers have received training on remedial sanctions. The quality of the training has varied but has shown a pattern of consistent and

PDF created with pdfFactory trial version www.pdffactory.com

steady improvement. Interim updates on remedial sanctions are provided through a variety of mechanisms including Paroles Division electronic alerts, memos, and targeted training provided in units.

- The sustained level of compliance leads the Special Master to consider this issue to be in substantial compliance.

### *Reporting on the Development of the Parole Violation Decision-Making Instrument*

The Defendants are required in the Remedial Sanctions Order to "report to the Special Master and Plaintiffs on the progress and results of this investigation [of a parole violation decision-making instrument] no later than July 1, 2007, and periodically thereafter as necessary, but at least every 60 days until completion of the matrix investigations or resulting matrix implementation." Over a two-year period, the Defendants created, tested, and implemented a parole violation decision-making instrument.[15]

Parties were provided with an overview of the violation decision-making process in March 2008. An overview of what violation instrument is and how the proposed instrument would work in California was provided. Participants were informed at this time that the instrument would replace the activity report that documents parole violations. Four sites were chosen to pilot the training. Master training was provided for all senior Paroles Division and Board of Parole Hearings staff and the supervisors of the four pilot sites in October and November 2008. The Special Master attended this training. Plaintiffs and the Special Master attended some of the Paroles Division pilot site trainings. Upon completion of the pilot (the results of the pilot are discussed in the Sixth Report of the Special Master), statewide Paroles Division training began. Over 90% of

PDF created with pdfFactory trial version www.pdffactory.com

Parole Agents and supervisors have been trained on the instrument as this writing.[16] Ninety nine percent of Paroles Division staff will have been trained in the instrument by September 23, 2009.[17]

The Board of Parole Hearings presented a statewide Parole Violation Decision-making Instrument training for Deputy Commissioners in April and May 2009. The one hour training provided an overview of the Parole Violation Decision-making Instrument and information on how to enter data into the revocation database at revocation proceedings. All but two permanent full time Deputy Commissioners and retired annuitant Deputy Commissioners have undergone the training and the remaining two are due for training by the end of September 2009.[18] The Paroles Division and the Board are to be commended for their excellent effort to train decision-makers in the Parole Violation Decision-making Instrument.

Upon completion of the training, staff began to use the instrument. To date, approximately 33,000 parole violation instruments are completed. The use of the instrument has been noted in several monitoring reports this Round. An evaluation conducted by University of California-Irvine, Center for Evidence-Based Corrections, will be complete by the end of September 2009. Both the Paroles Division and the Board of Parole Hearings have created systems to track level of agreement with the instrument and when there is disagreement whether the decision-maker chose a lesser or more serious sanction.

Data from Deputy Commissioners indicates that, in 34% of the hearings, there was no Parole Violation Decision-Making Instrument. In the remainder of the cases, the Deputy Commissioners agreed with the instrument in 50% of the cases. Given that many

PDF created with pdfFactory trial version www.pdffactory.com

Deputy Commissioners had not been trained in the instrument during this period, this data indicates a high agreement rate with the instrument. In an additional 2% of the cases, the Deputy Commissioners went with a lesser sanction than the instrument recommended.[19]

Similarly, initial data from the Paroles Division indicates that Parole Agents are agreeing with the instrument in 52% of the cases. In addition, in 26% of the cases, they gave a sanction less severe than the recommendation.[20] As with the Deputy Commissioners, Parole decision-makers are demonstrating a relatively high level of agreement with the instrument in the early stages of implementation. Continued training typically increases confidence in, and thus agreement with, the instrument.

Defendants have gone beyond the requirement of reporting on the Parole Violation Decision-Making Instrument. They have fully engaged the Plaintiffs and the Special Master in the development and implementation process. While use of the instrument is not a part of the *Valdivia* Remedial Sanctions Order or Permanent Injunction, it can be reviewed to assess whether remedial sanctions are considered, in conjunction with reviewing hearing officers' articulation of the basis for hearing decisions, and to understand individual clients' problems. It will continue to yield valuable data that can help to shape policy for the Defendants.

> The Special Master considers Defendants to be in substantial compliance with the requirement to inform about the decision-making matrix until its implementation. There are no other *Valdivia* requirements governing this tool, and no *Valdivia* obligation to continue using it.  To the extent that it is used, however, the parties may review it in conjunction with assessing the consideration of remedial sanctions, the articulation of basis for findings, or where necessary in reviewing individual parolee concerns.

PDF created with pdfFactory trial version www.pdffactory.com

**Information Systems**
(Order, November 13, 2006)

This Court ordered in November 2006 that Defendants initiate information system application changes to improve their ability to manage r*evocatio*n proceedings and to demonstrate compliance. Defendants were required to complete the changes within one year and six months of that Order.[21]

Defendants have continued to improve the information system's accuracy and functionality. They implemented a substantial upgrade in July 2009, created some new reports, and corrected or updated others to perform necessary functions. Information systems staff worked to fulfill requests from other departments and from the Special Master.

From the perspective of demonstrating compliance, the most important remaining issue is that CDCR cannot demonstrate the timeliness of the notice of rights and charges, a major *Valdivia* component. Of similar importance are several reports concerning revocation extension that appear to be inaccurate. Several other existing reports need basic functions, such as calculating a total; without this, the hundreds of pages of entries cannot be used for management or monitoring purposes.

§   There is adequate progress and good compliance on this requirement.

**Internal Oversight**
(Order, November 13, 2006)

In prior Rounds, Defendants created the Office of Court Compliance consistent with the Court's November 13, 2006 Order, drawing on professionals from each of the three key divisions involved in *Valdivia*. The group's work originated with rigorous studies of targeted problems and convening workgroups that designed and tested

23

remedies. The office established comprehensive assessments during site visits that spotted facility-specific and systemic issues, and initiated fixes for them.

As site visits continued, staff recognized the need to shift from issue-spotting to greater problem-solving. They suspended onsite monitoring in favor of designing and implementing more streamlined electronic methods for gathering and managing information, and updating their monitoring methods. (see also Monitoring as reasonably necessary, *infra*)

Throughout, staffing vacancies have been a substantial barrier to an oversight program that goes beyond onsite monitoring. There has been no hiring into critical positions – running only half-filled – for three Rounds. Staff are rarely able to continue with subject-specific studies or follow through on corrective actions. The office has also shifted its orientation to include legal responsibilities.

During the Round, staff reportedly made progress in several of these areas. They conducted a collaborative process to update their monitoring methods with the advice of the divisions being monitored. They reportedly have worked on an internal agreement that will strengthen their work on corrective action plans; that agreement is pending as of this writing. They reclassified three positions into more attractive categories – a parole supervisor and two legal positions – and are in the process of advertising those positions and interviewing for them.

The divisions, a multidisciplinary task force, and the Quality Control Unit also employ different methods for supervision and quality improvement. Those mechanisms

PDF created with pdfFactory trial version www.pdffactory.com

have been described in prior reports of the Special Master and, to his knowledge, they continue.[22]

§   There is adequate progress and adequate compliance on this requirement.

**Remedial Sanctions**
Stipulation and Order Regarding Remedial Sanctions, April 4, 2007
Permanent Injunction Exhibit A – Remedial Plan

Defendants have demonstrated that they have institutionalized systems for the referral and placement of parolees in remedial sanctions as well as training for decision-makers like Parole Agents and Deputy Commissioners so they better understand what remedial sanctions exist and how to use them. Defendants have made available an effective system for helping decision-makers understand bed availability. They have also implemented the Parole Violation Decision-Making Instrument, which has the concept of remedial sanctions at its center. This instrument is designed to help decision-makers think about the entire array of non-custodial options for parole violators. Defendants will need to continue their training efforts to increase the understanding of the systems and to ensure adherence to their desired policy direction regarding remedial sanctions.

This Round, Defendants have done a better job of ensuring that Plaintiffs are engaged in the review of contracts for remedial sanctions. For the first time, the Plaintiffs were given the opportunity to review and provide feedback on the Substance Abuse Coordination Agencies request for proposals.[23]   Finally, and perhaps most notably, the Defendants protected the remedial sanctions from budget cuts in a time when many programs are being eliminated. As of this writing no CDCR funded programs that are used as remedial placements for parolees in the revocation process have been cut. It

PDF created with pdfFactory trial version www.pdffactory.com

appears there is a strong possibility that the Parolee Substance Abuse Program in the Division of Addiction and Recovery Services will lose its funding.

All of these activities demonstrate a clear and convincing commitment to the concept of remedial sanctions. While process improvements will continue to be needed, the Defendants have demonstrated a philosophical commitment to the concept of remedial sanctions and have created systems to encourage their use. The following items in the Remedial Sanctions Order continue to show good improvement and are nearing substantial compliance.

***Creating ICDTP Options for Dually Diagnosed Parolees***

Defendants have demonstrated over several Rounds that they have exceeded the requirements of creating 20 credible ICDTP beds for dually diagnosed parolees per region. The Division of Addiction and Recovery Services has demonstrated in past Rounds that CCCMS parolees were regularly and consistently being placed in ICDTP. Data from this Round again affirms that parolees with dual diagnoses of mental illness and addiction are being placed in ICDTP.

In Round Four, the Division of Addiction and Recovery Services finalized criteria for ICDTPs that wanted to serve dually diagnosed parolees. These criteria was approved by Plaintiffs at a December 2007 meet and confer. Providers were then surveyed for their capacity to meet the higher standard of care. The criteria create specifications identifying the specific services a community-based ICDTP must provide to qualify to serve dually diagnosed parolees.[24] The Division of Addiction and Recovery Services provided the Special Master with an updated list of those programs that meet the criteria to serve

PDF created with pdfFactory trial version www.pdffactory.com

dually diagnosed parolees.[25] The list makes it clear that the capacity for serving this population far exceeds 20 beds per region.

In the last Round, the extent to which parolees designated as Enhanced Outpatient (EOP) are being served in ICDTP programs was unclear. The designation of CCCMS or EOP is a CDCR institutional classification that is not used in the jail or community-based programs. Thus, it is not possible to ask the ICDTP providers to provide aggregate data on this issue. When questioned by the Special Master on site visits, the ICDTP programs have all indicated they serve the dually diagnosed population and some ICDTP programs specialize in working with this population.

At the request of the Special Master, the Division of Addiction and Recovery Services analyzed the ICDTP referrals from June 2008 to May 2009.[26] While the report is labeled "referral," the list is of parolees placed in ICDTP during this time period. The list of parolees placed in ICDTP includes 140 parolees with an EOP designation. An additional 772 parolees placed in ICDTP had a CCCMS designation for this time period. This is consistent with anecdotal information provided by ICDTP and parole agents and supervisors when interviewed by the Special Master on site visits.

Using the placement data in ICDTP for fiscal year 2009, this would mean about 4% of the ICDTP placements, or an average of 72 parolees per month, have a dual diagnosis. Given that ICDTP is a relatively new program, the numbers of parolees with dual diagnoses being placed is relatively high.

Questions still remain regarding whether the 20 beds per region specially designed for dually diagnosed parolees are being used for this population.[27] The Substance Abuse Coordinating Agencies are responsible for ensuring that dually

PDF created with pdfFactory trial version www.pdffactory.com

diagnosed parolees are placed in programs that meet or exceed the criteria for serving dually diagnosed parolees.

- There is continued and good compliance and progress on this item.

*Parolees with Disabilities*

The revised ICDTP policies clearly outline the commitment of the Defendants to provide ICDTP services to parolees with disabilities. The role and responsibility of each system actor with regard to ensuring equal access is clearly outlined. Defendants have created a system that ensures equivalency of program access and participation for disabled parolees in ICDTP.

New systems have been put in place to ensure that the referral source, the Substance Abuse Service Coordination Agencies, for community-based ICDTP have access to the disability database system. With this information, the agencies can make better determinations regarding placements of disabled parolees. The Division of Addiction and Recovery Services has a list that shows the referring agencies which programs can accommodate different disabilities. This list has been made available to Parole Administrators, Decentralized Revocation Unit Staff, and Deputy Commissioners. The agencies also have a contract for interpretation services and a list of certified interpreters is made available to ICDTPs. The agencies provide the ICDTP with a Self-Disclosure Questionnaire and any information gathered from the disability database system. The Self-Disclosure Questionnaire is designed to provide an opportunity for the parolee to share a possible disability that may not have been diagnosed and entered into the disability database.

PDF created with pdfFactory trial version www.pdffactory.com

Plaintiffs' monitoring reports early in the Round have described instances where ICDTP staff has not had the forms used by parolees to request a reasonable modification or accommodation for a disability. As the Round has progressed, fewer instances have occurred. Similar problems occurred with access to the disability database. Follow-up to these instances has resulted in the discovery that in most cases staff did have the needed forms and data. The system shows continual improvement regarding the implementation of these systems and their routine use.

Jail-based ICDTPs present some unique challenges regarding disabled parolees. On May 1, 2009, the Division of Addiction and Recovery Services began faxing individual parolee disability information to the jail-based ICDTP programs for each parolee who was recommended for placement at that jail.[28] The packets of information include the ICDTP Self-Disclosure Questionnaire, the ICDTP Participant Consent for Release of Confidential Information, the disability identification form from the most recent revocation hearing, and the Division of Adult Institutions Summary. The Division of Addiction and Recovery Services has purchased laptop computers and has a bid out for internet access equipment for Parole Agent IIs so they will have access to the disability database even in remote locations.

Finally, the Division of Addiction and Recovery Services continues to work with the California Association of Addiction and Recovery Resources through its contract with the Department of Alcohol and Drug Programs.  Consequently, any of the Substance Abuse Services Coordinating Agencies' community-based ICDTPs can take advantage of a free evaluation.

PDF created with pdfFactory trial version www.pdffactory.com

The Special Master believes that the requirement for equivalency for disabled parolees in the Remedial Sanctions Order has been met because Defendants have and continue to demonstrate that they have the capacity to serve parolees with disabilities.

- There is continued and good compliance and progress on this item.

### Female Parolees

The Remedial Sanctions Order required Defendants to "plan to provide remedial sanctions to female parolees that are the same or equivalent to remedial sanctions available to male parolees, including the availability of Parolee Substance Abuse Program or programs providing equivalent benefits to female parolees."[29] There are ICDTP jail and community-based beds for women in Regions, I, II and IV.  Region III has only community-based ICDTP for both men and women. In addition, there is one Female Multi-Residential Service Center and women are accepted in the Parolee Substance Abuse Program and other Division of Paroles programs that accept parolees in the revocation process. Other than a desire for more Female Multi-Residential Service Center programs, there have been few concerns raised by the parties concerning the lack of any services for female parolees in the revocation process.

- There is continued and good compliance and progress on this item.

### Out of County Transfers

The Remedial Sanctions Order requires that the Defendants "modify policy to allow for the temporary placement of out-of-county parolees into remedial sanction programs." This was done with the development of Policy 07-40. Examples of transfers of parolees between counties have been provided upon request by the Special Master. Plaintiffs have questioned in their monitoring reports the failure to use out of county

PDF created with pdfFactory trial version www.pdffactory.com

transfers in some cases. The Remedial Sanctions Order states "The appropriateness of a county to county transfer is within the sole discretion of the CDCR." Defendants have directed staff in Policy 07-40 to consider the use of out of county transfers and have demonstrated consistent use of the practice. Since there is no obligation to use transfers in all cases, the Special Master finds the Defendants to be in good compliance on this issue.

