**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**


**JERRY VALDIVIA, et al.,**

    **Plaintiffs,**

      **vs.**                        **No. CIV S-94-671 LKK/GGH**

**EDMUND G. BROWN, JR., et al.,**

    **Defendants.**

_____/


**TWELFTH REPORT OF THE SPECIAL MASTER**
**ON THE STATUS OF**
**CONDITIONS OF THE REMEDIAL ORDER**


**Background**

On May 2, 1994, the lawsuit now known as *Valdivia vs. Brown* was filed. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan consistent with the rights provided by *Morrissey v. Brewer*. The Stipulated Order for Permanent Injunctive Relief ("Permanent Injunction") entered on March 8, 2004 memorialized the ordered plan.

In December 2005 and January 2006, the Office of the Special Master was established. The Mastership has filed 11 prior reports in this action, noting progress and deficiencies in compliance with this Court's orders.

Issues requiring further court orders to remedy – resulting either from the Master's reports, Plaintiffs' motions, or the parties requesting dispute resolution through a fact-finding hearing – were:

- remedial sanctions (June 2005 and April 2007)

- improvements to Defendants' information system (November 2006 and December 2010)

- establishment of internal oversight mechanisms (November 2006)

- due process for parolees who appear too mentally ill to participate in revocation proceedings (November 2007)

- preserving confrontation rights consistent with current case law (March 2008)

- timely access to inpatient psychiatric hospitalization, and psychiatric evaluation pursuant to California Welfare and Institutions Code § 5150 (August 2008)

Of these, only the April 2007 remedial sanctions order has been found to be substantially compliant in full.

Since entry of the Permanent Injunction, there have also been orders concerning designating information as confidential; parolee attorney access to information in clients' field files, witness contact information, and mental health information; interstate parolees; and civil addicts. In January 2012, after interpreting the constitutionality of the Victims' Rights and Protection Act of 2008 ("Proposition 9"), this Court amended the timeframe for revocation hearings to 45 days; the Court's order is now on appeal.

The Special Master has found some requirements in substantial compliance, including nine from the Permanent Injunction, and the full April 4, 2007 Stipulation and Order Regarding Remedial Sanctions.

## Special Master Activities

During this Round, the Special Master and his team met on several occasions with a variety of CDCR executives and staff, principally concerning implementation of legislative changes and needed changes to the information system. The team met with the parties concerning Project HOPE and monitoring. The Special Master oversaw the early stages of a fact-finding hearing process concerning the adequacy of the hearing space utilized at certain jails, which the parties successfully resolved before hearing. The Mastership observed training for Board staff and parole agents, as well as Defendants' task force meeting.

The team conducted staff, parolee and attorney interviews, and observed notice service, probable cause hearings and revocation hearings, at Santa Barbara, Ventura, Merced and Stanislaus county jails; West Valley, Robert Presley, and West County detention centers, and San Bernardino parole unit.

## Scope and Approach for This Report

This report will not discuss every area relevant to compliance. It begins by summarizing the procedural background of this action and the Special Master's activities in the Round. It then discusses the implementation and effects of "Realignment," the 2011 legislative changes concerning parole supervision and revocation.

The report then assesses high-priority Permanent Injunction provisions -- most of which require attention – and the information technology supporting the ability to demonstrate compliance. Following that discussion, this report comments on requirements potentially in substantial compliance, and concludes with recommendations for court orders.

This report discusses observations and activities spanning September 2011 through January 2012, collectively referred to as "the Round."  Where data is employed, it is data the Special Master received during that period, commonly covering July 1 through December 31, 2011, or a subset of that period, depending on data availability.

References to the Special Master's activities frequently include the actions of one or more members of his team. The term "monitoring reports" refers collectively to reports generated by Plaintiffs' monitoring and by Defendants' self-monitoring, unless otherwise specified.[1]

## Realignment

### Implementation Strategies

Given the magnitude of the change imposed by 2011 legislative changes –- commonly termed "Realignment" -- and the brevity of the implementation timeframe, both the Board and Paroles Division staff have done an outstanding job of coping with the instability and challenges posed by such a significant change process. Defendants have had to attempt to address the concerns of their own staff as well as those of the counties at times when they frankly had few answers. As is typical of new legislation, the law sometimes left gaps as to direction and/or interpretation that created unforeseen challenges for Defendants. Defendants used multiple strategies to collaborate with their internal and external stakeholders and to inform them as quickly as possible of agreements reached and/or of proposed solutions to systems issues.

Defendants' efforts since the passage of the Realignment laws were almost entirely focused on preparing for the October 1, 2011 implementation date for the first cases to be transferred from the state to the counties and for any changes in how counties

responded to holding state-supervised parolees. This effort was complex because the state has had to attempt to accommodate the requirements of 58 very different and widespread counties.

Efforts to educate and to support county staff took place on many levels. These efforts, while concentrated in the early months of implementation of Realignment, continued in various forms throughout the Round. Senior leaders of CDCR, including the Secretary's Office, the Division of Adult Institutions, the Board and the Paroles Division engaged in a variety of strategies to reach out to the counties. Examples of activities the CDCR senior leaders provided include:

- Weekly teleconferences with stakeholders including probation, the Sheriff's Association and the Courts starting in April,
- A presentation at a California State Sheriff's Association meeting,
- Three webinars for probation and sheriff's staff,
- Regional presentations for county probation and sheriff department staff were held in Los Angeles, Fresno and Galt[2], and
- An Internet site for counties to access CDCR presentations, handbooks and a time calculation manual was created.[3]

The Board and Paroles Division also provided joint presentations and briefings as well as separate presentations with counties on issues that pertain solely to their respective divisions.  Finally, the regional Board and Paroles Division staff continues to meet with the counties in their respective catchment areas.

Throughout September and October, Board and Paroles Division staff jointly travelled to jurisdictions throughout California to discuss and to develop mutually agreeable procedures for the state and the impacted county stakeholders regarding the transfer of parolees from supervision by the state to post release supervision by the counties and the processing and custody of state-supervised parolees.[4] Defendants

proactively shared their *Valdivia* processes for notice and hearing. Presentations included issues such as: how to read the Board's orders, dropping of parole holds, controlling discharge dates and optional waiver reviews.[5] The Board and the Paroles Division also have provided presentations for a single county when requested. The counties have been provided a telephone contact that is available 24 hours a day to answer any questions or concerns regarding the hearing and/or confinement processes.[6] Defendants do not believe the counties' post release supervision is part of *Valdivia* and as such, their efforts to assist the counties focused largely on working with the state- supervised parolees.

Regional Board and Paroles Division staff continues to provide information and to meet with counties to problem-solve on a regular basis.[7] The Board has met with the sheriff and jail commanders in each county.[8]

Defendants continued to inform Plaintiffs and the Special Master's team regarding changes in practice, policy and/or regulations regarding Realignment issues. Meet and confer sessions that addressed Realignment issues were held on September 7, 2011 and January 5, 2012. Defendants provided opportunities for Plaintiffs to offer input into policy and regulation changes that resulted from Realignment,[9] and to attend scheduled training and information sessions for Board and Paroles Division staff.[10]

During this Round, the Board went through the process to revise and get approval for changes to Title 15 CCR §§ 2606, 2635.1, 2646.1, 2733, 2740, 2742, 2743, 2744 and New § 2742.1, which were necessitated by Realignment. The public comment period has ended. The Board is scheduled to review the changes for final approval on February 22, 2012. If approved, the regulation package will be submitted to the Office of Administrative Law for approval and adoption.

*Implementation Impact*

**Caseloads**

Board and Paroles Division projections regarding the impact of the transfer of lower risk offenders to county Post Release Community Supervision (PRCS) appear to be similar to initial projections. The Office of Research indicates that the number of parolees placed onto PRCS status by month from October through December is[11]:

| | |
|---|---|
| October | 3,104 |
| November | 4,732 |
| December | <u>4,539</u> |
| Total | 12,375 |

The caseload for parolees supervised by the state has declined slightly each month since the inception of Realignment. In July the caseload for active parolees was 103,390. Caseloads supervised by the state since the inception of Realignment are:

| | |
|---|---|
| October | 102,057 |
| November | 100,797 |
| December | 98,717 |

***Valdivia* Process**

The impact of Realignment on the *Valdivia* process is difficult to assess because of the early stage of implementation and changes in data collection systems. At this point it appears that Defendants have been able to devise systems and strategies to address implementation problems without negatively impacting the timeliness of the *Valdivia* process. Like parolee caseloads, as noted in Table I below, there has been a slight decrease in the number of assessments (RTCA) and initial hearings (PCH) in the *Valdivia* process.

**Table I[12]**
**Number of RTCA and PCH Hearings Held by Month**
**July 1- December 31, 2011**

| Month | July | August | September | October | November | December |
|-------|------|--------|-----------|---------|----------|----------|
| RTCA | 7,037 | 7,566 | 6,895 | 6,198 | 5,689 | 6,400 |
| PCH | 5,919 | 6,867 | 6,366 | 5,768 | 5,133 | 5,661 |

The number of revocation hearings is less than initially projected.[13] Revocation hearings have shown a notable decrease since the beginning of Realignment.[14]

| | |
|-----------|-----|
| July | 575 |
| August | 658 |
| September | 668 |
| October | 603 |
| November | 350 |
| December | 349 |

This may be an artifact of the reduced confinement time frames with Realignment that appears to be resulting in more parolees negotiating a settlement at the probable cause hearing .

Realignment has resulted in an increase in the number of not in custody (NIC) hearings held.[15]  The more than doubling of the number of NIC hearings appears to be an artifact of some jails not being willing to hold state-supervised parolees so where possible the Paroles Division is using NIC hearings.

| | |
|-----------|----|
| July | 15 |
| August | 24 |
| September | 26 |
| October | 24 |
| November | 50 |
| December | 62 |

**Staffing Changes**

Realignment will result in a significant decrease in both Board and Paroles Division staff. Staffing reductions due to Realignment are occurring in the Division of Adult Institutions and planning is underway in the Paroles Division for[16] reductions to be implemented July 1, 2012. To address the current and projected vacancies, the Board has begun to consolidate revocation centers. In the last quarter of 2011, the California Institution for Women revocation center was consolidated into the California Institution for Men revocation center. In January 2012, the Deuel Vocational Institution revocation center was consolidated into the Rio Consumnes Correctional Center revocation center and the North Kern State Prison revocation center was consolidated into the Wasco State Prison revocation center. The Board is in labor negotiations regarding additional mergers.

