**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**


**JERRY VALDIVIA, et al.,**

     **Plaintiffs,**

        **vs.**                      **No. CIV S-94-671 LKK/GGH**

**EDMUND G. BROWN, JR., et al.,**

     **Defendants.**

_____/


**THIRTEENTH REPORT OF THE SPECIAL MASTER**
**ON THE STATUS OF**
**CONDITIONS OF THE REMEDIAL ORDER**


**Background**

On May 2, 1994, the lawsuit now known as *Valdivia vs. Brown* was filed. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan consistent with the rights provided by *Morrissey v. Brewer*. The Stipulated Order for Permanent Injunctive Relief ("Permanent Injunction") entered on March 8, 2004 memorialized the ordered plan.

In December 2005 and January 2006, the Office of the Special Master was established. The Mastership has filed 12 prior reports in this action, noting progress and deficiencies in compliance with this Court's orders.

Issues requiring further court orders to remedy – resulting either from the Master's reports, Plaintiffs' motions, or the parties requesting dispute resolution through a fact-finding hearing – were:

- remedial sanctions (June 2005 and April 2007)

- improvements to Defendants' information system (November 2006 and December 2010)

- establishment of internal oversight mechanisms (November 2006)

- due process for parolees who appear too mentally ill to participate in revocation proceedings (January 2008)

- preserving confrontation rights consistent with current case law (March 2008)

- timely access to inpatient psychiatric hospitalization, and psychiatric evaluation pursuant to California Welfare and Institutions Code § 5150 (August 2008)

Since entry of the Permanent Injunction, there have also been orders concerning designating information as confidential; parolee attorney access to information in clients' field files, witness contact information, and mental health information; interstate parolees; and civil addicts. In January 2012, after interpreting the constitutionality of the Victims' Rights and Protection Act of 2008 ("Proposition 9"), this Court amended the timeframe for revocation hearings to 45 days; the remaining issues in the Court's order have been appealed and the litigation process is ongoing.

The Special Master submits the following report assessing the status of the State's compliance with this Court's orders. The Court has allowed two extensions of the date for filing the Report. For the instant report, the 13th Round covers activities from February through October 2012. Where data is employed, it is data the Special Master

received during that period, commonly covering January 1 through June 30, 2012.[1] This report frequently reflects on the changes the State has made over time to reach the current level of performance.

### Realignment

Realignment – the law whose terms currently most relevant to parole revocation are the shifting of a substantial portion of men and women from State parole supervision to "Post-Release Community Supervision," and changing the location and length of terms for parole revocation -- has been in effect for a year and procedures have been integrated into *Valdivia* operations. Paroles Division has shifted so that all notice service takes place in county jails rather than CDCR. The Board has made the necessary adjustments for all hearings to take place in jails. Both divisions have responded to the need to provide more proceedings in the community when jails release arrested parolees before the *Valdivia* process is complete.

Defendants have worked with jail staff to improve and align communication about Board orders and their meaning for length of time in custody; reportedly different interpretations arise periodically and it appears that Defendants' staff continue to address them. Defendants have reorganized their tracking systems in part to address the new realities.

As significant numbers of former parolees leave the supervision caseload, layoffs have begun in Paroles Division and the Board has eliminated vacant positions. Some Board revocation centers and parole units have closed and consolidated. With these changes come reorganized caseloads and orientation to new locations and ways of operating.

Defendants appear to have managed these massive changes very well, responding to waves of change requiring new initiatives, new procedures, new thinking. Many have risen to the challenge. In addition to generating all that is newly required, *Valdivia* processes continue uninterrupted and at high performance levels.

More change is on the horizon, the largest of which is preparing for the cessation of revocation hearings by the Board and the interaction between the Paroles Division and county judicial systems that will assume those duties. Paroles Division is deeply involved in that planning and design, along with other duties – such as Discharge Reviews -- that accompanied Realignment and other legislative changes for the division.

## Approach to Assessing Status of Compliance

The *Valdivia* remedy was designed as a whole; it is the collective functioning of its parts that creates due process. As such, the Special Master does not see a failure at one step as equivalent to a violation of due process. Rather, it is the combination of steps that occurred for a parolee that determines whether he received the process that was due. Critical to assessing failure at one step in the process is whether 'harm was done' in the totality to the parolee.

As the Office of the Special Master has said throughout its tenure, the parole revocation system must also be assessed in this holistic manner.  Each of the steps of the *Valdivia* remedy must function substantially as they were designed; it is necessary to know the status of the component parts in order to reach conclusions about the parole revocation system's compliance. Then assessing system compliance requires weighing and balancing. A uniform compliance percentage is neither necessary nor appropriate.

Different components may reach different compliance levels and still support a finding that the system is in substantial compliance. The analysis for compliance should center on:

- Does the system protect the parolees' ability to prepare and present a defense, to face only adverse evidence that is fairly introduced, and to have hearings expeditiously?

- If there are failures in any *Valdivia* requirements, is fairness and timeliness still protected? This likely involves such questions as: were any of the next steps impacted? Does harm result? Do later steps in the process correct errors or is a remedy provided?

Each of these questions must be answered in the aggregate; while individual cases illustrate any analysis points, it is the overarching trends in fairness, harm and timeliness that matter in a case reforming a system.

In 2012, Defendants presented a detailed case arguing for a finding of substantial compliance for the parole revocation system. Staff invested countless hours analyzing each point of the *Valdivia* remedy. They gathered data demonstrating practice, aggregating it over a several-year period, and crafted extensive arguments employing this data.

Plaintiffs prepared a thorough response, accepting some of the arguments for substantial compliance on specified requirements, challenging evidence or otherwise seeking the basis for some of Defendants' conclusions, and vigorously opposing some arguments and the request for an overall finding of substantial compliance.

The Special Master has employed the term "substantial compliance" to mean "highly effective consistently over time." He is aware that case law has interpreted "substantial compliance" in remedial class actions in multiple ways and that the parties are in dispute as to whether and how that legal standard may apply in this action. This

report continues to apply the Special Master's functional definition and does not intend to suggest a legal interpretation.

Defendants reached a major milestone when the Court first found substantial compliance on significant components of the *Valdivia* remedy in January 2010. Defendants have made steady progress in demonstrating areas of compliance, with the Court finding substantial compliance on further requirements in each of the subsequent Rounds. If the Court adopts the recommendations of this report, Defendants will have achieved substantial compliance on 35 of the 44 requirements delineated in this Court's orders.[2] This is a major accomplishment reflecting the skill and dedication of staff. In briefest summary, the Special Master determines the following to be the status of the *Valdivia* remedy:

| *Within revocation process* | |
|---|---|
| **Probable cause determination** (11(b)(ii))[3] | substantial compliance |
| **Notice of rights and charges** (11(b)(iii))<br>   ADA form, determination<br>   Notice of Rights | substantial compliance<br><br>substantial compliance |
| **Violation report** | substantial compliance |
| **Unit Supervisor review** | substantial compliance |
| Transmitting violation packet | substantial compliance |
| **Parole Administrator review** | substantial compliance |
| **Return to Custody Assessment** | substantial compliance |
| Appoint counsel, expedited hearing (11(b)(i)) | substantial compliance |
|    ADA information to attorneys  (13) | substantial compliance |
|    Confidential information<br>   (15, additional order) | substantial compliance |
|    Files available to attorneys<br>   (16, additional order) | substantial compliance |
|    Attorney guidelines  (17) | substantial compliance |
| **Probable cause hearing**  (11(d)) | substantial compliance, except timeliness |

| | |
|---|---|
| Parolees may present evidence at probable cause hearing  (22) | substantial compliance |
| No increase from RTCA | substantial compliance |
| Witness lists | substantial compliance |
| **Revocation hearing**  (11(b)(iv), 23) | partial |
| Witnesses on equal terms (21) | substantial compliance |
| Confrontation rights (24, additional order) | partial |
| Disclosing adverse evidence  (14) | substantial compliance |
| Within 50 miles | substantial compliance |
| Full range of dispositions | substantial compliance |
| Parolee waivers | substantial compliance |
| Attorney continuances without parolee consent | substantial compliance |
| Revocation extension  (31(b)) | substantial compliance |
| Remedial Sanctions ICDTP Electronic monitoring Supervised environments, outpatient | substantial compliance substantial compliance substantial compliance |
| Mentally ill parolees  (additional order) | partial |
| Effective communication  (18) | partial |
| ADA accommodations | partial |
| Simplified and translated forms (19) | substantial compliance |
| Hearing tapes (20) | partial |
| | |
| *Supportive systems* | |
| | |
| Meet and confer  (10, 26) | substantial compliance |
| Policies   (11(a), (e)) | substantial compliance |
| Facilities   (11(c)) | substantial compliance |
| Staffing  (V) | substantial compliance |
| Plaintiffs' monitoring   (25) | substantial compliance |
| Individual concerns   (27) | substantial compliance |
| Information systems  (additional order) | partial |
| Internal oversight  (additional order) | substantial compliance |

The basis for the new findings of substantial compliance, and discussion of the status of other requirements, follows.

## **Systems**

**Information System[4]**

 Defendants have taken extraordinary and effective measures to address information system issues that previously gave the impression of inaccurate and incomplete compliance reporting. Most anticipated upgrade were completed and the result supports a compliance picture in which the Court can have confidence. The system also provides needed information for management reports that Defendants can use to sustain progress achieved to date.

 Staff and contractors redesigned the reporting logic so that it captures large populations previously absent from timeliness reporting; this addressed both the inability to show timeliness for those populations and the concern that some might be falling through the cracks. Open cases are included on aggregate reports with an indication of whether they are timely to date. The Mastership understands that all special populations are now measured according to their unique timeframes and included in aggregate timeliness numbers;[5] this addresses populations incorrectly appearing late, and requiring laborious hand calculations to reach accurate conclusions.

 Once the new logic was written, staff spent months comparing sources to verify that summary reports accurately reflected the detail underlying them, that detail reports accurately reflected the hearing records or other sources underlying them, that the logic was including all relevant cases, and that calculations were operating correctly. From all current appearances, this paid off in highly consistent, effective reporting for the Board's revocation proceeding steps.

Staff also devoted attention to verifying the accuracy of manually entered parole hold dates, a data point that affects all timeframes in a case. Staff devised a comparison method that sought to identify any discrepancies between the date a case was initiated in the database and the hold date. They identified only 151 such discrepancies for a several-year period – an extremely low rate -- investigated them, and made corrections where possible.

The Mastership relies on this report on the figures concerning volume of revocation actions and timeliness of Board activity. In a few instances, a few key functions limit the ability to demonstrate compliance. The reports capturing postponements have been designed but had not been validated as of this writing, so time to hearing figures are partial at this time. Reports of the Parole Division's steps in the revocation process appear to require more attention before they are operating effectively.

These improvements are an important step forward. They allow Defendants to demonstrate the good practice they know to be occurring in the field so that the Court is better able to make an accurate assessment of current practice.

**Oversight**

Defendants have enhanced their oversight by instituting regular meetings between Board supervisory staff and CalPAP regional representatives.[6] These meetings seek to ensure smooth hearing operations and to surface and address concerns about procedures, policies, and hearing practice. This is an important means of oversight and demonstration of Defendants' willingness to identify and address breakdowns.

Defendants also enhanced Decision Review procedures in recent Rounds. The particulars have been described in previous reports of the Special Master. The

enhancements are a significant improvement to due process. In the initial years of *Valdivia* implementation, Paroles Division staff or attorneys could sometimes get a decision reversed or amended through an *ad hoc* contact with hearing officers' supervisors. Defendants addressed this through setting up a centralized process adhering to regulatory standards; more recent revisions made the process more transparent and strengthened its rigorousness. Defendants now strongly look to attorneys to make use of this system as a means to protect parolees' rights and to call process breakdowns to the attention of the State.[7]

Additionally, this Court ordered, in November 2006, the State to institute and maintain the infrastructure needed for self-monitoring. As noted in Defendants' Compliance Assessment Report of July 2012, Defendants responded to the Court's Order of 2006 and developed a staff group (now called the Office of Audits and Court Compliance) to provide external monitoring of the Board of Parole Hearings and the Paroles Division.[8] Permanent full time positions were created and most have been staffed. The organization of the group and the number of staff members has changed over time in response to changes in case progress, legislation and the dire fiscal crisis of the state.

The 2006 Court Order required "staffing and resources sufficient to conduct site visits, assessments and quality improvement efforts at the Decentralized Revocation Units, contracted jail facilities, contracted legal services for parolees, CDCR and non-CDCR facilities providing remedial sanctions and other facilities and services falling under the auspices of the *Valdivia* remedies."[9] Defendants have met the requirements of the Court's Order.

The external monitoring team has provided credible analysis and review of Paroles Division and Board of Parole Hearings *Valdivia* implementation efforts. The unit has conducted tours of revocation units, contracted jail facilities as well as contracted and CDCR facilities that provide remedial sanction programs. The focus, quantity and nature of physical tours have changed over the course of the case. For example, as the number of revocation units has diminished as a result of Realignment, county jails are now targeted for a greater number of tours. The significant reduction in the parolee population and the impending transfer of functions to the counties will likely result in more changes in focus and staffing.

Physical tours were greatly improved by the development of an audit tool that Plaintiffs were provided an opportunity to critique in previous Rounds.[10] The number of physical tours has been decreased due to the development of management reports and a data base (of independent data collection from sample revocation packets) that, combined with file and hearing tape review, allow for "paper" tours to be conducted. In short, the monitoring unit has found several ways to work smarter and to save time and money in doing so. That said, the fiscal crisis travel ban resulted in the unit only completing one physical tour in the first six months of 2012.[11] The unit staff is now in the process of visiting each region of the state and intends to produce a statewide progress report by the end of 2012.[12]

The unit has positions for one deputy commissioner, one parole agent III, two parole service analysts and two correctional counselors. The deputy commissioner position recently became vacant.[13]

Since 2008, the unit has issued 18 tour reports, each with a corrective action plan.

