UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JERRY VALDIVIA, ALFRED YANCY,
and HOSSIE WELCH, on their own
behalf and on behalf of the class
of all persons similarly situated,

             NO. CIV. S-94-671 LKK/GGH

       Plaintiffs,

   v.                 O R D E R

EDMUND G. BROWN, JR., Governor of
the State of California, et al.,

       Defendants.
_____/

    In 1994, plaintiffs commenced this action, which challenged the constitutionality of California's then-existing parole revocation system. In 2011, California began enacting legislation, commonly known as "Realignment," that significantly altered the state's criminal justice system. The question before this court is whether, in light of Realignment, this lawsuit remains the proper vehicle for ensuring that parolees receive Constitutionally-guaranteed due process protections. Having carefully considered the question, the court concludes that this case became moot as of July

1

1, 2013, when the new parole revocation system was scheduled to go fully into effect. Accordingly, for the reasons set forth below, the plaintiff class will be decertified and this matter dismissed.

**I. BACKGROUND**

**A. History of the litigation**

On May 2, 1994, plaintiffs filed the instant lawsuit, challenging California's parole revocation procedures under the Fourteenth Amendment. Plaintiffs' initial complaint alleged that "[t]he Defendants and by and through the Department of Corrections . . . continue a practice of revocation of parole and remand of parolees, in violation of law as alleged herein, which practice has been continuing for many years." (Complaint ¶ 48, ECF No. 1.) Class certification was sought on the grounds that "[i]n general, the common questions of law and fact involve the summary remand to prison of parolees without due consideration of the right to counsel and without due process of law, in violation of Gagnon v. Scarpelli, [411 U.S. 778 (1973)] and Morrissey v. Brewer, [408 U.S. 471 (1972)]." (Id. ¶ 58.)

On December 1, 1994, the court certified a plaintiff class consisting of California parolees (1) who are at large; (2) who are in custody as alleged parole violators awaiting revocation of their parole status; or (3) who are in custody having been found in violation of parole. (Order, ECF No. 76)

The parties engaged in discovery for several years thereafter. On June 13, 2002, the court granted partial summary judgment in favor of plaintiffs, finding that California's parole revocation

hearing system failed to safeguard plaintiffs' procedural due process rights under <u>Morrissey</u>, 408 U.S. at 487-90, and <u>Gagnon</u>, 411 U.S. at 786. The court's order emphasized that, in order to ensure adequate due process, probable cause hearings must be both accurate and promptly-held. <u>See</u> <u>Valdivia v. Davis</u>, 206 F. Supp. 2d 1068 (E.D. Cal. 2002).

Four months later, the court ordered defendants to file a proposed remedial plan to address identified due process violations. The court also directed the parties to meet and confer so that defendants could adapt the proposed remedial plan into a proposed remedial order to be presented to the court. (Order, Oct. 18, 2002, ECF No. 742.)

After some delay, defendants filed a proposed remedial plan, to which plaintiffs objected. (ECF No. 784.) At the hearing on plaintiff's objections, defendants indicated "that they would appreciate guidance from the court on precisely what the Constitution requires with respect to the timing and substance of the preliminary parole revocation hearing." (Order at 3, July 23, 2003, ECF No. 796.) In a subsequent order, the court initially expressed its hesitation at so doing, in light of the principle that "due process is flexible and calls for such procedural protections as the particular situation demands." <u>Morrissey</u>, 408 U.S. at 481. Nevertheless, in order to facilitate the development of an adequate remedy, the court undertook a comprehensive review of the case law surrounding the promptness of probable cause hearings in the parole context, as well as in the context of other

1  constitutional deprivations, and advised as follows:

> 2  [A] period of ten days strikes a reasonable balance
> between inevitable administrative delays and the
> 3  state's interest in conducting its parole system, on
> the one hand, and the liberty interests of parolees,
> 4  on the other. I conclude that the Constitution simply
> does not tolerate the state's detaining parolees for
> 5  over ten days, with all the attendant disruptions such
> detention entails, without affording a preliminary
> 6  hearing to determine whether there is probable cause
> for the detention. (Id. at 13.)[1]

7

8  The court then set forth the following minimum standards for

9  probable cause hearings: that they be conducted by a neutral

10  decisionmaker, that parolees have an opportunity to both present

11  documentary evidence and witnesses, and to cross-examine adverse

12  witnesses, and that the hearing's results be documented in a

13  written report. Alternatively, defendants could hold a unified

14  hearing that was sufficiently prompt and the content of which met

15  the due process requirements for both probable cause and revocation

16  hearings. (Id. at 15-16.)

17     Ultimately, the parties filed a stipulated order for permanent

18

_____

19     [1] It *absolutely* does not follow from this determination that
20  detention for periods of ten days or less, without notice and a
    preliminary hearing, is constitutionally adequate in all
21  circumstances. The ten day limit was a highly context-specific
    determination; per Morissey, 408 U.S. at 481, it was the level of
22  "procedural protections as the particular situation demand[ed]."
    The principal consideration in determining whether notice and
23  hearing is sufficiently timely is that "[t]he effect of detention
    itself, in its disruption of the parolee's family relationship,
24  job, and life, is sufficiently significant [so as] to require"
    procedural due process safeguards. Valdivia, 206 F. Supp. 2d at
25  1078. "The process due must include procedures which will prevent
    parole from being revoked because of 'erroneous information or
26  because of an erroneous evaluation.'" Id. at 1074 (quoting
    Morrissey, 408 U.S. at 484).

injunctive relief, which the court entered. (Order, March 8, 2004
("Injunction"), ECF No. 1034.) The parties to the Injunction were
the previously-certified plaintiff class and "the [defendant] state
officials responsible for the policies and procedures by which
California conducts parole revocation proceedings." (Injunction
¶ 8.) All of these defendants were members of the state's executive
branch. Critical provisions of the Injunction include:

1.   Notice of charges and rights, to be served on parolees
     not later than three business days from the placement
     of a parole hold. (Injunction ¶ 11(b)(iii).)