- There is continued and good compliance and progress on this item.

**Consideration of Remedial Sanctions at Each Step**

In the Remedial Sanctions Order, Defendants were tasked with creating a plan for modification of information systems to track the consideration of remedial sanctions at each stage of the parole revocation process. Defendants now have several defined mechanisms. Defendants have made modifications to the revocation database and created the Parole Violation Decision-Making Instrument, which provides a method for documenting use of remedial sanctions at each step in the *Valdivia* process. The latter will likely be the most valuable system for determining at the individual and aggregate level how often and what type of remedial sanctions are being considered.

As in the last two Rounds, the data reports titled Parole Administrator Statistics Closed Case Remedial Sanctions Summary by Decentralized Revocation Unit continue to indicate that referrals to remedial sanctions are being made at all steps of the *Valdivia* process. In the last Round, staff created a different version of the Closed Case Remedial Sanctions Summary by Decentralized Revocation Unit, which tracks the number of remedial sanctions assigned at each step in the *Valdivia* process. In addition, the Remedial Sanction Monthly Workload Report provides a snapshot of the type of remedial sanctions placements made by month.

An analysis of Parole Administrator decisions from April 1, 2009 through August 31, 2009 by the Office of Court Compliance for the Special Master demonstrates

31

PDF created with pdfFactory trial version www.pdffactory.com

continued consideration and recommendation of all remedial sanction options by Parole Administrators. Of 54,564 cases reviewed by Parole Administrators statewide, there were 7,966 (15%) recommendations by the Parole Administrator for placements other than a return to prison. This data is similar to the data in the Closed Case Remedial Sanctions report which shows Parole Administrators recommended remedial sanctions in 12% of the cases they reviewed for the same time period.

The overall percentages of recommendations to the various programs are similar to the last two Rounds. There is a small decrease in the percentage of recommendations to ICDTP and a corollary increase in the recommendations to programs like the Parolee Service Centers. A similar trend is seen in the Remedial Sanction Monthly Workload Report. The numbers of recommendations to programs is based on the 7,966 total numbers of cases where a Parole Administrator referred to an alternative to prison. Table 2 shows the distribution of recommendations by Parole Administrators.

**Table 2[30]**
**Recommendations for Remedial Sanctions**
**By Parole Administrators**

| PROGRAM | TOTAL NUMBER OF CASES | PERCENT OF TOTAL |
|---|---|---|
| | | |
| ICDTP | 4146 | 52 |
| Other Programs | 277 | 3 |
| Prop 36 | 1079 | 14 |
| FRMSC | 20 | .3 |
| RMSC | 138 | 2 |
| NIC | 118 | 2 |
| RCOP | 185 | 2 |
| COP | 458 | 2 |
| DRC | 63 | 1 |
| DIS | 21 | .2 |
| SASCA | 5 | .06 |
| PSAP | 764 | 10 |
| PSC | 182 | 2 |
| STAR | 18 | 2 |

PDF created with pdfFactory trial version www.pdffactory.com

| EID | 10 | .1 |
| REMOVE HOLD | 482 | 6 |

The Closed Case Remedial Sanctions Summary report again shows some consideration for the use of remedial sanctions at every step in the revocation process.[31] The report has been modified to distinguish between a recommendation and a decision. As in the last Round, rates are highest for *consideration* of remedial sanctions at the probable cause determination, 45% average for the Round, and referral averaged 47% for the Round. The same reports from a similar time period in 2008 show that the consideration rate at the probable cause determination has increased by about 10% and the referral between 3-4%.[32] There is little change in the rate of *actual placement* at the Return to Custody Assessment, probable cause hearing or revocation hearing.  Remedial sanctions were recommended or ordered in 12% of the probable cause hearings, compared to 13% in the last Round, and in 5% of the revocation hearings, as compared to 6% in the last Round. While one would expect a decrease in the numbers of remedial sanctions as one moves from consideration to disposition, the continued low rate or disposition bears further investigation in the next Round.

The Remedial Sanction Monthly Workload Report has typically underreported placements.[33] That trend is changing. It appears that parole staff are doing a much better job of documenting placements in the revocation database. For example, placement numbers in Parolee Service Centers in the revocation database averaged 117 placements for the Round. While still under reporting compared to the Paroles Division program data tracking, it is much closer. The Remedial Sanctions Monthly Workload Report indicates

33

PDF created with pdfFactory trial version www.pdffactory.com

referrals to all programs, with Proposition 36 and the Substance Abuse Treatment and Recovery program receiving the most referrals.

Another method for determining the consideration of remedial sanctions at each step in the *Valdivia* process is an analysis of the Parole Violation Decision-Making Instrument. Plaintiffs are noting in their monitoring reports the recommendations for remedial sanctions by different decision-makers for remedial sanctions. [34]The evaluation of the process and outcomes of the implementation of the instrument should shed light on how often remedial sanctions are considered at each step in the *Valdivia* process.

- There is continued and good compliance and progress on this item.
.

### Meeting the Requirements of the Broader Injunction

Having satisfied many of the requirements of the Remedial Sanctions Order, it is now time to turn to the issue of remedial sanctions in the context of the broader Permanent Injunction. The Defendants have begun to lay a solid foundation of policies and systems that are needed to achieve compliance with the Permanent Injunction. Several issues remain that must be addressed in the Permanent Injunction. It is the opinion of the Special Master that two issues in the Remedial Sanctions Order should be discussed in the context of the broader injunction. These issues are what are often called the "third prong" of remedial sanctions, the alternative placements in structured and supervised environments, and the self-help outpatient/aftercare programs, both used primarily by parole agents.  Other issues discussed in this section, while not a part of the Remedial Sanctions Order, are related to meeting the requirements of the Permanent Injunction.

PDF created with pdfFactory trial version www.pdffactory.com

*Transportation*

A significant systems issue that remains a concern is the number of parolees who are accepted for ICDTP and then are not transported in a timely fashion.[35] Parties disagree about defining a realistic period for transport to ICDTP. The current agreement is that parolees should be transported within five days. Defendants agreed to examine this issue and to date have made limited progress. The issue of what is a reasonable time for transport has not been fully resolved.

Transportation audits were begun by the Division of Addiction and Recovery Services. As indicated in Round Six, the audit for Region I resulted in some system changes to expedite transportation. The Region III audit was appropriately criticized by Plaintiffs for both its inaccuracies and lack of any credible solutions to the problem.[36] Curtailment of Defendants' travel resulted in an attempt to conduct the audit remotely. The result was a poor product that is not typical of the Division of Addiction and Recovery Services. The Division has now received travel authorization to go on site to conduct an in-depth audit. The Region IV audit is also underway.

As Plaintiffs note in their July monitoring report at Pitchess Detention Center, the length of time to transport for that facility, for the period of the report, was an average of 21 days, with the delay ranging from 8 to 81 days. Recognizing that Los Angeles County Jail and Pitchess Detention Center are the two most complex jails in the state, this is still a clearly unacceptable length of time waiting for transfer from jail to ICDTP. While not nearly as extreme, other areas in the state are also experiencing transportation problems.

The Division of Addiction and Recovery Services has crafted a proposal to begin addressing the transportation problem. A budget request has been approved for funding

PDF created with pdfFactory trial version www.pdffactory.com

for the following ICDTP dedicated positions and equipment to facilitate transportation from jails to community-based ICDTPs:

§   11 Parole Agent Is ;

§   8 Parole Service Assistants have been established;

§   11 full sized passenger vans.

Positions descriptions are being written and equipment is being ordered.

The Division of Addiction and Recovery Services plans to have the Parole Service Assistants facilitate and track all ICDTP placements from each of the Decentralized Revocation Units.  Since there are 13 such facilities statewide, some of the Parole Agents and the Parole Service Assistants will provide support service to more than one facility. The Parole Agents will provide transportation of the parolee to the ICDTPs. The 11 vans will be dedicated to transporting ICDTP participants to programs to ensure compliance with the court order.  These new resources will provide stopgap support to facilitate the movement of participants to both jail and community-based treatment programs when the Institutions transportation unit is unable to transport within the timelines.

*Parole Violation Decision-Making Instrument*

As noted in the Substantial Compliance section of this report, the Defendants have done an excellent job of structuring a process to create an instrument that is congruent with best practices and research in the field. Additionally, they created an interactive training that almost all Paroles Division and Board of Parole Hearings decision-makers have attended. The violation instrument can be very valuable in helping decision-makers to understand whether or not their decisions are consistent with current

PDF created with pdfFactory trial version www.pdffactory.com

evidence-based best practices in parole. In the Parole Violation Decision-Making Instrument training, data regarding effective and ineffective practices was provided. The Paroles Division has continued to introduce best practices with a motivational interviewing pilot in Region I.[37]  A continual training focus on evidence-based practices and how individual and collective decision-makers can be more consistent with practices that work to enhance parolee reintegration is essential to the successful implementation of the Parole Violation Decision-Making Instrument.

Several monitoring reports by Plaintiffs have begun to note and comment on the use of the Parole Violation Decision-Making Instrument. Plaintiffs question why hearings fail to document Paroles Division recommendations.[38] Such questions while not within the purview of this case are certainly issues that the managers of the Department of Corrections should be exploring. Once the evaluation by UC Irvine is completed the Defendants will have better information to understand what the data is telling them about how well decision-makers use remedial sanctions. Of particular interest is whether hearing officers review and consider the instrument and other decision-makers' recommendations.

Data from the revocation database indicates there remains the potential for significant growth in the consideration of remedial sanctions, especially in the disposition of cases. What level of remedial sanction use or availability is needed to demonstrate compliance with the requirements of the Permanent Injunction has not been determined by the parties or the Court. Beyond that, it is the opinion of the Special Master that how much greater use of remedial sanctions should be undertaken is a policy decision that is not within the purview of the *Valdivia* Permanent Injunction.

PDF created with pdfFactory trial version www.pdffactory.com

*Alternative Placement in Structured and Supervised Environments and Self Help/Outpatient Aftercare Programs*

While there is clear evidence of the use of other programs that are not specifically called remedial sanctions to avert revocation, what the standard is to achieve the benchmarks regarding "alternative placement in structured and supervised environments" and "self-help outpatient/aftercare programs" it is not clear. This issue is an integral part of the Defendants' ability to achieve substantial compliance in the Permanent Injunction. It is part of the unresolved issue of how many and what type of programs constitutes an effective array of remedial sanctions for parolees in the revocation process. The parties have not reached agreement regarding at what point a referral to a program constitutes a remedial sanction.

*Substantial Compliance Definitions*

Recognizing that the parties reaching agreement on substantial compliance definitions would be desirable but not a requirement, as ultimately, the Special Master will make recommendations to the Court, and the Court will decide the definitions or conditions of compliance, the Special Master believes it desirable for the parties to resume efforts to determine if they can agree on a standard for substantial compliance in the area of remedial sanctions.

On June 8, 2009, Defendants informed the Special Master of their belief that given the current fiscal crisis, it is premature to develop a proposal for defining substantial compliance.[39] The Defendants requested that the proposal be delayed until after the Governor reached a resolution on the 2009-2010 budget. The Special Master

38

PDF created with pdfFactory trial version www.pdffactory.com

agreed to this delay but has informed Defendants that it is time to complete a proposal for defining substantial compliance by the fourth quarter of 2009.

If the parties can reach agreement on the standard for defining substantial compliance, the parameters for what programs should be considered as part of the array of Remedial Sanctions options can be defined. This, in turn, will allow for the creation of a plan to evaluate whether Defendants have the needed array of Remedial Sanctions and, if not, what steps can be taken to remedy the situation.

### Mentally Ill Parolees
Orders, January 14, 2008 and August 8, 2008

Defendants launched a well-designed policy and procedure, long in development, to provide due process to parolees who appear unable to participate in revocation proceedings by virtue of mental illness. It is meant to balance providing access to treatment in the hope that the person will be able to participate in a defense with ensuring there is legal authority to hold the person. Defendants and CalPAP trained staff in April and May 2009. Final policies were issued in June 2009. Minor revisions have continued to incorporate lessons learned from experience. Several of the policy's components had been phased in, and they appear to be fully in use. For a description, please see the Sixth Report of the Special Master.

There is evidence that these practices have enhanced parolees' ability to access treatment and  their mental health being taken into account in the handling of their parole violation charges.

PDF created with pdfFactory trial version www.pdffactory.com

About 167 parolees were affected during the Round, with 42 men and women requiring a suspended hearing at the current time.[40] In a change from at least 15 years of history, 15 parolees pending revocation[41] transferred to acute and intermediate care at three Department of Mental Health facilities. There is no indication that any referrals were rejected. Nearly all of these parolees had their holds dropped while at the hospitals, either at the expiration of their return to custody assessments or earlier.

For the entire population whose hearings were suspended, more than half have stabilized and participated in hearings. Most commonly, this occurred in two to six weeks (76%). The others capable of returning to hearing did so in two to eight months.

Among women, the proportion who stabilized in a short time was the same as for men. For those who did not stabilize, however, a much smaller proportion went to a higher level of care. Only one was committed to the Department of Mental Health as incompetent to stand  trial and none were referred by CDCR; those women remained in CDCR facilities or county jails for multiple months unable to participate in hearings.[42]

It was also clear that hearing officers mitigate penalties in recognition of mental illness. At hearing, 14 parolees were given credit for time served, seven cases were dismissed, and one parolee was placed in a community drug treatment program.

Among those currently in custody without a hearing, the time since suspension ranges from a few days to nine months, and cases are evenly distributed across that spectrum.

For those who were never able to have a hearing, the procedure appears mostly to have worked as intended; 16 parolees were given credit for time served as of the designated date. Another four were also given this disposition later than the plan called

40

PDF created with pdfFactory trial version www.pdffactory.com

for.[43] Moreover, holds were dropped for another nine parolees far earlier than their return to custody assessment date. Some of these actions were deferring to incompetent to stand trial placements. Others were men and women who had not been able to participate in a hearing for several months.

A few implementation issues have surfaced to date, particularly with staff being over-inclusive with parolees on suicide watch and being conservative and not allowing attorneys access to those parolees. Reportedly, these events have been on a small scale and Defendants and CalPAP acted to remedy them by addressing the sources and drafting guidance for the field; this memorandum is pending as of this writing.

This appears to have been an appropriate response, and it illustrates the need for one of the few outstanding features: a mechanism to routinely review this practice for whether it is operating as intended. Additionally, Defendants deferred, but will need to return to, determining means to reliably carry out this process in non-CDCR facilities.[44]

The August 8, 2008 Order also requires the Paroles Division to have parolees evaluated  pursuant to California Welfare & Institutions Code §5150 if the parolee's agent takes him into custody and believes the parolee may pose a danger to himself or others by virtue of his mental condition. Staff assert that this has been a longstanding practice for parole agents. Neither the Special Master nor the parties examined compliance with this aspect of the Order during this Round, with the exception of Plaintiffs' monitoring at one site; revocation documentation for four mentally ill parolees raised concerns for Plaintiffs about whether this Order, and related policies, were followed.

§   There is good progress and good compliance with most of the Court's Orders concerning the mentally ill. Compliance is unknown as to the use of §5150.