Staffing reductions have been organized in groups commonly referred to as "waves." Wave 1 staffing reductions included a decrease of 14.5 vacant positions.[17] Position reductions were primarily from support and clerical functions. Projected Wave 2 position reductions will be effective July 1, 2012 and will include 51.6 positions, 41 of which are currently vacant. In this wave of reductions, there is an increase in the number of direct service positions eliminated, such as the elimination of 10.4 deputy commissioners. One quarter of all deputy commissioner positions and clerical positions are currently vacant and one-third of program technician positions are vacant; Paroles Division is also operating with 13% vacancies among parole agents. The Department of Adult Institutions has eliminated all *Valdivia*-related case record positions at the institutions.[18]

### Implementation Challenges

As expected, with a change of this magnitude, there are several implementation challenges that have arisen. The most challenging at this point in time appear to be jails refusing to hold state-supervised parolees, early release of parolees during and after the *Valdivia* process, and a decline in parolees accepting the ICTDP remedial sanction.

**Early Release**

Depending on the size, capacity and practice of the county, some counties are finding their jails are overcrowded. This has resulted in early releases of both parolees in various steps of the *Valdivia* process and/or during the sanction period. In some locations, jails will not accept parolees facing only pending revocation for booking. The revocation database indicates that, rarely, parolees are booked but released before service of the notice of rights and charges[19] or, more often, before a probable cause hearing can take place. The counties do not always notify parole agents of these releases timely, posing a potential risk both for supervision and for timely completion of *Valdivia* requirements. The Paroles Division is working with counties to try and understand the nature and magnitude of the problem and to develop possible solutions.[20]

Faced with the challenge of not being able to hold a parolee in a jail for revocation proceedings and/or the release of a parolee while in the revocation process, the Board has worked with the Paroles Division to create an option for a settlement conference when a not-in-custody hearing is to be held. This process conforms to all *Valdivia* requirements and creates an early hearing and settlement option when a probable cause hearing has not been held. Plaintiffs have provided input into the Settlement

Conference option policy. Hearing Directive, 12-01, Criminal Justice Realignment Not-In-Custody Process is undergoing final revisions.

**Remedial Sanctions**

The legislated decrease in the amount of time that can be served by parolees for revocations has resulted in a significant decrease of placements in ICDTP.  The Special Master team, as well as Board and Paroles Division staff, observes that there has been no change in the level of referrals, but the program rejection rate has increased considerably. In light of these patterns, the Office of Offender Services is discussing with the relevant stakeholders whether the ICDTP program should be modified to better align with the new law.

Parolees in ICDTP by Month 2011[21]

| | |
|---|---|
| July | 1,437 |
| August | 1,356 |
| September | 1,525 |
| October | 1,459 |
| November | 1,289 |
| December | 1,142 |

The number of placements in electronic home detention (EID) as remedial sanctions appears to have remained the same.[22]

EID Remedial Sanctions by month

| | |
|---|---|
| July | 398 |
| August | 394 |
| September | 409 |
| October | 427 |
| November | 436 |
| December | 442 |

**Over-detention**

Realignment has given rise to a risk of over-detention. The Board remains responsible for ordering the length of incarceration, but the counties calculate release dates. All parties have observed cases in which the state's and the county's calculations differed, especially where state processes generate secondary orders with which county staff are unfamiliar. Some reportedly resulted in parolees remaining in custody longer than ordered. The issue of over-detention is a matter in dispute between the parties as to whether it falls within *Valdivia*. Both divisions have employed multiple methods to address these difficulties and continue to problem-solve.

**Revocation Extension**

Finally, Realignment will have the effect of greatly reducing the population affected by the *Valdivia* requirements for revocation extension, the proceedings that can extend a parolee's revocation term for in-custody misconduct. Defendants understand the new law to limit revocation extensions to parolees with holds or revocation terms initiated before October 1, 2011; Plaintiffs interpret it as ending all authority for revocation extensions as of that date.[23] The parties are addressing the dispute concerning this, and related provisions, in discussions as well as in the comment process for pending regulations.

Under the broader interpretation, then, the only parolees subject to revocation extension will be those with life sentences, or those who have served their terms by October 2012, with a predictably small number of exceptions whose pre-Realignment terms were already extended because of in-custody misconduct during 2011 or 2012.

Defendants' numbers are consistent with these assumptions. The revocation database reflects more than 100 cases brought monthly early in the Round, and a steady decline in new cases each month since Realignment.[24] The total for the Round was less than 1% of parole revocation actions initiated.

Revocation extension has been one of the lowest scoring functions in terms of timeliness. The pre-hearing steps were all 72% timely or less and commonly the late cases outnumbered the timely ones. The Board's steps fared better with percentages generally in the mid-80s. For unknown reasons, since Realignment arguably affects CDCR institutions the least, the lowest percentages were in the most recent month.

Most of these timeliness numbers were improvements, however, over recent Rounds.[25] Additionally, Defendants assert that these parolees do not have a liberty interest at stake in that they are already serving a term when they are charged; the only exceptions would be any parolees set to release before revocation extension proceedings conclude.

Plaintiffs' monitoring also suggests heightened difficulty with ADA and effective communication issues in these proceedings.[26] The Special Master has not observed these proceedings in operation.

## High-Priority Due Process/Injunction Requirements

In addition to the requirements and progress discussed in this report, the Permanent Injunction, and subsequent Orders, contain at least 30 more mandates for which Defendants must demonstrate compliance. As in the last three reports of the Special Master, this section highlights key issues and defers discussing other

requirements. Problematic practice has been observed in each of the areas below, each over the course of several years, and Defendants have not provided demonstration that these have been addressed. The Special Master again encourages Defendants to make these a priority.

The Board has taken an important step toward the demonstrations it must make to this Court. Executives took a detailed look at all court-ordered requirements and began outlining an overarching strategy. This comprehensive, strategic approach, in combination with project management principles for its implementation, is a very welcome addition.

Information technology holds the key to much of Defendants' obligation to demonstrate compliance and there have been significant drawbacks to reporting ability to date. There have been Orders for improvement since the earliest days of the Mastership, and further Orders were necessary in 2010. There is partial compliance on each and their deadlines are long past.

The Realignment laws have generated new practices and new problems; all divisions have worked on spotting these issues so that tracking of them can be automated and the problems solved.[27] The Board designed major changes to adapt to these new tracking and information needs. Reporting is reflecting new data gathered, a greater diversity of hearing locations, and a new logic for how to think about the cases.[28] In the process, the Board is taking the opportunity address some of the longstanding inconsistencies or inaccuracies in prior reporting mechanisms. While a few of the new reports are in limited use and many other functions and reports remain in process, Board staff and information technology contractors worked effectively, generating remarkable

14

progress in such a short time. It will be critical for resources to remain with this project until it is complete.

In the meantime, the pre-Realignment reporting structure is the primary vehicle for demonstrating compliance. Small changes are evident, and many of the limitations detailed in previous reports of the Special Master remain, rendering firm conclusions impossible.

Promisingly, the rates of timeliness of most steps in Defendants' process appear to have been sustained at pre-Realignment levels. There is an important *caveat*. More than half of the hold dates are manually entered. If hold dates are incorrect, the automated timeliness calculations will also likely be inaccurate. Defendants conducted a verification exercise during this Round and found that 10% of the examined hold dates did not match another source. Half of those varied by more than a day; indeed, many were off by more than three days. This exercise left open the question of whether it was the revocation database or the comparison source that was more accurate.[29] Thus, there is an indication that a substantial additional percentage of cases may be late.

For these reasons, this database, as is, cannot provide definitive answers for compliance reporting. Defendants will likely need to determine additional means to substantiate the accuracy of the timeliness reports,[30] provide supplementary material, or make the case that timeliness compliance is sufficient even with that amount of uncertainty taken into account.

*Valdivia,* of course, finds its source in *Morrissey v. Brewer*, the seminal case identifying the elements of due process in parole revocation hearings.[31] *Morrissey* specified that "minimum requirements of due process … include" (1) notice, (2)

disclosure of adverse evidence, (3) a right to be heard and present evidence, (4) a right to confront adverse witnesses unless there is good cause to deny that, (5) a neutral and detached decisionmaker, and (5) a written record. Defendants' system has deficiencies in several of these areas.

Defendants correctly note that the system includes several protections to preserve these rights. Primarily, the universal appointment of attorneys provides an important safeguard to prevent due process violations and to mitigate the effect of any that may occur. Both Defendants' "Decision Review" process, and writs to superior courts, provide avenues to correct due process violations if they were not adequately addressed during hearings.

### Notice of Rights and Charges

#### Nature of the practice

To provide due process, CDCR must deliver notice of the allegations to the parolee, giving adequate information in sufficient time to prepare a defense. There have been significant numbers of Charge Reports that do not provide a "short factual summary" sufficient to communicate the basis for the charges and there is some work to be done to ensure that agents include all charges in the original notice that they know, or had available from file information, as of the time the notice is written.[32] For studies of the frequency of deficiencies, please see previous reports of the Special Master and both parties' montoring reports.

Given the immediacy of the demands of implementing Realignment, it is understandable that Defendants did not address these issues during this Round. It will be

necessary to demonstrate compliance on these requirements before *Valdivia* can be concluded.