In addition, the self-monitoring team has submitted 11 compliance reports assessing statewide compliance with the requirements of the Injunction and related Court orders.[14]

Defendants are in substantial compliance with the requirement for internal oversight in this Court's Order implementing the recommendations of the Special Master's first report.

## Permanent Injunction and Subsequent Orders

The *Valdivia* remedy consists of the following steps in a revocation process:

- Unit Supervisor and Parole Agent confer concerning probable cause and remedial sanctions
- Notice of rights and charges served
- Violation report
- Unit Supervisor review
- Parole Administrator review
- Return to Custody Assessment
- Probable Cause Hearing
- Revocation Hearing

The Permanent Injunction specifies certain features of those steps as requirements. Additionally, it mandates functions such as monitoring, policies, facilities and the like to oversee and support the ability to carry out the revocation process steps.

It is indisputable that *Morrissey v. Brewer* is the touchstone for constitutional parole revocation systems. From established law, it distills the key components of due process in this context. The *Valdivia* parties and Special Master draw on *Morrissey* in agreeing that the notice of rights and charges, the probable cause hearing, and the revocation hearing – and certain core functions and principles within them -- are most critical to due process in California's parole revocation system.

**Probable Cause Determination**

The Permanent Injunction provides:

> The parole officer and supervisor will confer within 48 hours to determine if probable cause exists to continue a hold.

The Special Master will not address the parties' issue of whether the probable cause determination step is a fundamental due process right.[15] The Special Master does agree that a supervisory review of the determination of probable cause is a good management practice that is commonly used in this type of situation to ensure that parole officers are not using detention unnecessarily. Supervisory review is typically used to ensure adherence to policy; in this case, ensuring there is probable cause to continue a parole hold. The critical issue before the court is whether this mechanism serves the ultimate purpose of ensuring that parole officers have sufficient probable cause to continue a hold. How the mechanism to ensure this is devised is of less consequence than achieving the outcome.

Plaintiffs have argued it is essential that the supervisor and parole officer meet in real-time and that can be in person, by phone, video or computer conferencing to discuss whether probable cause is sufficient to warrant the continuation of a parole hold.[16] The Special Master has also questioned whether the notion of "confer" requires an in-person meeting.[17] While the word confer implies discussion, it does not require an in-person discussion.[18] The idea that the best way to ensure unwarranted detention at this step is through an in-person meeting is not borne out in practice.

More and more organizations are using electronic means not just to communicate but to reach agreement and to make decisions.[19] High-cost in-person meetings are being

avoided not just by multi-national corporations but also by government and service providers of all sorts. In-person meetings are used sparingly and for those situations where relationship-building and/or complex negotiations are needed. Issues that are more routine in nature and where the individuals involved know each other well are often resolved through less costly options. In the case of a review for probable cause sufficient to warrant a parole hold, this is a practice that a parole supervisor engages in daily with subordinates that he or she knows well. There is little if anything that indicates the review is enhanced by face-to-face contact. Indeed the most common practice for a circumstance such as this is independent review by the supervisor with the option for discussion in person or through electronic means if the supervisor disagrees with the subordinates recommendation or the subordinate disagrees with the supervisor's decision.[20]

Upon request by the Special Master, Defendants analyzed the Probable Cause Determination step to determine if there is data that supports their supposition that supervisors are actively engaged in the review of their subordinates' parole holds. The Special Master posited that if this is the case, there should be some parole holds that are dropped after review by the parole supervisor. The Master requested that Defendants use the new reporting model to eliminate some of the concerns regarding the validity and reliability of the old reporting system's data.

Defendants used the reports "PCD Results Summary" and "PCD Referral Step Results Summary" to analyze whether the additional supervisory review resulted in any decrease in holds. "Between January 1, 2012 and June 30, 2012, there were 67,758 Probable Cause Determination actions entered into the revocation database. Of those, probable cause was found on at least one charge in 66,662 actions (98.38%). In 1,096

actions, or 1.62 percent, probable cause was not found and the case was dismissed."[21]

While low in numbers, the dismissal of cases is evidence that supervisors are engaged in the review of probable cause at this step. Other than timeliness, the parties did not stipulate to any measure, methodology or definition of what constitutes the desired outcome of the conferring between supervisor and parole officer. The Special Master assumes that both parties have an interest in ensuring there is sufficient probable cause to warrant a parole hold. Presumably at this step there either is or is not probable cause. There should not be an addition of cases so the only logical measure for this step would be a decline in cases. That decline, while arguably low, is evidence of a supervisory review. The method used for this review should be whatever one is most effective to accomplish the goal.

With one exception, timeliness has remained in the high 80th percentile since 2009.[22] While not as high as other steps, the consistently high rate of timeliness combined with the evidence of review of probable cause indicate that Defendants are in substantial compliance.

**Notice of rights and charges**

The Permanent Injunction requires:

If the hold is continued, the parolee will be served actual notice of rights, with a factual summary and written notice of rights, within 3 business days.

Defendants have had a system in place long-term to provide parolees with notice of their rights and charges. Data has indicated that compliance with the specified timeframe was at 90% early in the Special Master's tenure and remained consistent through the Rounds, with 91% of service timely in this Round.[23] In recent Rounds,

however, Defendants have demonstrated that a significant amount of the remaining service was initiated timely but staff were unable to access the parolees; in this Round, data shows that this occurred for 8% of service.[24] In previous analyses, some of the initially unsuccessful service was completed timely nevertheless. In other instances, and with some other late cases, service was completed soon after the deadline, and a very small percentage were very late.[25] It remains likely that these practices continue, but time to completion numbers were not available. Defendants report that 2.37% of parolees – 527 persons – proceeded to hearing without having been served.[26] Myriad changes in locations, procedures, and staffing attendant to Realignment carry the risk of significant complications for notice service.

Defendants have consistently included the document entitled Notice of Rights in their service throughout implementation. There have been no reports of deficiencies as to this document during this Round, and Defendants' performance has been exemplary long-term.[27] The Mastership does not recall any issues raised on-point in monitoring reports or the Mastership's own observations over time. This aspect of notice service is treated as a separate function in the *Valdivia* Remedial Plan and, as such, it can be considered in substantial compliance.

As to the required summary of charges, the Special Master has written, "The parties have recognized, long-term, that there are significant numbers of Charge Reports that do not provide a "short factual summary" sufficient to communicate the basis for the charges. Additionally, there is some work to be done to ensure that agents include all charges in the original notice that they know, or had available from file information, as of the time the notice is written."[28]

No systemic analysis of this issue has been presented to the Special Master. As one means of analysis, the Special Master reviewed all of the parties' monitoring reports from the first six months of 2012 -- 18 Plaintiffs' monitoring reports and one report from Defendants -- to attempt to understand the status of the quality of the short factual summaries and the addition of charges after the notice of rights is served.[29] There are many limitations in attempting to use monitoring reports to establish trend data that make the conclusions reached here only gross estimates of compliance and highly subjective.[30]

Of 18 Plaintiffs' monitoring reports reviewed, the average number of cases reviewed per monitoring report is 35.[31] Plaintiffs contend the factual summaries were always sufficient in eight monitoring reports and in seven monitoring reports there were one to two factual summaries that are alleged to be insufficient. In two monitoring reports, there were three factual summaries alleged to be insufficient and in one monitoring report, there is alleged to be four inadequate factual summaries. The Special Master did not always agree with the allegation of an insufficient factual summary. In six monitoring reports the Special Master found some of the allegations of insufficient factual summaries to be unfounded.[32] The one Defendants' report indicates that out of 40 cases reviewed, 14 had an insufficient factual summary.

The only conclusion the Special Master can reach from the review of monitoring reports is that monitoring reports are not a good measure of the magnitude of the problem and that the determination of what constitutes an adequate factual summary is subjective.

The Special Master also investigated where parolees' counsel was experiencing problems with the factual summary.[33] The Executive Director of CalPAP indicated that the CalPAP attorneys who represent parolees indicate that for the most part the factual

summaries are sufficient. While not systemic, there are times where there is only summary information. CalPAP attorneys note it is not something that parolees have complained about.

On balance it appears that the short factual summaries are sufficient. That said, Defendants should ensure unit supervisors work with those parole agents who do not provide adequate detail to do so.

The status of the question of added charges is also a disputed issue between the parties. Out of 19 monitoring reports reviewed, five indicate no charges are added after the original notice. All other reports vary from as low as 13% to as high as 46% of the cases have charges added after the original notice. Some monitors do an excellent job of identifying when charges are technical in nature and should have been known by the agent of record or are criminal charges but appear to be clearly known at the time of the original notice. Other times monitors are clear they can't be sure if the new charges should have been known. In many cases the Special Master did not agree with the allegations made by monitors that charges should have been known at the time of the original notice of charges.[34]

The Special Master agrees that technical violations should be addressed in the initial notice of rights. The agent of record or the unit supervisor imposes technical violations. There is no reason that they are not known at the time of notice.[35] Defendants conducted a very useful study on this point, which is much more comprehensive than other efforts. It found that, about 25% of the time, technical violations are added after the initial notice of charges no matter who the arresting agency is.[36] This study indicates

there is still work to be done to eliminate the addition of technical charges after the initial notice of charges.

Criminal charges are another matter. Defendants estimate that approximately 50% of the time local law enforcement alone is the arresting agency.[37] In these cases Defendants rely on the quality and quantity of information provided by the arresting agency. The ability of Defendants to get accurate and timely information depends on many factors such as the size of the jurisdiction, the nature of relationships between agencies and other factors that Defendants have little control over.  In many cases, accurate information is not known at the time of the initial notice of charges.

Again the Special Master inquired of CalPAP what the experience is of the attorneys representing parolees. Overall, the staff attorneys agree that the notice of charges typically provides sufficient notice of the charges to the parolee and his attorney. Two of the 10 staff attorneys noted, however, that charges are added or changed after initial service of the notice of charges, but the changes do not affect a liberty interest, as they are not the only charges keeping a client in custody. The ten staff attorneys supervise a total of 160 attorneys.

In addition to providing the right documents, containing the right information, according to the required timeframe, the parties have been concerned with whether the notices are effectively communicated. Again, the Plaintiffs' and Defendants' monitoring reports serve as a partial source of information on point. The Special Master's review of reports for the first six months of 2012 indicates that notice agents are doing a good job of ensuring that they understand if there are any impediments to effective communication with a parolee and of remedying any problems during the notice.[38] Eleven of nineteen

monitoring reports indicate no problems with effective communication by the notice agent. Five reports indicate one problem with the remainder being less than three. Many of the reports commented on the thorough and detailed approach of notice agents to ensuring that the parolee understands what is being communicated. This review is only of the actual serve of the notice and does not include problems in documenting any of the impediments to effective communication.

Plaintiffs have also repeatedly raised concerns about noisy and public service locations and their potential for affecting effective communication. For detail, please see previous reports of the Special Master. The Special Master agrees that one site, the Los Angeles County Jail, location for notice of rights is so noisy that it makes communicating with parolees difficult and that confidentiality may be occasionally compromised. The Defendants worked with the jail to remedy the situation but the project was not completed. In light of Realignment and the upcoming removal of the Board from the revocation process, it is possible that space that was used for the Board could be used to remedy this situation.

When considering the multiple issues in the notice of rights, the Special Master finds this step in the revocation process to be in substantial compliance.


**Violation Report**

The *Valdivia* Remedial Plan calls for a violation report to be completed within six working days after the hold.  In previous Rounds, the Special Master reviewed the subsequent process step, in which the Unit Supervisor reviews and determines whether the report is accurate and complete.The deadline for the supervisor review is one day

after the report is due. There is a subsequent, additional review by a Parole Administrator, who can return any incomplete reports. In 2011, the Special Master found, based on Defendants' analysis, that the Unit Supervisor's requirement had been completed at a high rate of timeliness for years.[39] For this to occur, the violation report must have been completed timely or less than one day late. Additionally, the very low rate of incomplete reports returned in the second supervisory review suggests that violation reports are adequate at the time they are forwarded to the Board and parolee attorneys.

It is therefore reasonable to conclude that the Violation Report step is in substantial compliance and the Special Master recommends such a finding.


**Unit Supervisor and Parole Administrator reviews, Return to Custody Assessment**

The Unit Supervisor and the Parole Administrator each reviews the revocation packet for completeness and demonstrating probable cause, and they consider remedial sanctions placements or recommendations. The hearing officer conducting the Return to Custody Assessment considers probable cause and remedial sanctions, and makes an offer of the length of a revocation term or other disposition.

Each of these steps has previously been found in substantial compliance.

**Appointing counsel**

Defendants are obligated to ensure counsel is provided to all parolees on or before the sixth business day after the parolee is served notice.[40] The Special Master noted in his 11th report that Defendants have "consistently appointed attorneys to parolees facing revocation at least since 2006. It has never come to the Special Master's attention that

any appointment has been overlooked during that time."[41] The one outstanding issue in the appointment of counsel is the lack of timeliness in two locations.[42]

The Special Master found Defendants to be in substantial compliance with timely appointment of counsel at all locations except Richard J. Donovan Correctional Facility and California Institution for Men.[43] These locations have experienced periodic spikes in the number of cases not timely in the appointment of counsel. In his 12th report, the Special Master again noted that CalPAP data indicated the situation remains unchanged.[44] That report reviewed data through December of 2011. The data for 2012 indicates the situation at both locations has been remedied.