2.   Probable cause hearings, to be held no later than 10
     business days after parolees are served notice of
     charges and rights. (Injunction ¶ 11(d).)

3.   Appointment of counsel for all parolees at the
     beginning of the Return to Custody Assessment[2] stage
     of the revocation proceedings. (Injunction ¶
     11(b)(i).)

4.   Expedited probable cause hearings, if appointed
     counsel makes a sufficient offer of proof of a
     complete defense to all parole violation charges.
     (Injunction ¶ 11(b)(i).)

5.   The ability of parolees' counsel to subpoena and
     present witnesses and evidence to the same extent and

_____

[2] "Return to Custody Assessment" refers to "the practice by
which Defendants offer a parolee a specific disposition in return
for a waiver of the parolee's right to a preliminary or final
revocation hearing, or both." (Injunction ¶ 9(d).)

1          under the same terms as the state. (Injunction ¶ 21.)

2     6.   Adequate allowance, at probable cause hearings, for

3          parolees to present evidence to defend or mitigate

4          against the charges and proposed disposition. Such

5          evidence may be presented through documentary evidence

6          or through the charged parolee's testimony, either or

7          both of which may include hearsay testimony.

8          (Injunction ¶ 22.)

9     7.   Limitations on the use of hearsay evidence at hearing

10         in light of parolees' confrontation rights, as

11         provided for in United States v. Comito, 177 F.3d 1166

12         (9th Cir. 1999). (Injunction ¶ 24.)

13    8.   Parole revocation hearings to be held no later than 35

14         calendar days from the date of placement of a parole

15         hold. (Injunction ¶¶ 11(b)(iv), 23.)

16  The Injunction also addressed topics such as provision of

17  assistance for parolees with communicative or cognitive

18  impairments, training of appointed counsel, and the handling of

19  confidential information. The Injunction does not specify an end

20  date for court supervision, providing instead that "[t]he Court

21  shall retain jurisdiction to enforce the terms of this Order. The

22  Court shall have the power to enforce [these terms] through

23  specific performance and all other remedies permitted by law or

24  equity." (Injunction ¶ 28.)

25       Defendants subsequently moved, successfully, for the

26  appointment of a Special Master, and on December 16, 2005, the

6

1   court appointed Chase Riveland to that position. (ECF Nos. 1198,

2   1213, 1245.) The Special Master has subsequently filed thirteen

3   reports with the court addressing implementation of the <u>Valdivia</u>

4   Injunction, as well as the court's subsequent orders herein. (ECF

5   Nos. 1302, 1335, 1388, 1479, 1483, 1539, 1570, 1585, 1647, 1730,

6   1750, 1783.)[3]

7       **B. Proposition 9**

8       On November 4, 2008, California voters passed Proposition 9,

9   entitled "Victims' Bill of Rights Act of 2008: Marsy's Law."

10  Proposition 9's amendments to the California Penal Code altered a

11  number of the parameters for the parole revocation system that had

12  been mandated by the Injunction. Plaintiffs moved to enjoin

13  enforcement of portions of Penal Code § 3044 (enacted by Prop. 9)

14  as conflicting with provisions of the Injunction; defendants cross-

15  moved to modify the Injunction to conform to Proposition 9.

16  <u>Valdivia v. Schwarzenegger</u>, 603 F. Supp. 2d 1275 (E.D. Cal. 2009).

17  After hearing, the court denied defendants' motion, and granted

18  plaintiffs' motion in substantial part. <u>Id.</u> On appeal, the Ninth

19  Circuit held that the court had erred by failing to make an

20  "express determination that any aspect of the California parole

21  revocation procedures, as modified by Proposition 9, violated

22  constitutional rights, or that the Injunction was necessary to

23  remedy a constitutional violation . . . ." <u>Valdivia v.</u>

24  <u>Schwarzenegger</u>, 599 F.3d 984, 995 (9th Cir. 2010). On remand, the

25  ────────────

26      [3] The Special Master's Ninth Report does not appear to have
    been docketed.

7

court determined that the following aspects of Cal. Penal Code §
3044, as enacted by Section 5.3 of Proposition 9, were
unconstitutional:

> (1) Holding probable cause hearings no later than 15 days
> after the parolee's arrest for parole violations "did not
> guarantee a prompt probable cause hearing with all of the
> minimum process set forth in Morrisey." Valdivia v. Brown,
> No. S-94-671-LKK-GGH, 2012 WL 219342 at *6, 2012 U.S. Dist.
> LEXIS 8092 at *21 (E.D. Cal. Jan. 24, 2012).

> (2) Providing parolees with counsel on a case-by-case
> basis, and even then, only for those parolees who were both
> indigent and "incapable of speaking effectively in [their]
> own defense," both "deprived [parolees] of the right to
> notice of the right to counsel" and failed, under Gagnon,
> to provide for "a presumptive right to counsel when the
> parolee makes a colorable claim that he has not committed
> the alleged violations or claims colorable mitigation."
> Id., 2012 WL 219342 at *8, 2012 U.S. Dist. LEXIS 8092 at
> *26. The court also found that ¶ 11(b)(i) of the
> Injunction, under which all parolees are appointed counsel
> beginning at the Return to Custody Assessment stage, "is a
> properly tailored remedy . . . [which] addresses and
> relates to a Constitutional violation[.]" Id., 2012 WL
> 219342 at *9, 2012 U.S. Dist. LEXIS 8092 at *28.