PDF created with pdfFactory trial version www.pdffactory.com

**Confrontation Rights**
Order, March 25, 2008; Permanent Injunction ¶24

Pursuant to the Special Master's Report and Recommendations, this Court ordered a revision of policy and procedure consistent with the reading of the law captured in the Special Master's report; a plan for training Deputy Commissioners and Paroles Division staff initially and in continuing education; and plans for setting minimum standards for Deputy Commissioners conducting revocation hearings, and for evaluating those hearing officers.[45] That order is on appeal and stays have been denied.

Defendants have taken some important steps forward. They revised the main policy consistent with the Court's order and completed it in collaboration with Plaintiffs' counsel and CalPAP. Unfortunately, neither division had distributed their policies as of this writing.[46] Some additional Board policies touching on confrontation rights must be revised. The parties agreed the latter revision was less urgent than some other steps, but this still must be addressed.

Defendants formulated a reasonable plan aimed at training and supervision, again in consultation with affected parties, but have been able to carry out little of it to date. CalPAP attorneys reportedly were trained. Because of an oversight, most Paroles Division staff were not. Defendants recently resumed efforts to accomplish this.[47]

The Board's training was a highlight. For both experienced hearing officers and new hires attending the academy, the Board redesigned its curriculum to emphasize practical application, clearly delineated steps in the reasoning process, interactive problem-solving, coaching for questions, and case study practice. This was supplemented by excellent written guidance and protocols to support decision-making in the field. It

PDF created with pdfFactory trial version www.pdffactory.com

was particularly worthwhile to include supervisors from Paroles Division, so that their increased familiarity with the reasoning process and effective evidence can help inform parole officers. This program was a strong start and, as will be discussed below, some improved practice is already evident during hearings. The Board has not yet followed through on its plan to provide training quarterly.

Oversight will be critical to reinforce the training and strengthen hearing officers' practice as they encounter inevitable challenges and questions in day-to-day application. This, unfortunately, is the least developed aspect of Defendants' response to this Court's order. In the last Round, Defendants did establish reasonable standards for assessing practice, a significant feature that had never previously been in place. Those standards are used in a central review process; it does not appear that field supervisors have been asked to use the standards.

Defendants designed a good method for quality improvement – centrally reviewing a random sample of hearing tapes and records, concentrating on enough cases per hearing officer to determine his or her usual practice, and providing feedback to the hearing officers and their supervisors about good practices and those needing to be changed. Unfortunately, this has been little used. Defendants reviewed a small group in the last Round, then suspended reviews with the idea that it would be more effective to assess practice after training.[48] Since then, however, staff have only reviewed 9 cases, which amounts to 1% of the hearings where confrontation objections were known to be raised since the training, the most generous measure.[49]

Defendants note there was only one deficiency among the cases reviewed, as compared to half of the cases in the prior Round's review. While this does suggest

PDF created with pdfFactory trial version www.pdffactory.com

improvement, the small sample size and the single case reviewed per hearing officer do not permit any conclusions about practice.

The Special Master also conducted a review of 436 cases, based on hearing officers' written records collected by CalPAP. According to the Special Master's analysis,[50] the majority of hearing officers had poor or inconsistent practice with the *Comito* test, at least as it was recorded. This data, however, was collected mostly preceding the recent training, so it should serve as good baseline information against which to measure improvement. While it is too early to see how much benefit has been realized from the training, in the subsequent two months, several hearing officers' documents showed improvement; a few others clearly did not and will need further support.

It is of note that, despite BPH trainings and memoranda to the contrary, in a handful of cases, hearing officers continued to use hearsay exceptions as the basis for admitting hearsay. In a few other cases, hearing officers appropriately used hearsay exceptions as indicia of reliability affecting the balancing test. Certainly, statistics reflect a recognition of the parolees' rights. CalPAP tracking indicates there were 844 objections on this basis made during a seven-month period in this Round[51] and of those, 66% were sustained, a rate similar to the preceding Round.

The parties have noted that, with some frequency, hearing officers do not record the confrontation rights objection or their handling of it. This was a key issue Defendants began to address in their early 2009 reviews. CalPAP records show a continuing problem; 15% of *Comito* objections attorneys reported did not appear in the official hearing record. This improved only slightly since the initial oversight and training. For most hearing

44

PDF created with pdfFactory trial version www.pdffactory.com

officers, this occurred very occasionally; for a handful, the objection was missing in ¼ to ½ of their hearings in which *Comito* objections were known to have occurred.

Defendants assert that individualized remedial training, another feature of their training and oversight plan, has also taken place, but the Board has never provided support despite five months of Special Master requests for this.

An additional requirement of the Court order was a means to identify hearings in which confrontation rights objections were raised, and to gather and analyze facts relevant to hearing officer handling of these issues. This mechanism is key for effective oversight. Defendants have updated their revocation database to identify the cases and hearing officers, which can serve as the starting point for electronic or paper file review. At present, it captures about 75% of the cases known to CalPAP. It does not aggregate any data or collect any information from which one can assess hearing officers' analysis. However, recent revisions to the CalPAP tracking system cover both of those functions, so collectively CalPAP and Defendants are on track to satisfy this requirement.

§   There was good progress early in the Round, but recent events threaten to derail it; Defendants should take care to sustain these efforts as much more is needed to meet the Court's requirements. There is adequate compliance on this issue.

### Probable Cause Assessments
Fifth Report recommendations; Permanent Injunction ¶11(d)

In the Special Master's Fifth Report, the recommendations used this language: "**While the Special Master does not seek court orders at this time, it is strongly recommended** that Defendants" take certain actions, and addressing this issue was first on the list.

PDF created with pdfFactory trial version www.pdffactory.com

Defendants should understand the Fifth Report's language to indicate that it is nearing the point that a court order is warranted.

The Special Master comes to such an assessment rarely and after many attempts to remedy a problem with less intrusive measures. Defendants have participated in *many* conversations with the Special Master on-point, beginning in *February 2006.* It was noted as a problem in the Special Master's Third, Fourth, Fifth, and Sixth reports. It has been on the list of priorities in the last two Rounds and was highlighted in the Special Master's talk at the Deputy Commissioner academy.

To date, the responsive measures that have been described to the Special Master are: the redistribution of a memo in early 2009, a limited discussion during training – this was a brief reminder to document, rather than taking on the issue of hearing officers who solely negotiate a disposition and give no indication they have considered probable cause at all -- and  talks about possible supervision measures, none of which have been undertaken.

Defendants have not attempted to determine whether this is a limited or a widespread problem. They have not, to the Special Master's knowledge, asked supervisors to work with hearing officers on this point. They have not followed up with the identified hearing officers who have been observed failing to meet this most fundamental requirement.

Defendants would be well-advised to make this issue a priority in the coming Round.

- Activity has been poor in this area.

PDF created with pdfFactory trial version www.pdffactory.com

**Los Angeles County Jail**
Fifth Report recommendations

Defendants have demonstrated a genuine commitment to resolving problems at the Los Angeles County Jail. In the last Round, the Paroles Division did a good job of organizing a system to bring needed resources and talent to focus on this critical issue. The Board, which in the last Round had done little to further its understanding of where improvements could be made in its processes and systems in Los Angeles County, has done a better job this Round. The Executive Officer has demonstrated his commitment to working on ways to improve the outcomes in Los Angeles County.

In February 2009, a corrective action plan was developed by the Office of Court Compliance that identifies what issues need to be worked on and which division is the lead on the issue; this was updated in July 2009.[52] Much of this product is helpful, though portions need strengthening. These plans have been shared with the Special Master. Finally, two problem-solving meetings between the Board, the Paroles Division and the Division of Addiction and Recovery Services have taken place and quarterly meetings are scheduled.

Paroles Division headquarters has demonstrated its commitment to improving outcomes in Los Angeles County in many ways. Staff have made permanent the Parole Administrator who was reassigned to lead the process improvement effort, and they have continued having regional administrators report on the status of problems and improvements.[53]

Paroles Division regional and executive staff have had ongoing meetings with county jail executives to create an improved location for notice service and other

PDF created with pdfFactory trial version www.pdffactory.com

operations. It will consist of a centralized office with data line capability, revocation packet scanning, support staff, better access to Board staff, and additional times to access parolees. Construction drawings for the renovation have been approved.[54] Paroles Division executive staff have met with the Chief Information Officer for the state and gained approval for the scanning of revocation packets.[55] The scanning project must be integrated into other planned technology changes so it will move slower than once initially hoped for but approval to move forward was granted.

The Board has also been actively engaged in attempting to address the issues at this location. The Executive Officer of the Board of Parole Hearings met with Paroles Division staff to review the challenges and proposed corrective action plans. Among the recent Deputy Commissioner hires, the Board dedicated four to Los Angeles to address staffing vacancies. These Deputy Commissioners have attended their initial training and have begun work. The office hired additional support staff, helping to address a chronic difficulty, and there are currently four support staff vacancies, down from a high of nine. The Board is currently examining local retention issues and solutions.[56]

The Board instituted a number of procedures to expedite processing, to prioritize cases with short timeframes remaining, to monitor and address recurrent conflicts and obstacles, and to facilitate quick rescheduling.[57] Scanning capability has been established between the Los Angeles County Jail and the decentralized revocation units in Glendale and at Pitchess Detention Center. This is expected to help ensure that hearing locations can be shifted on short notice if the parolees have moved, as is common, and that parole holds are lifted in a timely manner. Further measures will be discussed below.

PDF created with pdfFactory trial version www.pdffactory.com

In terms of timely compliance, for mainstream cases, Los Angeles County Jail's timeliness matches or exceeds that of the rest of the system at the agent-unit supervisor conference, parole administrator review, probable cause hearing, and revocation hearing.[58]  Total compliance on hearings is unknown, however, as these figures omit substantial populations, as discussed below.

Timeliness suffers at the notice of rights, violation report, unit supervisor review, and return to custody assessment steps. These lag behind the rest of the system, most by 4% to 10%; this, of course, is a large number of parolees at this location. There are particular problems with providing source documents, which were omitted from 39-55% of relevant revocation packets produced to CalPAP.

The Paroles Division has worked to improve the service of notice of rights and charges, both as to timeliness and quality. After the first steps taken in the last Round, the Paroles Division dedicated a supervising notice agent to overseeing improvements.[59] He instituted excellent measures, with training and check lists with detailed guidance. He reviews reports weekly, and has line staff investigate deficiencies and develop corrective actions.

This appears to have included emphasis on completeness of packets. This facility had the worst rate in the state at the beginning of the year for providing disability forms in attorneys' revocation packets, but this improved from 95% to 99% in April and was maintained at intermediate levels in subsequent months; there was little improvement in providing the source documents, however. [60] Additionally, In May, the Paroles Division started submitting a monthly report on the timeliness of notices of rights, which Regional Administrators and the division's Litigation Compliance Unit use to monitor process

49

PDF created with pdfFactory trial version www.pdffactory.com

improvement measures. Changes to the duties of and location of work of some Paroles Division staff are in the early planning stages by the Parole Administrator and headquarters staff. Improvement in the timeliness of service is not yet evident, but the measures taken are important steps nevertheless.

The Special Master is not aware of whether efforts have been undertaken to address the timeliness of violation reports and unit supervisor reviews.

The Board's Executive Officer supported a current initiative by the Parole Administrator to review late and incomplete revocation packets to attempt to identify problems with specific parole units and to provide more remedial training for the units and/or Board clerical staff. The Paroles Division plans to send staff to help with the review process. The review will be shared with Board staff for joint problem resolution.[61]

The divisions have substantially improved the timing of return to custody assessments during the Round, jumping from 78% to 92% and  sustaining them at or above that level for three months.  This was accomplished through deliberate measures -- improved coordination between the divisions to increase timeliness of the Parole Administrator work that precedes this step, and changes to increase the consistency and availability of staffing for return to custody assessments  -- which are likely to make the improvement sustainable.[62]

Optional waivers and postponements are not a part of the above-described timeliness numbers, and are a large part of the workload at Los Angeles County Jail. Optional waiver activations are about 52% of the revocation hearings.[63] Facially, it appears that Los Angeles County Jail's timeliness in handling optional waivers is about 95%.[64] This database report, however, suffers from a variety of errors, so certainty cannot

PDF created with pdfFactory trial version www.pdffactory.com

be had. On the other hand, a small internal audit found that, in the cases studied, only one case that appeared late was genuinely late. Postponements appear to represent an additional 8% of hearings.[65] History indicates that performance on postponed cases may be more problematic, but Board staff have brought good attention to remedying that during the Round. A large proportion of postponements occur because the parolee is unavailable while in court or was moved to another location. In May, the Board initiated several practices to reduce these conflicts, including checking multiple information sources sufficiently ahead of hearings that timely rescheduling is possible, and scanning communications between the jail and the two involved Decentralized Revocation Units.[66] Defendants continue to adjust these methods as they learn what is effective, and have begun a collaborative effort with the deputy sheriffs to improve location information and coordination.

Significant success is evident. Staff's tracking shows almost 150 cases per month where conflicts or location change were identified and a hearing was scheduled timely.[67] This dramatically reduced the number of postponements for these reasons; these postponements in August were *one-quarter* of what they were in February. This is excellent progress. Further remedies are under discussion.

As staff continue to investigate these issues, it would be worthwhile to examine the postponements caused by "other" reasons -- about 20% of the postponements at this location – to determine trends and whether these cases involve good cause reasons. There is also a concern about the length of time until postponed cases are reheard. An analysis has not been conducted to date, but that will be necessary to determine whether practice is reasonable, and therefore compliant, in this regard.[68]

PDF created with pdfFactory trial version www.pdffactory.com

Interestingly, it appears that Los Angeles County Jail and its related parole units resolve cases pre-hearing much more often than does the rest of the system. Units resolved 36% of the cases, as opposed to 28% for the rest of the system.[69] A great deal of cases are removed from the system at the Violation Report stage. Additionally, 9% of the cases closed at return to custody assessment, double the rate elsewhere.

### Staffing
Fifth Report recommendations; Permanent Injunction ¶ V

Defendants' latest staffing numbers show positions eliminated for the first time during the Mastership's involvement.[70] The numbers eliminated to date remain small, about 13 net positions, a handful in each division and fewer than 2% of the total. The Board's losses were concentrated in research and information systems, which lost a large proportion of their staff; while the Board training department's allocated positions remain the same, its vacancies leave it in a similar position – there are *no* training staff. The Board did gain a handful of clerical positions.[71]

Hiring news, however, was much more hopeful in several categories. The Board generated the most successes, reducing its vacancies by 36, hiring much-needed clerical managers and staff, hearings coordinators, and hearing officers. Nearly all of the other divisions routinely approach full *Valdivia* staffing, and each reduced their vacancies by an additional handful. Overall, the vacancy rate is 10%. Unfortunately, the most chronic vacancies are among the most impactful: both the Board's management structure and the Office of Court Compliance, largely responsible for assuming duties now carried out by court oversight, have never reached even 50% staffing throughout *Valdivia* implementation.

PDF created with pdfFactory trial version www.pdffactory.com

These numbers also do not take into account the layoff notices that were widely distributed, but are still in their notice period ,or any further budget cuts attendant to the $1.2 billion cut pending before the legislature. These could well generate further losses in the next Round. As discussed *supra*, a reportedly substantial amount of turnover, staff experienced in state service but not in parole-related functions, and a 15% reduction in work hours all likely contribute to a *de facto* reduction in staffing resources available. At the same time, there has been some slippage of timeliness numbers. Among agent-supervisor conferences, notice, probable cause hearings and revocation hearings, the number of late cases grew steadily all year, as did the number with the longest delays. For notices, these numbers became much worse in July and August. [72]

The cause of this is not clear, but it is predictable that fluctuations and decreases in staffing levels may be contributing.