### Timeliness

Paroles Division was able to maintain the timeliness level established in recent Rounds -- indeed, it was slightly improved for the full Round.[33] Likely between 90-95%[34] of service was completed timely; the most recent month declined a couple of percentage points, which may or may not be a reflection of barriers posed by Realignment.[35] It was common to complete a late service in an additional day. The longest time was recorded as 29 business days, and more than 100 cases were shown as served late enough that it would have been impossible to have a timely probable cause hearing.[36] This is a very small percentage, 1/4% of all service. According to printouts, for 2%, or 920 parolees, no attempt was made to serve them.[37] Defendants indicate that this can occur when notice agents learn that the parole agent intends to lift the hold, rendering service unnecessary.[38]

As to reasons, Defendants manage obstacles well so that these almost never create a delay; among the few recorded instances where two or more attempts at service were required, the vast majority was completed by the Stipulated Injunction timeframe nevertheless.[39] By far, the most common reasons recorded for service delayed more than a few days were late paperwork processing and the parolee being in transit. To date, few indicated that an early release from jail caused late notice service, a concern attendant to Realignment.

Service was late more often with extradition cases, which were only 70% timely for the full Round, and below 50% in recent months.[40] Extradition cases constituted 2%

of all parolees served notice during the Round.[41] Timeliness difficulties were particularly heightened by Realignment because parolees are now transported to a variety of county jails instead of two entry points, requiring a new system to track and respond to their arrival. Defendants report that all involved divisions have been working to determine more effective mechanisms, and Paroles Division management recently began monitoring the timeliness of this step for improvement or further needs.[42]

Similarly, parolees kept in the community while pending revocation hearing were served late, even according to an extended timeframe, or not served, more often than mainstream cases, with a timeliness rate of 82%.[43] "Not in custody" cases constituted 1/3% of all parolees served notice during the Round.[44] For those parolees who were served, this is less impactful because, with a longer time to the first hearing, they still had a substantial time to prepare a defense.[45] It is problematic that 8% of these not-in-custody parolees appear not to have been served.[46]

Performance on both in-custody and in-community service timeliness may fall short of these numbers because of the hold date verification issue described above. It is also unknown whether previous issues with these database reports have been corrected. This analysis does not include open cases, a substantial subset of the population that may or may not be consistent with the completed cases.

### *Probable Cause Hearings*

#### Nature of the practice

The probable cause hearings the Mastership observed were consistent with those seen previously, with the same strengths and weaknesses. Procedures ran smoothly at

those jails and Board staff reported similar activity at the other jails in which they personally hold hearings. Realignment does not seem to have affected these proceedings. The principal risk it seems to pose concerns timeliness, which will be discussed *infra*.

**Probable cause assessment:** While a number of probable cause hearings are run well, some are conducted solely as negotiations and do not invite probable cause argument or make probable cause findings aloud. It is a necessary condition for compliance that what is held is actually a probable cause hearing.

Defendants have not told the Special Master of any attempts to address this specific issue since the October 2009 report indicated this was "nearing the point that a court order is warranted."[47]

**Factual findings**: *Morrissey* notes, "The hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parole revocation and of the parolee's position. … The decision maker should state the reasons for his [/her] determination and indicate the evidence he [/she] relied on." Multiple studies over time have revealed significant deficiencies in this regard.[48]

Given the immediacy of the demands of implementing Realignment, it is understandable that Defendants did not address these probable cause hearing issues during this Round. It will be necessary to demonstrate compliance on these requirements before *Valdivia* can be concluded. It is Defendants' intention to do so primarily through attorney concerns directed to an enhanced Decision Review process.

**Timeliness** Probable cause hearings constitute the largest group of hearings in the revocation process, and their timeliness is the most difficult to discern. It could be

between 82-95%; it is most likely toward the higher end of this range, but Defendants' system is not yet able to provide any greater certainty.[49]

Probable cause hearings after extradition were 95% timely overall. They dipped to 90% when Realignment was implemented, but the rates have been rebuilding each month since.[50] Postponements constitute as much as 8% of probable cause hearings, but these numbers have diminished dramatically in recent months, which may be a product of Realignment.[51] Timeliness calculations are not currently possible.

Defendants have not been holding probable cause hearings when they intend to hold the revocation hearing "not in custody" though, as discussed *supra,* they have begun a "settlement conference" step for certain of those parolees, without an associated timeframe requirement.[52] This analysis does not include open cases, a substantial subset of the population that may or may not be consistent with the completed cases.

As to optional waiver reviews – a hearing similar to probable cause hearings -- the parties negotiated a policy that went into effect in 2010;[53] it gives no firm deadline for optional waiver reviews, but does direct that they be placed on the next available calendar, "normally …within three business days." In the months reviewed, only 11% met this goal. Nearly all were concluded by the subsequent deadline for a revocation hearing.[54] Activated optional waivers constituted 10% of all hearings, about the same as pre-Realignment numbers.

### *Revocation hearings*

#### **Nature of the practice**

The following analysis assesses the status of Defendants' practices on the hearing requirements indicated in *Morrissey*. Several show a very high rate of good practice; some continue to show problematic practice. Given the immediacy of the demands of implementing Realignment, it is understandable that Defendants did not address the identified revocation hearing issues during this Round. It will be necessary to demonstrate compliance on the key due process practices in revocation hearings before *Valdivia* can be concluded. This will be important, as the reviews below suggest due process problems may be occurring in up to 9% of revocation hearings – cases where it appears evidence may have been used unfairly, up to 15% late hearings, and an unknown percentage of written records insufficient under *Morrissey*'s definition.

These percentages are an approximation, based on totaling the practice and timeliness problems detailed *infra*. Board Order completeness, and some other issues, are not quantified, which could make the total higher. Some of the facially problematic cases described here might be explained if further researched, and there may be overlap between the categories (*e.g.,* the same case might be late and have had late-produced evidence), which would make the total lower. These numbers, thus, are not precise, but should be taken to illustrate that due process problems occur across the spectrum and the frequency is not *de minimus.*

It is Defendants' intention to demonstrate compliance primarily through attorney concerns directed to an enhanced Decision Review process.

**Disclosing adverse evidence**: The Permanent Injunction requires providing the parolee the evidence on which the state intends to rely at the time an attorney is appointed or, if discovered later, as soon as practicable before the hearing. Defendants' policy

requires exclusion of evidence provided for the first time during hearing, unless the state shows good cause for not producing it earlier.

The Mastership examined all cases in which an objection on this basis was reported. Overall, these constituted less than 1% of revocation hearings. Not only does this indicate good practice, but with fewer such objections than in the previous Round, it suggests an improvement in providing evidence timely.[55]

Among these objections, hearing officers appeared not to follow policy 67% of the time, apparently letting the evidence in without any assessment of whether there was good cause to produce it so late, or not recording the objection at all.

**Right to be heard and present evidence:** The Mastership reviewed all objections on point and Defendants continue to preserve these rights well.[56] The review identified potential problems with the right to be heard in less than 1% of revocation hearings. This demonstrates, arguably, a satisfaction of expected behavior.

Data reflected some objections concerning hearings being held in absentia or after the parolee had been removed for being disruptive. These were infrequent; the Special Master has insufficient information to reach a conclusion on whether these present any significant limitation on the system providing for the right to be heard. Examples surfaced of parolees being denied their witnesses,[57] the ability to cross-examine a key witness because an interpreter was not present, and an attorney-client consultation during hearing. Each of these also appeared rare in recorded objections, though a comprehensive examination of all revocation hearings was not undertaken.

**Right to confront adverse evidence**: The Permanent Injunction specifically highlights this right, and further orders of this Court were necessary in 2008. Some

progress was made in 2009 but none has been demonstrated since that time. The Mastership's reviews during this Round confirmed continued problems in applying the law.[58] At a rate of 4-6% of revocation hearings, this has an impact on fairness.[59]

**Elements of violations proven**: It was common for legal arguments to be raised, according to outside tracking, but the hearing record gave no indication that the argument was considered and that the state's evidence overcame it. This was most common in arguments that one or more elements were not proved and that there was insufficient evidence for a charge or the case as a whole. It may be that hearing officers considered the arguments and the failure is in documentation. The cost would be high, though, if in some cases hearing officers revoked parolees without the charges being proven.[60] In the absence of the hearing record discussing the argument and the decisionmaker's reasoning concerning it, it is impossible to determine whether the issue was with documentation alone, or with due process.

The Mastership's study of this topic was not comprehensive. It suggested that these omissions may occur in 1.5% of revocation hearings, indicating that this potential problem was rare, if the results are generalizable. Defendants argue that the fact that parolees are represented by attorneys should mitigate the Defendants' culpability for assuring that proper evidence is present.

**Bias**: *Morrissey* requires a neutral and detached hearing officer or body. Objections on point are rare in Defendants' system and appear to be handled well in Board Orders. The system appears to be working well in this regard. There were a handful of other objections alleging various forms of unfairness in the system; these, too,

did not raise any major concerns for the Mastership and appeared reasonably handled by the hearing officers.[61]

**Written hearing record**: As noted *supra*, a written record of the proceedings is a requirement of minimum due process. Previous reports of the Special Master have detailed deficiencies in this regard. While the Mastership did not undertake a comprehensive review, the team does note significant improvement in capturing confrontation rights objections,[62] which previously had often been missing, and the quality of the factual basis for findings was high in the records reviewed.[63] Capturing other objections, motions to dismiss,[64] and some other aspects of the hearing records, is less successful. The Mastership did not attempt to quantify issues with completeness of written records.

### Timeliness

After taking into account possibly inaccurate hold dates and postponements for state witnesses without good cause (see discussion elsewhere in this report), it appears that revocation hearing timeliness was between 85-90%.[65] Extradition cases and hearings after optional waiver activation were consistent with this. Not in custody hearings showed a nearly perfect timeliness rate.[66] Defendants are to be commended for maintaining these percentages; they are comparable to recent Rounds and appear unaffected by Realignment.[67]

**Postponements for state witnesses**: The practice of postponing hearings for state witnesses undermines timeliness statistics and fairness. The Mastership examined all such cases reported during the Round.[68] In some, Defendants determined whether there was good cause for the absence and were careful to reschedule the hearing within the

Permanent Injunction's deadline.[69]  An equal number were more problematic, however; orders indicate the hearings were postponed over the parolees' objections without knowing any cause for the witness' absence, or with the knowledge that the absence was not justified.[70] Defendants report nearly all of these cases as timely despite hearing times of as much as 82 days without good cause.

This issue was concentrated at only six locations, and more than half occurred at Los Angeles County Jail. Problematic postponements on this basis constituted 1% of the revocation hearings during the Round, arguably a relatively small percentage.