Richard J. Donovan had a rate of 22% of cases not in compliance in January of 2012. The rate dropped to less than one percent in February of 2012 and has never exceeded 2% through September of 2013.[45] The California Institution for Men continued to experience problems with timely appointment of attorneys through March of 2012. The rate dropped from 13% in March to 2% in April and has never exceeded three percent through September of 2012. The Special Master finds Defendants to now be in compliance with appointment of counsel for all locations and thus is in substantial compliance with the relevant Permanent Injunction provision.

The Permanent Injunction, at ¶13, also requires that, "at the time of appointment, counsel appointed to represent parolees who have difficulty in communicating or participating in revocation proceedings, shall be informed of the nature of the difficulty" and it goes on to indicate several example conditions. This provision also requires that, "the appointment shall allow counsel adequate time to represent the parolee properly at each stage of the proceeding." The mechanism for conveying this information is forms in

the revocation packet reflecting a review of conditions requiring accommodation or effective communication; the form is completed by the agent serving the notice of rights who has reviewed the electronic disability database and physical files, and asked disability questions and made observations during service. Where a relevant condition has been identified, it will be named on that form and the source of that information is also to be included in the packet.

Throughout *Valdivia* implementation, CalPAP has shown a small number of packets arriving without the ADA review form (2% to 5%) and a large percentage of source documents missing for the subset of parolees with relevant conditions (20% to 27% missing).[46] These figures remain true today.[47] On the other hand, attorneys can retrieve information from the disability tracking system and the CalPAP administration believes that attorneys receive information sufficiently identifying parolees with communication and participation barriers. Plaintiffs question whether, in the absence of disabilities expertise, attorneys would know what accommodations are effective and what additional information might be missing.[48] The Special Master recommends a substantial compliance finding on the requirement specified in ¶13.

The Permanent Injunction requires standards, guidelines, and training for effective assistance of state appointed counsel in the parole revocation process. Subsequent orders of this Court governed designating information as confidential, and providing attorneys access to mental health and other private information. This Court has previously issued substantial compliance findings in each of these areas.

In the area of attorney representation, Plaintiffs and CalPAP have raised another concern long-term. They object that, in certain situations – principally having to do with

absconding and substance abuse – Defendants invite parolees to sign waivers before they have been appointed counsel.[49] While not a specific provision of the Permanent Injunction, there is an argument that this has implications for due process. Because this is not tracked, to the Special Master's knowledge, and occurs outside the usual *Valdivia* process and would not necessarily come to the parties' attention, it is difficult to quantify, or even determine whether it remains a current practice.

**Expedited probable cause hearings**

The Permanent Injunction also calls for:

Expedited probable cause hearing upon sufficient offer of proof that there is a complete defense to all charges

Defendants created policies, trained staff and created monitoring capacity for an expedited probable cause hearing. When appointed counsel presents sufficient evidence that there is a complete defense to all parole violation charges that are the basis for the parole hold an expedited hearing can be requested. Defendants indicate that between January 1, 2009 and March 31, 2012, the Board of Paroles took 265,981 actions at the PCH step. "During this same time period, parolees and their appointed counsel requested and received four expedited PCHs based upon sufficient offers of proof."[50] In only one instance was an appeal made regarding the decision to reject the request for an expedited hearing. The Special Master finds Defendants to be substantially compliant in the creation of a process for an expedited probable cause hearing.

**Probable cause hearings**

When this Court ruled on the constitutionality of the State's parole revocation system, much of its due process analysis centered on the length of time until parolees had an opportunity to present a defense. At the time, the system's structure was[51]:

- Parole staff determined whether there was probable cause to detain
- Parolees received notice of their charges approximately seven days after incarceration
- Parolees were offered a custody term without counsel and without presenting a defense to a decisionmaker
- Parolees who wished to defend against the charges commonly were given their first opportunity after 30 to 45 days in custody, and complications could greatly extend those times.

This Court ruled that creating a Probable Cause Hearing, on a much shorter timeframe, was an essential component of remedying this situation.

Defendants quickly put in place a procedure that had elements of the previous system and the one contemplated by the Court. The parolee and his attorney still receive a custody time offer. When they meet with the hearing officer, policy calls for (a) the parolee to have an opportunity to be heard and present evidence, (b) the hearing officer to decide whether there is probable cause for each charge, and (c) the parolee and attorney to decide whether to accept the original, or a negotiated, custody time or remedial sanction offer, or to proceed to a revocation hearing. To have remedied the previously problematic system, it is critical that all three functions be carried out.

Presenting a defense:

Through at least 2009, defense preparation could be affected by incomplete packets provided to attorneys. Missing documents most commonly had to do with ADA accommodations and effective communication, but sometimes attorney packets did not include police reports, violation reports or other material of evidentiary value.[52] Some improvements were noted as of late 2009, and the Paroles Division continued to address

it during certain site visits through early 2011. CalPAP and Defendants have mechanisms to obtain documents that initially are missing, and reportedly this works well. No recent information has come to the Special Master's attention regarding whether the issue of incomplete packets has been corrected, though it is reasonable to believe that problems with missing key evidence might surface.

Importantly, Defendants have greatly reduced "add-ons," a practice of the first several years in which cases were added to the hearing calendar the same day, or with only a day's notice, creating a risk for adequately preparing a defense. Defendants' staff worked diligently to solve this problem, which now occurs very rarely, if at all.[53]

There has been a dispute throughout implementation concerning whether conducting probable cause hearings by telephone compromises due process, effective communication and the ability to present a defense effectively, particularly in the hearing officer's ability to determine the parolee's veracity and remorse. Defendants strongly assert that the procedure comports with due process and is necessary to manage scarce resources. For more detail, please see previous reports of the Special Master. Through most of *Valdivia* implementation, this has involved fewer than 1% of probable cause hearings; this rose in 2012, but constitutes less than 2% in the current Round.[54]

The Permanent Injunction specifically protects parolees' right to put on a defense, with this additional requirement:

> At probable cause hearings, parolees shall be allowed to present evidence to defend or mitigate against the charges and proposed disposition. Such evidence shall be presented through documentary evidence or the charged parolee's testimony, either or both of which may include hearsay testimony.

Defendants have preserved this right very well throughout implementation. The Special Master noted this practice during site observations over the years, as did both parties'

monitors. CalPAP confirms that this right is consistently upheld. This is an important feature of Defendants' compliance with the probable cause hearing requirement, and the Special Master affirms that it should be found in substantial compliance as an independent requirement.

Hearing officers are expected to check for jurisdiction in general, but they do not entertain challenges based on the two major policy changes of recent years. As discussed in previous reports of the Special Master, one group was designated in 2010 as "non-revocable parole"; by policy, hearing officers are not to resolve questions of whether the parolee should not be subject to revocation on this basis, but are to refer the parolee to a grievance process.  In 2011, the law transferred a large group from parole to county supervision, known as Post-Release Community Supervision. CalPAP reports that challenges to revocation on this basis – that the parolee was incorrectly classified as remaining under the Paroles Division supervision and thus cannot be revoked by the Board – are sometimes also not handled at probable cause hearings. The hearing goes forward and the parolee is instructed to take up the challenge afterward or at a revocation hearing.[55] Although such a fundamental issue is very frustrating for attorneys, objections records suggest this situation is extremely rare, affecting far less than 1% of hearings.

Probable cause is challenged in a fairly small proportion of hearings, approximately 17% in this Round, according to CalPAP records.[56] There are few very objections, Decision Reviews or other allegations of bias by hearing officers, suggesting that Defendants' system protects the important right of a neutral and detached decisionmaker, a right specifically named in *Morrissey*.[57]

<u>Assessing probable cause</u>:

In implementation through 2011, the Special Master and the parties' monitors observed a subset of hearing officers who routinely did not invite probable cause argument nor expressly make probable cause findings. Rather, they framed the meeting as one whose purpose was to negotiate the custody time offer. It was never determined how many hearing officers conducted proceedings in this fashion.

In recent Rounds, Defendants have solicited concerns on-point in routine meetings with CalPAP offices, and have been told it is not a concern. Presently, CalPAP representatives report that this practice occurs but is not systemic. Fewer than 7% of hearing officers – or a total of six people -- are described by attorneys as frequently failing to accept, or take into account, evidence or legal argument.[58]. These sources are useful and, in a system this large, monitoring necessarily captures too few hearing officers and cases from which to draw systemwide conclusions. Since no monitoring source has presented a systemwide look at this practice, the Special Master examined a large sample of hearing records to ensure that hearings are serving this critical function.[59]

Probable cause challenges are certainly taken into account on some occasions, as charges are amended or dismissed, or the parolee's version is discussed, in the hearing records of almost half of the challenged cases. Defendants note that at least one charge was dismissed for lack of probable cause in 12% of the hearings in this Round.[60] On the other hand, in the sample, the parolee's actual argument is mentioned extremely rarely. Thus, in more than half of the challenged cases, one cannot determine from the record whether the hearing officer reached a conclusion based on the State's documents alone, or by weighing the State's case and the parolee's case. In a substantial number,[61] the

hearing record expressly asserts no challenge was made, which may add weight to the concern that such arguments were not considered. Defendants note that no complaints concerning probable cause assessment were submitted to the State's Decision Review process in a more than three-year period overlapping with this Round.[62]

Offer of custody time or other outcome:

Throughout the Special Master's and the parties' monitoring, observers have noted that, during negotiations, hearing officers observe the proscription against increasing the original offer; generally consider parolee requests for shorter time and alternatives to incarceration; and present the parolee a genuine, uncoerced choice. Indeed, some of these features have been found in substantial compliance during previous Rounds.

CalPAP attorneys have raised one concern about outcomes decisions over the years that continues today. There is a practice of hearing officers, or their supervisors, closing out pending revocation actions by granting credit for time served in the absence of a hearing and sometimes without the parolee's or attorney's knowledge. This most commonly occurs when the parolee has been sentenced to a new prison term. The practice has appeal in terms of efficiency and a limited revocation term. While credit for time served can be seen as a beneficial outcome, it can also have future impact. The record then contains a good cause finding on the charges, which adds the time in custody to the parole supervision period and may affect perceptions of repetitive violations, amenability to parole supervision, and eligibility for alternatives to incarceration.. If the parolee wished to contest these findings but did not have the opportunity, this would

cause harm. The frequency with which this occurs, and whether parolees are aware of, and make use of, mechanisms to contest these findings is not known.

Fewer than 10% of parole revocations proceed to revocation hearing. In those instances, hearing officers are expected to decide whether there is probable cause to continue to detain the parolee pending the revocation hearing.[63] Hearing officers routinely record boilerplate language for this decision. In a number of cases – unmeasured at this time – the boilerplate reasoning does not appear related to the charges, casting doubt as to whether a genuine assessment has occurred. That release pending hearing has only been granted to 177 parolees in more than three years[64] may be consistent with that skeptical view. Hearing officers do routinely collect witness lists from parolees proceeding to revocation hearing, and the State has previously been found in substantial compliance on this requirement.

Written record

Fundamental fairness requires that parolees receive a written record of the proceedings. As *Morrissey* puts it:

> The hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parole revocation and of the parolee's position. …

> the decision maker should state the reasons for his determination and indicate the evidence he relied on … (citing *Goldberg v. Kelly*)

The Mastership reviewed a substantial sample of hearing records to assess compliance with this expected element.[65] The results as to factual findings were excellent, with 93% providing some factual basis for the findings on each of the charges.

As described above, records typically do not include the parolee's version, with documentation in only a minority of cases known to have raised a challenge. Records commonly use a large number of abbreviations that may or may not communicate to the parolee and certainly are unlikely to be clear for a court should the parolee appeal the decision. CalPAP tracking also has noted the absence of objections in some hearing records; it is unknown how many may have occurred in probable cause hearings. On the other hand, CalPAP reports that it is extremely rare for parolees to file writs, in part because the maximum revocation term is effectively 90 days and writs would be moot by the time they are heard.

Defendants employ routines for providing a copy of the hearing record to the parolee. Often, the parolee receives it immediately after the hearing. On other occasions, Defendants' staff deliver it to the parolee, provide it to jail staff to convey, or send it through jail mail.[66] The Special Master has not been made aware of any reviews to determine whether parolees reliably receive their copies through the alternatives taking place outside the hearing room.[67] Defendants note that they received only eight such complaints in more than three years of Decision Reviews, and that all were denied.[68]

Timeliness

One of the key reasons to add a probable cause hearing step to Defendants' revocation system was to shorten the time until parolees have an opportunity to be heard on the charges.[69] For this reason, timeliness of probable cause hearings is particularly important.

Defendants' data shows an average of approximately 5,615 probable cause hearings per month in the first half of 2012.[70] There has been a steady decrease since a

high in 2007 of more than 8,000 probable cause hearings per month;[71] there does *not* appear to have been a large decrease since the implementation of Realignment.

During this Round, timeliness numbers for the system appear to be:

90 %    within 13 business days[72]
 4.56%            beyond that time
 5%     postponed cases, unknown, most likely beyond that time[73]

It is also the case that, while the systemwide rate of cases shown late is 4.56%, the late cases occur at double that rate, or more, at nearly one-third of the locations.[74]

Defendants studied probable cause timeliness over more than a three-year span and found figures consistent with the current Round.[75] The Compliance Assessment Report found 95% timeliness in the first period of the 13th Round. It found 97% timeliness in 2011 and 95% in each of the two preceding years, for an overall average of 95%. This analysis includes postponements in the aggregate numbers and makes the same assumptions about them that will be described *infra*.