1    (3) Modifying the decision criteria for the Board of Parole

2    Hearings ("BPH"), *e.g.*, by "entrust[ing]" BPH "with the

3    safety of victims and the public" and including

4    requirements that BPH "not be influenced by or weigh the

5    state cost or burden associated with just decisions," was

6    unconstitutional under <u>Morrissey</u> in its violation of

7    parolees' right to a neutral decisionmaker, and under <u>Brown

8    v. Plata</u>, __ U.S. __, 131 S. Ct. 1910 (2011) in its

9    interference with California's constitutionally-mandated

10   efforts to reduce its prison population. <u>Id.</u>, 2012 WL

11   219342 at *10, 2012 U.S. Dist. LEXIS 8092 at *31-32.

12

13   (4) Finally, allowing the unconditional use of hearsay

14   evidence in parole revocation hearings was

15   unconstitutional, as it did not permit the balancing of

16   "the releasee's interest in his constitutionally guaranteed

17   right to confrontation against the Government's good cause

18   for denying it." <u>Id.</u>, 2012 WL 219342 at *11, 2012 U.S.

19   Dist. LEXIS 8092 at *34 (quoting <u>Comito</u>, 177 F.3d at 1170

20   (9th Cir. 1999)).

21 The court ultimately granted plaintiffs' motion to enforce the

22 Injunction, though it did modify its terms to specify, consonant

23 with Proposition 9, that parole revocation hearings were to be

24 held no later than 45 days after placement of the parole hold.

25 <u>Id.</u>, 2012 WL 219342 at *12, 2012 U.S. Dist. LEXIS 8092 at *39.

26 ////

1          **C. Realignment**

2          From the inception of this lawsuit until the present, the

3     California Department of Corrections and Rehabilitation ("CDCR")

4     has been largely responsible for the parole system's functioning.

5     BPH, a board operating under the auspices of CDCR, has been

6     responsible for conducting probable cause and parole revocation

7     hearings, and for functions such as issuing arrest warrants for

8     suspected parole violators. CDCR's Division of Adult Parole

9     Operations ("DAPO") has overseen much of the rest of the parole

10    system.

11         This system began to change on April 4, 2011, when the

12    Governor signed Assembly Bill 109, entitled "The 2011 Realignment

13    Legislation Addressing Public Safety."[4] AB 109, *inter alia*,

14    transferred substantial responsibilities for the parole system to

15    county authorities, and called for state courts "to perform various

16    parole-related functions, including . . . conducting parole

17    discharge, retention, and revocation proceedings[,] and modifying

18    terms and conditions of parole . . . ." (Memorandum from

19    Administrative Office of the Courts, May 20, 2011, Decl. Ernest

20    Galvan, Ex. 2 at 4, ECF No. 1829-3.) Subsequent legislative

21    enactments[5] have narrowed the state courts' role to conducting

22    parole revocation proceedings, and have clarified the counties' and

23    _____

24         [4] Cal. Stats. 2011, ch. 15.

25         [5] See, e.g., AB 117, Cal. Stats. 2011, ch. 39; AB 116, Cal.
      Stats. 2011, ch. 136; AB 17, Cal. Stats. 2011-2012, 1st Ex. Sess.,
      ch. 12; AB 1470, Cal. Stats. 2012, Ch. 24; SB 1144, Cal. Stats.
26    2012, ch. 867; SB 1023, Cal. Stats. 2012, ch. 43.

the state's respective responsibilities in the post-Realignment parole system. Briefly, beginning on July 1, 2013, this system is expected to function as set out below.

DAPO will supervise the parole of individuals convicted of any of the following: (1) serious felonies (as described in Cal. Penal Code § 1192.7(c)), (2) violent felonies (as described in Cal. Penal Code § 667.5), (3) "third strikes," (4) crimes where the person is classified as a High Risk Sex Offender, and (5) crimes where the person is required, as a condition of parole, to undergo treatment by the Department of Mental Health. Cal. Penal Code § 3000.08(a).[6] DAPO will also continue to supervise parolees who were under its supervision prior to July 1, 2013. State courts will be responsible for hearing petitions for parole revocation and imposing parole terms for these individuals. Individuals paroled from life terms in prison will also be under DAPO supervision, and subject to the jurisdiction of BPH for purposes of parole revocation hearings. Cal. Penal Code. § 3000.1.[7]

All other individuals subject to parole will be released to Postrelease Community Supervision ("PRCS"), to be supervised by county probation departments. Cal. Penal Code § 3000.08(b). Those prisoners who were sent to county jails to complete their terms in

---

[6] All citations to Cal. Penal Code § 3000.08 are to the version operative on July 1, 2013.

[7] The parties have long disputed whether so-called "lifers" are members of the Valdivia class. The court has never been called upon to decide this issue, and finds it unnecessary to do so herein.

1  the initial stage of Realignment (which began on October 1, 2011)

2  are similarly subject to PRCS, rather than DAPO parole supervision.

3  (Viera Rose Decl. ¶ 6., ECF No. 1825.) The parties appear to agree

4  that individuals subject to PRCS should not be considered part of

5  the <u>Valdivia</u> class.[8] For convenience, the court will use the term

6  "parolee" hereinafter to refer to those individuals subject to DAPO

7  supervision after July 1.

8      If DAPO suspects a parolee of having violated the terms and

9  conditions of parole, it may do one of the following:

10      (1) Return the parolee to custody without a warrant (*i.e.*,

11      place a "parole hold" on the parolee). Cal. Penal Code

12      §§ 1203.2(a), 3000.08(c), 3056; or

13      (2) Seek a warrant from the state court for the parolee to

14      be returned to custody. Cal. Penal Code §§ 1203.2(a),

15      3000(b)(9)(A), 3000.08(c). The state court has the

16      authority to summarily revoke parole at this stage. Cal.

17      Penal Code § 1203.2(a).

18  Once a parolee is in custody, DAPO determines whether there is

19  probable cause to believe "that [he or she] has committed a

20  violation of law or violated his or her conditions of parole." Cal.