One compliance failure directly linked to staffing surfaced, but on examination, its scope was very limited. Plaintiffs' counsel observed, in their sample during July 2009 monitoring of Santa Rita County Jail, a large proportion of postponed probable cause hearings because hearing officers were not available. [73] Similarly, Defendants studied a spate of late probable cause hearings at that location in May 2009, and found a substantial number explained by a lack of hearing officers. [74] In both instances, late cases were generally heard within an additional three days, and all were completed within an additional week. The timeliness rate at this location was 85% in May and 76% in July. On the other hand, this problem was not apparent at other facilities in the system and appeared confined to these months at this location. [75]

PDF created with pdfFactory trial version www.pdffactory.com

The Special Master has not seen any other direct link between compliance reductions and staffing; indeed, under these conditions, it is impressive that staff have maintained this level of compliance. The situation bears close, continuing examination, as the existing pressures may take their toll and further cuts threaten to erode current performance.

§    There is reasonable progress, but it is fragile. Compliance is adequate.

# Permanent Injunction Requirements
## (Steps in the process)

The volume of actions rose steadily through most of the Round, declining only in the final month, so that holds were 20% higher at the end of the Round.[76] An average of 28% of the holds were resolved at the unit level; this, too, occurred more often recently.

The number reaching the Board was much more variable, and it averaged 7,189 cases per month. About 5% were resolved as of the Return to Custody Assessment, and the great majority were completed at probable cause hearing. Only 6% of all holds resulted in a revocation hearing; these represent 8% to 9% of all cases that had a probable cause hearing.

### *The parole officer and supervisor will confer within 48 hours to determine if probable cause exists to continue a hold* (¶11(b)(ii))

CDCR continues to be very timely in completing the probable cause determination in most cases. This step was completed within timeframes 98% of the time for mainstream cases, with another 1% completed one day late. An additional 1% were very lengthy; a week or more was not uncommon in these cases, and the longest time

PDF created with pdfFactory trial version www.pdffactory.com

shown was more than seven months.[77] It is unclear whether these cases were overlooked, or how many may reflect data entry errors. As would be expected, the absolute number in this very late category went up substantially in the most recent months as the number of holds rose.

Compliance rates were similar for pending mainstream cases and for extradition cases.[78] Practice was problematic with not in custody referrals, where this conference occurred timely in only 80% of the cases and declined substantially in the most recent month.[79]

It has been reported for several Rounds that unit supervisors sometimes make this determination based on document review alone. The Special Master has noted this in prior reports, and the parties have not examined the frequency with which this occurs. Unit supervisors described this as commonplace at one parole unit the Special Master toured, and rejected it as poor practice at another.

Defendants now assert that the requirement "the parole agent and unit supervisor will confer" does not mean that they must speak. While the Special Master understands that a conference might be conducted in person, by phone, by videoconference, or by online meeting, it does not appear that the plain language of the Permanent Injunction permits this requirement to be fulfilled by a document review without a conversation.

> **§**   There appears to be good compliance on a decision being made at the 48-hour point for mainstream and extradition cases, and there is low compliance for the small number of not-in-custody cases. It is unknown whether the conference requirement is being met.

PDF created with pdfFactory trial version www.pdffactory.com

***If the hold is continued, the parolee will be served actual notice of rights, with a factual summary and written notice of rights, within 3 business days*** (¶11(b)(iii)

Data maintained by CalPAP, covering a large proportion of the cases, shows that 89% of the mainstream cases were timely, a figure very similar to the last few Rounds.[80] The lowest compliance – generally in both absolute numbers and percentages -- was at California Institution for Men, Pitchess Detention Center, Santa Rita County Jail, and Los Angeles County Jail. Three of the four improved significantly during the Round, most particularly Pitchess.

Richard J. Donovan Correctional Facility, Rio Cosumnes Correctional Center, and High Desert State Prison continued consistently to have the best performance.

CDCR data showed somewhat lower compliance. Only 85% of notices in mainstream cases were timely, with an additional 3% completed in one extra day. This meant that 12% of the notices were completed very late.[81] It is noteworthy that compliance was much worse in the most recent month – it dropped to 81%.[82]

For a substantial number of notices, there was a timely first attempt at service, but completion was delayed for a variety of reasons. Staff encountered obstacles as such the parolee being at court, in transit, too physically or mentally ill to approach, and so on. The CDCR information system captures such occurrences, but cannot yet demonstrate whether the barriers ultimately caused the service to be late and by how much time. While there is reason to believe that the revocation database is not fully accurate, it appears that almost none of the initially delayed attempts at service were ultimately completely timely.[83] CDCR considers a list of 14 common obstacles to be good cause for a late service, while Plaintiffs disagree. It is of note that the data system only allows staff to choose among the seven most common reasons. Some of the figures that follow may

56

PDF created with pdfFactory trial version www.pdffactory.com

not be fully correct if staff entered an existing reason that did not apply because the correct reason was not offered as an option.

By far, the most common reasons selected are that the parolee is in court or has been moved or is in transit (94%).[84] Several other obstacles of concern occur at a fairly low frequency. Only 47 attempts were not completed because parolees were in inpatient mental health treatment. Access was more limited during this Round by the parolee's medical condition, with 259 instances when ill parolees were not immediately served. Quarantine posed a barrier on another 47 occasions. Lockdowns prevented service on 200 occasions. In 39 cases, the reason was recorded as Administrative Segregation, a reason not considered good cause by any of the parties.

Compliance was lower still for one of the special populations, those returned from out of state for revocation proceedings. For the 1,829 cases during the Round, service was accomplished timely for only 71% of them.[85] This practice has continued to decline for several Rounds; during this Round, it declined further, and by the final month, only 66% of serves were timely. It is well past time for CDCR to bring attention to this area of poor performance.

The parties have agreed that, where a parolee remains in the community for a not in custody hearing, Paroles Division may serve that parolee within five business days. Nevertheless, compliance with that standard was only at 76% during this Round.[86]

With notice service in general, monitors and the Special Master generally note that service is conducted reasonably, with notice agents reviewing with the parolees their rights, charges, and expectations for the process. Plaintiffs sometimes relate concerns about disability reviews, effective communication, and privacy and related safety risks.

PDF created with pdfFactory trial version www.pdffactory.com

These particularly occur at Los Angeles and Santa Rita county jails, as detailed in prior reports of the Special Master.

Substantive concerns with the notice and charge documents tend to revolve around the factual summary of the conduct and alleged violation, and whether all charges are contained in the original notice. The Special Master did not examine these practices during this Round.

> § There was a decline in some aspects of this requirement, but there is adequate compliance.

### By the sixth business day after the hold, the parole agent shall complete a violation report (Exhibit A – Remedial Plan)

The revocation database shows that 85% of violation reports were transmitted timely, and 97% were completed by the following day, a rate slightly lower than in the preceding Round.[87] For the reports sent later than that, the parole units associated with High Desert and North Kern state prisons had the best rates, at 1% or less.

The units associated with Los Angeles County Jail had the lowest compliance in absolute numbers and percentages, with 5% late enough to delay the next step in the process[88] and 145 reports generated *on or after the deadline for timely probable cause hearing*, rendering that impossible. A substantial number appeared to take multiple months.[89] These figures seem to be a slight decline from the prior Round.[90] Paroles Division administrators indicate that, as part of their efforts at this facility, they have begun examining the reasons that violation reports are late in order to address them.[91]

> • Performance declined slightly during this Round, but compliance is adequate.

PDF created with pdfFactory trial version www.pdffactory.com

***By the seventh business day after the hold, the Unit Supervisor shall review the case for whether to go forward and the appropriateness of remedial sanctions*** (Exhibit A – Remedial Plan)

This requirement appears to be going smoothly, with 98% of cases reaching this step being completed timely, and 99% completed within one additional day.[92] A small proportion of the latest cases appear to have taken weeks or months to complete; it is unclear whether these cases were overlooked up through this point, or whether this reflects data entry errors.[93] To the Special Master's knowledge, none of the parties have examined the quality of the Unit Supervisors' review.

- There is good compliance on this requirement.

***By the ninth business day after the hold, the Parole Administrator shall review the packet to determine whether the case is sufficient to move forward and whether remedial sanctions may be appropriate*** (Exhibit A – Remedial Plan)

The revocation database indicates that Parole Administrators reviewed 54,145 cases during this seven-month period, continuing the trend of fewer cases during each successive Round.[94] Staff maintained a timeliness rate of at least 94%. The majority of untimely cases were handled by the following day, although a significant minority took an additional three or more days to complete. California Institution for Men improved its numbers during the Round, while those for Deuel Vocational Institution and Wasco State Prison declined. Defendants have decided not to have Parole Administrators review extradition cases. The reasons for this decision have not been conveyed, and it has not been established that this is a permissible exception to this requirement.

A potentially larger problem are the cases appearing as missed by Parole Administrators; during this Round, the total was 2,936 (5% of all cases). Paroles Division studied a large proportion of this set, and determined that the great majority were not

PDF created with pdfFactory trial version www.pdffactory.com

overlooked, but were intentionally not reviewed because they were revocation extensions or extraditions.[95] The study indicated that fewer than 2% of Parole Administrator cases were genuinely missed.

§   Both progress and compliance are adequate on this requirement.

**_By the tenth business day after the hold, Defendants shall create a Return to Custody Assessment_** (Exhibit A – Remedial Plan)

In substantial compliance – see discussion *supra*

**_Appoint counsel for all parolees by Return to Custody Assessment (RTCA) stage of revocation hearing_** (¶11(b)(i))

CDCR provided revocation packets to CalPAP by the agreed date in 94% of cases measured, according to CalPAP data, about the same rate as in the prior Round.[96] The percentages at most facilities showed a modest decline from the last Round. Data does not reflect the amount of time for delayed cases, so one cannot practically determine whether there was sufficient time to prepare a defense.

Deficiencies were consistently highest at the decentralized revocation units associated with CalPAP's Madera office, in the range of 21 to 37%; in fact, its absolute numbers worsened substantially during the Round. This has been the case for several years; the Special Master has highlighted the need to address this, but Defendants have not. Performance was volatile at other facilities, with six institutions rotating in and out of the lowest positions for absolute numbers or percentages of late cases. Rio Cosumnes Correctional Center, Santa Rita County Jail and High Desert State Prison consistently had the strongest performance.

PDF created with pdfFactory trial version www.pdffactory.com

The Special Master previously has reported the parties' and CalPAP's concerns about documents missing from packets and about notice of hearing schedules close in time to the hearings themselves. The Special Master understands that these issues continue, although he does not know to what degree.

CalPAP continues to provide well-prepared attorneys, solid representation, and excellent administration of the panel.

§   There was decline during the Round – and it is well past time to address the problems on point in Madera. There is adequate compliance with this requirement.

**_At the time of appointment, counsel shall be provided with all nonconfidential reports and documents the state intends to rely upon; if the state learns of additional evidence, it shall be produced as soon as practicable before the hearing_** (¶ 14)

CalPAP indicates that this practice generally operates well. There were 28 objections during the Round regarding evidence offered at hearing but not previously presented to counsel. Defendants indicate that, in this situation, admission is at the discretion of the hearing officer and the decision should be based on when the evidence was available to the State.[97] With these objections, 8 were granted and 20 were denied.

• There is adequate compliance on this requirement.

**_Counsel shall access to all non-confidential portions of field files_** (¶ 16)

In substantial compliance – see discussion *supra*

PDF created with pdfFactory trial version www.pdffactory.com

***Defendants shall develop and implement policies and procedures for designation of information as confidential consistent with requirements of due process*** (¶15)

Policies were put in place in 2007 and, after difficulties in the initial Rounds, CalPAP now reports that this system operates well. Materials reflected no objections concerning materials designated as confidential.

> § There is good compliance on this requirement.

***Expedited probable cause hearing shall be held upon sufficient offer of proof that there is a complete defense to all charges*** (¶11(b)(i))

There continued to be no expedited hearing requests during the Round.[98] Neither the parties nor the Special Master have systematically reviewed this topic and minimal information came to the Special Master's attention.

On the one hand, some hearing officers noted a complete defense while preparing the return to custody assessment, and they dismissed the charges in a handful of cases.[99] On the other hand, information from one parolee suggested he was arguing he had a complete defense and there was no record of his request being considered. Plaintiffs' interviews at that location suggested staff were unfamiliar with how parolees make these requests, and one staff member's approach risks some requests going unidentified. Because staff's knowledge and processes in the system are unknown, the Special Master cannot, at this time, determine whether there are other risks.

> • The Special Master is unable to assess compliance.

PDF created with pdfFactory trial version www.pdffactory.com

**_Probable cause hearings shall be held no later than 10 business days after service of charges and rights_** (¶11(d))

The Board completed an average of 7,189 hearings per month, a volume that falls between that of the last two Rounds.[100]

In assessing this requirement, there are a number of considerations. The system must consistently provide timely hearings to the great majority of cases. It must also function to provide hearings timely to special populations, sometimes small groups whose circumstances dictate counting timelines differently or suspending and resuming proceedings once conditions have been met. In operation, the hearings must provide due process, satisfying questions such as fairness, opportunity to be heard, elements of the violation proved sufficient for the applicable standard, and consideration of appropriate sanctions.

### Timeliness

To understand whether these hearings were timely, one must be able to assess the time to hearing for:

- mainstream cases completed according to the usual _Valdivia_ standards
- mainstream cases pending and handled according to the usual _Valdivia_ standards
- if a case is postponed, the timeliness of its return to hearing
- extradition cases handled according to the _Valdivia_ standards calculated from arrival in California, rather than hold date – completed and pending

Among completed mainstream cases, the timeliness rate was 96%, a slight decline from the prior Round.[101] As many as 98% were heard within one additional business day.[102] In 172 instances, the time to hearing appeared to stretch from three weeks to nearly three months.[103]

PDF created with pdfFactory trial version www.pdffactory.com

<u>Postponed</u>: Hearings are commonly postponed for reasons similar to those for unsuccessful attempts at service. As noted above, the parties have not reached agreement about whether there is good cause for postponement, and which circumstances would constitute good cause, but Defendants have developed their own operating definitions. In the first two months for which data is available, reports suggest that nearly all postponements[104] occurred for reasons Defendants consider to be good cause. In that period, it appears that 18 hearings were postponed for reasons considered by all *not* to be good cause, contrary to the parties' expectations that such hearings would go forward. This will be useful information for management follow-up. Additionally, a substantial number of postponements were for "other" reasons; one cannot determine what proportion of these were for good cause without closer examination.

Although the revocation database newly provides reports on-point, their current format does not make a timeliness analysis possible.[105] There is cause for concern, however, that some postponed hearings are not rescheduled timely. For example, a recent report shows that 20% of parolee time waivers at probable cause hearings were pending beyond the date specified in the waiver.[106] In the "not good cause" postponements mentioned above, some cases took as long as 25 days to reschedule.[107] Anecdotally, the Special Master has observed a small number of postponements that were rescheduled two weeks to more than a month hence. This issue is ripe for examination to determine whether these examples are an exception or illustrate a more widespread practice problem.