### Remedies

Defendants have taken an additional step to provide fairness in their system by offering a remedy for parolees whose hearings are held late without good cause. While not required by the Permanent Injunction, Defendants will provide an additional measure to address the inevitable timeliness breakdowns that occur occasionally in a large system.

The Board's extensive work on negotiations came to fruition during this Round, and the policy is authorized for implementation shortly after the writing of this report. Staff has been trained and the revocation database has been modified to accomplish this change.[71]

The remedy is day-for-day credit for the number of days by which probable cause hearings, optional waiver reviews and revocation hearings exceed their timeframes, and for some revocation extension proceedings.[72] If any revocation meets these criteria and the final hearing occurs on the 60th day or later, the case is to be dismissed.

Remedies apply to incarcerated parolees who receive a revocation term and not to those who are released. It does not apply if there is good cause for a delay, for serial

delays if only one had good cause, or where the parolee specifies a time-limited time waiver and the hearing occurs outside of that, and it does not provide for reviewing the length of the delay. Plaintiffs have objected to these limitations.[73]

Despite not being constitutionally mandated, a system of remedies provides a key assurance of protecting due process as part of an overall system, and instituting this is an important advance.

## Requirements in Substantial Compliance

As discussed in previous reports of the Special Master, where Defendants' systems have proven highly effective consistently over time, the Special Master will consider those requirements to be fulfilled and they will be termed "substantially compliant." Plaintiffs continue to dispute that "substantial compliance" is relevant to this case.

The Special Master maintains that good work deserves recognition and reward and that removal of items that have been complied with over time allows all parties to concentrate on other important issues.

Substantially compliant items will generally remain within the Permanent Injunction, but the Special Master and the Plaintiffs will discontinue review of such items unless they are inextricably linked with review of the hearing process. Requirements will remain in this status unless and until a significant decline in performance surfaces, or if and when it is appropriate to seek removal from the Permanent Injunction. Defendants should continue to review these items during quality improvement efforts at regular intervals to prevent such a decline.

In April 2011, Defendants made the case for four requirements to be considered in substantial compliance. They also sought a substantial compliance finding on two aspects of remedial sanctions requirements. The Special Master's thoughts follow.

**Parole Administrator review** (*Valdivia* Remedial Plan page 4, flowchart)

One step required by the *Valdivia* Remedial Plan is for the Parole Administrator to review the revocation packet to determine whether there is sufficient basis for the charges to move forward and whether a Remedial Sanctions placement is appropriate.

The standard for timeliness is somewhat unclear in the Permanent Injunction. Defendants measure timeliness according to the standard laid out in the flowchart; this differs by two business days from the Remedial Plan. Both are attached to the Permanent Injunction. The flowchart standard has been in use since the outset of implementation without objection, to the Special Master's knowledge. The Special Master has already found the two steps preceding this, which occur at the seventh and eighth business day, to be in substantial compliance, so Parole Administrator reviews could not logically be expected to occur earlier than the ninth business day standard being applied. The current practice also does not deter timely appointment of counsel, which occurs on the same date and has also been found in substantial compliance.

Defendants reviewed a large group of Parole Administrator reviews for timeliness.[74] While Defendants took care to use random selection method, the 1,197 cases constituted less than 1% of all cases handled at this step in the two-year period reviewed, so cannot be considered representative. Nevertheless, it is a substantial number of cases

giving a useful snapshot. Additionally, the Mastership updated this information with the aggregate numbers for the most recent six months.[75]

|  | Timely[76] | Late | within 1-2 business days | ≥3 business days late | latest | not reviewed |
|---|---|---|---|---|---|---|
| 2009-10 study | 89-94%[77] | 4% | 93-98% | 4 cases | 13 business days late | 2%[78] |
| Jun-Nov '11 | 91.3-96.3% | 0.2% | 91-96% | 20 cases | cannot tell | 3.5% |

Throughout this time, Parole Administrators did not review some cases because they were extradition cases; this is a practice adopted by Defendants with which the Plaintiffs do not agree. There are smaller numbers of cases not reviewed for other reasons. Defendants indicate that some cases appear as missed but were actually reviewed but not recorded because of issues with the revocation database (especially missed entry, locked out because had proceeded to charge step, and supplemental charges).[79]

As indicated, the percentage of timely cases has been maintained at solid levels for years and appears to have improved in 2011.[80] A few institutions had more late cases than the systemwide totals, but none exceeded 1% in the 2011 review. The total cases with very late times to completion remained extremely small.[81] The number of cases not reviewed worsened slightly.

The Mastership believes these compliance levels were accomplished, and can be maintained, because of systems Defendants put in place. For example, they expect Paroles Division regional leaders to monitor missed cases monthly and a corrective action plan is encouraged if percentages increase 2% or more; they report that such plans have been submitted.[82]

In onsite interviews, Parole Administrators regularly describe their review as including checking for probable cause and support for the charges, as well as considering remedial sanctions.[83] A revocation database report titled Parole Administrator Statistics is one means for determining the decisions resulting from this review. This report reflects that in recent months, for example, about 15% of decisions at this step requested more substantiation, changed the outcome decision to continue on parole or dismissed the charges – presumably some of these were tied to lack of evidence – or newly recommended remedial sanctions.[84] Additionally, the Parole Violation Decisionmaking Matrix captures cases where the Parole Administrator endorsed other staff's recommendations of remedial sanctions. These sources indicate that the necessary substantive review is occurring.

This step appears to be accomplishing its intended purpose. The timeliness numbers are reasonably good, even taking into account cases not reviewed, and this has been sustained over time. This performance is sufficient for the Special Master to consider this requirement to be in substantial compliance.

### *Range of disposition options* (*Valdivia* Remedial Plan page 5)

The *Valdivia* Remedial Plan requires that hearing officers "have the complete range of options to resolve the case (continue on parole, credit for time served, release from custody with pending charges, remedial sanctions/community based treatment, reduce the offer downward, dismiss some or all of the charges)."

Defendants distributed this instruction in policy and they indicate they have also communicated it during training.[85] Defendants made all of these options available in the revocation database screens in which hearing officers record their decisions.[86] The

Mastership has seen these various dispositions during hearings and in Board Orders and revocation database reports. The Special Master is not aware of any accounts – from attorneys, parolees, Defendants' staff, or monitors – that the range of options was not available to the hearing officers.

The Special Master finds that this requirement is in substantial compliance.

**Parolee witness list**  (*Valdivia* Remedial Plan page 5)

If a case is proceeding to revocation hearing, the *Valdivia* Remedial Plan calls for the parolee to provide, at the conclusion of the probable cause hearing, a list of any witnesses desired.

Defendants routinely provide a form for this purpose to the parolee when serving his notice of rights and charges, and attorneys commonly consult with parolees and submit this form after rejecting an offer at a probable cause hearing.[87] CalPAP affirms that Defendants' staff collects this form consistently.[88]

The Special Master is not aware of any reports from attorneys, parolees, or monitors that submitting a witness form was not allowed. Likewise, Defendants reviewed attorney objections and monitoring reports for 2009 and 2010 and found no objections concerning denial of witness lists.[89] CalPAP has raised some concerns about hearing officers requiring an offer of proof before approving some witnesses; Defendants assert that this only occurs in an attempt to reduce redundant testimony. CalPAP has expressed this concern in principle, but has not indicated there have been any unfair denials of witnesses when submitting lists.

The Special Master finds that this requirement is in substantial compliance.

### *Standards, guidelines, and training for the effective assistance of state-appointed counsel* (¶ 17)

CalPAP administers the panel of parolee attorneys, and it has maintained a set of standards and guidelines for the effective assistance of state-appointed counsel long term. CalPAP has required attorney training in these standards, as well as other aspects of *Valdivia* representation and operations, at regular intervals since implementation. CalPAP also operates a quality assurance system that includes regular data collection and review and attorney observation.[90] It is the Special Master's impression that these are conscientiously conducted and effective.

The *Valdivia* parties have not resolved this item. While Plaintiffs have generally been complimentary about the quality of representation and administrative oversight given, they are concerned that the written guidelines need much more specificity. They note that the parties agreed in 2006 to develop standards on 11 topics and that most of this has not been accomplished.[91] They also assert key guidance is missing from some of the topics covered.

While acknowledging Plaintiffs' position, the Special Master believes that the spirit of this requirement has been met and will consider it in substantial compliance.

### Remedial Sanctions "Third Prong"

Defendants have submitted three reports to the Special Master in which they request a determination of substantial compliance for the requirements of "self-help outpatient/aftercare programs" and "alternative placement in structured and supervised environments," which the parties refer to collectively as the "third prong" of remedial sanctions.[92]  Plaintiffs believe Defendants have not achieved substantial compliance.

The parties have not reached agreement regarding the definition of the third prong, what constitutes a sufficient amount and location of such programs, what constitutes consideration of such programs or whether a program constitutes a true alternative to revocation. The Special Master will address each of these issues and make a determination of whether substantial compliance has been achieved.

A significant consideration regarding all remedial sanctions at this time is the impact of Realignment on both the number of parolees that will be supervised by the state as well as the nature of the risk and needs of the parolees to be supervised. The projected transfer of approximately 60% of current parolees from state supervision to county supervision will have a significant impact on the amount and type of remedial sanctions appropriate for the remaining parolees and, perhaps, on what the state has an obligation to provide.

For each "prong" of remedial sanctions, the Permanent Injunction and subsequent Orders require Defendants to establish that:

- o   remedial sanctions includes these programs [93]
- o   Defendants use these programs [94]
- o   the programs are "appropriately and fairly available" [95]
- o   the programs are given consideration at every step of the *Valdivia* process [96]

**Remedial sanctions includes these programs**

Defendants argue that unlike the programs specified in the Permanent Injunction – In-Custody Drug Treatment Program ("ICDTP") and Electronic In-Home Detention ("EID") -- the Court has allowed significant discretion regarding what constitutes the third prong of remedial sanctions. [97] The definition of third prong remedial sanctions offered by the Defendants is:

> "Self-help/outpatient and self-help aftercare programs" means care for or betterment of the parolee by the parolee's own efforts, in a setting whereby the parolee leaves, without being lodged and fed there.
>
> "Alternative placements in structured and supervised environments" means there is a program with an organized structure and oversight designed to assess and educate the parolee.[98]

Plaintiffs assert that the Defendants' definition is too broad and should be more narrowly construed. They offer the following as a definition.