After Realignment, procedures in most counties appear to support the smooth operation of hearings. A few counties – notably Fresno, San Joaquin and Shasta, which collectively involve a substantial number of parolees – routinely either book and immediately release parolees, or release them before notice service or before probable cause hearing. As detailed in previous reports of the Special Master, the Board, in response, has designed good, alternate processes to manage these hearings in the community. The Special Master does not have information concerning whether these very early releases have contributed to making Defendants' timeliness numbers appear artificially high.[76]

The category of postponed cases contains a mix of: delays for good cause, delays where good cause is disputed, delays at the parolees' request, rescheduling within a few days, and rescheduling after longer periods have passed.

Defendants have applied definitions of good cause to postponements, and have captured postponement reasons in the revocation database, for several years. The information system treats all good cause cases that were timely when they were postponed as timely whether the rescheduled hearing occurs the next day or 30 days hence, for instance. The timeliness where Defendants determine there is not good cause – a very small group – is calculated as of the rescheduled hearing. Defendants report that only 15 postponements were not for good cause, according to their definition, which constitutes less than 1% of the 1,824 postponements they reported. These reasons and practices have been discussed in detail in previous reports of the Special Master.

The parties disagree as to some of the reasons that Defendants define as good cause, including some that account for a large number of postponements. They also disagree about whether there should be limits on how long it takes for a case to return to calendar. The latter disagreement concerns postponements that are not the fault of either Defendants or the parolees (for example, the county does not transport the parolee), as well as parolee time waivers. Attorneys typically specify the length of time they are waiving; Defendants' position in recent years is that, as in criminal proceedings, waivers mean that parolees are waiving the time limit, not waiving a specified amount of time.

 It is difficult to determine the length of time to probable cause hearing that provides due process. Several measures have figured importantly in this action:

10 days              This Court originally ordered Defendants to create a plan to

|  | deliver probable cause hearings within this time[77] |
| 13 business days | The timeframe the parties negotiated for the *Valdivia* Remedial Plan[78] |
| 20 days | This Court drew upon case law, when asked to determine the length of time due process allows for a "prompt" hearing, and found that 21 days is definitely too long [79] |

The Mastership reviewed Defendants' timeliness report and many postponement reports and individual hearing records.[80] Based on this analysis, it appears that the majority of delayed probable cause hearings are held beyond 20 days, whether as a postponement or recorded as late.[81] Whether good cause excuses hearings beyond 21 days, and whether there should be time limits for rescheduled hearings, are open questions.

Because the percentage of timeliness needed for substantial compliance is also uncertain, the postponement questions may be pivotal. The Court has not been asked to rule about an acceptable timeliness percentage for probable cause hearings. At summary judgment, the Court found that 10% of *revocation* hearings being held beyond an acceptable time warranted a remedy.[82] If a similar rationale were to apply to probable cause hearings, the 90% that are certain to be timely would be insufficient, but the increase provided by whatever proportion of postponed hearings was determined to be acceptable might prove sufficient. These are all open questions at this time.

It is also of concern that the timeliness of probable cause hearings appears to be declining in 2012. In each of four reporting sources, the late cases in August through October showed a several percent increase over the beginning of the year, ending at 7% to 10% late, depending on the source.[83]

Defendants instituted remedies during the Round as an important feature toward making parolees whole when there are rare, but inevitable, breakdowns in the system.

The State grants day-for-day credit for the amount of time hearings are held late; there are exceptions, principally for good cause delays.[84] There were 179 parolees whose harm was reduced at this step during this Round. The system showed 1,537 late probable cause actions during that period.[85]

The Special Master reviewed a sample of 43 cases where the probable cause hearing was held on the 21st day or later; a remedy was granted to nine of them. The 77% who did not receive a remedy generally fell within one of Defendants' exceptions – good cause postponements or waivers whose time was exceeded.[86]

In summary, this is the status of probable cause hearings under Defendants' system:

| | |
|---|---|
| Attorney packets missing documents relevant to defense | unknown status, unlikely to be of any substantial size |
| Add-on scheduling | rare, if any |
| Telephonic hearings | <2% |
| Parolees may present a defense | Excellent |
| Jurisdiction—NRP and PRCS challenges not handled in probable cause hearing | Far <1% |
| Probable cause arguments considered | >93% of hearing officers do, per verbal report<br>46% apparent in written record |
| Neutral, unbiased hearing officer | Excellent |
| Considering alternatives to incarceration | previously found in substantial compliance |
| Range of dispositions | previously found in substantial compliance |
| Time offer does not exceed RTCA | previously found in substantial compliance |
| Parolee has an uncoerced choice to go to hearing or accept offer | Excellent |
| Granting credit for time served without parolee participation | unknown frequency |
| Probable cause to detain – language suggests not considered | unknown frequency |
| Written record | 93% show factual basis |

| | |
|---|---|
| | 46% show parolee version missing objections – unknown if any provision: frequently direct; indirect methods not verified |
| Timeliness | 90% known timely 5% postponements |

In weighing all of the above, in the Special Master's experience of this system, there is no reason to believe that any revocations go forward with no probable cause on any charge. This fundamental and critical purpose is being fulfilled. It is difficult, at best, to discern whether cases proceed with any frequency when there are probable cause findings on multiple charges, some of which appear unsupported. Here, the Special Master must rely heavily on the opinion of parolees' attorneys; the CalPAP administration is confident that, to the extent this does occur, if at all, fundamental fairness is still preserved in the outcomes and in the system's operation as a whole. Likewise, any concerns on-point are rare in the parties' monitoring.

There are certainly some issues with probable cause hearing practice that are current, or whose past occurrence has not been shown to be remedied. However, the most important features of this step are being fulfilled well. On balance, the Special Master considers this step to be in substantial compliance. He will recommend that the Court order this finding except for ongoing attention solely to the questions of timeliness.

**Optional Waiver Review**

Optional waiver review was not a step in the Permanent Injunction, but is a procedure allowed under California Code of Regulations Title 15, Section 2641(b). As described in detail in previous reports of the Special Master, it is a proceeding that

operates much like a probable cause hearing and takes place after a parolee has waived hearing timeliness because of pending criminal court charges, and later chooses to return to the revocation process.

After successfully concluding negotiations, Defendants issued a revised procedure in 2010. It which governs the handling of these proceedings and describes the timeframe, after receipt of a request for hearing (termed "activation"), as "the next available [probable cause hearing] calendar,[87] This will normally occur within three business days." If the parolee elects to continue to a revocation hearing, that is to be concluded within 35 days, just as with other revocation hearings. Defendants extended the latter deadline to 45 days pursuant to this Court's January 2012 order allowing that length of time for revocation hearings.

Defendants initially had no system for tracking optional waiver processing timeliness; they improved on this in 2008 and made more progress with the recent information system upgrades. Data shows there were only 756 activations during the Round, a large decrease from the past.[88] This predictably would result from the much shorter maximum revocation terms provided in Realignment.

The information system does not measure the Optional Waiver Review timing set out in the Hearing Directive, but does measure and find that all but one met the optional waiver revocation hearing deadline. This included some postponements, which may be subject to the analytical questions discussed in Probable Cause Hearing, *supra*. Because of their small number, the Special Master did not undertake a review.[89]

Early in Defendants' tracking, optional waiver Revocation Hearings appeared very late. Defendants brought about great improvement so that only 1% appeared late

when the Special Master reviewed this in 2009.[90] Defendants' current reports do not separate optional waiver Revocation Hearings, but it is the Special Master's understanding that they are included in the aggregate numbers for revocation hearings discussed *infra*.

In the Special Master's experience, Optional Waiver Reviews are conducted consistent with probable cause hearings.


**Revocation Hearing**

There were approximately 319 revocation hearings per month.[91] There has been a continuous decrease since the high of nearly 2,500 per month in 2007. Hearings dropped by about one-third with Realignment, and the amount has remained steady since then.[92]

According to *Morrissey* and/or the terms of the Permanent Injunction, due process is provided in revocation hearings when parolees have the opportunity to be heard and to present evidence on terms equal to the State; when adverse evidence has been disclosed by the time of attorney appointment or as soon as practicable before the hearing if the State discovers the evidence later; when their conditional right to confront adverse witnesses is preserved consistent with current case law; when the proceeding is held within 45 days of the parole hold and within 50 miles of the alleged behavior by a neutral and detached decisionmaker who has the full range of disposition options; and when the parolees are provided a written record of the proceedings.

Defendants have consistently protected parolees' right to be heard in revocation hearings long-term.[93] There was a surprising rise in the number of hearings held after the parolee was removed or was absent for other reasons; in the previous Round, there were

eight objections, while there were 29 in the current Round.[94] This is partly a product of a longer Round and may partly arise from the increase in not in custody hearings – held in counties where jails release parolees before hearing – where parolees have received notice of the hearing but do not appear. In any event, at a rate of about 1.5% of revocation hearings, this does not have significant systemwide impact on the class of parolees' opportunity to be heard. Objections concerning denial of parolee's evidence were even more rare.[95] Defendants analyzed CalPAP data for more than a three-year period. They found the occurrence of objections concerning the rights to be heard and present evidence to be even lower over time, indicating that these protections have served well on a sustained basis.[96]

Fundamental fairness requires that the State provide parolees the evidence against them in time to prepare a defense. The Permanent Injunction executes that through a mandate to provide the evidence on which the state intends to rely at the time an attorney is appointed or, if discovered later, as soon as practicable before the hearing. Defendants' policy requires exclusion of evidence provided for the first time during hearing, unless the state shows good cause for not producing it earlier.

Long-term, Defendants have routinely provided evidence in revocation packets to attorneys at the time of appointment.[97] As discussed *supra*, there have been difficulties in the past with evidence missing from packets. CalPAP has indicated that usually the representing attorney will contact the CalPAP office (that has access to RSTS) and they will furnish the attorney the missing information. Defendants and CalPAP have several mechanisms to follow up on missing documents and the Special Master sees no reason to believe any such issues are not addressed before the revocation hearing.

CalPAP data through the years has demonstrated allegations that, occasionally, the State has introduced evidence at revocation hearing that was not previously provided.[98] In the current Round, objections on point occurred in 1.7% of revocation hearings. This is an increase over the last two Rounds, but remains a low occurrence. Fewer than one-third of the objections were granted. . The majority of denials in recent Rounds reflected that the hearing officer let the evidence in without a review of whether there was good reason for not producing the evidence earlier[99] and this has occurred in the Special Master's presence. It is not known whether the hearing officers followed policy and conducted a good cause review during this Round's objections. When this review does not occur, it is an unfair practice, even though it happens infrequently.

Defendants' analysis shows that objections to evidence first produced at hearing occurred even less frequently over a more than three-year period overlapping with this Round. In that review, objections occurred at a rate of only 0.5%, and more than half of the objections were granted.[100]

The right to confrontation is conditional in parole revocation hearings and is subject to a balancing test developed through case law, most prominently *US v. Comito*.[101] The Permanent Injunction singles this out as a separate requirement in recognition of the importance that evidence not be used unfairly and that parole should be revoked based on "verified facts," in the language of *Morrissey*.

Defendants correctly note that, when adverse witnesses are present, parolee counsel consistently has the opportunity to cross-examine them.[102] There have been issues, however, when the witness does not appear; this requirement has been the subject

of further orders of the *Valdivia* court and the history of Defendants' efforts is covered extensively in the reports of the Special Master.

In the current Round, *Comito* objections were raised in 12% or more of the revocation hearings.[103] The Special Master reviewed a representative sample of these hearing tapes and written records drawn from a great majority of hearing officers who ruled on *Comito* objections during the Round.[104] At Defendants' request, all sampled cases involved a denied objection because of the potential for harm to the parolee. In exactly half of the review, the decisionmaker either did not employ the case law-required balancing test or used only the State's side of the test.[105] The evidence was let in against the parolee.[106] If the results are generalizable, this suggests an incorrect application of this case law in 6% of revocation hearings; this is consistent with the Special Master's analysis in the previous Round.[107]

In thinking in terms of harm, a large majority were revoked based in part on the improperly admitted evidence but five were not. Just over half were revoked based on other charges as well, while 40% appeared to have been revoked solely on the charges supported by the hearsay. Defendants argue that parolees are only harmed when they are revoked solely on the improperly admitted evidence, that this occurred in only three cases when they analyzed the sample, and that this rate is insignificant in relation to the total revocation hearings.

Defendants assert that the rate of objections sustained supports the view that no harm is occurring, and thus makes irrelevant whether the hearing officers are using the legal balancing test. In their analysis of a more than three-year period overlapping with

this Round, they found that 68% of objections on point were sustained; this is consistent with the Special Master's previous reviews.[108]

Defendants also see attorneys as having the obligation to protect their clients by appealing any incorrect *Comito* rulings through Defendants' Decision Review process

Defendants note that only two parolees sought Decision Review for improperly admitted hearsay during the Round, and that the system provided a remedy for one and found the other hearing had been properly handled,[109] indicating that the review process was effective. Also, in a study of a more than three-year period overlapping with the current Round, Defendants note that there have only been 58 such requests, 78% of which Defendants found were appropriately denied.[110]

The Court issued further orders as to this requirement in 2008. A summary of the status follows:

Specified revisions to policies and procedures: Defendants made very good revisions to the policies and procedures and distributed them in late 2009.

Training: Defendants and CalPAP initiated training in summer 2009. Defendants initially offered refresher training more often than the annual interval required. The most recent training the Special Master has been made aware of occurred in October 2010, so the annual training requirement has not been maintained.

Review of hearing officer practice: Defendants initiated a centrally located oversight system in 2008. It was revised and more broadly implemented in 2010. It has been used periodically, with multiple-month interruptions in some locations. The Special Master has not been made aware of whether it has been in use, and to what extent, in 2012.

Follow-up training and remediation: For hearing officers not demonstrating an understanding of this area of required practice, Defendants were to support them in increasing their knowledge and skill. Beyond a general statement that this is being done, the Special Master has received no updates since the 2008 order.

Information system tracking: CalPAP maintains a basic system along these lines.