21  Penal Code § 3000.08(d). If it so finds, DAPO may either apply

22

23

———————————

24      [8] Defendants explicitly assert that "[i]ndividuals released
to PRCS are not parolees." (Defendants' Opening 2, ECF No. 1824.)
25  Plaintiffs implicitly concede this point, as their briefing
addresses those elements of the parole revocation process that
26  remain under the jurisdiction of DAPO and/or BPH.

intermediate sanctions (including "flash incarceration")[9],[10] without involvement of the state court, or apply to the state court for parole revocation. Cal. Penal Code § 3000.08(d)-(f). Before seeking parole revocation, DAPO must determine that intermediate sanctions are "not appropriate" for the parolee. Cal. Penal Code § 3000.08(f).

DAPO initiates the parole revocation process by filing a petition with the state court, which must include "a written report that contains additional information regarding the petition, including the relevant terms and conditions of parole, the circumstances of the alleged underlying violation, the history and background of the parolee, and any recommendations." Id. The

_____

[9] Cal. Penal Code § 3000.08(e) defines "flash incarceration" as "a period of detention in county jail due to a violation of a parolee's conditions of parole. The length of the detention period can range between one and 10 consecutive days." The statute also provides that "[s]horter, but if necessary more frequent, periods of detention for violations of a parolee's conditions of parole shall appropriately punish a parolee while preventing the disruption in a work or home establishment that typically arises from longer periods of detention." Id.

[10] Guillermo Viera Rosa, DAPO's Acting Associate Director, avers that, "Despite DAPO's authority to impose terms of flash incarceration upon parolees under its supervision on or after July 1, 2013, DAPO will not utilize flash incarceration pursuant to Penal Code sections 3000.08 and 1203.2(g)." (Viera Rosa Decl. ¶ 9, ECF No. 1825.) Plaintiffs attack this averment on the grounds that it is insufficient as a matter of law to foreclose the use of flash incarceration; as no legislation prohibits DAPO's use of the sanction, DAPO could use it at any time. See Bell v. City of Boise, 709 F.3d 890 (9th Cir. 2013) (holding that voluntary cessation of challenged activity that could be resumed as soon as case is dismissed does not moot plaintiffs' claims for relief). The court need not weigh Mr. Viera Rosa's declaration, as its decision herein does not rest on whether DAPO has permanently forsworn flash incarceration.

1  parolee must be "informed of his or her right to consult with
2  counsel, and if indigent the right to secure court appointed
3  counsel." Cal. Penal Code § 1203.2(b)(2). While a hearing on the
4  petition is pending, "a parolee may waive, in writing, his or her
5  right to counsel, admit the parole violation, waive a court
6  hearing, and accept the proposed parole modification or
7  revocation." Cal. Penal Code § 3000.08(f); see also Cal. Penal Code
8  § 1203.2(b)(2) ("Upon the agreement by the supervised person in
9  writing to the specific terms of a modification or termination of
10 a specific term of supervision, any requirement that the supervised
11 person make a personal appearance in court for the purpose of a
12 modification or termination shall be waived").

13       The revocation hearing is to be conducted by the superior
14 court, specifically, a "judge, magistrate, or revocation hearing
15 officer described in Section 71622.5 of the Government Code." Cal.
16 Penal Code § 1203.2(f). The statutory scheme does not prescribe a
17 time frame in which the revocation hearing must be held. Upon
18 finding that a parolee has violated parole conditions, the court
19 has a number of alternatives, including revoking parole, returning
20 the parolee to parole supervision with a modification of parole
21 conditions (including a period of incarceration), referring the
22 parolee to an evidence-based program such as a reentry court, or
23 placing the parolee under electronic monitoring. Cal. Penal Code
24 §§ 3000.08(f), 3004(a). With certain exceptions, e.g., for
25 individuals previously sentenced to life terms, parolees whose
26 parole is revoked or modified are incarcerated in county jail. Cal.

1    Penal Code §§ 3000.08(f), (h).

2        BPH's responsibilities after July 1, 2013 include:

3    •    Determining inmate parole eligibility. Cal. Penal Code

4         §§ 3000, 3040.

5    •    For parolees arrested pursuant to warrants issued by

6         BPH before July 1, 2013, reviewing their cases before

7         DAPO may file a petition with the court to revoke

8         their parole. Cal. Penal Code § 3000(b)(9)(B).

9    •    If, at a revocation hearing, the state court

10        determines that a parolee (i) has violated the law or

11        the terms of his/her parole, and (ii) was previously

12        sentenced to an indeterminate life sentence or a

13        determinate sentence for certain sex crimes, BPH

14        (rather than the court) has jurisdiction to determine

15        how long the parolee will be incarcerated. Cal. Penal

16        Code §§ 3000(b)(4), 3000.1, 3000.08(h).

17   **D. Current Order**

18       Upon initial review, it appeared to the court that the post-

19   Realignment parole revocation system was sufficiently different

20   from the system addressed by <u>Valdivia</u> so as to implicate mootness

21   concerns. Accordingly, on May 6, 2013, the court issued an order

22   directing the parties to brief the following issues:

23       (a) As of July 1, 2013, which elements of the parole
         system that were formerly the exclusive responsibility
24       of defendants will now be the exclusive responsibility
         of county authorities and/or the state judiciary?

25
         (b) As of July 1, 2013, which elements of the parole
26       system that were formerly the exclusive responsibility

1  of defendants will now be the shared responsibility of
   defendants, county authorities, and the state
2  judiciary? What will defendants', county authorities',
   and the state judiciary's respective responsibilities
3  be as to these shared elements?

4  (c) Will defendants bear responsibility for elements
   of the parole system that are newly-created by
5  Realignment, such as "flash incarceration"?

6  (d) Is <u>Valdivia</u> moot as a result of Realignment?