<u>Extradition</u>: As to the 1,829 extradition cases, probable cause hearings were timely 92% of the time.[108] Among the late cases, 31% missed the deadline by only a few

PDF created with pdfFactory trial version www.pdffactory.com

days. Most typically, cases were heard one to two weeks later, and a handful took two to six months to be heard. Through much of this Round, the timeliness rate was similar to the prior Round; however, in the most recent month, it dropped significantly. This bears monitoring.

These numbers do not take into account parolees whose revocation hearings are held "not in custody," as Defendants assert no probable cause hearings are required for them, a position that is disputed.[109]

The parties have been in dispute concerning whether probable cause hearings satisfy due process if they are held by telephone with the Deputy Commissioner in one location and the parolee and attorney in another. Tracking indicates that several jail locations, and a few prisons, held a telephonic hearing from time to time. The most frequent users were Calaveras, El Dorado, Placer, and Yolo county jails; High Desert State Prison also had high usage in the final month of the fiscal year because retired annuitants, who would normally staff that location, had exhausted their eligible hours. The collective frequency continued to fall to an average of 22 hearings per month, far less than 1% of all probable cause hearings.[110]

### Additional timeliness issue

**There are additional instances of parolees held in custody longer than the court's deadlines whom, to the Special Master's knowledge, the parties have not examined. When staff encounter these individuals and lift the hold before attorney appointment, it mitigates the extent of the problem but this goes unidentified in the hearing statistics the parties use to identify extended times in custody. Defendants should examine very late cases at each process step to determine the actual**

PDF created with pdfFactory trial version www.pdffactory.com

**frequency of parolees held beyond 13 business days without a probable cause hearing.**

### *Due process in the conduct of hearings*

As discussed *supra,* there is a significant concern that some hearing officers do not assess whether there is probable cause for the alleged violations and for retaining the parolees in custody. This likely involves a minority of staff, but the seriousness of the issue warrants an examination. Indeed, to the Special Master's knowledge, Defendants rarely observe probable cause hearings and have not, in any systemic way, reviewed them. Defendants review probable cause hearings during self-monitoring visits but, by their nature, these capture a very small proportion of the nearly 86,000 hearings per year.

Monitors and the Special Master generally observe hearing officers to be fair. There are open questions about ensuring understanding, neutrality, openness to presenting evidence concerning mitigation but not concerning probable cause, ensuring that each violation element has been met, assessing probable cause for each charge, and assessing whether a retention in custody is warranted. A review would be well-advised to ensure that practices are consistent with the law, the Permanent Injunction, regulations, and due process, and to provide support and guidance should any deficiencies be discovered.

§   Compliance is adequate on this requirement.

66

PDF created with pdfFactory trial version www.pdffactory.com

_**At probable cause hearings, parolees are to have the ability to present evidence to defend or mitigate the charges or proposed disposition**_

Since 2005, Defendants have been providing probable cause hearings at which parolees can present evidence. This was accomplished well in the hearings the Special Master has observed throughout his tenure. The CalPAP administration reports no systemic difficulties with presenting evidence at this step. As discussed _supra,_ it would be useful for Defendants to review hearing officer practice to ensure that this critical due process component is being fulfilled.

- There appears to be good compliance on this requirement.

_**Final hearing within 35 days of the placement of the parole hold**_ (¶¶11(b)(iv), 23)

The number of revocation hearings rose each month, peaking in July before coming down. The average number of hearings was 580 per month. [111]

In assessing this requirement, there are a number of considerations. The system must consistently provide timely hearings to the great majority of cases. It must also function to provide hearings timely to special populations, sometimes small groups whose circumstances dictate counting timelines differently or suspending and resuming proceedings once conditions have been met. In operation, the hearings must provide due process, satisfying questions such as fairness, opportunity to be heard, elements of the violation proved sufficient for the applicable standard, and consideration of appropriate sanctions.

_///_

PDF created with pdfFactory trial version www.pdffactory.com

*Timeliness*

To understand whether these hearings were timely, one must be able to assess the time to hearing for:

- mainstream cases completed according to the usual *Valdivia* standards (41% of the hearings)
- mainstream cases pending and handled according to the usual *Valdivia* standards (5%)[112]
- activated optional waiver cases, handled according to the usual *Valdivia* standards calculated from the date of activation -- completed and pending (49%)
- extradition cases handled according to the *Valdivia* standards calculated from arrival in California, rather than hold date – completed and pending (1%)
- cases held while the parolee is not in custody, ordered at a probable cause hearing and calculated, for now, at 60 days after the hold -- completed and pending (1%)
- cases held while the parolee is not in custody, determined soon after the hold was placed and calculated, for now, at 60 days after the hold -- completed and pending (3%)
- cases postponed, and whether they return to calendar within the planned time or a reasonable time
- cases where supplemental charges are brought after original charges are in process, timing not established[113]

Among the mainstream cases completed, 97% were timely, continuing the rate of the prior Round.[114] For late cases, the time to hearing was fairly evenly distributed from four days to three and one-half months past the deadline.[115] **It is important to note, however, that this only represents 41% of the revocation hearings.** Timeliness for most of the rest of the hearings remains unknown. A discussion of the special populations follows.

*Special populations*

Optional waivers: There were 5,515 optional waivers taken during the Round, and about 5,000 parolees activated them, requesting a hearing.[116] This would mean that the population activating optional waivers is 49% of all revocation hearings.[117]

PDF created with pdfFactory trial version www.pdffactory.com

Defendants conduct an "optional waiver review," an in-person meeting of the parolee, attorney and hearing officer in which the original probable cause finding is reviewed and the parolee considers an offer of disposition. If the parolee prefers to proceed to revocation hearing, the parties have agreed that such hearings will be concluded within 35 days after activation of the waiver.

In recent Rounds, the Special Master requested that the parties place emphasis on this topic as the timeliness of response, after waiver activation, appeared poor in the revocation database. For example, among the optional waiver activations currently open, 20% appear to be overdue for hearing.[118] Figures from previous Rounds have been worse.

Defendants conducted a large, well-structured audit of 16% of the optional waiver activations in the Round. Where cases in the sample appeared late, Defendants investigated and determined that only a handful were genuinely late.[119] The late cases tended to be delayed lengthy periods – from weeks to more than three months – but it was encouraging that there were only 10 such cases. Similarly, the Associate Chief Deputy Commissioner at Los Angeles County Jail studied 15 optional waiver activations that appeared late, and found that all but one were explained by time waivers and data entry errors.[120]

In addition, Defendants exercised good oversight at Wasco State Prison, where some problems concerning optional waivers were known to exist.[121] The Associate Chief Deputy Commissioner worked with staff to institute better procedures, and he reviewed this population at regular intervals and investigated and remedied any problem cases. Performance is significantly improved at that location.[122] Plaintiffs are concerned that late

PDF created with pdfFactory trial version www.pdffactory.com

processing may continue at Wasco, as they observed instances in 2007 and 2008, and three examples during the Round.

Unfortunately, it was determined late that the electronic report concerning optional waivers contains many other types of inaccuracies, which likely reflect both data entry inconsistencies and programming issues causing miscalculation. For example, in the first 30 cases that Plaintiffs examined in the report relied upon for Defendants' audit, the automated calculation appeared incorrect for 29. Thus, Defendants' review of apparently late cases gives good insight into a piece of the optional waiver puzzle, and shows good performance in those cases, but the timeliness of many more cases cannot be determined without closer examination.

In the Sixth Round, the Special Master wrote: " To reach substantial compliance [concerning optional waivers], Defendants must either address this timeliness rate or demonstrate, for a high proportion of these cases, that good cause explains what would otherwise be untimely cases." Defendants have taken important first steps in this direction. In coming Rounds, it will be possible to establish timeliness by examining other segments of this population case by case, but it would be extremely labor-intensive. If Defendants can prioritize revisions to this data report and concentrate on improving data entry practices, it will go a long way toward demonstrating compliance for this critical population.

Extradition: Of the 103 extradition cases that went to revocation hearing, 89% were timely, a rate similar to the prior Round. This population represents 1% of the total revocation hearings. Only 1 case missed the requirement by a short time (1 day); the others were held from 1 week to 2.5 months late, with no pattern apparent.[123]

PDF created with pdfFactory trial version www.pdffactory.com

<u>Not in custody</u>: The Board ordered "not in custody" hearings -- when the parolees had been in custody but released to await hearing – an average of 15 times per month, slightly more than in the prior Round.[124] This population, thus, represents about 1% of all revocation hearings. Reports do not capture whether the subsequent hearings were held timely; it will be necessary to make this showing to demonstrate substantial compliance.[125]

Among those decisions, the Board determined that 82 people during the Round did not pose a threat to public safety sufficient to retain in custody pending their revocation hearings. Surprisingly, hearing officers at North Kern State Prison and Richard J. Donovan Correctional Facility found that *no* one was safe enough to release under these conditions, and Los Angeles County Jail – the facility with the highest number of actions -- released only one person pending hearing, the same as the facility with the second-lowest number of actions.[126]

Not in custody hearings initiated without the parolee being taken into custody occurred about 44 times per month – somewhat fewer than in the prior Round -- according to CDCR's database.[127] This represents about 3% of all revocation hearings. As discussed above, the parties have negotiated a longer time allowed to serve such parolees notice of their charges. Reports showed compliance rates in this and other prehearing steps far below those for the mainstream population. The Unit Supervisor case conference was improved, but still only timely in 81% of the cases, and it dropped to 76% in the most recent month. Notice was timely in only 76% of cases, and the supervisor's subsequent review was 82% in compliance.

PDF created with pdfFactory trial version www.pdffactory.com

Defendants assert that no return to custody assessments or probable cause hearings are required for this group, and are applying a standard of 60 days to revocation hearing; these are points of disagreement.[128] About 96% of these cases were timely according to Defendants' 60-day standard, slightly improved over the prior Round. Most locations had only one late revocation hearing, although the units associated with Wasco State Prison showed the majority of late hearings. About 1/3 of the cases heard beyond that standard took place within one additional week, while the majority were not heard until 2½ to 5½ months after the hold.[129] This represents a decline and, while the frequency is low, the lengths of time to hearing are quite troubling.

Postponed: Postponements likely are a significant part of the revocation hearings population. As described *supra,* a timeliness analysis for these cases is highly impractical at this time. There is cause for concern, however, that postponed hearings are not rescheduled timely. For example, a recent report concerning parolee time waivers shows 35% pending beyond the date specified in the waiver.[130] Delays were observed among "not good cause" postponements and in other cases occasionally coming to the Special Master's attention. Defendants will need to look into this issue, and ensure that times to reschedule are reasonable, before revocation hearings can be considered in substantial compliance.

### *Due process in the conduct of hearings*

In the vast majority of cases observed by monitors and the Special Master, revocation hearings were run fairly and the parolee had an opportunity to be heard and to present evidence. It is not always clear that hearing officers are assessing whether each

PDF created with pdfFactory trial version www.pdffactory.com

element of the violation has been shown, and problems as to the use of hearsay remain widespread (see discussion *supra*).

Dismissals also give a window into hearing officers' attention to due process during hearings. Hearing officers dismissed at least 837 cases for insufficient evidence,[131] 53 for lack of jurisdiction, and 24 in the interests of justice.[132] Special conditions of parole found to be invalid and mental health issues led to a handful of dismissals each.

In addition, about 62 cases were dismissed in deference to another jurisdiction. At least 55 cases were dismissed because the hearing date exceeded the timeframes.[133] Another 11 were released to have a not in custody hearing.

> § As tracking systems take their initial steps toward more accurate capture of information, they raise more questions than they can answer. We can now determine, for example, that there is reliable timeliness information for *less than half* of the revocation hearings. Some aspects of due process delivered within hearings are adequate; some are not. The absence of information is so great, the Special Master cannot reach any conclusions about compliance in final revocation hearings.

### *Parolee's counsel shall have the ability to subpoena and present witnesses and evidence under the same terms as the State* (¶21)

In general, CalPAP indicates that parolees are able to present evidence in accord with this requirement; monitors' and the Special Master's observations are consistent with this. Objections indicate 10 instances in which parolees' witnesses were not subpoenaed or allowed, parolees were not permitted a time waiver to obtain evidence, or the hearing proceeded without the parolee.[134] This is a rate similar to that of the prior Round. While these figures suggest these issues arise with low frequency, the practice is still potentially problematic.

> § There is adequate compliance on this issue.

73

***Hearsay evidence must be limited by parolees' confrontation rights under controlling law. Defendants are to preserve this balance in hearings and to provide case law-based guidelines and standards.*** (¶24)

Please see discussion *supra*.

***Revocation hearings to be held within 50 miles of the alleged violation*** (Exhibit A – Remedial Plan)

In substantial compliance – see discussion *supra*

***Upon written request, parolees shall be provided access to tapes of revocation hearings*** (¶20)

While there is a system in place, problems related to tapes surfaced during this Round. These concerned missing tapes, inaudible tapes, refusals of requests, incomplete tracking, possibly inaccurate tracking, and untimely filling of requests. Plaintiffs issued a notice of violation raising these points after learning that there were no tapes for 17% of their requests in 2009.[135]

Defendants report making available better equipment and instructing staff in measures to improve sound quality. They also identified situations in which it appears not all proceedings are recorded; they report instituting procedures to improve tapes being generated and returned to headquarters.[136] Several of these instructions are captured in a July memorandum, and Defendants report future plans as well. Defendants also removed the requirement for attorneys to obtain a release or subpoena to receive tapes. These changes are very recent, and review will be required to determine whether these remedy the stated problems.

PDF created with pdfFactory trial version www.pdffactory.com

Defendants' log shows 499 tape requests, over a six-month period, from a variety of sources including parolees.[137] Some do not show any response.[138] Additionally, the log appears not to capture all cases where a tape was not provided. Plaintiffs noted such instances, but all response letters are recorded identically and do not distinguish these cases, creating an incorrect impression. Reportedly, these concerns have not been addressed.[139]

At most, 91% of requests were answered, or were pending, within a 30-day timeframe, a continued decline from previous Rounds. A significant number of untimely cases were processed within a short additional time, and a handful took 6 to 16 weeks to process.  Another 10 cases may have been problematic in that the same person or entity made a second request for the same tape after an extended time; in each, the record indicated the tape had been sent, so it is unclear whether the repeated requests reflect mail delays, tape quality, requiring an additional copy, or other reasons.[140]

- Practice declined for the second consecutive Round, but compliance remains adequate.

### *Agreed-upon mechanism for addressing concerns regarding individual class members and emergencies* (¶27)

Defendants have had this mechanism in place long-term, and it appeared that it continued to work smoothly. Plaintiffs submitted requests concerning 89 parolees; these generally concerned the timeliness of process steps, drug treatment program considerations, and possible over-detention. Responses were timely, with the exception of one group of requests where the response was two days later than the parties' general agreement.[141]

- There is good compliance on this requirement.

75

***Appeals*** (¶31(a)

While appeals are not subject to a *Valdivia* court order, they were expressly reserved in the Permanent Injunction as an open issue in the litigation that the parties expected to negotiate. That issue remains unresolved.