> "Self-help outpatient/aftercare programs" are therapeutic programs that address some mental health, medical issue, or addiction. Programs that would fall within this category would include drug treatment programs, sober living programs, anger management or batterers' programs, and the like.
>
> "Structured and supervised environments" are programs that involve significant structure and supervision in a dedicated location. Community Based Coalition, Day Reporting Center, Female Residential Multi-Service Center and Residential Multi-Service Center all apparently satisfy this definition.[99]

The Special Master finds nothing in the Court's orders that preclude the Defendants from defining and determining the nature and content of the third prong of remedial sanctions. The definitions of self-help/outpatient, self-help aftercare programs and alternative placements in structured and supervised environments proposed by the Defendants offer enough specificity to determine whether parolees are being considered for such placements.

A broad definition of such programs is necessary to respond to changes in the external environment over which the Defendants have no control. The need for the Defendants to retain flexibility regarding the nature and type of programs is evidenced by recent economic and legislative changes. A significant change in the economy often impacts community-based programs. The impact of the recent economic downturn has

resulted in the Paroles Division reducing contracts with community providers of third prong options. Similarly, changes in the profile of the parolee population due to Realignment will likely result in a need for different types and amounts of all remedial sanctions.[100]

Using the third prong definition offered by the Defendants, the Special Master will assess whether the services that the Defendants indicate are third prong remedial sanctions are sufficient to demonstrate that these are appropriately and fairly available and that Defendants use them. The Special Master will also assess whether the programs are being meaningfully considered at each step of the *Valdivia* process.

### Programs Appropriately and Fairly Available and in Use

**Program Availability:** There are basically two types of third prong remedial sanction programs, those funded directly by CDCR and those that are funded by some other source.  Most state parole systems attempt to rely on existing community resources and only fund programs in the absence of reasonable community alternatives. All systems have gaps in resources and rarely can provide all of the resources that would best support effective reintegration into the community.

Both types of programs have changed in amount and location over time, but the Mastership does not see these changes as problematic for substantial compliance. These changes sometimes reflect thoughtful analysis of need on the part of the Defendants and at other times are born of necessity. For example, several county jails had such restrictive entrance criteria for jail-based ICDTP that the state wisely chose to cancel the contracts and target their resources to locations that are better able to serve the parolee population in the revocation process.[101]

The list below includes programs that have been funded by CDCR and have served as a referral for parolees in the revocation process. The Paroles Division has oversight of some programs and Office of Offender Services[102] has oversight of others. Not all of the programs are currently available. For example, The Parolee Services Network was eliminated in 2011.[103] Capacity of programs, number of programs and the location of services have varied over time. Program participants are commonly drawn from parolees facing revocation, as well as other parolees on supervision.  It is impossible to separate these two populations with precision. Even with those uncertainties, the demonstrated availability and usage for remedial sanctions collectively meets any minimum standard necessary to satisfy the Permanent Injunction. Some of the programs that have been used for remedial sanctions are[104]

- Community Based Coalition (CBC)
- Day Reporting Center (DRC)
- Female Residential Multi-Service Center (FRMSC)
- Parole Substance Abuse Program (PSAP)
- Parolee Service Center (PSC)
- Residential Multi-Service Centers (RMSC)
- Substance Abuse Services Coordinating Agencies (SASCA)
- Substance Abuse Recovery and Treatment Program (STAR)
- Female Offender Treatment and Employment Program (FOTEP)
- Parolee Services Network (PSN)

For Defendants trying to demonstrate availability of third prong options funded by the state, the agency budget is an indicator of commitment to programs. While the level of funding to such programs has decreased, it remains substantial especially in the context of the extremely difficult financial times and the projected reduction in the number of parolees due to Realignment. Defendants have clearly documented commitment to

funding of the programs, which partially serve as third prong remedial sanctions, over time.

**Fiscal Year Annual Funding Programs under Office of Offender Services**[105]

2005/2006  $26,420,676
2006/2007  $12,692,543
2007/2008  $25,773,379
2008/2009  $33,172,745
2009/2010  $34,295,643
2010/2011  $24,717,293

**Fiscal Year Annual Funding Programs under Paroles Division**[106]

2005/2006   $27,385,261
2006/2007   $55,895,177
2007/2008   $59,617,249
2008/2009   $63,094,354
2009/ 2010  $66,521,993
2010/ 2011  $51,830,872

While there have been several recent budget reductions, Defendants still maintain a serious commitment to remedial sanctions.  Defendants informed the Mastership and Plaintiffs of reductions to third prong program funding in May of 2011.[107] Cuts included deferral of contracts for four programs that had not been implemented and a reduction of three existing residential multi-service centers and one day reporting center. Out of a total of 3,104 program slots, the state eliminated 195.[108] While Plaintiff has characterized the reductions as significant, the Special Master disagrees. Similarly, significant funding reductions were made in the Office of Offender Services budget when the Parolee Services Network was eliminated but this is of less concern than it initially appears. This non-residential program served 700-900 parolees per year, only some of whom were likely in the revocation process and Defendants indicate they were not included in reports of total third prong participation in any event. Finally, the Substance Abuse Coordinating

Agencies budget was reduced by $25.9 million for fiscal year 2011-12. In light of the dramatic decline of the number of parolees on state supervision in the coming years, it is hard to see these reductions as significant.

A second type of third prong program is the community-based service provider who is not funded directly by either the Paroles Division or the Office of Offender Services. Examples of this type of program include referrals for treatment, housing, education and vocational support, medical, financial planning and other life skills. The list below provides examples of programs used for parolees, including those facing parole revocation.

- Alcoholics Anonymous (AA)
- Narcotic Anonymous  (NA)
- Salvation Army
- Catholic Charities
- Section 8 Housing
- Career Centers
- Substance Abuse Counseling
- Food Assistance
- Domestic Violence Programs
- Mental Health Centers

Defendants created a website that allows the general public to access information about existing community programs for all counties.[109] This website provides a vast array of services available in each county that parole agents, parolees and their families can easily and readily access.  There are hundreds if not thousands of examples of the type of third prong programs not funded by the state but that can be used to provide support to avoid revocation of parole.

Location of programs has varied over time. Community-based providers who are often challenged to find locations to site offender programs typically run third prong residential programs. The Paroles Division has worked hard over the years to expand the

locations of programs such as residential multi-service centers, citing programs even in difficult financial times and despite community resistance to programs. Not every region has every program. It is unclear that even with more funding if all communities could or should support all program types.

**Program Use:**   The *Valdivia* Remedial Plan requires Defendants to use third prong programs, though the extent is not specified. The parties have been unable to reach agreement regarding whether there is a baseline amount of third prong remedial sanctions that is required to demonstrate substantial compliance with the Permanent Injunction. The Special Master believes that the Permanent Injunction calls for the use of remedial sanctions and sets goals for reductions in return to prison for parole violations. There is no mandate regarding the number or location of any of the three prongs of remedial sanctions. The court has been clear that it considers a good faith consideration of remedial sanctions to be required.[110]

The data on program usage has remained relatively constant until the implementation of Realignment. [111] Program usage has declined significantly for ICDTP but has not changed much for third prong options.

A data set that helps to understand the behavior of parole agents, supervisors and administrators who make by far the greatest percentage of referrals to third prong remedial sanctions is the parole violation decision-making instrument (PVDMI). The decision-making instrument lists the actions that a person has made. The list of possible actions includes referrals to many of the types of programs that are consistent with the definition of third prong remedial sanctions. Data from the last round, October 1, 2010 to June 30, 2011 indicates that of 116,159 possible parole agent actions approximately 25%,

29,565, consisted of actions that can be construed to be third prong remedial sanctions. This compares with 36,925 recommendations for revocation or a rate of 34%.[112] Data for this round, July 1, 2011 to December 31, 2011 indicates that of 72,980 possible actions, 20,518 or 28% were referred to third prong remedial sanctions. During the same time period, 23,336 referrals for revocation were made for a percentage of 32%.[113] Parole supervisors and administrators also make a small percentage of referrals in addition to the parole agents. Comparing data from the last two rounds of Special Master reports, it appears that there has been and continues to be a significant proportion of actions taken by parole agents that can be construed to be referrals to third prong remedial sanctions thus documenting serious consideration of such programs.

An external data source that the Special Master considers reliable and often uses to verify the accuracy of Defendant's numbers is data collected by the California Parole Advocacy Program (CalPAP). Data from the Remedial Sanction by Location Summary of CalPAP tracks the use of remedial sanctions and dispositions such as continued on parole, credit for time served and dismissal. CalPAP collects the data after the appointment of an attorney so it will not capture the bulk of all referrals that are made by parole agents, supervisors and administrators. The data reflects actions prior to probable cause hearing, at the conclusion of the probable cause hearing, prior to revocation and at the conclusion of revocation. The parties disagree whether continuing on parole and Proposition 36 should be considered remedial sanctions. For purposes of this discussion the Special Master has considered a continuance on parole to be a remedial sanction but not Proposition 36.

**Table II**[114]
**Remedial Sanctions by Location Summary**
**Without ICDTP, EID, CTS, Dismiss, and Prop 36**
**July 1, 2011-December 31, 2012**

| Month | Percent |
|---|---|
| July | 1.94 |
| August | 2.10 |
| September | 2.26 |
| October | 1.66 |
| November | 1.30 |
| December | 1.19 |

The total number of referrals to third prong remedial sanctions is 661 out of 36,813 cases for the six-month period.[115] In approximately 2% of cases there is a referral to a third prong remedial sanction. This does not include the significant number of referrals to Proposition 36 that the Plaintiffs dispute is a remedial sanction. There has been a slight decrease in the use of third prong remedial sanctions since the implementation of Realignment. The time period is too short to determine if this trend will continue. This trend may be the result of a reduction in the number program options or it may be the beginning of the change in the demographics of the parole population that is being supervised by the state.