Defendants invested substantially in staff time, thought and energy to address this topic and made extended, good faith efforts to satisfy the Court's orders. It is unfortunate that, despite this, hearing officers' correct application of the law was measured at 50% in 2009,[111] before the policy change and training, and measures 50% today.

Revocation Hearing Timeliness:

Applying an analysis similar to that described in Probable Cause Hearing, *supra*, timeliness for revocation hearings appears to be:

| | |
|---|---|
| 86% | timely[112] |
| 4% | late |
| 10% | postponements |

Given this Court's determination, early in this action, that 90% timeliness supported a finding of constitutional violation, an 86% timeliness rate would not be sufficient. The Special Master examined a sample of postponed cases, and a minority of them exceeded 45 days. Thus, on closer examination and once postponement-related questions are resolved, these totals may well shift significantly.

Two parolees were granted remedies for late revocation hearings during the Round. [113]

Other features of the Injunction and due process:

As described in Probable Cause Hearings *supra*, various sources give the Special Master confidence that revocation hearings are conducted by neutral, detached hearing officers, an important right. The Court has previously found in substantial compliance the requirements that hearing officers have the full range of disposition options and that hearings be conducted within 50 miles of the alleged violation. By all appearances, these features continue to operate well.[114]

Written record:

The obligation to provide a written hearing record to the parolee is grounded in *Morrissey,* which includes in its summary, "…(f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole."[115] In the Special Master's review, a commendable 96% of revocation hearing records captured the evidence relied on and reasons for revoking parole.[116] CalPAP records indicate that 25% of the objections made do not appear in the hearing record; attorneys do have the opportunity to review records at the end of the hearings and request that such omissions be corrected.[117] There are the same possible limitations of relying on indirect methods of delivery in some locations.

In summary, as to revocation hearings:

| Opportunity to be heard | rise in objections, but 1.5% total |
| --- | --- |

|  |  |
|---|---|
| Presenting evidence on same terms as the State | <1 objection per month |
| Disclosing adverse evidence in advance | rise in objections, but 1.7% total |
| Confrontation rights | 50% applying case law<br><br>policies and procedures revised<br><br>training compliant 2009-2010, currently overdue<br><br>oversight set up, unknown status<br><br>tracking adequate |
| Timeliness | 86%    timely<br> 4%    late<br>10%    postponements |
| 50 miles | previously found in substantial compliance |
| Neutral decisionmaker | < ½ % objections |
| Full range of disposition options | previously found in substantial compliance |
| Written record | 96% show evidence relied upon and reasons for revocation<br><br>indirect delivery in some locations is of unknown consistency |

**Waivers and continuances**

The *Valdivia* Remedial Plan provides that

Parolee shall have the right to waive time as to any of these hearing time constraints with or without good cause.

Attorney shall have the right to a continuance upon the showing of good cause in the absence of his or her client's consent in cases of emergency or illness or upon such other showing that the Deputy Comrnissioner/Parole Administrator can make a finding of good cause

In the Special Master's experience, Defendants commonly permit waivers and continuances by parolees and their counsel. Objections to a denial of postponement were extremely rare during this Round.[118] The parties agree to a finding of substantial compliance[119] and CalPAP has not made known any objections to such a finding. The Special Master therefore recommends a finding of substantial compliance on both requirements.

**Revocation Extension**

.       The issue of revocation extensions – that is, proceedings where a parolee serving a revocation term can have that term extended for in-custody misconduct – is reserved as an outstanding issue in the Permanent Injunction. The parties subsequently agreed to hold these proceedings according to the *Valdivia* process.

The State did establish the *Valdivia* revocation steps, with Division of Adult Institutions staff assuming some of the responsibilities. In 2008, Defendants took an important step by integrating tracking into their main revocation database, which addressed problems attendant to disparate, local tracking methods. Over time, Defendants concentrated many staff resources – particularly within the self-monitoring team and in the Institutions division – on training, troubleshooting, setting up systems, mentoring and conducting oversight to improve this process.

Nevertheless, this has been one of the least compliant functions throughout *Valdivia* implementation. Progress has been evident over time, but compliance remained at inadequate levels. Timeliness numbers improved, but remained low at all steps. The best performance occurred at probable cause and final revocation hearings, but none

exceeded 75% timeliness rates, to the Special Master's knowledge. Monitors also observed possible problems with evidence and effective communication, inconsistent use of tracking and tapes, and other substantive and procedural issues.[120]

Defendants understand Realignment to have essentially ended revocation extensions for parolees. It will continue for prisoners with life terms. The State interprets the law to have permitted revocation extensions for parolees only if their holds or revocation terms were initiated before October 1, 2011; with maximum revocation terms set at one year, nearly all parolees have been released. Only those who incurred a revocation extension in the last year, apparently a total of 174 as of this writing, could potentially be subject to further revocation extensions.[121] Defendants report there were five revocation extension actions in September 2012, that these were sex offenders that refused to sign thei parole agreements,  and none since that time.[122] This is *de minimis* to the class. The Special Master recommends a substantial compliance finding.

**Remedial Sanctions**

The Court adopted the Special Master's findings of substantial compliance for consideration of remedial sanctions at each step of the *Valdivia* process,[123] the Remedial Sanctions Order,[124] and sufficient "third prong" remedial sanctions.[125] The remaining question before the Court is whether the requirements for remedial sanctions for the Permanent Injunction have been met. The definition of remedial sanctions is limited to the In Custody Drug Treatment Program (ICDTP) and Electronic In-Home Detention (EID).

Defendants argue that given the significant overlap between the Remedial Sanctions Order and the Permanent Injunction that the burden for substantial compliance for the Permanent Injunction has been met.[126] Plaintiffs argue that the change in the nature of the parolee population due to Realignment requires a change in the configuration of the ICDTP before substantial compliance can be achieved.[127] (Defendants' efforts to respond to changes that have resulted from Realignment are discussed below.) Both parties indicate that compliance has been met with the EID.[128] The Special Master agrees with this conclusion.

Defendants continue to retain funding for third prong, ICDTP and EID remedial sanctions.[129] The number of available program slots for ICTDP has not decreased and there continues to be ample capacity for women and parolees with disabilities. There is evidence of placement of women and parolees with physical and mental health disabilities.[130] Data continues to support that remedial sanctions are considered at every step in the revocation process.[131] By all measures Defendants have maintained a commitment to retaining the capacity, placement and monitoring systems for ICDTP and other remedial sanctions.

The impact of Realignment on the use of ICDTP was first evidenced in the last Round. By the end of 2011, the legislated decrease in the amount of time that can be served by parolees for revocations had begun to result in a significant decrease of placements in ICDTP. That trend continues in this Round. The average number of parolees in an ICDTP program the last six months of 2011 was 1,368. By September of 2012 the number of parolees has dropped to less than 300 parolees.

Parolees in ICDTP by Month 2012[132]

| | |
|---|---|
| January | 554 |
| February | 418 |
| March | 462 |
| April | 384 |
| May | 436 |
| June | 343 |
| July | 360 |
| August | 340 |
| September | 298 |

Defendants engaged in several efforts to understand the reason for the decline and to make minor changes to modify the program. For example, the jail-based program was eliminated because of the high percentage of parolees rejecting the program.[133] Program changes like the recent change of the pass policy have made been to make the program work better for shorter stays.[134] Despite these efforts, parolee rejections rate for the program remain high.

At the request of the Special Master, Defendants undertook a study to identify the refusal rate of ICDTP by parolees. Using the revocation database, Defendants were able to determine when a parolee refused the offer of remedial sanctions at probable cause hearing, settlement conference, optional waiver review and revocation hearing steps. The findings affirm the high rejection rate of ICDTP. Between January 1, 2012 and June 30, 2012, placements into remedial sanction programs at each step were as follows:

Probable Cause Hearing:   Of 35,554 total actions 1,779 (5%) were remedial sanction dispositions. Parolees refused ICDTP in 2,172 (6%) actions.

Settlement Conference:   Of 214 total actions 14 (7%) were remedial sanction dispositions. Parolees refused ICDTP in seven (3%) actions.

Optional waiver reviews:   Of 780 total actions, nine (1%) were remedial sanction dispositions. Parolees refused ICDTP in nine (1%) actions.

Revocation hearings:          Of 2,305 total actions, 142 (6%) were remedial sanction dispositions. Parolees refused ICDTP in 28 (1%) actions.

The rejection level at the probable cause hearing step is significant. This information will be valuable to Defendants as they begin to reshape their remedial sanction programs to better align with the composition of the parolee population.[135]

The question before the is Court is must the Defendants make changes to existing programs to respond to recent legislative changes to be in substantial compliance with the Permanent Injunction. The Special Master finds nothing in the Permanent Injunction that speaks to anything other than evidence that Defendants have remedial sanctions and considers them at every step of the revocation process. Defendants have developed a variety of different remedial sanctions in an attempt to meet the need of parolees. One of these programs, ICDTP is being seriously impacted by Realignment. That said, Defendants have continued their commitment to the program and it is their prerogative when and if the program content should change.

The Special Master finds Defendants to be in compliance with the Permanent Injunction requirements for all remedial sanctions.

**Mentally Ill Parolees**

Issues raised by mentally ill parolees facing revocation are difficult from a variety of perspectives -- due process, public safety and humanitarian – all of which must be balanced. The parties have devoted significant efforts to these issues since the earliest days of the *Valdivia* Remedial Plan. There has been very substantial progress over time and there are enough open questions that the Special Master is unable to make findings concerning compliance with this Court's orders at this time.

Early in *Valdivia* implementation, the State employed a category of revocations referred to as "psych returns," a process that returned mentally ill parolees to prison but sometimes operated poorly to connect them to treatment and to review when they were able to return to community. Importantly, Defendants eliminated this practice.

After extended negotiations supplemented by orders of this Court in January 2008 and August 2008, Defendants created a much more fair system intended to revoke only for violation behavior, suspend proceedings for those too decompensated to participate, request treatment, arrange for clinical evaluation, and review regularly for the parolee's ability to participate in a hearing. The system also has provisions for attorney access and, for severe cases, referral for assistance in community placement and release from custody at a set maximum date.

The system was designed for parolees housed in CDCR. Recognizing the differences in communicating with clinical and custody staff employed by other entities, the State deferred creating procedures specific to jails. When Realignment led to all new revocation terms being served in jails, beginning in October 2011, the State revised its procedures, principally lessening several mandates that rely on interaction with jail staff but encouraging the State's staff to continue with all policy components.

The system appeared to work well when the Special Master examined it in 2009, and according to subsequent anecdotal representations. Defendants have not indicated that they have reviewed the system since January 2009, before the system was fully in place and before the 2011 revision. There is, thus, insufficient information on which to reach a finding about whether current practice satisfies this Court's orders.

Plaintiffs objected to the 2011 policy change and have issued a Notice of Violation about current practices. Dispute resolution is set to begin at the end of November. Their allegations have to do with the system described above as well as two other aspects of this Court's 2008 orders – access to Department of Mental Health treatment and parole agents' use of short-term involuntary commitment procedures before initiating revocation actions, where appropriate.

The dispute involves questions of interpretation of this Court's language, the need for demonstration of practice as distinguished from actual violations, the scope of any identified breakdowns, differentiating due process risk from actual failures, and the interaction with orders from another federal court. With this complex mix pending, the Special Master declines to reach any findings on compliance with this Court's 2008 orders concerning the mentally ill and looks forward to a successful dispute resolution process.


**ADA and effective communication**

The Permanent Injunction mandates that "Defendants will ensure that parolees receive effective communication throughout the entire revocation process." Additionally, the *Valdivia* Remedial Plan discusses providing ADA accommodations when needed. Defendants' practices in this regard have been the subject of dispute long-term, in this action and in *Armstrong v. Brown*.

Defendants' policies and procedures require staff to assess a parolee's disabilities, offer accommodations, and provide effective communication assistance to parolees during each step of the revocation process.[136] The policies mandate notice agents and

hearing officers to identify the parolee's needs at each interaction by conducting interactive interviews with parolees, and reviewing field file information and an electronic database of disability and effective communication information.

The database was developed by the State pursuant to the *Armstrong* litigation and was deployed in 2007. It includes historical information about accommodations provided in revocation proceedings; all previous copies of the BPH form 1073 (disability and effective communication.information gathered for, and supplemented during, the revocation process);  medical, mental health, developmental disability, and educational classifications during the most recent CDCR incarceration; and some documents supporting these conditions, referred to as source documents.

Policies require staff to provide assistive devices, arrange for translation, and provide other needed accommodations during notice service and hearings, as well. Commonly, the attorney's presence is the accommodation provided for difficulty reading, understanding or communicating. For physical disabilities and language needs, Defendants work with magnifying sheets, hearing assistive devices, dual handset phones for calling translation services, and in-person language and sign language interpreters. Where additional needs are identified, and/or accommodations are provided, staff are required to enter the information in the database.

Staff have been trained in these policies, and monitors and the Special Master have observed these practices routinely in use. However, Plaintiffs regularly report learning of breakdowns in documentation and therefore tracking, and questions of whether any, or the appropriate, accommodation was provided.[137] Individual cases have been cited in monitoring reports, Plaintiffs' response to Defendants' Compliance

Assessment Report, and Plaintiffs' informal objections to the draft Special Master's report. It has been difficult, to date, for the Special Master to discern the scope, nature, and substantiation for these allegations. The Special Master understands that there have been longstanding orders in *Armstrong* concerning some of these practices, and further remedial orders issued in January and April 2012.[138]

If parolees believe a necessary accommodation is not available or sufficient, the attorney may object and attempt to have it provided during a hearing, they may complain through a designated ADA grievance system, or request a Decision Review. In a more than three-year period overlapping this Round, Defendants report that 47 grievances or Decision Review requests were submitted concerning ADA or effective communication issues. Two were granted and the cases dismissed; the others were denied and are detailed in Defendants' Compliance Assessment Report.