7  (e) If <u>Valdivia</u> is not moot, in what ways should the
   class definition and/or the Valdivia Remedy be altered
8  to reflect Realignment's changes to the parole system?
   (Order, ECF No. 1823.)
9

10  The parties filed opening briefs on May 28, 2013, and reply briefs

11  on June 11, 2013, together with supporting materials.

12  Defendants' position is that the post-July 1, 2013 parole

13  revocation system is so different from the prior system as to

14  require the plaintiff class to be decertified, and this case

15  dismissed. Defendants argue for dismissal on the grounds of

16  standing, mootness, and/or abstention.

17  Plaintiffs counter that significant elements of the parole

18  system remain under defendants' control, and accordingly, the court

19  should continue to enforce those provisions of the Injunction which

20  address parolees' due process rights prior to revocation hearings

21  conducted by the state courts.

22  **II. STANDARD**

23  **A. Justiciability vs. the court's equitable powers**

24  Article III, section 2 of the Constitution limits this court

25  to hearing actual cases and controversies. "An actual controversy

26  must be extant at all stages of review, not merely at the time the

1   complaint is filed." <u>Alvarez v. Smith</u>, 558 U.S. 87, 92 (2009)

2   (citations and internal quotation omitted). "[A] dispute solely

3   about the meaning of a law, abstracted from any concrete actual or

4   threatened harm, falls outside the scope of the constitutional

5   words 'Cases' and 'Controversies.'" <u>Id.</u> at 93.

6       Under Federal Rule of Civil Procedure 12(h)(3), "If the court

7   determines at any time that it lacks subject-matter jurisdiction,

8   the court must dismiss the action." Accordingly, district courts

9   may *sua sponte* examine justiciability issues such as standing,

10  mootness, and ripeness. See <u>Bernhardt v. Cnty. of Los Angeles</u> 279

11  F.3d 862, 868 (9th Cir. 2002) ("The district court had both the

12  power and the duty to raise the adequacy of [plaintiff's] standing

13  sua sponte").

14      Plaintiffs maintain that it is defendants who bear the

15  responsibility of demonstrating that the Injunction must be

16  modified or terminated, and that they (plaintiffs) must be afforded

17  notice, an opportunity for targeted discovery, and an evidentiary

18  hearing before the court issues a ruling. (Plaintiff's Reply 13-15,

19  ECF No. 1836.) This argument does not lie, given the court's

20  responsibility to determine the ongoing justiciability of this

21  action.[11]

22      The court acknowledges that it has the power to modify a

23  _____

24      [11] Incidentally, *contra* plaintiffs, there is nothing
    "improper" about defendants' request that the court decertify the
25  <u>Valdivia</u> class and dismiss this case. (Plaintiffs' Reply 13.) The
    court's May 6, 2013 Order directed the parties to brief these very
26  questions.

1   consent decree in order to reflect subsequent legislative

2   enactments. <u>See</u>, <u>e.g.</u>, <u>Railway Employees v. Wright</u>, 364 U.S. 642

3   (1961) (Harlan, J.) (holding that, in light of amendments to the

4   federal Railway Labor Act that allowed previously-prohibited union

5   shop agreements, district court could modify existing consent

6   decree between non-union employees and railroads). As the Supreme

7   Court observed in <u>Wright</u>:

8           There is also no dispute but that a sound judicial
            discretion may call for the modification of the terms
9           of an injunctive decree if the circumstances, whether
            of law or fact, obtaining at the time of its issuance
10          have changed, or new ones have since arisen.

11  <u>Id.</u> at 647. <u>See also</u> <u>United States v. Swift & Co.</u>, 286 U.S. 106,

12  114 (1932) (Cardozo, J.) ("We are not doubtful of the power of a

13  court of equity to modify an injunction in adaptation to changed

14  conditions, though it was entered by consent . . . . A continuing

15  decree of injunction directed to events to come is subject always

16  to adaptation as events may shape the need"); <u>Taylor v. U.S.</u>, 181

17  F.3d 1017, 1021 (9th Cir. 1999) ("[A] court always possesses the

18  power to revisit continuing prospective orders in light of the

19  evolving factual or legal landscape, and to modify or terminate the

20  relief . . .").

21      Nevertheless, the justiciability inquiry, rooted as it is in

22  Article III of the Constitution, is more fundamental than the

23  court's equitable power to modify a consent decree. "No principle

24  is more fundamental to the judiciary's proper role in our system

25  of government than the constitutional limitation of federal-court

26  jurisdiction to actual cases or controversies." <u>Simon v. E.</u>

18

Kentucky Welfare Rights Org., 426 U.S. 26, 37 (1976).

Accordingly, the court must first evaluate whether it retains jurisdiction over the post-Realignment parole revocation system; only if it so finds may it consider equitable modifications to the Injunction.

### B. Standard re: Mootness

The Ninth Circuit has set forth the following standard for determining whether an action for injunctive relief is moot:

> A moot action is one where the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome . . . . The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted. We have pointed out that courts of equity have broad discretion in shaping remedies. Thus, in deciding a mootness issue, the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief.

Nw. Envtl. Def. Ctr. v. Gordon, 849 F.2d. 1241, 1244-45 (9th Cir. 1988) (internal quotations and citations omitted).

A case that at one point presented an actual controversy between the parties may become moot due to subsequent statutory enactments. "A statutory change . . . is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed." Native Vill. of Noatak v. Blatchford, 38 F.3d 1505, 1510 (9th Cir. 1994).

The mere possibility that a party may suffer future harm is insufficient to preserve a case or controversy; the threat of injury must be "real and immediate," not "conjectural" or "hypothetical." See City of Los Angeles v. Lyons, 461 U.S. 95, 102

1  (1983); see also City News & Novelty Inc. v. City of Waukesha, 531

2  U.S. 278, 283 (2001).

3  **III. Analysis**

4      **A. Mootness**

5      The court begins by noting that Realignment is a comprehensive

6  legislative enactment. While "it is well settled that 'a

7  defendant's voluntary cessation of a challenged practice does not

8  deprive a federal court of its power to determine the legality of

9  the practice[,]'" Friends of the Earth, Inc. v. Laidlaw Envtl.