In the meantime, Defendants employ a system they distinguish from appeals.  The parties have reached agreement on the Defendants' system of "Decision Review." Defendants sent revised Decision Review policies and procedures to Plaintiffs and the Special Master on March 16, 2009. On May 1, 2009, Plaintiffs provided their feedback regarding the draft policies and procedures.[142] Defendants completed modifications of the Decision Review Paroles Division and Board of Parole Hearing policies and procedures in June 2009 and informed the Special Master and Plaintiffs of their intent to implement the new policies.[143] The final policies and procedures were implemented on July 28, 2009.[144] The Board of Parole Hearings used the desk procedures, policies and procedures, as well as a power point to train new Deputy Commissioners at their academy.[145]

Only two instances of potential problems with Decision Review were raised in individual inquiries during the Round. Defendants' response to both inquiries indicates that they were handled according to policy and procedure. It appears that the Decision Review policies and procedures are working well. Defendants need to produce the tracking data agreed to by the parties, so that implementation can be accurately assessed. Monitoring on this issue will continue in the next Round.

§   There is continued good compliance and progress on this item.

PDF created with pdfFactory trial version www.pdffactory.com

***Revocation Extension Proceedings*** (¶31(b))

Throughout the *Valdivia* remedy implementation, this has been an area of extremely poor performance. This Round is no different.

There have been monthly troubleshooting calls long-term, and other efforts to familiarize institutions staff with the requirements and their tasks. Most recently, the Office of Court Compliance designed and distributed excellent materials to support carrying out revocation extension proceedings.[146] There are clear, specific checklists for each position involved in the process. These are well-designed, giving a snapshot of context – making the tasks meaningful and helping employees see their role and its effect – and phrases suggesting an attempt to counteract previous misunderstandings of the process. Staff have distributed these materials to every CDCR institution, and have visited each one that contains a Decentralized Revocation Unit to review the contents and serve as a resource. Staff are working toward expanding this outreach. They also report that institutions are beginning to consult with them as needed.[147]

Staff report, and recent Plaintiffs' monitoring suggests, that some improvement is resulting. This is a welcome beginning; since the starting compliance numbers were extremely low, far more will be needed to establish even adequate compliance,

There were 743 revocation extension proceedings during the Round, roughly in the same proportion between probable cause hearings and revocation hearings as are seen in revocation extension actions.[148]

Compliance data is difficult to come by, as nearly every revocation database report related to revocation extension shows signs of inaccuracy, either in design or in

PDF created with pdfFactory trial version www.pdffactory.com

use. Certainly, it does not appear that staff can or do use them for management, with one purported exception.

Staff reportedly have worked to improve these reports, but limited change is evident to date. What is clear is that compliance is below 60% for every prehearing requirement – for most, it appeared to be *far* less -- and probable cause hearings do not fare much better. It appeared that the few revocation hearings were more timely than the other requirements.[149]

Plaintiffs' counsel issued three reports on point during the Round,[150] and conducted a detailed analysis of the lengths of time for each task. The sample totaled only about 3% of the actions during the period the reports spanned, so it may not be representative, but it provides a helpful piece of the puzzle and is especially useful for spotting issues.

Plaintiffs' analysis showed that the difficulties were *not* just a matter of a late initial step causing all others to be late; in many instances, the subsequent steps also took extended times, and the times to hearing were quite unreasonable. Plaintiffs found that, by the later months, initial steps had improved to about ¼ of the cases being timely and to almost ½ of the probable cause hearings held timely. Appointing an attorney and holding revocation hearings were near full compliance by the end of the Round, in Plaintiffs' sample.

Plaintiffs observed other issues in addition to timeliness. In several instances, there was a single example; nevertheless, these bear monitoring to determine whether there is a systemic problem. Issues included that fairly often, hearings were not recorded or there was difficulty hearing the speakers. Some records did not reflect a review for

PDF created with pdfFactory trial version www.pdffactory.com

disabilities or effective communication needs, or the information discovered therein, or failed to pick up needs evident in source material; in a subset, Plaintiffs' counsel did observe that the review had taken place but was not recorded. Hearing logistics reportedly could be overlooked, so that the attorney was not notified or subpoenas were not issued. Plaintiffs objected where mentally ill parolees refused their hearings and the hearing officers did not assess whether this was a knowing waiver. As a general matter, Plaintiffs continue to object to proceedings routinely being conducted by telephone.

On the other hand, sometimes the hearing officers handled mental illness well, considering closely whether a prisoner could participate, mitigating penalties, and lifting a hold for prisoners who then transferred to the Department of Mental Health. Plaintiffs' counsel also found that the hearing officers usually detailed the bases for their findings well and handled a confrontation rights objection correctly.

§   Little progress is apparent and there is poor compliance on this item.

## Permanent Injunction Requirements
## (applying throughout the process)

### _Defendants shall assure that parolees receive effective communication throughout the process_ (¶18)

This area affects parolees with hearing, visual, or speech impairments; speakers of languages other than English; those with limited literacy; and parolees with cognitive limitations, including those generated by mental illness. Defendants' structure to address these needs involves maintaining a database of known disabilities; requiring staff to check the database and paper files, and to assess needs, at each step of the revocation

PDF created with pdfFactory trial version www.pdffactory.com

process; providing reasonable accommodations; and documenting new disability information, the reviews, and the accommodations.

Defendants are required by the Court in *Armstrong v. Schwarzenegger* to maintain a database concerning prisoners' and parolees' disabilities, and to consult and to add to it at different times in the revocation process. While this has become common practice, there continue to be deficiencies apparent in monitoring reports and in document review. These take the form of some staff  not using the database or not recording that they had reviewed it, lack of knowledge about system functions or staff responsibilities, and known disabilities or accommodations being omitted or inaccurately recordedStaff are expected to record effective communication methods used, if applicable, during review of the special conditions of parole, as well as disabilities observed in person or in file reviews. These forms inform accommodations during notice, attorney visits, and hearings.  These practices are routine, but continue to show some of the same deficiencies as  the database. Also, the disability review form was missing in 2% of files provided to attorneys,[151] so information was unlikely available for those meetings and may not have been available at hearing. This rate was consistent with the prior Round.

Performance was much worse early in the year, but improved as the Round progressed. Several institutions did extremely well; those associated  with CalPAP offices in Madera, Sacramento, Susanville, Larkspur, and San Diego all repeatedly had two or fewer missing forms in a month, and sometimes perfect compliance. Los Angeles County Jail also showed dramatic improvement, from 5% to 1% missing mid-Round; its rates subsequently fluctuated, but were generally maintained at lower levels. Pitchess Detention Center had poor rates throughout, from 3% to 9%.

80

PDF created with pdfFactory trial version www.pdffactory.com

Facilities were less successful in providing the source documents for the disabilities documented on these forms. Compliance has been at 80% for a prolonged period, and declined to 74% in this Round. Los Angeles County Jail, Pitchess Detention Center, and Santa Rita County Jail consistently were missing 38% to 63% of these documents; Wasco State Prison, too, showed this level of deficiency but improved after the first few months of the year. Most facilities did not fare well, with only High Desert State Prison and Deuel Vocational Institution consistently providing nearly all source documents.

For those needing language assistance, a large proportion of translation is provided through telephone services. Also, in-person translators were hired an average of 85 times per month, according to Defendants' documents.[152]

Another report shows a great increase in the usage of sign language interpreters – 159 times at probable cause hearings or optional waiver reviews, and 108 times at revocation hearing -- during a period of nearly seven months.[153] It is not practical for the Special Master to discern from data reports whether there was any unmet need. The report does not capture availability of this service during notice service and attorney consultation, which will likely be necessary to demonstrate substantial compliance in this area.

Sign language interpretation is one of the topics reviewed during parties' monitoring. Reports capture knowledgeable staff and functional systems, as well as lapses. Plaintiffs wish to call the Court's attention to three examples of accommodation that appears inappropriate, and requirements at one jail and two Paroles Division offices

PDF created with pdfFactory trial version www.pdffactory.com

that pose barriers to using sign language interpreters and could potentially delay notice or parole agent contacts for such parolees.

§   There is adequate progress and adequate compliance on this item.

### *Meet periodically regarding policies, forms, and plans; submit policies and procedures to the court no later than July 1, 2004 with full implementation by July 1, 2005* (¶¶10-11(a), 11(e))

Defendants met the initial timeframe for submitting policies and procedures to the Court, though the parties remain in dispute as to the adequacy and completeness of those policies. Throughout the term of the Special Master's involvement, the parties have maintained a reasonable pace in negotiating these differences, but full implementation has not been achieved.

During this Round, the parties concentrated on identifying the universe of policies that exist and those that remain in dispute. It appears that this has been accomplished and Plaintiffs' counsel has submitted detailed requests for revisions, as well as an overarching objection to policies being organized in manuals for different job classifications rather than in one comprehensive set. They note the potential for confusion with the current method and they allege it is difficult for counsel and parolees to determine the rules applied to hearings. Plaintiffs also note that some regulations are not consistent with *Valdivia* requirements. The parties intend to resume negotiations on the disputed items.[154]

§   There is adequate progress and adequate compliance on this requirement.

PDF created with pdfFactory trial version www.pdffactory.com

***Forms provided to parolees are to be reviewed for accuracy, simplified, and translated to Spanish*** (¶19)

In recent Rounds, the Special Master requested that the parties place emphasis on this topic. Defendants report that, during the Round, Paroles Division initiated, but did not complete, translation of some of its forms.[155] The Board did not make progress. The divisions did not indicate whether forms are being simplified.

§   Progress is limited and compliance on this requirement is poor.

***Defendants shall develop training, standards, and guidelines for state-appointed counsel*** (¶17)

No new information came to the Special Master's attention through observation or information from the parties.

§   There is good compliance with this requirement.

***By July 1, 2004, an assessment of availability of facilities and a plan to provide hearing space for probable cause hearings*** (¶11(c))

The Defendants have access to space for hearings and other necessary tasks at the sites where parolees are housed. A very small number of county jails do not permit hearings on site, but Defendants have arranged reasonable alternatives. The vast majority of spaces are adequate to the purpose. The parties remain in dispute over some locations. Plaintiffs assert that some do not provide for adequate privacy and effective communication during notice service or attorney-client communications, most particularly Los Angeles and Santa Rita county jails. They object to arrangements at

PDF created with pdfFactory trial version www.pdffactory.com

Placer and Butte county jails, and newly at Rio Cosumnes Correctional Center, which use glass to separate the parolee from all other hearing participants.

§    There is good compliance on this requirement.

### *Defendants shall maintain staffing levels sufficient to meet all obligations under the Order* (¶ V)

Please see discussion *supra*.

### *Monitoring by Plaintiffs "as reasonably necessary"* (¶25)

Monitoring of decentralized revocation units, parole units, and CalPAP offices, and document productions were executed smoothly during this Round. Problems occurred with tape production, which is discussed *supra*. The parties reached agreements on the monitoring activities and schedule for the remainder of 2009 and the timeliness of Plaintiffs' monitoring reports improved significantly.

Defendants suspended self- monitoring tours for the second quarter due to the development of a self-audit tool. The audit tool is undergoing a pilot test and internal review. The Special Master and Plaintiffs look forward to the opportunity to review the tool and to provide feedback. Defendants believe that this tool will create a more efficient use of staff in the monitoring process and at the same time provide better information to the staff who implement the *Valdivia* revocation process each day. Goals of the audit tool include:

- Transparency
- Objective standards
- Standardization
- Clarifying the goals and standards for the programs
- Better assessment of progress[156]

PDF created with pdfFactory trial version www.pdffactory.com

Defendants have indicated that they hope to have completed negotiations on the tool and a new approach to monitoring by the end of 2009.[157] Defendants' self-monitoring tours resumed in July 2009.

The parties agreed to continue for the remainder of 2009 the monitoring agreements reached for the second quarter of 2009. Plaintiffs' monitoring remained at the 2008 level except for the addition of four "tapes and document" tours in the second quarter.[158] The tapes and document tours were to replace the loss of the Defendants' self-monitoring tours.

The Special Master has been discussing with the Defendants proposals to modify the monitoring process. The Plaintiffs' current monitoring process has provided valuable information but as the case has progressed, new strategies may be needed to help with some of the more complex issues that the Defendants now face. The Defendants are preparing a brief proposal for the Plaintiffs' consideration.

- Compliance is good on this issue.


**Interpretation Issues:**

The following issues were noted in prior reports of the Special Master. The information that came to the Special Master's attention during the Round was not sufficient basis to draw conclusions.

§   Parolee rights waivers before being appointed counsel

Plaintiffs object to the use of absconders' waivers, citing examples during the Round at San Quentin State Prison and California Institution for Men.

PDF created with pdfFactory trial version www.pdffactory.com

§   Adequate notice to parolees of the dates of their revocation hearings

§   Whether state employees and witnesses will be provided with attorney representation during hearings

§   Parolee timeliness waivers, including whether they are voluntary, parolee attorneys are requesting them at a reasonable rate, and whether hearings are resumed after a reasonable time

•   Whether there are sufficient provisions for attorney-client communications to be confidential in some locations

During the Round, Plaintiffs raised concerns about conditions for attorney-client consultation at California Institution for Men, Santa Rita County Jail, Los Angeles County Jail, North Kern State Prison, and Tulare County Jail.

### Summary

Defendants continued to work toward compliance under very difficult circumstances, and there were some successes. In particular, several issues subject to longstanding planning and negotiation came to fruition during this Round, and having them underway is a significant accomplishment. Many areas of remedial sanctions are well-established and subject to continuing improvement. With mentally ill parolees and decision review, it will be important for Defendants to oversee the processes to ensure that they operate as designed; with confrontation rights, Defendants completed an important milestone, and there is much further to go to ensure widespread, effective use of the required standards.

PDF created with pdfFactory trial version www.pdffactory.com

Timeliness standards slipped to a minor degree for several process steps during the last month or two of the Round. It remains to be seen whether that is an exception or indicative of ongoing practice.