Defendants have used several other reports in their efforts to demonstrate consideration of third prong remedial sanctions at each step. While there have been some concerns about the reliability of the revocation database, over time the trend is clear that some consideration of third program remedial sanctions occurs at each step of the hearing process. [116]

Ultimately Defendants conclude that in approximately a third of the cases, referrals are made to third prong remedial sanctions. The Special Master agrees with this

conclusion. The Defendants' analysis includes Proposition 36 referrals which if excluded would reduce this percentage. The Special Master feels confident that the PVDMI data is indicating that in approximately 25% of cases, parole agents are using third prong remedial sanctions. This percentage increases slightly if parole supervisors and administrators actions are counted. Adding the approximately 2% of cases that are referred in the hearing process as measured by CalPAP, it appears that approximately 25% to 30% of cases are referred to third prong remedial sanctions without reaching a determination on the Proposition 36 referrals which are significant, and arguably some of the parolees placed in Proposition 36 programs would be placed in remedial sanction programs if Proposition 36 programs were not mandated nor available. Program usage clearly demonstrates that consideration of third prong remedial sanctions occurs at every step and in a reasonable number of cases.

Plaintiffs have raised the concern that Defendants should "distinguish between use of the programs for parole supervision and their use as alternatives to parole revocation."[117] Plaintiffs raise a concern regarding the extent to which a referral is truly a diversion from revocation or in fact might constitute either a normal supervision strategy or net widening. It is true that the blending of these two populations makes it more difficult for Defendants to meet their obligation to clearly demonstrate that they are using these programs as remedial sanctions. However, without well-designed and costly research it is difficult if not impossible to answer this question at this time. Evaluation of programs is not a requirement of the Permanent  Injunction and the Special Master believes that Defendants can sufficiently demonstrate that they are using these programs, even if the analysis lacks precision.

Clearly the Paroles Division has and continues to take steps to attempt to educate parole staff regarding evidence-based practice with regard to effective supervision and reintegration of parolees as they return from prison to the community. This includes when and how to most effectively use the tool of revoking parole. The nature of the type of organizational culture change that this requires takes years. There are many indications that the Paroles Division continues to move forward in this direction and while laudable, it is not relevant to ensuring due process in the *Valdivia* case.

Defendants have taken reasonable measures to provide guidelines for parole agent decision-making that encourage diversion from revocation. The PVDMI attempts to guide the parole agent to divert appropriate parolees based on risk and need from the revocation process. Like the Plaintiffs, the Special Master has observed situations where it is difficult to comprehend why a parolee is in the revocation process. The Special Master encourages the Defendants to continue to study the outcomes from the PVDMI and to make adjustments where necessary to ensure appropriate diversion from revocation. While this is good correctional practice, the Special Master does not believe it is a requirement of the Permanent Injunction that every referral to a program be a remedial sanction. Nor is there a requirement or standard regarding what constitutes a valid or effective use of remedial sanctions in the revocation process.

What is clear is the stated *goal* for reductions in return to prison for all remedial sanctions was up to 10% in 2004 and up to 30% in 2006,[118] but this was never a Permanent Injunction *requirement*.  Moreover, in light of Realignment and the change in what will be the demographics of the parolee population to be supervised by the state it is unclear if these goals make sense. Ostensibly there is an argument that these goals are

unrealistic with the remaining more serious and violent parolee population that will remain when the less serious offenders are all transferred to county supervision. In light of Realignment, the Special Master finds these goals to be questionable and not a reasonable determinant of whether the Defendants have met the burden of considering third prong remedial sanctions for parolees in the revocation process.

In the final analysis the number and location of third prong programs is the prerogative of the state. The Defendants have demonstrated a continued commitment to funding some programs and using the resources of programs they do not fund that are in the community

### Consideration at Each Step of the *Valdivia* Process

Defendants argue that demonstrating meaningful consideration at each step of the *Valdivia* process is substantiated by training efforts, structuring systems to support consideration and program usage. The Special Master agrees that these are reasonable measures to demonstrate consideration of remedial sanctions including third prong sanctions. Notably, the Special Master found the consideration of remedial sanctions to be in substantial compliance in 2010 and the discussion that follows reaffirms that finding.

**Training:**   Extraordinary training efforts regarding remedial sanctions were initially required by Defendants. Remedial sanctions were a significant focus of training for the Board and Paroles Division staff for several years. Staff was exposed to multiple trainings on remedial sanctions. Defendants have been open to feedback and criticism from the Special Master team regarding ways to improve the remedial sanction training including making it more interactive. The training has matured into a thoughtful and

valuable process for staff. Training on remedial sanctions has been now added to the Academy training for new parole agents and deputy commissioners making it an ordinary expectation of their jobs.[119]   Processes to announce changes in programs like *Valdivia* alerts and online resource guides are used to keep staff updated. The Board has been creating online training modules for deputy commissioners and has ensured that a session regarding remedial sanctions is included.[120]

   **System Structure:** In addition to systemizing training, Defendants have built in mechanisms to ensure consideration by deputy commissioners, parole agents, parole supervisors and parole administrators. Wisely, Defendants have designed their case systems so that the case cannot move forward without an affirmative response regarding consideration. The Paroles Division revised its entire violation process to promote consideration of risk and need of the parolee and to recommend based on risk and need which type of remedial options should be considered in the violation process. A violation cannot move forward without the parole agent and parole supervisor completing the review of options outline in the PVDMI. Plaintiffs note that parole agents and their supervisors do not always abide by the PVDMI guidelines and that in some cases the system override does not appear to make sense. In some cases Plaintiffs note that the PVDMI recommends either a remedial sanction or a return to custody and the parole agent and the parole supervisor recommend only a return to custody.[121] The system does allow for discretion and while it can be argued that this discretion is not always wisely used the question at hand is consideration not agreement with the recommendation. The PVDMI like any parole decision-making instrument is not perfect and if used properly

will continue to be refined to better align with the best evidence regarding how to best serve parolees to reduce recidivism.

Similarly there are mechanisms that require deputy commissioners to proactively demonstrate in hearing records that they have considered remedial sanctions by identifying what remedial sanction they are recommending or the reason why they are not. Plaintiffs correctly note that some deputy commissioners use boilerplate language to document their consideration and when that boilerplate is inapplicable to the case, it gives the impression that placement has been given no thought. On other occasions, deputy commissioners reject remedial sanctions based on misinformation about eligibility and availability, implying, for example, that ICDTP is the only option. On the other hand, the Mastership and monitors routinely observe hearing officers discussing remedial sanctions during hearings, inviting and entertaining counsel's argument about it, and making those placements periodically. It may be true that practice can improve, but consideration clearly happens routinely in hearings and is sufficient for Permanent Injunction requirements.

### Finding of Substantial Compliance

Defendants request that they be found in substantial compliance with regard to third prong remedial sanctions as well as all remedial sanctions. The Special Master recommends the Court find the Defendants in substantial compliance with the Permanent Injunction regarding third prong remedial sanctions but defers the issue of the first two prongs of remedial sanctions. The issue of compliance with the ICDTP and EID prongs of remedial sanctions will be deferred to further study the impact of Realignment on these

programs. It is the belief of the Special Master that the significant change caused by Realignment will prove to change the requirements for remedial sanctions.

During previous Rounds, the following items were determined to be in substantial compliance:

### Requirements from the Permanent Injunction

- Unit Supervisor review
- Transmission of revocation packet
- Timely appointment of counsel except Richard J. Donovan Correctional Facility and California Institution for Men
- Counsel shall have access to all non-confidential portions of field files
- Designation of information as confidential
- By the tenth business day after the hold, Defendants shall create a Return to Custody Assessment
- Hearing officers do not increase the Return to Custody Assessment penalty at the probable cause hearing
- Revocation hearings are to be held within 50 miles of the alleged violation
- Consideration of remedial sanctions at each step
- Plaintiffs' counsel have access to information reasonably necessary to monitor compliance

### April 2007 Remedial Sanctions Order

As required, Defendants reviewed and reported on the items that were deemed in substantial compliance during previous Rounds. Their reports substantiate that Defendants have maintained these items in substantial compliance.[122] Of note, the report indicates that the number remains the same for hearings held beyond 50 miles of the alleged violation behavior; this was a concern as Realignment shifted responsibility for most transportation out of the control of Defendants, but Defendants have been able to maintain this requirement. CalPAP data additionally confirms that there have been no

hearings beyond the 50-mile limit in November and December 2011, a period not covered by Defendants' report.[123]

Timely appointment of counsel was previously found in substantial compliance except for two institutions. CalPAP data indicates that this situation is unchanged; those two institutions remain out of compliance while the rest of the system has maintained its high performance.[124]

Defendants have requested a different treatment for requirements that have been in substantial compliance for some time, advocating that such items should be removed from this action entirely. The Special Master believes that criteria for such decisions should be set comprehensively before taking this action as to individual requirements, and therefore will not adopt this request at this time. Discussions defining these criteria, however, are highly encouraged.

## Recommendations

The Defendants have demonstrated compliance with some requirements of the Permanent Injunction, meeting its essential aim. I therefore recommend that the Court order that the following requirements are substantially compliant, and that the subjects will therefore no longer be a primary focus of Plaintiffs' or the Special Master's monitoring unless they are inextricably linked with review of the hearing process or the remedial sanctions obligations of the Permanent Injunction, or arise in the course of investigating an individual parolee's situation. These items will remain in this status unless and until it comes to the parties' or the Special Master's attention that there has been a significant decline in compliance.

These orders should apply to the following requirements:

- On or before the fourth business day, the revocation packet is reviewed by the Parole Administrator to determine whether or not there is a sufficient basis for the case to move forward and whether or not Remedial Sanctions/Cornmunity Based Treatment is appropriate at this juncture (*Valdivia* Remedial Plan page 4, flowchart)

- The Deputy Commissioner/Parole Administrator shall have the complete range of options to resolve the case (*Valdivia* Remedial Plan page 5)

- If at the conclusion of the probable cause hearing, the parolee has rejected the offer, parolee shall provide the Deputy Cornrnissioner/Parole Administrator with a list of witnesses he or she would like to call at the revocation hearing (*Valdivia* Remedial Plan page 5)

- Defendants shall develop standards, guidelines, and training for the effective assistance of state-appointed counsel  in the parole revocation process (¶ 17)

- Defendants shall use remedial sanctions/community based treatment programs  [in the form of] self-help outpatient/aftercare programs, and alternative placement in structured and supervised environments (*Valdivia* Remedial Plan page 1, Order June 8, 2005 C.5.)