**Translating and simplifying forms**

The Permanent Injunction requires that forms provided to parolees were to be reviewed for accuracy, simplified, and translated to Spanish.

Paragraph 19 of the Injunction requires Defendants to ensure all forms provided to parolees by the Board of Paroles and the Paroles Division are reviewed for accuracy, simplified and translated into Spanish. The parties are in agreement that the following forms have been reviewed and translated:[139]

- BPH 1073 Request for Reasonable Accommodation
- BPH 1074 Disability-Related Grievance Form
- BPH 1100 Notice of Rights
- BPH 1100-B Witness Worksheet
- BPH 1102-A Time Lost for Absconders/ Parolees at Large

- BPH 1004-B Parolee/Attorney Decision Form
- BPH 1104-C Waiver of Attorney Assignment
- BPH 1135-A-1 Notice and Acknowledgement of Rights for Revocation Extension Proceedings

In addition the Board of Paroles has built into the revocation database the ability to print the following forms in either English or Spanish:

- BPH 1105 Subpoena
- BPH 1106 Subpoena Duces Tecum
- BPH 1107 Declaration ISO SDT
- BPH 1109 and 1109A Notice Requesting Appearance

These forms are printed in the appropriate language and then provided to the parolee. There is no need for a hard copy version of the form.

Plaintiffs assert that Defendants have yet to translate 1105, 1106, 1107, 1109, and 1109A, the 1100 INT-EXT, 1102 INT-EXT, and 1102 and the 1135-AX.[140] Defendants indicate that form 1106 became part of the 1107 in 2011.[141] Form 1109A became part of Form 1109. As stated Forms 1105, 1106, 1107 and 1109 are translated and printed from the revocation database. The 1515, the form that reviews the conditions of parole, has always been in Spanish. The 1515 addendum, a form that outlines special conditions of parole has not been translated. There is blank space on the 1515 to write in special conditions. Both forms were updated last spring to notify parolees that they do not have to sign the form. These new versions of the 1515 have not yet been translated. These forms will be translated into Spanish because they will continue to be used for parolees supervised by the Paroles Division. The remaining forms 1100 INT-EXT, 1102 INT EXT and the 1102 were not translated and it no longer makes sense to do so. The amount of time it would take to complete the translation and review process with Plaintiffs is several months. Given that revocation will no longer be under the jurisdiction of the Board of

Parole beginning in July 2013 and the small percentage of parolees affected, translating these forms at this date is not a wise use of resources. Form 1135X has been a disputed item between the parties. The form is not provided to parolees but is used to document the mental state of the parolee in the form of a chronological entry. As such the form should not be subject to paragraph 19.

The Special Master finds Defendants in substantial compliance with the requirement to provide accurate, simplified, Spanish translation of forms provided to parolees.

**Tapes**

The Permanent Injunction requires that:

Upon written request, parolees shall be provided access to tapes of parole revocation hearings.

This procedure appeared to work well through 2008. Logs showed requests made at a rate of approximately 60 to 80 per month and they indicated requests were filled within 30 days at a rate of 97% or better. There had been anecdotal reports of poor quality recordings from CalPAP attorneys and monitors.

In July 2009, Plaintiffs reported being told that no tapes existed for 15% of the tapes they had requested in recent months.[142] They also observed indicia of tracking log inaccuracy, late tape provision, and audibility issues with some tapes.  To address these issues, the Board distributed guidance to hearing officers and clerical staff; delivered new recording equipment; and devised additional procedures, including enhancing centralized tracking to ensure that tapes were submitted to headquarters, and supervision. In late

2009, the State's data showed somewhat less timely filling of requests, at 90%, and some very long times for a small number of cases.[143]

Plaintiffs more recently identified a subset of the above concerns, a very small number of cases in 2010 and 2011 in which the State was unable to provide tapes when those five parolees requested them in support of writs of habeas corpus. Defendants note that parolees also have the option to appeal decisions through the State's Decision Review process without a tape, and that two of the complainants were granted new revocation hearings, a remedy Plaintiffs had requested in 2009.[144] Defendants report that all five parolees who sought Decision Review for blank tapes, during a more than three-year period studied, were granted a new hearing or modified findings or dispositions.[145]

The Special Master has not received information about whether the remedial measures Defendants put in place in 2009 had the desired effect.


**Policies**

The Permanent Injunction specifies procedures and expectations for the parties to meet periodically regarding policies, forms, and plans, and for the Plaintiffs to have an opportunity to review and comment on any new or revised *Valdivia*-related policies.

The parties have several mechanisms that they have used to be compliant with this aspect of the Injunction. In the initial stages of the case there were frequent meet and confers to develop policies and forms as well as processes by which the parties and other key stakeholders such as CalPAP could keep each other informed of progress and/or changes. Sometimes the Special Master was requested to assist or to be engaged in these meetings while at other times, the parties met alone. The most recent examples of

meetings where the Mastership was involved have been over proposed changes due to Realignment. An example of the latter is where the Mastership has not been involved has been meetings by the parties to resolve a list of remaining disputed issues. Many issues as well as follow-up to in-person meet and confers are resolved through conference calls and/or correspondence.

Defendants have been conscientious and respectful of the requirement to ensure that Plaintiffs are not just informed of changes but are provided adequate time for input and response to proposed changes. When this has not occurred it has typically been a result of oversight by a staff member not aware of the requirement or not providing adequate time for input due to the late arrival of materials. This situation arose most often in the early years of the case. In recent years legislative changes such as Realignment have created significant uncertainty for Defendants. Despite this, Defendants have done an admirable job of informing the Plaintiffs of impending changes and where appropriate seeking their input and review.

Defendants cite in their most recent compliance report a list of 19 policies and/or forms that were negotiated with the Plaintiffs between January 1, 2011 and April 30, 2012.[146] Defendants also reference the disputed items process whereby the parties met from 2009 through 2011 to resolve a negotiated list of items where the parties were not in agreement. The process resulted in the parties reaching agreement on 24 items and partial agreement on one item. Twenty-one items remain in dispute and 17 were deferred.[147]

Defendants are in substantial compliance with this requirement of the Injunction. As with other requirements, it is the expectation of the Special Master that having

achieved substantial compliance does not relieve Defendants from adhering to this requirement until the case is closed.

Additionally, the Permanent Injunction requires Defendants to develop and implement sufficiently specific policies and procedures to ensure continuous compliance with all of the Permanent Injunction's requirements. Defendants accomplished a great deal in terms of policies and procedures initially. They continued to issue additional policies as time went on; to revise policies for current conditions; and to generate policies implementing new legislative priorities, integrating them with existing *Validivia* mandates.

As noted, Defendants routinely conferred with Plaintiffs throughout this process. While they reached agreement in many instances, the parties identified a large number of policy issues in dispute. Plaintiffs maintain that, absent policies on these disputed items, Defendants' policies remain insufficiently specific to ensure compliance.

**Facilities**

The Permanent Injunction requires:

*An assessment of availability of facilities and a plan to provide hearing space for probable cause hearings* (¶11(c))

Early in *Valdivia* implementation, the Defendants negotiated access to space for hearings and other revocation proceedings at nearly every site where parolees are housed. There was an exception at a very small number of county jails, but Defendants arranged reasonable alternatives. With Realignment, all proceedings, except revocation extensions, shifted to county jails. The Special Master has visited at least 10 jail sites since

Realignment implementation, and the parties have monitored a great deal more; it appears that jails were able to accommodate the increased volume and any other changes.

In 2011, the parties raised and resolved a dispute concerning jails that held hearings in rooms with barriers separating some parties. In the past, Plaintiffs have objected to the conditions for attorney-client meetings and for notice service at some locations, particularly offering concerns about confidentiality and effective communication.

On balance, the Special Master finds Defendants in  substantial compliance with the requirement captured in ¶11(c).


**Staffing**

The Permanent Injunction mandates that Defendants shall maintain staffing levels sufficient to meet all obligations under that order. The Special Master agrees with Defendants that the continued progress in providing timely processes and protecting the due process rights of parolees indicates that staffing levels are sufficient to meet the obligations of the *Valdivia* order. In the face of the added workload of Realignment and the resulting layoffs, the fact that the Paroles Division and particularly the Board continued to work on efforts to improve *Valdivia* processes, makes it difficult to argue the staffing resources are not adequate. The Defendants clearly heard the Special Master's caution to not let the work of Realignment defer critical compliance issues indefinitely.[148]

In the initial implementation of Realignment, the existing processes continued to function but efforts to improve upon them slowed.[149] Paroles Division and Board staff

worked diligently to create systems to prevent communication failures and to create needed information sharing between themselves and county agencies now involved in the parole revocation process.[150] The Board completed an impressive array of resource documents and self study modules all of which are designed to improve the parole revocation process.[151]

During the last Round, several revocation centers were consolidated with a resulting decrease in Board staff. Other planned decreases in Board, Paroles Division and *Valdivia* records positions at Institutions also took place.[152] This Round the Pitchess Detention Center was closed.[153] By July 1, 2013 the Board anticipates the elimination of most clerical and custody positions in field operations and more Deputy Commissioners.

The Special Master applauds the efforts of all divisions to maintain a focus on *Valdivia* processes in the face of the downsizing and eventual elimination of positions. Defendants have achieved substantial compliance in the area of maintaining sufficient staff levels.

**Plaintiffs' monitoring**

The Permanent Injunction provides for Plaintiffs' counsel to have access to information reasonably necessary to monitor Defendants' compliance with this Court's *Valdivia* orders and related policies and procedures. Defendants were found to be in substantial compliance with this provision during earlier Rounds.

The Permanent Injunction also requires that there be a mechanism for addressing concerns Plaintiffs counsel raise regarding individual class members and emergencies. The agreed upon mechanism to resolve individual parolee concerns raised by the Plaintiffs continue to work well. Defendants have been responsive to Plaintiffs' past

concerns about timeliness and response quality. The system is now timely and typically provides the level of quality required by Plaintiffs to respond effectively to individual parolee concerns.

In the first six months of 2012, Plaintiffs employed the mechanism ten times.[154] This is a decline from 187 requests for information in 2009. Defendants maintain a tracking log of all cases where a concern has been raised. In all cases during this Round, the issue raised was responded to within 30 days.[155] Plaintiffs are in agreement that both the timeliness and quality of Defendants' responses have improved over time.[156] The Special Master finds Defendants to be in substantial compliance with the requirement to maintain a mechanism for investigating individual concerns.

## Other Orders of this Court

As noted, in addition to the Permanent Injunction, this Court has issued orders concerning *Valdivia* implementation. The details of their status are offered above. In summary:

Designating information as confidential (May 2005): This Court has previously issued orders finding substantial compliance.

Remedial sanctions (June 2005 and April 2007): This Court has previously issued orders finding substantial compliance as to the 2007 order and aspects of the 2005 order, which reinforces obligations laid out in the *Valdivia* Remedial Plan. The Special Master now recommends a finding of substantial compliance for the remainder of the 2005 order.

Improvements to Defendants' information system (November 2006 and December 2010): Defendants have made progress periodically since 2006 and made

substantial gains during this Round. To satisfy these orders, a few significant tasks remain, particularly concerning reports displaying Paroles Division steps.

Establishment of internal oversight mechanisms (November 2006): The Special Master recommends a finding of substantial compliance.

Attorney access to information in clients' field files, witness contact information, and mental health information (June 2007): This Court has previously issued orders finding substantial compliance.

Interstate parolees and civil addicts (October 2007):  This order determined that these two groups are not subject to *Valdivia* requirements. No obligations flowed from this order and no further action is required.

Due process for parolees who appear too mentally ill to participate in revocation proceedings (January 2008): Defendants made very good progress in setting up this system by mid-2009. Information about its current operations, after significant contextual changes likely to affect practice, has not been presented.

Preserving confrontation rights consistent with current case law (March 2008): Defendants devoted significant attention to this set of requirements and made some progress in mid-2009. Approximately half of studied hearings do not apply the balancing test as called for in case law and Defendants' training materials. Not all aspects of the 2008 order appear to have been implemented.

Timely access to inpatient psychiatric hospitalization, and psychiatric evaluation pursuant to California Welfare and Institutions Code § 5150 (August 2008): These orders remain in dispute. As a consequence, no recent showing has been made as to practice. A dispute resolution process has been initiated.

# Recommendations

The Defendants have demonstrated compliance with many additional requirements of the Permanent Injunction and some subsequent orders, meeting their essential aim. I therefore recommend that the Court order that the following requirements are substantially compliant, and that the subjects will therefore no longer be a primary focus of Plaintiffs' or the Special Master's monitoring unless they are inextricably linked with review of the Permanent Injunction, or arise in the course of investigating an individual parolee's situation. These items will remain in this status unless and until it comes to the parties' or the Special Master's attention that there has been a significant decline in compliance.

These orders should apply to the following requirements:

- No later than 48 hours after the parole hold, or no later than the next business day if the hold is placed on a weekend or holiday, the parole agent and unit supervisor will confer to determine whether probable cause exists to continue the parole hold, and will document their determination.

- No later than 3 business days after the placement of the hold, the parolee will be served with actual notice of the alleged parole violation, including a short factual summary of the charged conduct and written notice of the parolee's rights regarding the revocation process and timefiames.

- Parolee shall be provided with a written notice of rights regarding the revocation process and time frames.

- No later than 6 business days after placement of the hold, a violation report shall be completed.

- Defendants shall appoint counsel for all parolees beginning at the RTCA stage of the revocation proceeding (all locations).