10 Servs., Inc., 528 U.S. 167, 170 (2000) (quoting City of Mesquite

11 v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)), the court

12 cannot discern any voluntary cessation of unlawful conduct of the

13 sort that would generally permit continued jurisdiction. Rather,

14 Realignment appears to be a "statutory change" sufficient to

15 implicate mootness. Noatak, 38 F.3d at 1510.

16      Turning to the mootness inquiry, then, "[t]he question is

17 whether there can be any effective relief." Gordon, 849 F.2d at

18 1245. The crux of plaintiffs' argument, in answering this question,

19 is that they "retain a significant interest in their liberty,

20 relationships and connections to their communities, and Defendants

21 retain the ability to endanger those interests based on claimed

22 violations of parole." (Plaintiffs Reply 1.) This may be true. But

23 it is insufficient, as a matter of law, to justify the court's

24 continued jurisdiction over this matter.

25      Realignment has established a fundamentally different parole

26 system than the one that the Valdivia plaintiffs challenged. That

1   system was largely administrative: DAPO supervised parolees; BPH

2   issued warrants for parolees' arrest and adjudicated their probable

3   cause and revocation hearings; upon revocation, CDCR would

4   incarcerate parolees in state prisons. As detailed above, DAPO and

5   BPH's powers and jurisdiction have changed significantly in the new

6   system. For example, DAPO will conduct probable cause

7   determinations (in lieu of BPH's probable cause hearings).

8   Moreover, the system features major new actors (county jails; the

9   California state courts; public defenders' offices) who are not

10  parties to this lawsuit. Further, the plaintiff class is

11  significantly reduced, both in raw numbers and as a matter of law,

12  for many categories of felons previously supervised by DAPO are now

13  subject to Post-Release Community Supervision by county probation

14  departments.

15       This is not Proposition 9, which tweaked features of the then-

16  existing system by increasing the time for probable cause hearings,

17  limiting parolees' right to counsel, altering BPH's decision

18  criteria at parole hearings, and liberalizing the use of hearsay

19  evidence at these hearings. The court could properly adjudicate the

20  constitutionality of these modifications because Prop. 9 did not

21  change the system of parole revocation itself. The steps in the

22  parole revocation process were the same, the system was still

23  administered by the executive branch through DAPO and BPH, there

24  was no change to the categories of felonies subject to DAPO/BPH

25  jurisdiction, and parolees still returned to state prison when

26  their parole was revoked. None of this is true of the "Realigned"

1 post-July 1, 2013 parole revocation system.

2      Plaintiffs nevertheless call for the court to retain

3 jurisdiction, arguing, "This is not a case of mootness, but of

4 changed circumstances that require modifications to the injunctive

5 relief that are suitably tailored to the new circumstances, and

6 that do not 'create or perpetuate a constitutional violation.'"

7 (Plaintiffs' Opening 11 (quoting <u>Rufo v. Inmates of Suffolk Cnty.</u>

8 <u>Jail</u>, 502 U.S. 367, 391 (1992)), ECF No. 1829.) They contend that

9 "after Realignment, just as before, essentially the entire parole

10 revocation process prior to the final hearing remains under the

11 control and oversight of the defendants," particularly DAPO. (Id.

12 9.) Consequently, plaintiffs warn that "Defendants' plan to abandon

13 [probable cause hearings] would return revocation proceedings to

14 a system that this Court has already expressly deemed

15 unconstitutional." (Id. 16.)

16      In evaluating these arguments, it is instructive to examine

17 how plaintiffs propose that the Injunction ought to be modified to

18 reflect the post-Realignment system. They write:

19      Plaintiffs agree that the post-July 1, 2013 revocation
     system changes will obviate the need for this Court to
20      continue oversight of final revocation hearing-related
     functions set forth in Injunction paragraphs 20 (final
21      revocation hearing tapes), 21 (parolee access to
     subpoenas and witnesses at final hearings), 23 [as
22      modified] (45-day deadline for final hearings), and 24
     (use of hearsay evidence and confrontation rights at
23      final hearings) and related orders. (Plaintiffs' Reply
     12.)
24

25 Nevertheless, while plaintiffs concede that "this Court is entitled

26 to presume that the judges of the state court will observe due

process in their conduct of final revocation hearings," they go on to request that the identified paragraphs of the Injunction "be modified only as follows: the relief with respect to final revocation hearings should be limited to monitoring by Plaintiffs and the Special Master for the purpose of determining whether the Defendants in this action are interfering with or obstructing the independent performance of due process functions by the state courts." (Plaintiffs' Opening 13.) Plaintiffs' proposed order then calls on the court to (i) require defendants to maintain the current system for providing parolees with probable cause hearings ("including the BPH system of hearing officers and the provision of counsel through CalPAP") until such time as any alternate system is approved by this court, (ii) prohibit defendants from imposing "flash incarceration" on Valdivia class members until adequate due process protections are approved by the court, (iii) require defendants to submit "policies and procedures to ensure that Defendants continue to make remedial sanctions programs available through and including at the final revocation hearings after such hearings are transitioned to the state courts," and (iv) direct the parties to meet and confer on necessary modifications to the Injunction in light of the court's findings. (ECF No. 1829-31.)