Of note are these issues of lowest compliance, which require attention:

- Revocation extension – all processes
- Attorney appointment at the facilities associated with CalPAP's Madera office
- Extradition cases – notices of rights and probable cause hearing timeliness
- Not in custody notices of rights
- Disability source documents, particularly at Los Angeles County Jail, Pitchess Detention Center, and Santa Rita County Jail
- Tracking system ability to accurately report notices of rights and revocation hearings after activated optional waivers

To summarize compliance on each requirement:

Substantial compliance:
- Return to custody assessments
- Hearings within 50 miles of the alleged violation
- Access to non-confidential documents and field files
- Remedial Sanctions Order Items:
  - Policies and Procedures
  - Interim Remedial Sanctions
  - Expanding Jail and Community-Based ICDTP Programs
  - Determining Availability of ICDTP
  - Electronic In-Home Detention
  - Sharing Information with Parolee Defense Counsel
  - Training about Remedial Sanctions
  - Reporting on the Parole Violation Decision-Making Instrument

Good performance:
- Compliance with the November 13, 2006 Order concerning information systems
- Compliance with the January 14, 2008 and August 8, 2008 Orders concerning mentally ill parolees (partial)
- Monitoring
- Case Conference within 48 hours to determine probable cause for a hold
- Implement policies and procedures for designation of information as confidential
- Unit Supervisor review

PDF created with pdfFactory trial version www.pdffactory.com

- Parolees ability to present evidence to defend or mitigate the charges or proposed disposition
- Training, standards, and guidelines for state appointed counsel
- Decision Review
- Consideration of remedial sanctions at each step
- Mechanism for individual concerns
- Hearing space
- Designation of information as confidential
- Remedial Sanctions Order Items:
  - Creating ICDTP Options for Dually Diagnosed Parolees
  - Parolees with Disabilities
  - Female Parolees
  - Out of County Transfers
  - Consideration of Remedial Sanctions at Each Step

Adequate performance:
- Compliance with the November 13, 2006 Order concerning internal oversight
- Policies and procedures
- Confrontation rights
- Staffing
- Probable cause hearings
- Notice of rights
- Violation report
- Parole Administrator review
- Appoint counsel timely
- At the time of appointment, counsel shall be provided with all non confidential reports and documents the state intends to rely upon
- Parolee's counsel shall have the ability to subpoena and present witnesses
- Evidence under the same terms as the state
- Parolee access to tapes of revocation hearings
- Accommodations and effective communication throughout the process
- Policies, forms, and plans

Poor performance:
- Notice service in extradition cases
- Translating and simplifying forms
- Revocation extension proceedings
- Probable Cause assessments

Unknown status:
- Revocation hearings
- Expedited probable cause hearings
- August 8, 2008 Order concerning evaluation of mentally ill parolees pursuant to California Welfare and Institutions Code § 5150

PDF created with pdfFactory trial version www.pdffactory.com

- Alternative Placement in Structured and Supervised Environments and Self Help/Outpatient After Care Programs

Where quantification is possible, compliance can be summarized as:

| | |
|---|---|
| Unit Supervisor and agent conference | 98% - mainstream and extradition cases |
| | 80% - not in custody cases |
| | |
| Notice to parolee | 85 or 89% - mainstream cases |
| | 71% - extradition |
| | 76% - not in custody cases |
| | |
| Violation report | 85% |
| Unit Supervisor review | 98% - mainstream cases |
| | 82% - not in custody cases |
| | |
| Parole Administrator review | 94% |
| | |
| Timely revocation packet to attorney | 94% |
| Disability form in attorney packet | 98% |
| Source documents in attorney packet | 74% |
| | |
| Return to custody assessment | 95% |
| Probable cause hearing | 96% - mainstream cases |
| | 92% - extradition |
| | |
| Revocation hearing | 97% - mainstream cases (41% of hearings) |
| | unknown - activated optional waivers (half of all hearings) |
| | 89% - extradition |

96% -- Not In Custody referrals held within
60 days

| | |
|---|---|
| Revocation extension | $\leq$60% - most steps |
| | 80% - revocation hearing |

89

PDF created with pdfFactory trial version www.pdffactory.com

**Recommendations**

The Special Master recommends to Defendants, in the strongest possible terms, that they undertake a review of probable cause hearings to satisfy themselves and the Court that due process is being carried out in those hearings. This should include addressing any pattern of hearing officers forgoing a probable cause assessment and solely conducting a negotiation session, to the extent this activity continues. If due process deficiencies of any type are discovered, Defendants should support the hearing officers with tools and guidance to help them strengthen their practice.

In addition, the Defendants have demonstrated compliance with several requirements of the Permanent Injunction and the Remedial Sanctions Order, meeting their essential aim. I therefore recommend that the Court order that the following requirements are substantially compliant, and that the subjects will therefore no longer be a primary focus of Plaintiffs' or Special Master's monitoring unless and until it comes to their attention that there has been a significant decline in compliance. Information about these requirements, however, remains relevant to overall monitoring and compliance to the extent they arise in the course of investigating an individual parolee's situation, or in assessing whether staff considered remedial sanctions or articulated the basis for hearing findings.

These orders should apply to the following requirements:

**Permanent Injunction Requirements**

- Return to Custody Assessment (except for Los Angeles County Jail Decentralized Unit)
- Revocation hearings within 50 miles of the alleged violation
- Parolee defense counsel shall have access to non-confidential portions of the field file

PDF created with pdfFactory trial version www.pdffactory.com

**Remedial Sanctions Order Requirements**

- Policies and procedures regarding the requirements of the April 2007 remedial sanctions order
- Expanding jail and community based ICDTP
- Determining availability of ICDTP
- Electronic in-home detention
- Training about the remedial sanctions requirements of the April 2007 remedial sanctions order
- Dedication of 50% of certain programs as Interim Remedial Sanctions under the April 2007 remedial sanctions order
- Sharing information with parolee defense counsel regarding the provisions of the April 2007 remedial sanctions order
- Reporting on the development of the Parole Violation Decision-Making Instrument

Although the above requirements would not be subject to external monitoring, I recommend that the Court order the Defendants to report the status of most of these requirements to all parties every six months. This may be incorporated in the Defendants' Compliance Reports. The reporting requirement should apply to all requirements found herein to be in substantial compliance *except* interim remedial sanctions, sharing information with defense counsel, and reporting on the development of the Parole Violation Decision-Making Instrument.

Respectfully submitted,

_/s/*Chase Riveland*

Chase Riveland
Special Master                                    DATED: October 13, 2009

---

[1]  Over 50 Mile Report Jan. through Jul., 2009
[2]  8 00 ICDTP Policy and Procedure 092409

PDF created with pdfFactory trial version www.pdffactory.com

[3] See e-mails from Macias-Price, ProgramQtlyUpdate and GoogleMapsforPrograms.

[4] See RS Monthly Workload 02-08 09

[5] An example of the PSC report is the Weekly Count 4-17-09 through 4-23/09. For an example of RMSC, see BSA 2009 2010. Similar reports are kept for other programs.

[6] See updated CBP Provider list.

[7] Data is drawn from the ICDTP Weekly Report issued 8/28/09 and the Updated CBP Provider list. The former contains an accurate number of jail beds but underestimates community-based beds.

[8] Includes 200 Parolee Substance Abuse Program beds. It appears this program may be eliminated. The region still will have over 400 beds available.

[9] Female beds are included in the totals for jail and community-based beds

[10] An example of the report is ICDTP Bed Availability All Regions 5-1-09

[11] See Jail ICDTP Criteria Matrix

[12] See Copy of DC Training

[13] See page 18 of the Defendants' Feb. 2, 2009 Compliance Report

[14] See sample training flyers; SASCA Training Flyer and SASCA Training.

[15] See OSM PVDMI for a summary produced by Robert Ambroselli, Paroles Division, for the Special Master

[16] See PVDMI Training Schedule

[17] See PVDMI Tally for the Paroles Division staff trained as of this date

[18] See e-mail from Skipper-Dotta, RE: Attendees at PVDMI Training

[19] See OSM PVDMI

[20] See OSM PVDMI

[21] Order of Nov. 13, 2006

[22] Source for this section was informal communications with Defendants

[23] See Katie Riley, e-mail of May 8, 2009; SASCA RFP.

[24] Document with the file name ICDTP Dually Diagnosed Matrix.doc

[25] See ICDTP Dual Diagnosis Providers 091109

[26] All Regions CCMS EOP ICDTP Referrals 6-08 to 5-09 xls.

[27] See Galvan e-mail, July 1. 2009

[28] See e-mail from staff counsel, Riley, May 27, 2009, ADA Info to Jail ICDTP.

[29] See Remedial Sanctions Order 4-03-07

[30] The data was collated from the Parole Administrator Statistics in the revocation database.

[31] See RSTS RS Summaries 02-09 to 08-09.

[32] See Exhibit 11 in 2008 Compliance Report Exhibit 1-14. Note the time frames differ so these are not exact comparisons.

[33] See RS Monthly Workload 02-09 to 08-09

[34] Examples include: Pitchess Detention Center Qtr 2 Plaintiffs

[35] For an example of delays see Monitoring Report, Pitchess Detention Center Q2 2009 Plaintiffs

[36] See FMN Response to DARS Region III Audit, 4-21-09, 720-1

[37] See Motivational Interviewing Training Memorandum, Region I, April 23, 2009

[38] See Monitoring Reports from Pitchess Detention Center and Qtr 2 Plaintiffs and Q3SRCJail.

[39] See Letter to Special Master Riveland, June 08, 2009.

[40] All analysis in this section relies on the document with computer file name Mentally Ill Suspension List to the State 8-14-09.xls; analysis includes only those parolees whose revocation proceedings were open or concluded between Feb. and Aug. 2009

[41] Another 9 may also have transferred. They are listed at California Medical Facility, but these entries do not specify whether it was the men were in the prison or the Department of Mental Health facility.

[42] There were 17 women whose hearings were suspended for mental health reasons. Among those with extended stays in custody without a hearing (4), only 1 went to DMH (she was committed).

Therefore, 6% of the women went to DMH (either by county courts or CDCR), as contrasted with 22% of men. More tellingly, only 1 woman with extended time in custody without hearing was sent to DMH as opposed to 33 men (length of time to stabilize suggesting a greater possible need for DMH care).

[43] One occurred two days late. Another was further delayed, but it did not affect a liberty interest in that he was being held for local prosecution. Two holds were dropped one week and two weeks late, respectively.

PDF created with pdfFactory trial version www.pdffactory.com

The hold was dropped for a third person because his maximum discharge date was approaching but, oddly, the effective date was set for two weeks after the discharge date.

[44] Among these parolees, at least 46 were housed in jails. One cannot tell the originating location for the parolees in  Department of Mental Health facilities.

[45]  Order, Mar. 25, 2008, incorporating by reference the Recommendations language at pages 26-29 of the Report and Recommendation Regarding Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction

[46] Informal communications with Defendants

[47] Informal communications with Defendants

[48] Informal communications with Defendants

[49] It represents on 1/5% of the revocation hearings in the Round. Spreadsheet with the computer file name BPH QCU Comito List 2009 #1.xls; Comito Objections Denied and Comito Objections Granted reports for each of Jan. through Jul. 2009; Hearing Objections With "Comito" 1103Rev by DRU, run for each of Feb. through Aug. 2009

[50] The Special Master reviewed 66 hearing officers' written treatment of *Comito* objections in 436 cases. These represented nearly all cases reporting such an objection from March through July 2009. (from March through May, a handful of hearsay objections each month – a total of 20 -- were recorded on the Other Objections report without narrative; in June, those cases were included in the analysis as there was sufficient narrative to assess) This review thus covered about 11% of all revocation hearings held in the Round.

Information recently surfaced that the CalPAP documents might not contain the full RSTS records for each case, as intended. For this reason, the Special Master will not include the percentages determined in the analysis, as they may be incorrect. The large number of problematic cases indicates, however, that even if that number is reduced (by some problematic cases improved by the previously omitted information), one can say with confidence that at least a majority would remain troubling.

A few of these hearing officers presided over too few hearings to draw firm conclusions about their practice. Since the study reviewed written records only, it is possible that deficiencies in some cases are of documentation, not of the *Comito* analysis itself. Known objections that were not recorded in RSTS were part of the total N reviewed but were analyzed separately and were not included in the overall assessments of these hearing officers.

Sources: *Comito* Objections Granted and *Comito* Objections Denied, each run for one-month periods for each of Mar. through Jul. 2009; Other Objections Jun. 2009; Closed Case Summary by DRU – Hearing Events, run for each of Feb. through Aug. 2009; Hearing Objections With "Comito" 1103Rev by DRU, run for each of Feb. through Aug. 2009

[51]  This was derived from the *Comito* Objections and Other Objections reports previously referenced, less a few cases identified as *Comito* issues but for which the hearing record described a different issue, and supplemented by a few cases from BPH QCU Comito List 2009 #1.xls that had not appeared on the CalPAP reports.

[52] See LACJ Corrective Action Plan with 2-10-09 Meeting Notes

[53]  Informal communications with Defendants

[54] See MCJ Cell 41 Renovation

[55] This information was shared by Robert Ambroselli, Acting Director of the Paroles Division to Nancy Campbell, Deputy OSM in a phone call.

[56] Informal communications with Defendants

[57]  G. Bock memo dated Jul. 7, 2009; informal communications with defendants

[58]  Unless otherwise specified, timeliness analysis in this section is based on Closed Case Summary by DRU – Valdivia Timeliness Rules, DRU LACJ, for each of Feb. through Aug. 2009 and Closed Case Summary by DRU – Valdivia Timeliness Rules, All DRUs, for each of Feb. through Aug. 2009 (analysis removes LACJ from these totals). This paragraph also relies on Parole Administrator Statistics, run for each DRU Feb. 1 through May 31, 2009, and Jun. 1 through Aug. 31, 2009.

It does *not* include open cases, extradition cases, or not in custody hearings. While open cases may be as much as another 50% of the workload, a recent example suggests the compliance levels are consistent with those of the closed cases. Open Case Summary by DRU – Valdivia Timeliness Rules, DRU LACJ, Sept. 11, 2009. Parolees returned from out of state are often housed at locations other than Los Angeles County Jail, so the revocation process is conducted elsewhere, while the revocation database reports them

93

PDF created with pdfFactory trial version www.pdffactory.com

according to the parole unit responsible for supervision. Thus, it is not possible to determine the timeliness of extradition cases the Los Angeles DRU actually handles, if any.

[59] Informal communications with defendants

[60] Cases Missing 1073 & Source Documents Monthly Report for each of Jan. through Jul. 2009

[61] Informal communications with Defendants

[62] Informal communications with Defendants

[63] Parolee Activated Optional Waiver by DRU, DRU LACJ, Feb. 8 through Aug. 8, 2009; Closed Case Summary Hearing Events – DRU LACJ, Feb. 1 through Jul. 31, 2009

[64] Parolee Activated Optional Waiver by DRU, DRU LACJ, Feb. 8 through Aug. 8, 2009

[65] Closed Case Summary – Good Cause Postponement by DRU, DRU LACJ, Feb. 1 through Jul. 31, 2009; Closed Case Summary – Good Cause Postponement by DRU, DRU LACJ, Aug. 2009; Closed Case Summary – Not Good Cause Postponement by DRU, DRU LACJ, Aug. 2009. These reports are voluminous and do not calculate totals, and they appear to include duplicate entries, so this figure is an estimate. Reports do not indicate whether postponement was taken at probable cause hearing or at revocation hearing.

[66] Letter from G. Bock to G. Morrison, Aug. 6, 2009; informal communications with Defendants; document with computer file name LACJ Memo July 7 09.pdf

[67] Letter from G. Bock to G. Morrison, Aug. 6, 2009; document with computer file name LACJ Court Dates Log.pdf; document with computer file name LACJ movement log.pdf; document with computer file name LACJ movement log 2.pdf

[68] A study cannot practically be done based on the electronic records in their current form. A reasonable time to reschedule would be different for a revocation hearing, which requires time for subpoenas, than for a probable cause hearing. The reports of postponements do not indicate the type of hearing.

[69] Closed Case Summary by DRU – Valdivia Timeliness Rules, DRU LACJ, for each of Feb. through Aug. 2009 and Closed Case Summary by DRU – Valdivia Timeliness Rules, All DRUs, for each of Feb. through Aug. 2009 (analysis removes LACJ from these totals)..

[70] All analysis in this section is based on *Valdivia* Staff Vacancy Report Sept. 1, 2009 and *Valdivia* Staff Vacancy Report Mar. 24, 2009

[71] It appears that some of the positions that have been reported for several Rounds are not fully *Valdivia* positions, but have shared responsibilities. Defendants have been asked to correct these numbers and, as a consequence, allocated positions will likely be lower in the Eighth Round.