I recommend that the Court order the Defendants to report the status of these requirements to all parties every six months, beginning on January 8, 2013.

Pursuant to the Order of Reference to the Special Master, the Special Master's reports shall be final, no later than twenty (20) days after service of the final report, unless a party files written objections with the Court. If any party files objections, the opposing party shall have twenty (20) days to file a reply to the objections with the Court. If objections are filed, the Court will consider the matter and issue an order adopting the report in full or as modified, or rejecting the report.

Respectfully submitted,

_/s/*Chase Riveland*

Chase Riveland
Special Master                                    DATED: February 15, 2012

---

[1]   The report may also use some language conventions. To the extent it characterizes progress and compliance, these are often discussed separately, indicating that movement is significant, even where results may be less evident. In assessing either, this report uses the terms "substantial compliance," "good," "adequate," and "poor." "Good" performance is a high bar, and it takes sustained Rounds at that level to reach "substantial compliance." When discussing problems, descriptors progress in severity from "minor" to "substantial" to "significant," and then stronger terms are used for issues of greatest concern.

[2] Examples of counties who attended the presentation in Los Angeles included: Los Angeles, Orange, San Diego, Riverside and San Bernardino. Many counties were also in attendance at the other two regional meetings. These meetings included representatives from the Board and Paroles Division as well as the Secretary's Office and Division of Adult Institutions.

[3] http://www.cdcr.ca.gov/realignment/index.html

[4]   The Special Master is aware that there are orders in *Armstrong v. Brown* concerning the State's obligations regarding disabled prisoners housed in county jails. The Special Master takes no position as to the applicability of the principles in those orders to *Valdivia*.

[5] See electronic documents titled AB 109 Roadshow PP and 3056 Hold PP.

[6] Conversation with Rodger Meier and Deputy Special Master Campbell, 2/3/2012.

[7]  See DAPO Realignment Meeting Log for examples of past and on-going interaction by the Paroles Division with the counties.

[8] Conversation with Rodger Meier and Deputy Special Master Campbell, 2/3/2012.

[9] For example, see E-mail Jacob re-Realignment Policy Changes. 9-6-11.pdf and E-mail re-Realignment Policy Changes. 9-27-11.pdf

[10] See E-mail Jacob re-Realignment Training. 9-16-11.pdf and E-mail Riley re-Board Regs Training. 11-10-11.

[11] E-mail Office of Research Parolees transferred to PRCS.

[12] Data is derived from the Monthly Workload All Regions for July through October and the BPH Workload Summary by County Report for November and December 2011. Given the change in the reporting standards and possible reliability issues with the Monthly Workload All Regions report, the data are sufficient to note trends but not absolute numbers.

[13] This assertion was made at a meet and confer on January 5, 2012. The numbers cited in that meeting nor the magnitude of decline in revocation hearings can be confirmed by the Special Master as Defendants' data sources differ.

[14] Ibid.

[15] Data is derived from the Closed Case Summary by DRU – NIC Referral Cases report.

[16] It appears that the Paroles Division will lose some positions in March 2012 and begun reductions in force in July 2012. Information source is conversations with Robert Ambroselli, Lori Macias-Price and Deputy Special Master Campbell.

[17] Taken from report Information Request from the Office of the Special Master (10) doc.

[18] *Valdivia* Staff Vacancy Report February 2012
[19]  NOR Unsuccessful Will Retry Jul. through Dec. 2011
[20] Data for October through December 2011 is captured in the spreadsheet labeled Early Release Data.xls.
[21] Data is taken from the Continuing Care Reports for the last week of each month.
[22] Data is derived from the Continuing Care Report for the last week of each month. FOTEP placements are deducted.

[23]  Correspondence from S. Huey to K. Riley, Dec. 2, 2011. Both parties acknowledge that it will continue to apply to prisoners serving life sentences in CDCR.
[24] Revocation Extension for each of Jul. through Dec. 2011
[25] Plaintiffs' Monitoring Report, Revocation Extension Proceedings, 3rd Quarter 2011
[26] *Id.*
[27] Informal communications during all-parties meetings and task force meetings
[28]  See, for example, Revocation Proceedings – Timeliness Report By County Dec. 1- 31, 2011, and the drafts titled RSTS Report Outline, Jan. 27, 2012,  Revocation Process Hearing Step Summary
[29] Informal communications with Defendants
[30] This could take many forms. It might be additional verification that the RSTS hold dates are the most accurate. It might be attempts to improve the accuracy of this critical point of data input. It might be demonstration that, despite incorrect data entry, the cases nevertheless met the actual timeliness requirements at each step. There may be other means that Defendants propose.
[31] *Morrissey* discussed probation revocation hearings, and subsequent cases quickly equated the rights of probation and parole revocation proceedings.
[32] This leaves aside, for the time being, the broader dispute concerning added charges, particularly involving arrests by other agencies.
[33] NOR Timeliness for each of these date ranges: Jul. through Dec. 2011, Jan. through Jun. 2011, and Jul. through Dec. 2010
[34] This reflects the range of variation introduced by the possibly inaccurate hold dates, as described *supra*.
[35] NOR Timeliness Dec. 2011
[36] NOR Timeliness Jul. through Dec. 2011 and various NORTimeliness Detail reports contained in the electronic folder titled NOR. At nine business days, even if the violation report had been produced concurrently, if each of  the subsequent steps took one day, the probable cause hearing would be late.
[37] NOR Timeliness Jul. through Dec. 2011, see Functional Description
[38] Informal communication with Defendants
[39] Only 159 cases required more than one attempt at service and 90% of them were completed within timeframes. NOR Unsuccessful Will Retry, Jul. through Dec. 2011 and related individual records in the electronic file titled NOR

    Another report, NOR Unsuccessful Will Not Retry, Jul. through Dec. 2011, shows those cases whose serves could not be completed because the parolee was released from custody, transferred to another state, or died.
[40]  Closed Case Summary – Extradition Cases Jul. through Dec. 2011, and for each of  Nov. and Dec. 2011. This is a subset of the population discussed *supra.*
[41]  Closed Case Summary and Closed Case – Extradition, each for Jul. through Dec. 2011
[42] Informal communication with Defendants
[43]  Closed Case Summary – NIC Referrals Jul. through Dec. 2011; this also  is a subset of the population discussed *supra*
[44]  Closed Case Summary and Closed Case – NIC Referral Cases, each for Jul. through Dec. 2011
[45]  Closed Case Detail – NIC Referral Cases, late NORs, run for each relevant DRU in the period Jul. through Dec. 2011
[46] *Id.,* informal communication with Defendants
[47]  As discussed in several reports of the Special Master, the Board did institute a system of supervisor review of probable cause hearings during that time. The Master's reports also discuss that the review system documents provided to the Special Master did not discuss this issue and Defendants told the Special Master that they did not follow up with hearing officers identified as solely conducting negotiations in Defendants' internal monitoring, by the Special Master, and by Plaintiffs' monitoring.
[48]  *See, e.g.,* the Tenth and Eleventh reports of the Special Master

[49] Closed Case Summary Jul. through Dec. 2011 shows 95% timeliness. This might be reduced by as much as 5% because of hold date uncertainties, as discussed *supra*. It might be further reduced a maximum of 8%, representing the percentage of postponements automatically reflected as timely. It is unlikely to be this much reduction, however, as the postponement reports contain duplicates, postponements at revocation hearing, and postponements for good cause that are rescheduled quickly. These distinctions cannot readily be made without a case by case review. Closed Case Summary – Good Cause Postponement for each of Jul. through Dec. 2011; Closed Case Summary – Not Good Cause Postponement Jul. through Dec. 2011

[50] Closed Case Summary – Extradition Cases Jul. through Dec. 2011, and run separately for each of Oct. through Dec. 2011. These dates are more certain because they are not calculated from the date of the hold.

[51] Closed Case Summary – Good Cause Postponement for each of Jul. through Dec. 2011; Closed Case Summary and Closed Case Summary – Not Good Cause Postponement, each run for the period Jul. through Dec. 2011

[52] Draft HEARING DIRECTIVE 12/01, CRIMINAL JUSTICE REALIGNMENT NOT-IN-CUSTODY HEARING PROCESS dated Jan. 4, 2012, and related flowchart

[53] Hearing Directive 10/02 – Optional Waiver Reviews – Revised Procedure, dated Aug. 5, 2010

[54] Of the 1,057 optional waiver reviews in the two-month period examined, only three took longer than 35 days from activation. It was not practical to discern how many cases heard at or near this timeframe proceeded to revocation hearing and whether it affected that hearing's timeliness. Parolee Activated Optional Waiver Oct. 29 through Dec. 28, 2011

[55] Other Objections reports for each of Aug. through Dec. 2011

[56] *Id.*

[57] These rulings did not appear to be supported by any legal or policy basis or practical barriers such as the witness not having identification.

[58] This consisted of data for 164 cases contained in the reports titled *Comito* Objections Denied for each of Aug. through Oct. 2011 and Other Objections for each of Aug. through Dec. 2011

[59][59] The problematic cases reviewed constituted 4% of all revocation hearings for that period. These were principally cases in which evidence was admitted against a parolee after an invalid *Comito* balancing test, or none apparent at all.

If these results are generalizable to all cases with confrontation rights objections, this would total 6% of all revocation hearings.