- Defendants shall provide an expedited probable cause hearing upon a sufficient offer of proof by appointed counsel that there is a complete defense to all parole violation charges that are the basis of the parole hold.

- At the time of appointment, counsel appointed to represent parolees who have difficulty in communicating or participating in revocation proceedings, shall be informed of the nature of the difficulty…The appointment shall allow counsel adequate time to represent the parolee properly at each stage of the proceeding.

- At probable cause hearings, parolees shall be allowed to present evidence to defend or mitigate against the charges and proposed disposition.

- Parolees' counsel shall have the ability to subpoena and present witnesses and evidence to the same extent and under the same terms as the state.

- Counsel shall be provided documents the State intends to rely on

- Parolee shall have the right to waive time as to any of these hearing time constraints with or without good cause.

- Attorney shall have the right to a continuance upon the showing of good cause in the absence of his or her client's consent.

- Revocation extension proceedings

- All remedial sanctions obligations

- Defendants will ensure that all forms provided to parolees are reviewed for accuracy and are simplified … This process will include translation of forms to Spanish.

- Defendants shall meet periodically with Plaintiffs' counsel to discuss their development of policies, procedures, forms, and plans.

- Defendants shall develop and implement sufficiently specific policies and procedures that will ensure continuous compliance with all of the requirements of the Permanent Injunction.

- Defendants shall serve on counsel for Plaintiffs an assessment of the availability of facilities and a plan to provide hearing space for separate probable cause hearings.

- Defendants shall maintain sufficient staffing levels in the CDC and BPT to meet all of the obligations of this Order.

- The parties shall agree on a mechanism for promptly addressing concerns raised by Plaintiffs' counsel regarding individual class members and emergencies.

- Defendants shall institute and maintain the infrastructure needed for self-monitoring

The Special Master also recommends that the Court find the Probable Cause Hearing step in substantial compliance. As to that step, onsite monitoring should be discontinued, consistent with other items found in substantial compliance, but reporting on questions of timeliness shall continue.

I recommend that the Court order the Defendants to report the status of these requirements to all parties effective May 15, 2013 and, if the *Valdivia* action continues beyond July 1, 2013, the Defendants should report every six months thereafter, until the action is finally closed, on the status of items found in substantial compliance that have not been dismissed from the action.

Pursuant to the Order of Reference to the Special Master, the Special Master's reports shall be final, no later than twenty (20) days after service of the final report, unless a party files written objections with the Court. If any party files objections, the opposing party shall have twenty (20) days to file a reply to the objections with the Court. If objections are filed, the Court will consider the matter and issue an order adopting the report in full or as modified, or rejecting the report.

Respectfully submitted,

_/s/ *Chase Riveland*

Chase Riveland
Special Master                                        DATED: December 17, 2012

[1]  On occasion, an analysis incorporates data through July or August 2012.

[2]  Determining the number of requirements is somewhat of an art. The Permanent Injunction describes 23 discrete requirements, set out in numbered paragraphs. The attached *Valdivia* Remedial Plan and process flowchart reinforce many of those requirements, and specify more process steps and activities. In each of these documents, a requirement is commonly a full process step (for example, a probable cause hearing), but sometimes a function *within* a process step (*e.g.,* evidence can be presented at probable cause hearings) is listed as an independent requirement.

Court orders subsequent to the Permanent Injunction generally have reinforced or amplified requirements already contained in the Permanent Injunction and its attachments. They added only three unique issues – information systems, internal oversight, and mentally ill parolees. Understanding that not all of these requirements carry equal weight and that counting will necessarily not be fully precise, by the Special Master's reckoning, they amount to 44 requirements, of which 35 have been satisfied sufficient to remove them from monitoring.

[3]  A number reflects an associated numbered paragraph in the Permanent Injunction

[4]  Sources for this section are the document with the electronic file name OSM Analysis Request.pdf, document titled RSTS Postponement Report Assumptions, and the Special Master's extensive reviews of new reporting model reports with subsequent conversations with Defendants' staff to clarify understanding of how RSTS is currently operating

[5]  Special populations such as extradition cases and not in custody proceedings are subject to alternate timeframes. In the past, these have been small populations, and the timeliness of some steps has been lower than for the general population. The Special Master's understanding is that these groups are included in the aggregate numbers and there are no longer reports that show the timeliness for these populations.

[6]  Compliance Assessment Report

[7]  Compliance Assessment Report; informal communications with Defendants

[8] Compliance Assessment Report, p. 74

[9] Order, Nov. 13, 2006

[10] Defendants are to be congratulated for developing a sound methodology to continue monitoring in a less costly but equally effective way. Physical tours are only really needed to observe notice of rights and probable cause hearings. The audit tools for each step of the process are embedded in the Nov. 13, 2012 e-mail from Dan Carvo, Parole Agent III, Re: OACC staffing.

[11] Plaintiffs allege that the unit no longer is completing corrective action plans after tours. *See* Plaintiffs' Corrected Response to *Valdivia* Compliance Assessment Report, 9-27-12 p.101. The tours Plaintiffs cite are those that were cancelled due to the budget-related travel ban. All Defendant monitoring tour reports since mid-2008 have corrective action plans.

[12] *See* Nov. 13, 2012 e-mail from Dan Carvo, Parole Agent III, Re: OACC Staffing

[13] The Parole Agent III is a designated subject matter expert who can fill in for the deputy commissioner until this position is filled.

[14] *See* Defendant Compliance Reports

[15] *See* Plaintiffs' Corrected Compliance Assessment Report Response, Sept. 27,2012, p. 108.

[16] *See* Plaintiff's Corrected Compliance Assessment Report Response, 9-27-12, p. 109-110

[17] *See* OSM 5th Report, p.5; OSM 6th Report, p.56; and OSM 7th Report. p. 55.

[18] For efficiency's sake, there have been many times when meet and confer sessions in this case were held by phone in their entirety and many times when some members participated by phone.

[19] The younger generation uses many innovative ways to solicit feedback and to reach agreement. Skype, Google chat rooms, and twitter are used by organizations in various ways to reach agreement. Such mechanisms are likely to be used more in the future.

[20] It is important to remember that most supervisors are in the same office location as their direct reports, the parole agents.

[21] OSM Analysis Request, p.2.

[22] In December of 2011, timeliness for this step fell just below 85%. *See* Compliance Assessment Report, p. 80.

[23] See each report from OSM 2d Report forward.  ; DAPO Timeliness Summary Jan. through Jun, 2012; NOR Step Result Summary for each of Jan. through Jun, 2012

In recent Rounds, service was delayed much more often for populations such as extradition cases and not in custody proceedings. (see, *e.g.,* OSM 12th Report). It is of concern that it is no longer possible to review the timeliness of those populations to see whether it is improving. On the other hand, in the 12th Round, these populations, taken together, constituted just over 2% of the total holds, and the late cases in that population totaled less than 0.5% of the notice services overall.

[24] NOR Step Result Summary for each of Jan. through Jun, 2012

[25] See, *e.g.,* OSM 2d, 3d, 5th, 6th, 7th, 8th and 12th Reports

[26] Facially, data reports show 17,585 fewer Notice of Rights service actions than actions at the Referral step. DAPO Step Summary Jan. through Jun. 2012. In the *Valdivia* process design, the Referral step occurs *after* service of the notice of rights and charges, so this could suggest that some service is being missed.

In practice, however, the Referral step sometimes occurs before service and sometimes afterward. If the Referral decision disposed of a case before notice was due, the absence of notice is not a problem. Defendants provided a supplemental analysis of when relevant cases closed. (see Dec. 17, 2012 email from C. Buffleben). Of the 22,263 cases where the parolee was not served notice, 12,863 were disposed of  as of the time notice was due. Taken together with notices completed in the Round (49,053), that would narrow the cases not served to 6,161.

In this analysis, Defendants also provided figures for unserved parolees whose cases were disposed of at subsequent process steps before hearing. This suggests that staff knew notice would be unnecessary as they were working toward continuing the persons on parole, dismissing the cases, or placing the persons in remedial sanctions, or that the persons were not harmed because they did not proceed to hearing. These figures exceeded the 6,161 cases above.  Defendants found that 2.37% of cases – 527 persons -- reached probable cause hearing without having been served.

While not all numbers match between the different sources, this is a strong indication that cases are disposed of before requiring a notice, parolees are served, or cases proceed a few additional days without service but service is made moot because the case does not proceed to hearing.

[27] Compliance Assessment Report; Special Master's observations

[28] OSM 11th Report, p. 25. The broader dispute concerning added charges, particularly involving arrests by other agencies will be discussed below.

[29] Defendants' budget-related travel ban resulted in only one self-monitoring report for the first six months of 2012.

[30] Plaintiffs' monitoring reports present many interpretation problems. For example, there is no standard reporting mechanism, which means different firms and sometimes authors within a firm, define terms slightly differently, have different reporting formats, and sometimes include underlying documents and other times not. In short, it is not comparing apples to apples. Some authors are very articulate about why they make an assumption while others are not. Some exhibits fail to include the very documentation needed to affirm a conclusion. On a few occasions, cases are referred to in exhibits that are not there. Ironically, Plaintiffs' reports suffer from the very problems that they raise about the Defendants' reports that they are monitoring. Defendants' one report was excellent. Defendants provide clear documentation for assertions and have the advantage of an audit tool that assesses the exact same elements in each observation or file review.

[31] Plaintiffs allege that they did not receive 1502b documentation for all cases and thus there is an average of 29 cases. The Special Master can not verify this allegation.

[32] The conclusions reached by the Special Master are questionable because of the many problems with lack of adequate information in the monitoring reports to support an allegation.

[33] The Special Master spoke with Mary Swanson on August 8th and 17th, 2012. Ms. Swanson investigated this issue and the issue of added charges for the Special Master.

[34] The Special Master always assumes a technical violation should be addressed in notice of charges. The Master attempted to discern from existing documentation in the monitoring report whether added criminal charges were appropriate. In the face of no evidence to the contrary, the Master assumes these added charges are legitimate.

[35] There may be a very small percentage of times when the agent of record is not available and a duty officer completes the notice of rights and if the case documentation is not sufficient may not know a technical violation has occurred. Good record keeping is required to ensure this occurs in a very low number of instances

[36] Document with the electronic file name OSM Analysis Request.pdf, pp. 3-5.

[37] Id., p. 4.

[38] Monitors were able to observe 15 serves onsite. Defendants' data reflects that close to 48,932 serves took place during that time.

[39] OSM 11th Report

[40] *Valdivia* Remedial Plan, p. 4.

[41] OSM 11th Report, p. 35.

[42] This issue was discussed in OSM 11th and 12th Reports.

[43] OSM 11th Report, p. 37.

[44] OSM 12th Report, p. 47.

[45] Date Case Assigned Compliance Reports, January 2012 thru September 2012. Percentages are rounded.

[46] See, *e.g.,* OSM 2d, 3d, 4th and 7th Reports

[47] Cases Missing 1073 and Cases Missing Source Documents, each of Jan. 2012 through Jul. 2012

[48] The phenomenon of "they don't know what they don't know."

[49] Informal communications with the parties

[50] Compliance Assessment Report, p. 77. *See* electronic folder titled Expedited PCHs for data.

[51] *Valdivia v. Davis,* 206 F. Supp. 2d 1068

[52] See, for example, OSM 2d, 3d, 4th and 7th Reports

[53] Informal communication with CalPAP

[54] See OSM reports from the 4th Round forward; Telephonic Probable Cause Hearing Summary Jan-Apr and May-July 2012

[55] See, *e.g.,* the 18 objections concerning jurisdiction contained in Other Objections Reports for each of Jan. through Aug. 2012

[56] Documents with the electronic file names PC Disputed (01.01.12 – 06.30.12).xlsx and PC Disputed (07.01.12 – 08.31.12).xlsx compared to the total probable cause hearings found in Board of Parole Hearings Step Summary, Jan. through Aug. 2012

[57] See, *e.g.,* the 9 objections alleging bias contained in Other Objections Reports for each of Jan. through Aug. 2012; Compliance Assessment Report

[58] CalPAP surveyed its attorneys, who consistently identified a small, finite number of hearing officers with such problematic practices. They constitute 7% of the current hearing officer pool, whose numbers were recently identified as 86 in informal communications with Board executives.

[59] For the analysis that follows, the Special Master studied a 15% sample, chosen by random selection, of all cases identified by CalPAP as having challenged probable cause during hearings held between Jan. and Aug. 2012. The total of cases reviewed was 1,156. See Documents with the electronic file names PC Disputed (01.01.12 – 06.30.12).xlsx and PC Disputed (07.01.12 – 08.31.12).xlsx and the individual records in the electronic file titled PCH Arguments

[60] Email communication of analysis, C. Buffleben, Dec. 17, 2012

[61] In the study, this occurred in 9% of cases in which attorneys reported that probable cause was challenged

[62] A word about the references in this report to Decision Review submissions and Objections during hearings: Defendants often cite to these numbers to demonstrate the frequency of alleged problems and the scope and likelihood of harm stemming from them. These sources are particularly strong where it is the norm to object, and where it involves the type of complaint that normally surfaces.

There are also some limitations, which should inform how this information is used. Parolee defense attorneys are principally concerned with the parolee's sentence; once that is decided, matters of process in how that outcome was achieved may be seen as moot for their role. Filing a complaint may surface a system unfairness, but where a rehearing can also jeopardize undoing a client's outcome, an attorney's obligation is to the client. Additionally, both attorneys and parolees may not take advantage of complaint systems where they believe the system operates with foregone conclusions and therefore it is futile, they are unfamiliar with its existence or procedures, they are fatalistic, they see other issues as more important, or where they do not see it as their role to fix the revocation system.

Thus, the number of complaints is a good *indicator* about many issues, but not an exclusive measure, and it should be taken into account along with other information sources. The system's handling of the complaints received is also an important reflection of the system's ability to remedy issues.