Nothing more clearly demonstrates the mootness of this action than the fact that such extensive measures would be necessary to reconcile the Injunction with the post-July 1, 2013 system. In enacting Realignment, California's legislature has fundamentally altered the structure of the state's parole system. Realignment

1   introduces new actors, adds to and subtracts from defendants'

2   responsibilities, redefines what constitutes a "parolee," and

3   incorporates wholly-new elements such as flash incarceration. The

4   magnitude of the change is significant enough that this court

5   cannot, as plaintiffs suggest, simply identify those components of

6   the old system that recur in the new system, and try to reconcile

7   the Injunction with those components. To do so risks bringing the

8   new system grinding to a halt. Although this court is empowered to

9   modify the Injunction to ameliorate unconstitutional conditions,

10  this power is not a license to jumble together the old and the new

11  in the hopes that a functioning, constitutional system will result.

12  Whether the new system provides adequate due process must be

13  demonstrated in practice, without untoward judicial interference

14  until the need for intervention is clear.

15      Moreover, continuing to enforce the Injunction risks intruding

16  on the prerogatives of the state courts. Abstention from

17  unwarranted interference with state court proceedings is a well-

18  settled principle. See, e.g., O'Shea v. Littleton, 414 U.S. 488,

19  500 (1974) ("This seems to us nothing less than an ongoing federal

20  audit of state criminal proceedings which would indirectly

21  accomplish the kind of interference that Younger v. Harris[, 401

22  U.S. 37 (1971)] and related cases sought to prevent"); Los Angeles

23  Cnty. Bar Ass'n v. Eu, 979 F.2d 697, 703 (9th Cir. 1992) ("We

24  should be very reluctant to grant relief that would entail heavy

25  federal interference in such sensitive state activities as

26  administration of the judicial system"); E.T. v. Cantil-Sakauye,

1    682 F.3d 1121, 1124 (2011) ("[T]he district court properly
2    concluded that '[P]laintiffs' challenges to the juvenile dependency
3    court system necessarily require the court to intrude upon the
4    state's administration of its government, and more specifically,
5    its court system'"). Defendants assert that "any due process
6    concerns that arise as a result of DAPO's conduct will be directly
7    reviewed and addressed by the superior courts." (Defendants'
8    Opening 2.) For this court to, *e.g.*, require defendants to maintain
9    the current system for providing parolees with probable cause
10   hearings (including, as plaintiffs request, "the BPH system of
11   hearing officers and the provision of counsel through CalPAP")
12   would certainly interfere with the system of due process review
13   envisioned by the state.

14       The court acknowledges that immense resources have been
15   devoted to this case, and that it is well-settled that "[o]nce a
16   defendant has engaged in conduct the plaintiff contends is unlawful
17   and the courts have devoted resources to determining the dispute,
18   there is Article III jurisdiction to decide the case as long as
19   'the parties [do not] plainly lack a continuing interest . . . .'"
20   Demery v. Arpaio, 378 F.3d 1020, 1026 (9th Cir. 2004) (quoting
21   Friends of the Earth, 528 U.S. at 192). But it is the court's
22   considered judgment that California's new parole revocation system
23   is so substantially different from the prior system that neither
24   party retains any continuing interest. In bringing this action,
25   plaintiffs sought to safeguard their due process rights in an
26   administrative system; defendants were the parties responsible for

that system's functioning. The post-Realignment parole revocation system involves a complex interplay between the state's executive and judicial branches, as well as county authorities. Acknowledging that "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available, the question is whether there can be any effective relief," Gordon, 849 F.2d at 1245, it does not appear to the court that continued enforcement of the Injunction can provide "any effective relief" for plaintiffs. While plaintiffs retain a continuing interest in safeguarding their constitutional rights, the functioning of the system has changed to such a degree that Valdivia no longer provides a viable means for providing those safeguards.

None of this is to say that the constitutionality of the new parole system is immune from challenge. It may well be, *e.g.*, that DAPO's probable cause "determinations" represent a "rever[sion] to a wholly internal review process for assessing probable cause" (Plaintiffs' Opening 22) of the type that this court found unconstitutional in 2002. Nevertheless, for the reasons set forth above, any such infirmities will have to be addressed, if at all, in a subsequent lawsuit or lawsuits.

**B. Plaintiffs' remaining arguments**

Plaintiffs make a number of fact-specific arguments for why the court should continue to exercise jurisdiction over this case, as follows:

• The vast majority of cases will be resolved by DAPO

26

1    without ever proceeding to final revocation hearings

2    in the state court, thereby depriving plaintiffs of

3    due process protections. (Plaintiffs' Opening 1-2, 5.)

4    This argument rests on the Special Master's finding

5    that, of late, 94% of parole revocation cases have

6    resolved prior to any final revocation hearing. (Id.

7    9.)

8    • Despite defendants' averments that they do not intend

9    to deploy flash incarceration, plaintiffs offer

10   evidence suggesting that DAPO not only can, but will,

11   "flash incarcerate" parolees. This evidence includes

12   draft CDCR documents describing and authorizing the

13   use of this sanction, as well as the fact that the

14   state's new Parole Violation Disposition Tracking

15   System software captures data regarding flash

16   incarceration

17   These dangers are, at this point, entirely speculative, and as

18   such, implicate both mootness and ripeness concerns. To present a

19   continuing case or controversy, the threat of injury must be "real

20   and immediate," not "conjectural" or "hypothetical." Lyons, 461

21   U.S. at 102 (1983). "A claim is not ripe for adjudication if it

22   rests upon contingent future events that may not occur as

23   anticipated, or indeed may not occur at all." Texas v. United

24   States, 523 U.S. 296, 300 (quoting Thomas v. Union Carbide Agric.

25   Prods. Co., 473 U.S. 568, 580-81 (1985)). No one can yet know how

26   the post-Realignment parole revocation system will function in

27

1   practice. One cannot infer from the relatively small number of

2   cases proceeding to revocation hearings before BPH under the old

3   system that similarly small numbers will proceed to hearings before

4   the courts under the new system. Moreover, plaintiffs' argument is

5   premised on the assumption that the new system will not provide

6   adequate due process protections prior to final revocation

7   hearings, a finding the court explicitly declines to make.