[72] Closed Case Summary by DRU – Case Prep Events, run for one-month periods for each of Feb. through Aug. 2009; Closed Case Summary by DRU – Hearing Events, run for one-month periods for each of Feb. through Aug. 2009

[73] This occurred in 20 of 49 cases reviewed; monitoring report for Santa Rita County Jail review in July 2009

[74] It appears 65 of 140 late cases occurred for this reason; spreadsheet with computer file name PCHs with Missed VTFs-CDCR analysis.xls

[75] Closed Case Summary – Hearing Events for Santa Rita County Jail each of May through Aug. 2009; Closed Case Summary – Hearing Events for NKSP, SQ, and all DRUs Jul. 2009

[76] Closed Case Summary by DRU – Hearing Events, run for one-month periods for each of Feb. through Aug. 2009

[77] Closed Case Summary by DRU – Case Prep Events, Closed Case Summary by DRU – Extradition, both run for Feb. 1 through Jul. 31, 2009 and for Aug. 2009. The Special Master drilled down on LACJ, WSP and CIM in the column of latest cases but did not save those documents. Note: CDCR has not yet demonstrated compliance levels for *pending* extradition cases.

[78] Closed Case Summary by DRU – Extradition Cases. Feb. 1 through Jul. 31, 2009; Case Summary by DRU – Extradition Cases, Aug. 2009; Open Case Summary by DRU – Valdivia Timeliness Rules run on each of Aug. 8, Aug. 28, and Sept. 4, 2009

[79] Closed Case Summary by DRU – NIC Referral Cases. Feb. 1 through Jul. 31, 2009; Case Summary by DRU – NIC Referral Cases, Aug. 2009. Note: CDCR has not yet demonstrated compliance levels for *pending* not in custody cases.

[80] All figures in this section arise from the Special Master's analysis of California Parole Advocacy Program, Notice of Rights Compliance Report for each of Jan. through Jul. 2009. Missing from this analysis are 3% of cases where the service date was missing from the materials available to CalPAP (1,531

PDF created with pdfFactory trial version www.pdffactory.com

cases). Thus, of the 97% of the cases that could be examined, 92% were timely, yielding a compliance rate of 89%. Other categories of cases – not in custody, supplemental, optional waiver activation, and extradition – are treated separately

[81]   The analysis in the preceding paragraph is based on Closed Case Summary by DRU – Case Prep Events, Feb. 1 through Aug. 31, 2009; it does not include open cases, which appear to be about 10% of the total cases at any given time.

    Included in these numbers are 766 cases that were impossible to serve because they were released, transferred out of state, or died before they could be served. It was not practical, however, to attempt to identify at what point – within three days or subsequently – this determination was made. The answer could affect the timeliness numbers positively or negatively, but would only amount to 1% in any event. NOR Unsuccessful, Will Not Retry, Feb. 1 through Jul. 31, 2009

    The time for the lengthiest cases could not be determined; when drilling down on the column of latest cases, many individual cases appear without key data.

[82]   Closed Case Summary by DRU – Case Prep Events, Aug. 2009

[83]   The total number of serves completed was 68,959, and 85% of them were timely. Closed Case Summary by DRU – Case Prep Events, Feb. 1 through Aug. 31, 2009. The total number of unsuccessful attempts was 11,322, 927 of which could not be completed because the parolee was released, transferred out of state, or deceased. The remaining number of unsuccessful attempts is 15% of the total actions – the same number as those ultimately noncompliant. NOR Unsuccessful – Will Not Retry by DRU, Feb. 1 through Aug. 31, 2009; NOR Unsuccessful – Will Retry by DRU, Feb. 1 through Aug. 31, 2009.

[84]   . NOR Unsuccessful – Will Retry – Feb. 1 through Aug. 31, 2009

[85]   Closed Case Summary by DRU – Extradition Cases, Feb. 1 through Jul. 31, 2009; Closed Case Summary by DRU – Extradition Cases, Aug. 2009.  Note: these numbers may prove to be incorrect, as a revocation database problem calling them into question.

    Also note: CDCR has not yet demonstrated compliance levels for *pending* extradition cases; depending on the size of this population, that could affect compliance numbers significantly.

[86]   Closed Case Summary by DRU – NIC Referral Cases, Feb. 1 through Jul. 31, 2009.  Note: CDCR has not yet demonstrated compliance levels for *pending* not in custody cases.

[87]   Closed Case Summary by DRU – Case Prep Events, Feb. 1 through Aug. 31, 2009; Closed Case Summary by DRU – Case Prep Events, Sept. 1, 2008 through Jan. 31, 2009

[88] *Id.;* Closed Case Detail by DRU – Case Prep Events, DRU LACJ, Step REFER, Feb. 1 through Aug. 31, 2009

[89]   Undoubtedly, some of these cases were genuine deficiencies, some were handled timely but an information system function was completed much later, while others likely involved both. Some may not have generated harm (*e.g.,* overlooked while serving time on another charge and hold released upon error discovery), but others may have caused a prolonged time in custody that is not picked up in other statistics. It was impractical for the Special Master to undertake a study to discern how much cause for concern these cases present, but encourages Defendants to do so.

[90]   Closed Case Summary – Case Prep Events, DRU LACJ, Step REFER, Sept. 1, 2008 through Jan. 31, 2009; Closed Case Detail – Case Prep Events, DRU LACJ, Step REFER, Sept. 1, 2008 through Jan. 31, 2009

[91]   Document with computer file name Par Ad Missed Cases.doc

[92]   Closed Case Summary by DRU – Case Prep Events, Feb. 1 through Aug. 31, 2009; drill downs on latest cases reviewed but not saved

[93]   Often, steps appearing to be months late in the revocation database are determined to be data entry errors, upon examination. The  Special Master does not know whether that applies in this instance.

[94]   All analysis in this section is based on a review of: Parole Administrator Statistics run for each DRU and Cumulative Parole Administrator Actions by DRU, each run for the periods Feb. 1 through May 31 and Jun. 1 through Aug. 31, 2009. While 99% of the reviewed cases were timely, 5% were shown as missed, therefore the verified timeliness rate was 99% of 95%, or 94%. As will be discussed, compliance is likely higher but cannot be shown at this time.

[95]   Document with computer file name Par Ad Missed Cases.doc. The study reviewed all cases at the three DRUs with the highest numbers of missed cases; reviewers examined six months of data.

[96]   Date Case Assigned Compliance Report, run each month from Jan. through Jul. 2009. CalPAP data does not include several categories of cases: not-in-custody hearings, where there may not be a hold date and

PDF created with pdfFactory trial version www.pdffactory.com

there is no set timeframe for attorney appointment; supplemental charges and optional waiver activations, where the attorney would already have been appointed.

It also does not include extradition cases; CDCR and CalPAP should be coordinating more effectively to share the date of California arrival in these cases. As it stands, CalPAP cannot include these cases in its figure, but the group is small enough that the omission affects the outcome by 3% at most.

[97]  Informal communications with Defendants

[98]  The revocation database showed one such case but, on investigation, it appears that this was a routine case mistakenly labeled. CalPAP Requested Expedited Hearings Feb. 1 through Jul. 31, 2009; CalPAP Requested Expedited Hearings Aug. 2009; informal communication with Defendants

[99]  CalPAP Requested Expedited Hearings, Feb. 1 through Jul. 31, 2009;  CalPAP Requested Expedited Hearings Aug. 2009; Board Decision Dismiss, Feb. 1 through July 31, 2009; Board Decision Dismiss Aug. 2009

[100]  Closed Case Summary by DRU – Hearing Events, run for one-month periods for each of Feb. through Aug. 2009. This does not include open cases.

[101]  Closed Case Summary by DRU – *Valdivia* Timeliness Rules

[102]  Closed Case Summary by DRU – Hearing Events, Feb. 1 through Aug. 31, 2009

[103]  Closed Case Detail by DRU  - Hearing Events, Feb. 1 through Aug. 31, 2009, Step PCH, for CIM, LACJ,  SQ, SR

[104]  Note that data includes both probable cause and revocation hearings, and most printouts do not distinguish them. Thus, the totals and overall percentages reported here would likely be somewhat different for the different types of hearings.

[105]  *See, e.g.,* Closed Case Summary – Good Cause Postponement and Closed Case Summary – Not Good Cause Postponement, each run for Jul. 11 through Aug. 7, 2009 and Aug. 8 – Sept. 4, 2009. The current reports span 24 to 45 pages each month, do not have any totals, do not distinguish probable cause hearings from revocation hearings, and sometimes contain multiple entries for the same occurrence.

[106]  Open Case Summary by DRU – Time Waiver run Aug. 28, 2009. Reports are not available  to show hearings completed after time waivers were taken, so one cannot determine whether this is representative.

[107]  The type of hearing is not indicated, but most or all of these were likely to be revocation hearings.

[108]  Closed Case Summary by DRU – Extradition Cases, Feb. 1 through Jul. 31, 2009; Closed Case Summary by DRU – Extradition Cases, Aug. 2009

[109]  Informal communication with parties

[110]  CalPAP Telephonic Probable Cause Hearing Summary Sheet, Jan. through Jun. 2009;  CalPAP Telephonic Probable Cause Hearing Summary Sheet, Jul. 2009; informal communications with defendants

[111]  Closed Case Summary by DRU – Hearing Events, run for one-month periods for each of Feb. through Aug. 2009

[112]  *See, e.g.,* Open Case Summary, Aug. 28, 2009

[113]  Reports now capture timeliness for closed mainstream cases, open mainstream cases, closed extradition cases, and closed NIC referrals from the parole units.

It cannot yet show time open for pending extradition cases, activated optional waivers, NIC referrals, and NICs ordered at probable cause hearing. It cannot show time to hearing for completed NICs ordered at probable cause hearing. Without a standard to apply, supplemental charge timeliness cannot be calculated.

[114]  Closed Case Summary – *Valdivia* Timeliness Rules, Feb. 1 through Aug. 31, 2009

[115]  Closed Case Summary – Hearing Events, Feb. 1 through Aug. 31, 2009. The Special Master also drilled down on CIM, SQ and SR in the column with the lengthiest times but did not retain copies.

[116]  Optional Waiver Taken – Closed Cases; Parolee Activated Optional Waiver by DRU, each run for Feb. 1 through Aug. 31, 2009. Average of: Optional Waiver Taken – Open Cases, Feb. 1 through Aug. 31, 2009, run Sept. 9, 2009; Optional Waiver Taken – Open Cases, Feb. 1 through Aug. 8, 2009, run Aug. 8, 2009.

[117]  *Id.;* Closed Case Summary by DRU – Hearing Events, Feb. 1 through Aug. 31, 2009

[118]  Optional Waiver Taken – Open Cases, Feb. 1 through Aug. 31, 2009, run Sept. 9, 2009

[119]  See Optional Waiver Review Report. This reflects 688 cases reviewed; these were selected by a random sample (every sixth case) of all activated optional waivers in the Round. In the study, only 10 cases exceeded the deadline; others that appeared late generally were explained by parolees activating waivers multiple times, or data entry errors.

[120]  G. Bock letter dated Aug. 6, 2009

[121]  Informal communications with Defendants

PDF created with pdfFactory trial version www.pdffactory.com

---

[122]  Informal communications with Defendants

[123]  Closed Case Summary – Extradition Cases  Feb. 1 through Jul. 31, 2009; Closed Case Summary – Extradition Cases  Aug. 2009

[124]  Board Decision NIC, Feb. 1 through Jul. 31, 2009; [124]  Board Decision NIC Aug. 2009. The total of these actions was 105 in a seven-month period.

[125]  The report captures the date the decision was made to have a "not in custody" hearing and the date the hold was lifted.

[126] Board Decision NIC, Feb. 1 through July 31, 2009

[127]  All figures in this section are drawn from Closed Case Summary by DRU – NIC Referral Cases, Feb. 1 through Jul. 31, 2009, and Aug. 2009. The total of these actions was 306 in a seven-month period.

[128] Informal communication with parties

[129]  Closed  Case Detail reports linked to Closed Case Summary – NIC Referral  reports referenced above. With so few late cases, it is not possible to discern patterns of problem practices. In these cases, some contributing reasons were the late provision of  a revocation packet, a case overlooked for rescheduling after postponement, and several showed delayed scheduling. One case that appeared late was not a not-in-custody case.

[130]  Open Case Summary by DRU – Time Waiver run Aug. 28, 2009

[131]  This includes a significant number of cases labeled "other" where the descriptions indicated elements had not been shown and/or the witnesses failed to appear. As there were 30 pages of entries labeled "other," it is impractical to attempt to determine the exact number of dismissals for each reason.

[132] Board Decision Dismiss, Feb. 1 through July 31, 2009

[133] Board Decision Dismiss, Feb. 1 through July 31, 2009

[134]  CalPAP report titled Other Objections, run monthly for each of Jan. through Jun. 2009

[135]  Letters from S. Huey to K. Riley, Jul. 1 and Jul 9, 2009

[136]  Letter from K. Xiong to S. Huey, Jul. 30, 3009

[137]  There were 513 requests, but 14 appeared to be duplicate entries for the identical request. The analysis in this section is based on Excel spreadsheet with computer file name BPH 2009 Tape Request Log (2-1-09 to 8-09).xls. These cover Sept. 2008 through Feb. 2009.

[138]  This refers to 9 cases initiated between February and June that had no recorded response The pending July requests were counted as timely, since 30 days had not elapsed when this document was provided to the Special Master.

[139]  Letter from S. Huey to K. Riley, Jul. 1, 2009; informal communications with Defendants

[140]  There were an additional 16 cases with second requests too close in time to have expected Defendants to have filled the first request.

[141]  Spreadsheet and Word document both titled Problem Cases 2-09 to 8-09

[142]  See HMB defs letter re decision review

[143]  See June 25, 2009 E-mail from Katie Riley; Decision Review-Final Revisions.

[144]  Decision Review-DAPO 6-25-09 and DESK PROCEDURES DECISION REVIEW

[145]  See DECISION REVIEW.ppt

[146]  Binder with cover sheet titled Revocation Extension Policy, Classification & Parole Representative; R. Holtz memorandum dated Jul. 1, 2009

[147]  Informal communications with Defendants

[148]  Revocation Extensions by Location Jan. and Feb. 2009; Location of Revocation Extension Hearings for each of Mar. through Jul. 2009  for probable cause and revocation hearings. These figures do not include optional waiver reviews.

[149]  Revocation Extension Closed Case Summary, Feb. 1 through Aug. 31, 2009

[150]  Letters from S. Christian dated Apr. 13, 2009, May 18, 2009 and Aug. 13, 2009

[151]  Analysis in this section relies on Cases Missing 1073 & Source Documents Monthly Report for each of Jan. through Jul. 2009

[152]  Interpreter Logs provided with monthly productions from Mar. through Jul. 2009. There was a significant drop in usage in the most recent month – about half of the usual practice over an extended period – for unknown reasons.

[153]  BPH Provided SLI Feb. 1 through Aug. 15, 2009

[154]  E. Galvan and A. Mania letters dated Jul. 20, 2009 and Aug. 17, 2009, respectively; informal communications with parties

PDF created with pdfFactory trial version www.pdffactory.com

---

[155] Informal communication with Defendants
[156] Taken from Special Master Notes of the March 16, 2009 Monitoring Meet and Confer
[157] See June 3. 2009 Tebrock letter: CDCR Monitoring Proposal-Third Q 2009
[158] See HMB-Defs Confirming Q2 2009 Monitoring plan 3-19-09 720-1

PDF created with pdfFactory trial version www.pdffactory.com