[60] Other Objections for each of Aug. through Dec. 2011, and individual records in electronic file titled Motions to Dismiss - undocumented

[61] *Id.*

[62] *Comito* Objections Denied for each of Aug. through Dec. 2011

[63] See individual records in the electronic folder titled State Postponements

[64] Other Objections for each of Aug. through Dec. 2011

[65] Closed Case Summary Jul. through Dec. 2011; as elsewhere, the range reflects the possible effect of inaccurate hold dates

[66] Closed Case Summary – Extradition Cases Jul. through Dec. 2011 shows 90% timeliness. Parolee Activated Optional Waiver, run for each of Jul. through Dec. 2011, shows 88% timeliness. Closed Case Summary – NIC Referral Cases Jul. through Dec. 2011 shows only *two* late cases.

These reports are likely unaffected by any hold date irregularities because one group has no hold and timeliness for the other two is not calculated from the hold date. Timeliness could be reduced by postponements, but the current state of the revocation database makes that impractical to discern.

[67] Closed Case Summary for each of these date ranges: Jul. through Dec. 2011, Jan. through Jun. 2011, and Jul. through Dec. 2010; individual records contained in the electronic folder titled State Postponements; discussion of hold date verification *supra*. This analysis does not include supplemental charges and open cases, a substantial subset of the population that may or may not be consistent with the completed cases.

In January 2011, after this data period, this Court ordered that, because of a change in state law, the deadline for revocation hearings will be 45 days. This standard will be applied in the next Round. Had it been applicable during this Round, it appears that another 4% of revocation hearings would have been timely. Closed Case Details underlying Closed Case Summary run for each DRU for Jul. through Dec. 201,

subtracting cases from Closed Case Details underlying Closed Case Summary NIC Referrals for the same period

[68] The cases were identified by CalPAP; see individual records contained in the electronic folder titled State Postponements.

[69] Of the 94 relevant cases, 29 were finalized by the original deadline or within the time the parolee had waived. During this Round, the Permanent Injunction required a revocation hearing within 35 days after the hold unless there is good cause to go beyond that date. This Court recently ruled that reconciling the Permanent Injunction with the Victim's Rights and Protection Act of 2008 will extend that deadline to 45 days. The ruling was made in 2012 and thus does not apply to this 2011 data; if it had, another 25 cases would have been timely.

[70] This analysis applies Defendants' own definition of good cause for absence. The definition is one of the disputed items the parties are negotiating. There were 30 cases postponed for State witnesses without known good cause that then exceeded the timeframe.

[71] Informal communications with Defendants. See, for example, presentation titled Day for Day Remedy and Dismissal After 60 Days

[72] Hearing Directive 12/01, Reduction of Revocation Periods Based on Delays in Revocation Processing. Optional waiver reviews do not have a set timeframe, so a remedy is provided if any exceed the deadline for a revocation hearing after optional waiver activation. The remedy applies if the revocation extension action has extended beyond the date the parolee would otherwise have been released from prison and the *Valdivia* timeframes have been exceeded for the applicable final hearing.

[73] Correspondence from E. Galvan to K. Riley, Oct. 14, 2011

[74] All references to Defendants' analysis herein are derived from the document titled *Valdivia v. Brown* Compliance Report, April 18, 2011and its exhibits

[75] All references to the Mastership's 2011 analysis are derived from Cumulative Parole Administrator Actions by DRU, Jun. 1 through Nov. 30, 2011, the associated Parole Administrator Statistics report for each facility (DRU), and Closed Case Summary – Extradition Cases Jun. 1 through Nov. 30, 2011.

[76] Where ranges are indicated, this reflects the uncertainty introduced by possibly inaccurate hold dates

[77] The higher percentage reflects Defendants' analysis, 96% compliance in the 98% of cases in which information was recorded.

[78] *Valdivia v. Brown* Compliance Report, April 18, 2011. The study differs from the aggregate numbers for 2009-2010 in terms of cases not reviewed. Overall for that period, 3.2% of cases were not reviewed when taking extradition cases into account. Cumulative Parole Administrator Actions Jan. 1, 2009 through Dec. 31, 2010; Closed Case Summary – Extradition Cases May 1 through Dec. 31, 2010 (the period in which these cases no longer were captured in the Cumulative Parole Administrator Actions report).

[79] *Valdivia v. Brown* Compliance Report, April 18, 2011 p. 6

[80] Since the revocation database does not report Parole Administrator timeliness data in aggregate, it would be labor-intensive and of limited utility to calculate 2009-2010 numbers after this much time has passed. The Special Master declines to do so.

[81] The 20 cases represent $1/20^{th}$ of 1%. Because the 2009-2010 study was not of comparable size, and a full population analysis for that period is impractical, it is not possible to determine whether this number may be an improvement, a steady state, or a decline.

[82] *Valdivia v. Brown* Compliance Report, April 18, 2011 p. 6

[83] Special Master's observations

[84] Parole Administrator Statistics, Jun. 1 through Nov. 30, 2011, run for each facility (DRU)

[85] *Valdivia v. Brown* Compliance Report, April 18, 2011 p. 9; Deputy Commissioner Manual for Parole Revocation Proceedings pp. 18-28, 33, 37-39, 47, 53, 54-55; email from Russa Boyd dated Dec. 29, 2011

[86] *Valdivia v. Brown* Compliance Report, April 18, 2011  p. 9-10 and Exhibit E. This applies to all resolution options specified except reducing an offer; the software allows a hearing officer to enter any amount of return to custody time, so reductions are easily accomplished but are not labeled as such. They can be identified through the Board Order's narrative and/or by comparing the Return to Custody Assessment and the return to custody time in the Probable Cause Hearing order.

[87] Special Master's observation of notice service, probable cause hearings, and revocation packets, with the form 1100 calling for an acknowledgement that the witness form was received

[88] *Valdivia v. Brown* Compliance Report, April 18, 2011 p. 12 and Exhibit G

[89] *Id.* at 12-13

[90] Informal communications with all parties and CalPAP; review of CalPAP data and interviews of those responsible for maintaining, analyzing and applying it

[91] Correspondence from E. Galvan to Defendants Oct. 3, 2006. The agreed topics were: duty to advise client fully regarding options; client decisions/lawyer decisions; protecting confidentiality; duty to keep client informed; negotiating dispositions; preserving client's Fifth Amendment rights; advocating for alternative sanctions; standards for interviewing witnesses, including limitations in the June 1, 2005 Order and August 4, 2005 Protective Order; guidelines for use of confidential information under the June 1, 2005 Order and August 31, 2005 Order; preserving avenues of appeal or review; and identifying cases that should be reviewed by the courts, including those specified under the June 1, 2005 Order.

[92] Third Prong Remedial Sanctions Report, 9-2-2010, Supplemental Compliance Report Concerning Third Prong Remedial Sanctions, 3-14-2011 and Supplemental Substantial Compliance Report, 5-6-2011.

[93] Order, Jun. 8, 2005, p. 10, C.5.

[94] *Valdivia* Remedial Plan, p.1.

[95] Stipulation and Order Regarding Remedial Sanctions, p. 6  IV.B.

[96] Order, Jun. 8, 2005 and Stipulation and Order Regarding Remedial Sanctions

[97] P. 1, Third Prong Remedial Sanctions Report, 9-2-2010.

[98] P. 3 Supplemental Compliance Report Concerning Third Prong Remedial Sanctions, 3-14-2011.

[99] P. 10, electronic document titled MVM-SM, Response re Supp 3rd-Prong Remedial Sanctions Report, 5-6-11, 720-1 Reports.pdf.

[100] See discussion of remedial sanctions in the Realignment Section.

[101] The change in distribution of ICDTP jail and community-based beds has been discussed in several past OSM reports. For example, *see* OSM 10, p.47, OSM 11, p. 34

[102] Office of Offender Services was formerly OSATS and is referred to as such in the Defendants' Compliance reports.

[103] P. 8, electronic document titled Supp 3rd-Prong Remedial Sanctions Report, 5-6-11, 720-1 Reports.pdf.

[104] For examples of how the programs have fluctuated see Supplemental Compliance Report Concerning Third Prong Remedial Sanctions, 3-14-2010 and Supplemental Compliance Report Concerning Remedial Sanctions, 5- 6-2011.

[105] P. 12, Supplemental Compliance Report Concerning Third Prong Remedial Sanctions, 3-14-2010. Programs funded by these allocations include PSN, FOTEP and SASCA.

[106] Id., p.10. Programs funded by these allocations include CBC, DRC, RMSC, PSC and Substance Abuse Treatment and Recovery.

[107] See electronic document titled Supp 3rd-Prong Remedial Sanctions Report, 5-6-11, 720-1 Reports.pdf.

[108] P. 8, electronic document titled Supp 3rd-Prong Remedial Sanctions Report, 5-6-11, 720-1 Reports.pdf.

[109] http://www.cdcr.ca.gov/Community_Partnerships/SearchBy.aspx  is the website that provides lists of programs that are third prong remedial sanction options.

[110] Order, Jun. 8, 2005

[111] *Supra*

[112] PVDMI items the Special Master considers to be third prong options include items 1b, 1h-1l, 1p, 2b, 2j-2t and 3a-3c. The items can be reviewed in the document, PVDMI Data October 2010 – June 2011 xls.

[113] See PVDMI Data July 1- December 31, 2011 xls.

[114] To assess trends on third prong remedial sanctions, the Special Master included continue on parole but not Proposition 36, credit for time served or dismissal.

[116] This issue is discussed in several past Special Master reports.

[117] P. 6, electronic document titled MVM-SM, Response re Supp 3rd-Prong Remedial Sanctions Report, 5-6-11, 720-1 Reports.pdf.

[118] *Valdivia*  Remedial Plan, P. 2

[119] See pp. 11-12 of Supplemental Compliance Report Concerning Third Prong Remedial Sanctions, 3-14-2011 for a synopsis of these events over time. Training has also been discussed in several prior Special Master reports to the Court.

[120]P. 12electronic document titled,1-9-12 Valdivia Substantial Compliance Status Report--FINAL.pdf

[121] P. 15, electronic document titled MVM-SM, Response re Supp 3rd-Prong Remedial Sanctions Report, 5-6-11, 720-1 Reports.pdf.

---

[122]  Substantial Compliance Status Report, Jan. 9, 2012
[123]  Informal communication with CalPAP
[124]  Date Case Assigned reports for each of Aug. through Dec. 2011