[63] Compliance Assessment Report

[64] Compliance Assessment Report

[65] The Special Master reviewed revocation hearing records for a subset of the parolees in the sample selected for the study of probable cause challenges described *supra.*

[66] Compliance Assessment Report; Special Master's observations

[67] Without reviews, the parties do not know whether parolees receive their documents consistently or inconsistently. Plaintiffs are particularly concerned that parolees have their documents in the event they need to advocate with jail staff that their release dates have passed, a necessity that has been reported in some cases.

[68] Compliance Assessment Report

[69] *Valdivia v. Davis,* 206 F. Supp. 2d 1068

[70] Board of Parole Hearings Timeliness Summary by County, Jan. through Jun. 2012

[71] See all OSM Reports, with OSM 4th Report showing the peak activity

[72] Board of Parole Hearings Timeliness Summary by County, Jan. through Jun. 2012. This shows a higher percent of timely cases, but this includes all postponements if the first attempted hearing was timely and the postponement was for good cause. It is more appropriate to remove that category of cases for a separate determination of whether they were timely; see discussion *supra.*

Far less than 1% of cases were excluded from timeliness calculations as Defendants found there were obvious data entry errors, as indicated by negative numbers, or the entry was for administrative purposes and was not an actual hearing. The Special Master is confident that these exclusions are appropriate.

[73] It is possible that some cases were originallyscheduled early enough that the rescheduled hearing occurred within timeframes. It is *more* likely that postponements carry cases beyond 13 business days. Such an analysis is impractical at this time but could be undertaken in the future to determine the clearly timely population with more precision.

[74] Board of Parole Hearings Timeliness Summary by County, Jan. through Jun. 2012

[75] Compliance Assessment Report

[76] Predictably, this is the case in some instances. There is no deadline for the "settlement conferences" offered in the community, and sometimes they are recorded in the information system on probable cause hearing records. This would make some proceedings appear late according to probable cause timeframes when those do not apply.

An initial look at probable cause hearing timeliness data does *not* indicate that problem in two counties, but Shasta county's probable cause hearings appear late at a rate of 15%, much higher than the system average. Data *does* suggest an impact at the revocation hearing level, with Fresno county's hearings being late 16% of the time and San Joaquin county's being late 32% of the time, albeit at a much lower volume.

[77] Order Jul. 23, 2003. This order followed extended deliberation about the appropriate length of time.

[78] The interpretation of this agreement was disputed for some time. Originally, the Defendants understood it to be 13 business days and Plaintiffs understood it to be 10 business days after actual  service of notice, which could take anywhere from 1 to 3 business days. The system has been operating based on Defendants' view since at least 2006, and it is the Special Master's belief that the parties have accepted this definition.

[79] Order Jul. 23, 2003

[80] Sample of hearing records drawn from Closed Case Summary – Good Cause Postponement and Closed Case Summary – Not Good Cause Postponement for each of Jan. through Apr. 2012; Board of Parole Hearings Non-Multiple Postponement Summary, PCH, and related detail reports, for each of Jan. through Jun. 2012, and analogous reports for Multiple Postponements

[81] For example, the Special Master reviewed 460 postponed probable cause hearings, which constitutes ¼ of the postponements in the first half of 2012. Among them, 77% were held more than two days after postponement, which would be the 21-day mark if the original hearings were scheduled on the original deadline.

[82] *Valdivia v. Davis,* 206 F. Supp. 2d 1068, citing Defendants' Statement of Undisputed Facts

[83] Closed Case Summary  and  Closed Case Summary -Valdivia Timeliness Rules for each of Jan. through Sept. 2012, Probable Cause Hearing Compliance Report for each of Jan. through Oct. 2012, PCH Step

Result Summary for each of Jan. through Oct. 2012. This does not appear to be accounted for by late cases being compared to a reduced number of probable cause hearings alone.

[84]   Hearing Directive 12/01, Reduction of Revocation Periods Based on Delays in Revocation Processing

[85]   Board of Parole Hearings Remedy Report, Jan.-Jun. 2012; [85]  Board of Parole Hearings Timeliness Summary by County, Jan. through Jun. 2012

[86]   The times to hearing ranged from 21 days to 135 days. The latter was one example where time was waived for a portion of that period, but there were delays of an additional 57 days beyond the waiver. The delay *was* taken into account in sentencing in that instance. The total sample was 43 cases; three were thrown out as caused by hospitalization or attorney actions throughout the wait. Two of the remaining cases were delayed as described, but took optional waivers at their hearings so do not appear to have been harmed.

   Sample identified from Closed Case Summary – Good Cause Postponement and Closed Case Summary – Not Good Cause Postponement for each of Jan. through Apr. 2012.

[87]   Hearing Directive 10/02 – Optional Waiver Reviews – Revised Procedure

[88]   Board of Parole Hearings Step Summary Jan. through Jun. 2012. Compare, *e.g.,* Parolee Activated Optional Waiver Aug through Dec. 2010, showing 2,608 cases for a shorter period.

[89]   Board of Parole Hearings Step Result Summary OWR for each of Jan. through Jun. 2012. There were 47 postponements, or 7% of this already small population.

[90]   See OSM 5th, 6th and 7th Reports

[91]   Board of Parole Hearings Timeliness Summary by County, Jan. through Jun. 2012. The actual number is somewhat lower as this total includes interstate cases, who are not subject to *Valdivia* requirements, and some "settlement conferences" were recorded on revocation hearing records. Both of these groups are likely to be small and have little effect on the aggregate numbers. The number shown on the report is 2,027. The Special Master has reduced that number by the 111 interstate revocation hearings that came to his attention, so the unit for analysis is 1,916. There may be others but, as indicated, that group is likely small.

[92]   See Closed Case Summary Aug. through Dec. 2011 and previous OSM Reports

[93]   Compliance Assessment Report; previous OSM Reports

[94]   Other Objections Reports for each of Jan. through Aug. 2012; compare to the same reports provided with OSM 12th Report

[95]   There were five such objections apparent. Other Objections Reports for each of Jan. through Aug. 2012

[96]   Compliance Assessment Report identified 81 relevant objections over a 39-month period.

[97]   Compliance Assessment Report; Special Master's observations; informal communications with parties and CalPAP

[98]   See Other Objections Reports from at least 2008 forward, OSM Reports

[99]   See, *e.g.,* OSM 12th Report

[100]   Compliance Assessment Report

[101]   For that reason, the parties typically refer to the handling of confrontation rights as the *Comito* issue. The Special Master will adopt that convention in this report.

[102]   Compliance Assessment Report; Special Master's observations

[103]   Comito Objections Denied Report and Comito Objections Granted Report for each of Jan. through Jun. 2012. When controlling for multiple objections in some hearings, the total number of cases affected by *Comito* objections was 234, by the Special Master's calculation. Board of Parole Hearings Timeliness Summary by County, Jan. through Jun. 2012, adjusted as above, shows 1,916 cases that went to revocation hearing. The total number of revocation hearings may be further reduced by a likely small, but unknown, number of interstate cases and settlement conferences.

[104]   A total of 40 hearings were reviewed, which totals at least 17% of the hearings with *Comito* objections. There were 53 hearing officers who presided over hearings that contained *Comito* objections; the sample included 38 of them. At Defendants' request, all sampled cases involved a denied objection because of the potential for harm to the parolee.

[105]   In the remaining half, the hearing officer used the factors, explicitly or implicitly, and conducted a balancing. In two cases, the hearing officer did so on the written record but not aloud; these were considered compliant.

[106]   There were a small number of exceptions. One likely worked to the parolee's advantage: although the test was not applied and the hearing officer postponed the hearing, it was rescheduled within timeframes. In

one case the problematic practice was different: the hearing officer discussed all factors but allowed the evidence in on the basis that the hearsay corroborated itself.

[107] As discussed above, there were approximately 1,916 revocation hearings in the relevant period, 234 of which involved confrontation rights objections. Since the study found that half of the sample did not apply the balancing test, half of 234 is 117, which is 6% of all revocation hearings held.

[108] Compliance Assessment Report;

[109] The Special Master's review agreed.

[110] Compliance Assessment Report

[111] See OSM 6th and 7th Reports

[112] Board of Parole Hearings Timeliness Report Jan. through Jun. 2012 shows 1,871 hearings timely, less the postponed hearings whose timing is uncertain depending on the questions to be resolved. However, it appears from Board of Parole Hearings Step Result Detail, monthly from Jan. through Jun. 2012, that timeliness is calculated at 35 days. Once the cases that closed between 35 and 46 days are removed, the total timely cases rise to 86%. This analysis does not adjust for interstate cases as their timeliness is unknown at this time.

[113] Board of Parole Hearings Remedy Report Jan. through Jun. 2012

[114] Anecdotally, one or two hearings have come to the Special Master's attention in which staff noted that the hearing could not be held within 50 miles because transportation was not possible across counties. The Special Master does not have any information suggesting that this is widespread.

[115] In the context of probable cause hearings, the opinion also describes the necessary contents of a written record as "The hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parole revocation and of the parolee's position." It is not entirely clear whether the *Morrissey* court intended to distinguish the contents of the two hearings' records, but there is a reasonable argument to that effect.

[116] The Special Master reviewed 412 records chosen by random selection; this constitutes 22% of the revocation hearings. Records where the parolee stipulated or admitted to good cause were considered compliant without a factual description. See electronic folder titled RevH Factual Basis

[117] Other Objections Reports for each of Jan. through Aug. 2012

[118] CalPAP data shows 10 such objections over an eight-month period, meaning they occurred in less than ½% of revocation hearings. The Special Master did not review the hearing records for the circumstances of these denials. Anecdotally, four came to the Special Master's attention during hearing reviews for other purposes. In three cases, the denial was appropriate. In the third, the witness' failure to appear was described as exigent and the reason for the denial was not stated.

[119] Compliance Assessment Report; Plaintiffs' Corrected Compliance Assessment Report Response

[120] See OSM 9th, 10th, 11th and 12th Reports

[121] Informal communication with Defendants Nov. 16, 2012

[122] Data shows a handful more cases in September and October 2012. Reportedly, these are not genuinely revocation extensions, but a group of prisoners set to release to parole who are retained in custody because of refusing to sign paperwork. These prisoners have not attained the status of parolees, and thus their parole is not being revoked. Their cases are captured in Defendants' revocation extension data because there is not a tracking mechanism for their separate circumstance. See document with electronic file name Revocation Extension Cases.docx

[123] OSM 8th Report

[124] OSM 9th Report

[125] OSM 12th Report

[126] Compliance Assessment Report, p.62

[127] Plaintiffs' Corrected Compliance Assessment Report Response, 9-27-12, 720-1/pdf, p. 92-93

[128] Id; Compliance Assessment Report, pp. 66-67

[129] Id., p. 67

[130] The Office of Offender Services (OOS) reports show the number of parolees placed with disabilities. The same is true for placements for women. *See* document with the electronic file name Report for Special Masters Jan 2012 to Sept 2012 revised.xls.

[131] *See* document with the electronic file name OSM Analysis Request.pdf, p. 2 and Compliance Assessment Report, pp. 69-73

[132] Data is taken from the Continuing Care Reports for the last week of each month.

[133] The closure of the jail-based program was a cost savings measure because the jails were paid whether the program was in use or not. The high rejection rate of the program made it an appropriate choice for elimination.

[134] IDCTP Pass Issuance Policy e-mail

[135] Conversation between Roberto Mata and Deputy Special Master Campbell on October 31, 2012. The changes in population are being assessed and planning is beginning to determine how best to serve the projected parolee population.

[136] Most information in this section is gathered from Compliance Assessment Report pp. 56-61, and from Special Master observations and party communications long-term

[137] Plaintiffs' Corrected Compliance Assessment Report Response

[138] Order Granting Plaintiffs' Renewed Motion to Require Defendants to Track and Accommodate Needs of Armstrong Class Members Housed in County Jails, Ensure Access to a Grievance Procedure, and to Enforce 2001 Permanent Injunction (Jan. 13, 2012, Docket No. 1974) and related orders provided as Exhibit K to Plaintiffs' Corrected Compliance Assessment Report Response

[139] Plaintiffs did review and provide input on these forms. See document with the electronic file name Status of disputed items meet and confers 4-28-11 clean copy.doc for an example of the parties working together to reach agreement.

[140] Plaintiffs' Corrected Compliance Assessment Report Response, 9-27-12, 720-1.pdf, pp. 91-92.

[141] See e-mail Translated Forms, November 13, 2012 from Rhonda Skipper Dotta, Chief Deputy

[142] This was 13 of the 89 requests made . Correspondence from S. Huey to K. Riley, July 1, 2009

[143] See OSM 8th Report

[144] Correspondence between K. Mantoan and K. Riley dated Feb. 9, 2012, Mar. 14, 2012, May 23, 2012, and June 11, 2012; Compliance Assessment Report

[145] Compliance Assessment Report

[146] Compliance Assessment Report, p. 92.

[147] See document with the electronic file name Status of disputed items meet and confers 4-28-11 clean copy.doc

[148] OSM 11th Report, p. 5.

[149] Id.

[150] Id., p. 20.

[151] Id., p. 20-22.

[152] OSM 12th Report, p. 9.

[153] See document with the electronic file name BPH Staffing Update-Nov 2012

[154] Document with the electronic file name Valdivia Paragraph 27 log Jan – June 2012.pdf.

[155] See document with the electronic file name Ex.6.9 2012-06022 Valdivia Paragraph 27 log updated 62212 (final).pdf. for the log from 2009 thru 2012.

[156] Plaintiffs' Corrected Compliance Assessment Report Response, 9-27-12, 720-1.pdf, p. 106.