8   Similarly, regardless of whether DAPO is prevaricating in its claim

9   that it will not use flash incarceration, it would be premature for

10  the court to rule on the measure's constitutionality, both because

11  it is a single element of a complex new system and because its use

12  by DAPO "may not occur at all." Texas, 523 U.S. at 300.

13       Next, plaintiffs argue that defendants have failed to present

14  "sufficient evidence for the Court to determine whether

15  modification or termination of the remedy, or any parts of it,

16  would 'create or perpetuate a constitutional violation.'"

17  (Plaintiffs' Reply 14 (citing Rufo 502 U.S. at 391)). Plaintiffs

18  miss the point that, as of July 1, 2013, the court no longer has

19  jurisdiction to determine whether there is an ongoing

20  constitutional violation in this matter. The court has reached that

21  conclusion based on the statutory scheme enacted by the California

22  legislature,[12] not on the basis of factual evidence adduced by the

23  ───────────────────

24       [12]  This is not to say that the court has no concerns about
    the new system. Under the post-Realignment system, it appears
    entirely possible for a parolee to be detained for an indefinite

25  period of time, without notice of charges or a probable cause
    hearing, before DAPO finally files a petition for parole revocation

26  with the state court. An indeterminate interval may again pass

1  parties. Again, it is the court's view that any constitutional
2  infirmities of the post-Realignment parole revocation system must
3  be addressed in subsequent litigation.

4       Finally, there is the matter of plaintiffs' supplemental reply
5  to the court's May 6, 2013 Order, filed on June 27, 2013. (ECF Nos.
6  1841, 1842.) The parties should note that, in general, the court
7  disapproves of the filing of supplemental briefing without leave.
8  Plaintiffs could have sought leave, and in so doing, apprised the
9  court and defendants of the relevant issues; if the court found the
10 issues raised to be meritorious, it would have then set an
11 appropriate briefing schedule. The parties are cautioned that
12 failure to follow these steps in the future may be grounds for
13 sanctions.

14      Plaintiffs' supplemental reply raises the issue of how the
15 state will handle parole supervision and revocation for those
16 inmates due to be released from state prison pursuant to the June
17 20, 2013 Order of the Three Judge Court in Coleman v. Brown, No.
18 2:90-cv-0520-LKK-JFM (E.D. Cal.) (ECF No. 4662) and Plata v. Brown,
19 No. 3:01-01351-TEH (N.D. Cal.) (ECF No. 2659). Plaintiffs contend:

20        [A]ssuming the defendants do not disregard the Court's
          June 20 Order in the Plata/Coleman matter, more than
21        5,000 class members will be released on parole between
          now and the end of 2013, and they will not be subject to
22

_____

23 before the state court holds a revocation hearing. In the meantime,
   the parolee may have lost custody of his children, his job, his
24 home and/or his car. The parolee will have no redress if the state
   court ultimately finds that there was no basis for revoking parole.
25 Despite the probable unconstitutionality of such procedures, these
   harms remain hypothetical, not actual, and as such, may not be
26 addressed in this action.

                              29

1    Realignment processes. Rather, they will be supervised
     by the <u>Valdivia</u> defendants — and not by the counties.
2    And they will be returned to state prison — and not to
     county jail — upon a finding that their conditions of
3    parole were violated. The state courts have no
     jurisdiction under A.B. 109 and its clean-up bills to
4    return a person to state prison for a parole violation.
     See Cal. Penal Code §§ 3000.08(f), (g) (version
5    operative July 1, 2013). The anticipated process,
     therefore, must be within the CDCR and/or Board of
6    Parole Hearings. These class members, therefore, will be
     subject to revocation proceedings and hearings by the
7    <u>Valdivia</u> defendants — and not by the state courts. (ECF

8    No. 1841.)

9    Fortuitously, at the time that plaintiffs' filed their supplemental

10   briefing, the court was conducting a bench trial in the matter of

11   <u>Gilman v. Brown</u>, No. 2:05-cv-830-LKK-CKD (E.D. Cal.). On Monday,

12   July 1, 2013, Jennifer Shaffer, the Executive Officer of BPH, was

13   called as a witness in that trial. After she was sworn in, the

14   court asked Ms. Shaffer whether parole violations among those

15   inmates released pursuant to the Order of the Three Judge Court

16   would be handled under the prior parole revocation system, or the

17   current one. Ms. Shaffer responded that, according to her

18   understanding, petitions to revoke these inmates' parole would be

19   filed with the state courts, which would then handle them. It is

20   evident that, by virtue of her position, Ms. Shaffer is in a

21   position to testify competently regarding BPH's responsibilities.

22   Moreover, she testified under oath. For the reasons set forth

23   above, this court has already determined that state court

24   jurisdiction over parole revocation hearings is sufficient to moot

25   this case. Accordingly, based on Ms. Shaffer's testimony, the

26   court finds that the contentions raised by plaintiffs' supplemental

1  briefing provide an inadequate basis for the court's continued

2  exercise of jurisdiction over this matter. In other words, <u>Valdivia</u>

3  is moot.

4  **IV. CONCLUSION**

5       The court hereby orders as follows:

6       [1] The court FINDS that this case is moot. Accordingly,

7       the court DECLINES to adopt the Thirteenth Report of the

8       Special Master on the Status of Conditions of the Remedial

9       Order (ECF No. 1783.) A forthcoming order will address the

10      parties' outstanding requests to seal documents.

11

12      [2] The parties and the Special Master are DIRECTED to file

13      final motions, if any, for fees and costs within twenty-

14      eight (28) days of the date of entry of this order. Upon

15      resolution of these motions, the court will decertify the

16      class and dismiss this case.

17      IT IS SO ORDERED.

18      DATED: July 2, 2013.

19

20

21                          LAWRENCE K. KARLTON
22                          SENIOR JUDGE
                            UNITED STATES DISTRICT COURT
23

24

25

26